RECORD NUMBER: 17-1303

# United States Court of Appeals

### *for the*

# Fourth Circuit

D'JARIS A. MOORE,

*Plaintiff/Appellant,*

– v. –

ELITE METAL PERFORMANCE LLC,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT BEUFORT

# JOINT APPENDIX

ROBIN A. BRAITHWAITE
TAYLOR S. BRAITHWAITE
BRAITHWAITE TIMMERMAN, LLC
759 Richland Avenue West
Aiken, SC 29802
(803) 649-4144
rbwaite@bfbtlaw.com
taylor@bfbtlaw.com

JAMES A. BROWN, JR.
LAW OFFICES OF
JIM BROWN, PA
P.O. Box 592
Beaufort, SC 29901
(843) 470-0003
jimbrownlaw@hargray.com

*Counsel for Appellee*

*Counsel for Appellant*

 COUNSEL PRESS • VA – (800) 275-0668

# **TABLE OF CONTENTS**

District Court Docket Sheets .................................................................................. 1

Notice of Removal (DE 1)
　　　Filed February 2, 2016 ........................................................................... 7

　　　Complaint (DE 1-1) ............................................................................... 9

Answer of Defendant Elite Metal Performance, LLC (DE 3)
　　　Filed February 2, 2016 ......................................................................... 18

Motion in Limine of Defendant Elite Metal Performance (DE 37)
　　　Filed October 26, 2016 ......................................................................... 26

　　　Memorandum in Support of Defendant Elite Metal Performance's Motion in
　　　Limine (DE 37-1) .................................................................................. 28

Notice of Motion and Motion for Summary Judgment (DE 38)
　　　Filed October 26, 2016 ......................................................................... 39

　　　Memorandum in Support of Defendant Elite Metal Performance's Motion for
　　　Summary Judgment (DE 38-1) ............................................................. 41

　　　Excerpt of Deposition of Michelle Beck, taken 8/2/16 (DE 38-2) ................... 51

　　　Excerpt of Deposition of D'Jaris Moore, taken 9/21/16 (DE 38-2) ............... 56

Motion to Amend Scheduling Order to Extend Deadline for Identifying Expert
Witness and Filing of Records Custodian Witness (DE 40)
　　　Filed November 4, 2016 ......................................................................... 66

Response of Defendant in Opposition to Plaintiff's Motion to Amend Scheduling
Order (DE 41)
　　　Filed November 6, 2016 ......................................................................... 68

Order (DE 42)
　　　Entered November 10, 2016 .................................................................. 72

Plaintiff's Response to Defendant's Motion in Limine (DE 44)
　　　Filed November 14, 2016 ...................................................................... 75

i

Plaintiff's Response to Summary Judgment (DE 45)
      Filed November 14, 2016 ................................................................ 84

      Exhibit 1 – Traffic Collision Report Form (DE 45-1) ........................ 96

      Deposition of Robin David Hanger, taken 8/19/16 (DE 45-2) ........ 99

      Deposition of Walter Gavin Gouveia, taken 8/2/16 (DE 45-3) ..................... 249

      Deposition of Ryan Keola Gouveia, taken 8/2/16 (DE 45-4) ........................ 318

Reply to Plaintiff's Response in Opposition to Defendant's Motion in Limine (DE 47)
      Filed November 26, 2016 .............................................................. 391

      Exhibit A – Inspection Checklist (DE 47-1) .................................... 396

Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary
Judgment (DE 48)
      Filed November 26, 2016 .............................................................. 399

      Exhibit A – Inspection Checklist (DE 48-1) .................................... 406

      Excerpt of Deposition of Michelle Beck, taken 8/2/16 (DE 48-2) ................ 409

Rule 26(a)(3) Pre-Trial Disclosures of Defendant Elite Metal
Performance, LLC (DE 53)
      Filed January 11, 2017 .................................................................. 418

Rule 26(a)(3) Pre-Trial Disclosures of Plaintiff D'Jaris Moore (DE 54)
      Filed January 19, 2017 .................................................................. 421

Order (DE 55)
      Entered January 24, 2017 .............................................................. 425

Motion to Reconsider (DE 57)
      Filed February 3, 2017 .................................................................. 432

Motion to Reconsider (DE 58)
      Filed February 3, 2017 .................................................................. 434

Order (DE 59)
    Entered February 7, 2017 ........................................................................ 445

Notice of Appeal (DE 60)
    Filed March 7, 2017 ................................................................................ 451

5/25/2017                           CM/ECF - scd

APPEAL,CLOSED,JURY

# U.S. District Court
## District of South Carolina (Beaufort)
## CIVIL DOCKET FOR CASE #: 9:16-cv-00318-RMG

Moore v. Elite Metal Performance LLC
Assigned to: Honorable Richard M Gergel
Case in other court:  4CCA, 17-01303
                       Jasper County Court of Common Pleas, 2015-
                       CP-27-00553
Cause: 28:1332 Diversity-Motor Vehicle Product Liability

Date Filed: 02/02/2016
Date Terminated: 01/24/2017
Jury Demand: Both
Nature of Suit: 355 Motor Vehicle Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**D'Jaris A Moore**                    represented by  **Daphne S Withrow**
                                                       West Olivetti LLC
                                                       2 Corpus Christi Place
                                                       Suite 105
                                                       Hilton Head, SC 29928
                                                       843-341-9260
                                                       Fax: 843-341-9261
                                                       Email: daphne@westolivetti.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Robert W Murphy**                    represented by  **Lowry Darby Plexico , III**
*TERMINATED: 12/28/2016*                               Brown and Brehmer
                                                       PO Box 7966
                                                       Columbia, SC 29202
                                                       803-771-6600
                                                       Fax: 803-252-1620
                                                       Email: ldp@brownandbrehmer.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Elite Metal Performance LLC**        represented by  **Robin Anderson Braithwaite**
                                                       PO Box 324
                                                       Aiken, SC 29802
                                                       803-649-4144
                                                       Fax: 803-649-4696
                                                       Email: rbwaite@bfbtlaw.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Taylor Scott Braithwaite**
                                                       Braithwaite Law Firm
                                                       PO Box 324

1

5/25/2017                                CM/ECF - scd

                                                  Aiken, SC 29802
                                                  803-649-4144
                                                  Email: taylor@bfbtlaw.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**Car Shop Trailer Services LLC**          represented by **James Rufus Bratton , III**
*TERMINATED: 12/19/2016*                                  Aiken Bridges Nunn Elliott and Tyler
*doing business as*                                       PO Drawer 1931
Best Price Trailers                                       Florence, SC 29503
*TERMINATED: 12/19/2016*                                  843-669-8787
                                                          Email: jrb@aikenbridges.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2016 | 1 | NOTICE OF REMOVAL from Jasper County Court of Common Pleas, case number 2015-CP-27-0553. (Filing fee $ 400 receipt number 0420-6377678), filed by Elite Metal Performance LLC. (Attachments: # 1 State Court Documents)(sshe, ) (Entered: 02/03/2016) |
| 02/02/2016 | 2 | Local Rule 26.01 Answers to Interrogatories by Elite Metal Performance LLC.(sshe, ) (Entered: 02/03/2016) |
| 02/02/2016 | 3 | ANSWER to Complaint (Notice of Removal) by Elite Metal Performance LLC. (sshe, ) (Entered: 02/03/2016) |
| 02/05/2016 | 5 | **CONFERENCE AND SCHEDULING ORDER: Rule 26(f) Conference Deadline 2/25/2016, 26(a) Initial Disclosures due by 3/10/2016, Rule 26 Report due by 3/10/2016, Motions to Amend Pleadings due by 5/4/2015, Plaintiffs ID of Expert Witness due by 6/3/2016, Defendants ID of Expert Witnesses due by 7/5/2016, Records Custodian Affidavit due by 7/11/2016, Discovery due by 8/2/2016, Jury Selection Deadline 11/7/2016. Signed by Honorable Richard M Gergel on 2/5/2015. (erav,)** (Entered: 02/05/2016) |
| 02/22/2016 | 6 | NOTICE of Appearance by Lowry Darby Plexico, III on behalf of Robert W Murphy (Plexico, Lowry) (Entered: 02/22/2016) |
| 02/23/2016 | 7 | First MOTION to Remand by D'Jaris A Moore. Response to Motion due by 3/11/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Withrow, Daphne) (Entered: 02/23/2016) |
| 02/23/2016 | 8 | **TEXT ORDER re 7 First MOTION to Remand filed by D'Jaris A Moore, The time to file a Response to Motion is shortened to 3/4/2016. Entered at the direction of the Honorable Richard M Gergel on 2/23/16. (ltap, )** (Entered: 02/23/2016) |
| 02/25/2016 | 9 | NOTICE of Appearance by James Rufus Bratton, III on behalf of Car Shop Trailer Services LLC (Bratton, James) (Entered: 02/25/2016) |
| 02/25/2016 | 10 | ANSWER to Complaint by Car Shop Trailer Services LLC.(Bratton, James) (Entered: 02/25/2016) |
| 02/25/2016 | 11 | Local Rule 26.01 Answers to Interrogatories by Car Shop Trailer Services LLC.(Bratton, James) (Entered: 02/25/2016) |

2

| | | |
|---|---|---|
| 02/25/2016 | 12 | RESPONSE in Opposition re 7 First MOTION to Remand Response filed by Robert W Murphy.Reply to Response to Motion due by 3/7/2016 (Plexico, Lowry) (Entered: 02/25/2016) |
| 03/03/2016 | 13 | **TEXT ORDER: This matter comes before the Court pursuant to Plaintiff's Motion to Remand. (Dkt. No. 7). Plaintiff seeks to remand the case to federal court, citing the rule of unanimity, which requires all defendants to "affirmatively and unambiguously assert their desire to remove to federal court." Unicom Systems, Inc. v. Nat'l Louis Univ., 262 F. Supp. 2d 638, 642 (E.D. Va. 2003). When Defendant Elite Metal Performance removed to federal court, it did not express whether the other two defendants consented to the removal of the action. Defendants Robert W. Murphy and Car Shot Trailer Services, LLC have since acknowledged their consent to removal. (Dkt. Nos. 10, 12). Accordingly, the Court DENIES Plaintiff's motion to remand. (Dkt. No. 7). AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 3/3/16.(ltap, ) (Entered: 03/03/2016)** |
| 03/04/2016 | 14 | ACCEPTANCE OF SERVICE OF COMPLAINT by D'Jaris A. Moore. All Defendants. (Withrow, Daphne) (Main Document 14 replaced on 3/7/2016 (egra, ). (Additional attachment(s) added on 3/7/2016: # 1 Affidavit of Service) (egra, ). Modified on 3/7/2016 to add notice of filing page as provided by filing user (egra, ). (Entered: 03/04/2016) |
| 03/04/2016 | 15 | ACCEPTANCE OF SERVICE OF COMPLAINT by D'Jaris A. Moore. All Defendants. (Withrow, Daphne) (Main Document 15 replaced on 3/7/2016 (egra, ). (Additional attachment(s) added on 3/7/2016: # 1 Service Receipts) (egra, ). Modified on 3/7/2016 to add notice of filing page as provided by filing user (egra, ). (Entered: 03/04/2016) |
| 03/07/2016 | 16 | Local Rule 26.01 Answers to Interrogatories by Robert W Murphy.(Plexico, Lowry) (Entered: 03/07/2016) |
| 03/08/2016 | 17 | First MOTION for Reconsideration by D'Jaris A Moore. Response to Motion due by 3/25/2016. No proposed order.(Withrow, Daphne) (Entered: 03/08/2016) |
| 03/08/2016 | 18 | RESPONSE in Opposition re 17 First MOTION for Reconsideration *of Defendant Elite Metal Performance, LLC* Response filed by Elite Metal Performance LLC.Reply to Response to Motion due by 3/18/2016 (Braithwaite, Taylor) (Entered: 03/08/2016) |
| 03/10/2016 | 19 | NOTICE of Request for Protection from Court Appearance by Daphne S Withrow for 4/15/16 through 4/25/16 (Withrow, Daphne) (Entered: 03/10/2016) |
| 03/10/2016 | 20 | Joint Rule 26(f) Report by Elite Metal Performance LLC. (Attachments: # 1 Addendum Court's Required Mediation Enclosure, # 2 LR 26.03 Answers Joint LR 26.03 Report) (Braithwaite, Taylor) (Entered: 03/10/2016) |
| 03/10/2016 | 21 | *Joint* Rule 26 Outline of Discovery Plan by Elite Metal Performance LLC.(Braithwaite, Taylor) (Entered: 03/10/2016) |
| 03/10/2016 | 22 | Local Rule 26.01 Answers to Interrogatories by D'Jaris A Moore.(Withrow, Daphne) (Entered: 03/10/2016) |
| 03/10/2016 | 23 | **TEXT ORDER re 19 Notice of Request for Protection from Court Appearance filed by D'Jaris A. Moore. Counsel is granted protection from court appearances from April 15- 25, 2016. Entered at the direction of the Honorable Richard M Gergel on 3/10/16. (ltap, )** (Entered: 03/10/2016) |
| 03/10/2016 | 24 | **ORDER TO CONDUCT MEDIATION Mediation Due by 9/2/2016 Signed by Honorable Richard M Gergel on 3/10/2016. (sshe, )** (Entered: 03/10/2016) |
| 03/16/2016 | 25 | First MOTION for Protective Order *with Proposed Order* by Elite Metal Performance LLC. Response to Motion due by 4/4/2016. No proposed order.(Braithwaite, Taylor) |

3

|            |    | (Entered: 03/16/2016) |
|------------|----|----------------------|
| 03/16/2016 | 26 | **TEXT ORDER re 25 First MOTION for Protective Order filed by Elite Metal Performance LLC. Attorney Taylor Braithwaite is granted protection form court appearances on May 9 - 20, 2016. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 3/16/16. (ltap, ) (Entered: 03/16/2016)** |
| 03/23/2016 | 27 | MOTION for Protective Order *with Proposed Order* by Car Shop Trailer Services LLC. Response to Motion due by 4/11/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Bratton, James) (Entered: 03/23/2016) |
| 03/24/2016 | 28 | **TEXT ORDER Attorney J. Rufus Bratton, III is granted protection from court appearances on April 28, 2016 - May 2, 2016. AND IT IS SO ORDERED. Entered at the Direction of Honorable Richard M Gergel on 3/24/2016.(sshe, ) (Entered: 03/24/2016)** |
| 03/29/2016 | 29 | **ORDER denying 17 Plaintiff's Motion for Reconsideration of the Court's order denying remand Signed by Honorable Richard M Gergel on 3/29/2016.(sshe, ) (Entered: 03/29/2016)** |
| 06/01/2016 | 30 | First MOTION for Extension of Time *Consent Scheduling Order* by Elite Metal Performance LLC. Response to Motion due by 6/20/2016. (Attachments: # 1 Proposed Order Consent Order (All parties))Proposed order is being emailed to chambers with copy to opposing counsel.(Braithwaite, Taylor) (Entered: 06/01/2016) |
| 06/01/2016 | 31 | First MOTION for Confidentiality Order *(Consent Order)* by Elite Metal Performance LLC. Response to Motion due by 6/20/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Braithwaite, Taylor) (Main Document 31 replaced on 6/2/2016) (egra, ). (Additional attachment(s) added on 6/2/2016: # 1 Proposed Order) (egra, ). Modified on 6/2/2016 to add motion as main document and proposed order as attachment (egra, ). (Entered: 06/01/2016) |
| 06/02/2016 | 32 | **MEDIATION ORDER. Mediation Due by 11/15/2016. Signed by Honorable Richard M Gergel on 06/02/2016. (egra, ) (Entered: 06/02/2016)** |
| 06/02/2016 | 33 | **AMENDED SCHEDULING ORDER Plaintiffs ID of Expert Witness due by 8/3/2016, Defendants ID of Expert Witnesses Due by 9/2/2016, Records Custodian Affidavit due by 9/2/2016, Discovery due by 10/15/2016, Motion in Limine due by 1/17/2017, Motions due by 11/6/2016, Rule 26(a)(3) Disclosures due by 1/11/2017, Pretrial Briefs due by 1/27/2017, Jury Selection Deadline 2/1/2017. Signed by Honorable Richard M Gergel on 06/02/2016. (egra, ) (Entered: 06/02/2016)** |
| 07/13/2016 | 36 | **STIPULATION FOR PROTECTIVE ORDER AND ORDER THEREON granting 31 Motion for Confidentiality Order Signed by Honorable Richard M Gergel on 7/13/2016.(sshe, ) (Entered: 07/13/2016)** |
| 10/26/2016 | 37 | First MOTION in Limine *Exclusion of testimony of Robin Hanger* by Elite Metal Performance LLC. Response to Motion due by 11/14/2016. (Attachments: # 1 Memo in Support, # 2 Supporting Documents Cited Deposition Transcripts)Proposed order is being emailed to chambers with copy to opposing counsel.(Braithwaite, Taylor) (Entered: 10/26/2016) |
| 10/26/2016 | 38 | MOTION for Summary Judgment by Elite Metal Performance LLC. Response to Motion due by 11/14/2016. (Attachments: # 1 Memo in Support, # 2 Supporting Documents Cited Deposition Transcripts)Proposed order is being emailed to chambers with copy to opposing counsel.(Braithwaite, Taylor) (Entered: 10/26/2016) |
| 11/03/2016 | 39 | NOTICE of Request for Protection from Court Appearance by Daphne S Withrow for |

4

| | | |
|---|---|---|
| | | 11/18/2016 to 12/5/16 (Attachments: # 1 Order)(Withrow, Daphne) (Entered: 11/03/2016) |
| 11/04/2016 | 40 | Second MOTION to Amend/Correct 33 Scheduling Order, by D'Jaris A Moore. Response to Motion due by 11/21/2016. Proposed order is being emailed to chambers with copy to opposing counsel.(Withrow, Daphne) (Entered: 11/04/2016) |
| 11/06/2016 | 41 | RESPONSE in Opposition re 40 Second MOTION to Amend/Correct 33 Scheduling Order, *Request for Oral Argument and* Response filed by Elite Metal Performance LLC.Reply to Response to Motion due by 11/17/2016 (Braithwaite, Taylor) (Entered: 11/06/2016) |
| 11/10/2016 | 42 | **ORDER denying 40 Plaintiff's Motion to Amend/Correct the amended scheduling order. Signed by Honorable Richard M Gergel on 11/9/2016.(sshe, )** (Entered: 11/10/2016) |
| 11/14/2016 | 44 | RESPONSE in Opposition re 37 First MOTION in Limine *Exclusion of testimony of Robin Hanger* Response filed by D'Jaris A Moore.Reply to Response to Motion due by 11/28/2016 (Attachments: # 1 Exhibit Exhibit, # 2 Deposition Transcript, # 3 Deposition Transcript, # 4 Deposition Transcript)(Withrow, Daphne) (Entered: 11/14/2016) |
| 11/14/2016 | 45 | RESPONSE in Opposition re 38 MOTION for Summary Judgment Response filed by D'Jaris A Moore.Reply to Response to Motion due by 11/28/2016 (Attachments: # 1 Exhibit, # 2 Deposition Transcript, # 3 Deposition Transcript, # 4 Deposition Transcript, # 5 Affidavit)(Withrow, Daphne) (Entered: 11/14/2016) |
| 11/15/2016 | 46 | **TEXT ORDER granting protection from court appearances for Attorney Withrow from November 18, 2016 to December 5, 2016. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 11/15/16. (ltap, )** (Entered: 11/15/2016) |
| 11/26/2016 | 47 | REPLY to Response to Motion re 37 First MOTION in Limine *Exclusion of testimony of Robin Hanger* Response filed by Elite Metal Performance LLC. (Attachments: # 1 Supporting Documents Exhibit)(Braithwaite, Taylor) (Entered: 11/26/2016) |
| 11/26/2016 | 48 | REPLY to Response to Motion re 38 MOTION for Summary Judgment Response filed by Elite Metal Performance LLC. (Attachments: # 1 Supporting Documents Exhibit, # 2 Supporting Documents Cited Beck Deposition Excerpt)(Braithwaite, Taylor) (Entered: 11/26/2016) |
| 12/19/2016 | 49 | STIPULATION *of Dismissal with Prejudice as to Car Shop Trailer Sales, LLC d/b/a Best Price Trailers Only* by Car Shop Trailer Services LLC. (Bratton, James) (Entered: 12/19/2016) |
| 12/28/2016 | 51 | STIPULATION of Dismissal With Prejudice *as to Robert W. Murphy Only* by Robert W Murphy. (Plexico, Lowry) (Entered: 12/28/2016) |
| 01/11/2017 | 53 | RULE 26(a)(3)PRETRIAL DISCLOSURES by Elite Metal Performance LLC. Objections to PreTrial Disclosures due by 1/25/2017.(Braithwaite, Taylor) (Entered: 01/11/2017) |
| 01/19/2017 | 54 | RULE 26(a)(3)PRETRIAL DISCLOSURES by D'Jaris A Moore. Objections to PreTrial Disclosures due by 2/2/2017.(Withrow, Daphne) (Entered: 01/19/2017) |
| 01/24/2017 | 55 | **ORDER granting 38 Defendant's Motion for Summary Judgment Signed by Honorable Richard M Gergel on 1/24/2017.(sshe, )** (Entered: 01/24/2017) |
| 01/24/2017 | 56 | SUMMARY JUDGMENT in favor of Defendant Elite Metal Performance LLC. (sshe, ) (Entered: 01/24/2017) |
| 02/03/2017 | 57 | MOTION for Reconsideration re 56 Summary Judgment by D'Jaris A Moore. Response to Motion due by 2/17/2017. Add an additional 3 days only if served by mail or otherwise |

**5**

5/25/2017                          CM/ECF - scd

| | | |
|---|---|---|
| | | allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Proposed order is being emailed to chambers with copy to opposing counsel.(Withrow, Daphne) (Entered: 02/03/2017) |
| 02/03/2017 | 58 | MEMORANDUM IN SUPPORT OF Plaintiff's 57 MOTION for Reconsideration re 56 Summary Judgment by D'Jaris A Moore. (Withrow, Daphne) Modified on 2/7/2017 to correct event type from "Motion" to "Memorandum In Support" per chambers request (erav, ). (Entered: 02/03/2017) |
| 02/07/2017 | 59 | **ORDER denying 57 Motion for Reconsideration. Signed by Honorable Richard M Gergel on 2/7/2017. (erav, )** (Entered: 02/07/2017) |
| 03/07/2017 | 60 | NOTICE OF APPEAL as to 59 Order on Motion for Reconsideration, 42 Order on Motion to Amend/Correct, 55 Order on Motion in Limine, Order on Motion for Summary Judgment by D'Jaris A Moore. - Filing fee $ 505, receipt number 0420-7037002. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Brown, James) (Entered: 03/07/2017) |
| 03/08/2017 | 61 | Transmittal Sheet for Notice of Appeal to USCA re 60 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (sshe, ) (Entered: 03/08/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/25/2017 13:42:13 | | |
| **PACER Login:** | cpvaharmon:5048515:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 9:16-cv-00318-RMG |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

6

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH CAROLINA

## BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.: 9:16-cv-318-RMG |
| PLAINTIFF, | (Formerly Case No. 2015-CP-27-0553) |
| V. | |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SERVICES, LLC d/b/a BEST PRICE TRAILERS | **NOTICE OF REMOVAL** |
| DEFENDANTS. | |

TO:    THE UNITED STATES DISTRICT COURT:

Defendant Elite Metal Performance, LLC would respectfully show unto the Court in support of its Notice of Removal that:

1. The Summons and Complaint in this action were filed on December 28, 2015 in the Court of Common Pleas for Jasper County, South Carolina. Attached for the Court are copies of the Plaintiff's Summons and Complaint. The Complaint is the first pleading served upon the Defendants in this action and service was affected on Defendant Elite Metal Performance, LLC on January 4, 2016. Therefore, removal is timely under 28 U.S.C. §1446(b).

2. The United States District Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. The Plaintiff is a resident of the State of South Carolina. Defendant Robert W. Murphy is a resident of the State of Florida. Defendant Elite Metal Performance, LLC is a business incorporated under the laws of the State of North Carolina, with its principal place of business located in North Carolina. Defendant Car Shop Trailer Services, LLC is a business incorporated

under the laws of the State of Florida, with its principal place of business located in Florida. This action has been brought by the Plaintiff against the Defendants for an accident alleged to have occurred in Jasper County, South Carolina.

3.     Venue is proper in the Beaufort Division of this Court pursuant to 28 U.S.C. §1441(a).

4.     Plaintiff's counsel has alleged that the amount in controversy in this matter exceeds Seventy-Four Thousand Nine Hundred Ninety-Nine and 00/100 ($74,999.00) Dollars due to Plaintiff's injuries suffered as a result of the accident underlying the Plaintiff's Complaint, and in that Plaintiff alleges that she has suffered and will continue to suffer physical pain, humiliation, mental anguish, loss of enjoyment of life, past medical expenses, permanent disfigurement and permanent scarring.

5.     Defendant Elite Metal Performance, LLC has filed no pleading in this action with the Court of Common Pleas of Jasper County, South Carolina in response to the Plaintiff's Complaint. The Defendant's Answer to the Plaintiff's Complaint is filed herewith contemporaneously.

6.     Defendant Elite Metal Performance, LLC has furnished a copy of this notice to the Clerk of Court for Jasper County, South Carolina.

BRAITHWAITE TIMMERMAN, LLC

BY: _____

Taylor S. Braithwaite, Fed Bar No. 12219
Robin A. Braithwaite, Fed Bar No. 1449
Counsel   for   Defendant   Elite   Metal
Performance, LLC

Aiken, South Carolina                              Post Office Box 324
February   2   , 2016                              Aiken, South Carolina 29802-0324
                                                   (803)649-4144

8

*Clerk*

STATE OF SOUTH CAROLINA            )    IN THE COURT OF COMMON PLEAS
                                   )
COUNTY OF JASPER                   )    FOURTEENTH JUSDICIAL CIRCUIT
                                   )
D'JARIS A. MOORE.                  )    CIVIL ACTION NO.: 2015 _CP-27-0553
                                   )       125001
            PLAINTIFF,             )
                                   )         **SUMMONS**
v.                                 )
                                   )
ROBERT W. MURPHY, ELITE METAL      )
PERFORMANCE, LLC, CAR SHOP         )
TRAILER SALES, LLC dba: BEST       )
PRICE TRAILERS                     )
                                   )
            DEFENDANTS.            )
_____)



RECEIVED

JAN 04 2016

Lincoln Co. Sheriff's Office

TO THE DEFENDANTS NAMED ABOVE:

YOU ARE HEREBY SUMMONED and required to answer the Complaint herein, a copy of

which is herewith served upon you, and to serve a copy of your Answer to this Complaint upon

the subscribers, at their offices, 2 Corpus Christie Place, Suite 105, Hilton Head, South Carolina,

29928, within thirty (30) days after service hereof, exclusive of the day of such service; and if

you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered

against you for the relief demanded in the Complaint.

                    WEST OLIVETTI, LLC

                    _Daphne S. Withrow_

December **22** 2015        Daphne S. Withrow
Hilton Head, SC            2 Corpus Christi Place; Suite 105
                           Hilton Head, SC 29928
                           (843) 341-9260

9

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF JASPER | ) | FOURTEENTH JUSDICIAL CIRCUIT |
| | ) | |
| D'JARIS A. MOORE. | ) | CIVIL ACTION NO.: 2015 -CP-27-0553 |
| | ) | |
| PLAINTIFF, | ) | **COMPLAINT** |
| | ) | *(Jury Trial Requested)* |
| v. | ) | |
| | ) | |
| ROBERT W. MURPHY, ELITE METAL | ) | |
| PERFORMANCE, LLC, CAR SHOP | ) | |
| TRAILER SALES, LLC dba: BEST | ) | |
| PRICE TRAILERS | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Comes Now, D'Jaris A. Moore, Plaintiff in the above-styled action and files this

Complaint against the Defendants by showing this Honorable Court as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.  That Plaintiff is a citizen and resident of the County of Beaufort, State of South Carolina.

2.  That upon information and belief, Robert W. Murphy (hereafter, "Defendant Murphy") is
    a citizen and resident of the State of Florida and was at the time of the subject collision,
    the owner of the subject tow dolly.

3.  Upon information and belief, Elite Metal Performance, LLC (hereafter, "Defendant
    Elite") is a corporation existing under the laws of the State of North Carolina.

4.  Upon information and belief, Car Shop Trailer Sales, LLC dba: Best Price Trailers,
    (hereafter, "Defendant Best Price") is a corporation existing under the Laws of the State
    of Florida.

5.  The acts and omissions giving rise to the causes of action occurred primarily in Jasper

1

County, South Carolina, therefore venue is proper in the Jasper County Court of
Common Pleas.

## II. FACTUAL ALLEGATIONS

6.  Plaintiff re-alleges and incorporate herein each and every allegation of all preceding
    paragraphs.

7.  On June 9, 2015, Plaintiff was driving her vehicle southbound on Interstate 95 in the
    County of Jasper, State of South Carolina.  At the same time, Defendant Murphy was
    traveling northbound on Interstate 95 in his Recreational Vehicle which was towing a
    tow dolly containing another vehicle.

8.  The subject tow dolly towed by Defendant Murphy lost one its wheels and said wheel
    proceeded to cross the Interstate median and strike the Plaintiff's vehicle causing the
    wreck, injuries and damages complained of herein.

9.  Plaintiff did not cause or contribute to the collision in any manner, and further had
    no ability to avoid, prevent or mitigate any of the damages caused during the collision.

10. As a result of the collision, Plaintiff has incurred and will continue to incur in the future
    all of the following:

    (a)  Medical bills and expenses (ambulance, hospitals, physicians, prescription
         medications, physical therapy and all transportation associated therewith)

    (b)  Physical injury, pain and suffering, past, present and in the future;

    (c)  Emotional and psychological anguish;

    (d)  Loss of enjoyment of life, past and present;

    (e)  Shock, humiliation and embarrassment;

    (f)  Post-traumatic stress including memory loss and inability to concentrate;



11

(g)     Fear and anxiety;

(h)     Depression and despair;

(i)     Permanent impairment of health;

(j)     Permanent disfigurement and scarring;

(k)     Temporary and permanent restriction of normal activities;

(l)     Continuation of medical expenses in the future;

(m)     Loss of earning capacity;

(n)     Out of pocket expenses; and

(o)     Such other particulars as shown by evidence produced at trial.

11.     Plaintiff is entitled to judgement against the Defendants herein, jointly and severally, for the actual damages, for punitive damages, for the cost of this action, for pre-judgment interest on all special damages, and for post-judgment interest, for attorney's fees and costs, and for such other relief as this Court may deem just and appropriate.

### III. CAUSES OF ACTION

### A. NEGLIGENCE

### AS TO DEFENDANT MURPHY

12.     Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraphs.

13.     Defendant Murphy owed a duty of care to inspect and maintain subject tow dolly in proper working order before entering the public roadways.

14.     The collision and damages hereinafter set forth were caused, directly and proximately, by the negligence, carelessness, recklessness, willfulness, wantonness and grossly negligent conduct of the Defendant, combining and concurring in the following particulars:



12

(a)    In failing to properly maintain subject tow dolly and all its component parts in a safe, appropriate manner;

(b)    In failing to adequately perform safety inspections upon subject tow dolly and all its component parts prior to entering it onto a public roadway;

(c)    In failing to keep proper control of all the component parts of subject tow dolly attached to the Recreational Vehicle he was driving on Interstate 95;

(d)    By causing damage to another motor vehicle lawfully on Interstate 95.

(e)    In failing to exercise that degree of care that a reasonably prudent person would have exercised under the same or similar circumstances;

(f)    Such other and further acts of negligence, recklessness and willful conduct as may be shown by evidence produced at trial.

15.    Due to the harm inflicted upon the Plaintiff by the negligence of the Defendant, she is entitled to judgement against the Defendant for the actual damages, for punitive damages, for the cost of this action, for pre-judgment interest on all special damages, and for post-judgment interest, for attorney's fees and costs, and for such other relief as this Court may deem just and appropriate.

### AS TO DEFENDANTS ELITE AND BEST PRICE

16.    Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraphs.

17.    Defendants had a duty to distribute, sell, purchase, and/or manufacture subject tow dolly in an undamaged condition, free of defects that could potentially cause harm to individuals known and unknown.

18.    Defendants had a duty to inspect subject tow dolly to insure it was free of defects



and could operate safely and properly in the capacity for which it was intended.

19.    The collision and damages hereinafter set forth were caused, directly and proximately, by the negligence, carelessness, recklessness, willfulness, wantonness and grossly negligent conduct of the Defendants, combining and concurring in the following particulars:

(a)    In failing to properly manufacture and/or maintain the subject tow dolly and all its component parts in a safe, non-defective, appropriate manner;

(b)    In failing to adequately perform inspections upon the subject tow dolly and all its component parts;

(c)    Such other and further acts of negligence, recklessness and willful conduct as may be shown by evidence produced at trial.

20.    Due to the harm inflicted upon the Plaintiff by the negligence of the Defendants, she is entitled to judgement against all named Defendants herein, jointly and severally, for the actual damages, for punitive damages, for the cost of this action, for pre-judgment interest on all special damages, and for post-judgment interest, for attorney's fees and costs, and for such other relief as this Court may deem just and appropriate.

## B. STRICT LIABILITY
## AS TO DEFENDANT ELITE

21.    Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraphs.

22.    Defendant Elite was actively engaged, at all times relevant here, in the business of manufacturing, distributing and selling tow dollies, among other things, which were ultimately sold to the general public.

5

14

23.    The subject tow dolly sold by Defendant Elite to Defendant Best Price was defective and dangerous to an extent beyond that which would be contemplated by ordinary consumers and the public, generally.

24.    Defendant Elite sold relevant tow dolly in a defective condition which was unreasonably dangerous to Plaintiff.

25.    The subject defective tow dolly was the direct and proximate cause of the injury and other damages to the Plaintiff as previously outlined.

## AS TO DEFNDANT BEST PRICE

26.    Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraph.

27.    Defendant was actively engaged, at all times relevant here, in the business of purchasing, distributing and selling tow dollies, among other things, which were ultimately sold to the general public.

28.    The subject tow dolly sold by Defendant Best Price to Defendant Murphy was defective and dangerous to an extent beyond that which would be contemplated by ordinary consumers and the public, generally.

29.    Defendant Best Price sold subject tow dolly in a defective condition which was unreasonably dangerous to Plaintiff.

30.    The subject defective tow dolly was the direct and proximate cause of the injury and other damages to the Plaintiff as previously outlined.



6

## C. BREACH OF WARRANTY

### AS TO DEFENDENTS ELITE AND BEST PRICE

31.    Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraphs.

32.    The Defendants either purchased, sold, distributed and/or manufactured subject tow dolly and placed said tow dolly into the stream of commerce.

33.    By placing the subject tow dolly into the stream of commerce, the Defendants expressly and impliedly warranted its workmanship, marketability and fitness for the particular purpose and intended use of the subject tow dolly.

34.    The Defendants expressly and impliedly warranted that the subject tow dolly was safe and not in a defective and dangerous condition.

35.    As a direct and proximate cause of the Defendants placing the defective subject tow dolly into the stream of commerce, Plaintiff suffered injuries and other damages as previously outlined.

36.    Plaintiff is entitled to judgment against the Defendants herein, pursuant to S.C. Code § 36-2-318 and all other applicable law for actual damages, for punitive damages, for the cost of this action, for pre-judgment interest on all special damages, and for post-judgment interest, for attorney's fees and costs, and for such other relief as this Court may deem just and appropriate.

### D. RESERVATION OF ADDITIONAL CAUSES OF ACTION

37.    Plaintiff re-alleges and incorporates herein each and every allegation of all preceding paragraphs.

38.    Plaintiff reserves the right to amend her pleadings as necessary to assert any additional

16

causes of action as may revealed during discovery.

WHEREFORE, Plaintiff, having raised her Complaint herein, prays the Court inquire into the matters set forth herein and grant her judgment against each and all the named Defendants, jointly and severally, for actual damages, for punitive damages, for the cost of this action, for pre-judgment interest on all special damages, and for post-judgment interest, for attorney's fees and costs, and for such other relief as this Court may deem just and appropriate.


Daphne S. Withrow, Esquire
South Carolina Bar No. 102117; Fed. I.D. No. 12151
E-mail: daphne@westolivetti.com
WEST OLIVETTI, LLC
The Professional Building
2 Corpus Christi; Suite 105
Hilton Head, SC 29928
P-(843) 341-9260
F-(843) 341-9261
Attorney for Plaintiff


December 22, 2015

8

17

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.:   9:16-cv-318-RMG |
| PLAINTIFF, | (Formerly Case No. 2015-CP-27-0553) |
| V. | |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SERVICES, LLC d/b/a BEST PRICE TRAILERS | **ANSWER OF DEFENDANT ELITE METAL PERFORMANCE, LLC** |
| DEFENDANTS. | (JURY TRIAL DEMANDED) |

**COMES NOW** Defendant Elite Metal Performance, LLC (hereinafter also referred to as "this Defendant"), by and through its undersigned attorneys, answering the Complaint of the Plaintiff and would respectfully show unto this Court as follows:

**FOR A FIRST DEFENSE (FAILURE TO STATE A CAUSE OF ACTION)**

1.      The Plaintiff's Complaint fails to set forth a cause of action against Defendant Elite Metal Performance, LLC upon which relief may be granted, and should be therefore dismissed as to this Defendant.

**FOR A SECOND DEFENSE**

2.      This Defendant adopts the allegations contained hereinabove, where relevant, as fully as if repeated herein verbatim.

3.      This Defendant denies each and every allegation that is not hereinafter expressly and specifically admitted.

4.      Upon information and belief, this Defendant admits the allegations of Paragraph 1

1

18

of the Plaintiff's Complaint.

5.    Upon information and belief, this Defendant admits the allegations of Paragraph 2 of the Plaintiff's Complaint.

6.    This Defendant admits the allegations of Paragraph 3 of the Plaintiff's Complaint.

7.    Upon information and belief, this Defendant admits the allegations of Paragraph 4 of the Plaintiff's Complaint.

8.    Responding to the allegations of Paragraph 5 of the Plaintiff's Complaint, this Defendant admits that the acts or omissions alleged in the Plaintiff's Complaint occurred in Jasper County, South Carolina.  This Defendant denies the remaining allegations of Paragraph 5.

9.    As to the allegations re-alleged in Paragraph 6 of the Plaintiff's Complaint, this Defendant denies said allegations not expressly admitted herein and similarly incorporates hereinafter each allegation or response set forth above.

10.    This Defendant lacks sufficient knowledge or information to form a belief as to the allegations of Paragraphs 7, 8, 9, 10 of the Plaintiff's Complaint, and accordingly demands strict proof thereof.

11.    This Defendant denies the allegations of Paragraph 11 of the Plaintiff's Complaint.

12.    As to the allegations re-alleged in Paragraph 12 of the Plaintiff's Complaint, this Defendant denies said allegations not expressly admitted herein and similarly incorporates hereinafter each allegation or response set forth above.

13.    Paragraphs 13, 14, and 15 of the Plaintiff's Complaint set forth allegations directed towards a party separate and distinct from Defendant Elite Metal Performance, LLC, and therefore require no response of this Defendant.

14.     As to the allegations re-alleged in Paragraph 16 of the Plaintiff's Complaint, this Defendant denies said allegations not expressly admitted herein and similarly incorporates hereinafter each allegation or response set forth above.

15.     This Defendant admits as much of the allegations of Paragraph 17 of the Plaintiff's Complaint as can be construed to allege that Defendant Elite Metal Performance engaged in the manufacture and distribution of the tow dolly specified in the Plaintiff's Complaint.  This Defendant denies any remaining allegation of Paragraph 17.

16.     This Defendant admits as much of the allegations of Paragraph 18 of the Plaintiff's Complaint as can be construed to allege that Defendant Elite Metal Performance had a duty to inspect the subject tow dolly while said dolly was in the control of this Defendant during the manufacturing process.  This Defendant denies any remaining allegation of Paragraph 18.

17.     This Defendant denies the allegations of Paragraph 19 of the Plaintiff's Complaint.

18.     This Defendant denies the allegations of Paragraph 20 of the Plaintiff's Complaint.

19.     As to the allegations re-alleged in Paragraph 21 of the Plaintiff's Complaint, this Defendant denies said allegations not expressly admitted herein and similarly incorporates hereinafter each allegation or response set forth above.

20.     This Defendant admits the allegations of Paragraph 22 of the Plaintiff's Complaint.

21.     This Defendant denies the allegations of Paragraph 23 of the Plaintiff's Complaint.

22.     This Defendant denies the allegations of Paragraph 24 of the Plaintiff's

Complaint.

23.    This Defendant denies the allegations of Paragraph 25 of the Plaintiff's

Complaint.

24.    As to the allegations re-alleged in Paragraph 26 of the Plaintiff's Complaint, this

Defendant denies said allegations not expressly admitted herein and similarly incorporates

hereinafter each allegation or response set forth above.

25.    Upon information and belief, this Defendant admits the allegations of Paragraph

27 of the Plaintiff's Complaint.

26.    This Defendant denies the allegations of Paragraph 28, 29, and 30 of the

Plaintiff's Complaint.

27.    As to the allegations re-alleged in Paragraph 31 of the Plaintiff's Complaint, this

Defendant denies said allegations not expressly admitted herein and similarly incorporates

hereinafter each allegation or response set forth above.

28.    This Defendant admits the allegations of Paragraph 32 of the Plaintiff's

Complaint.

29.    This Defendant admits as much of the allegations of Paragraph 33 of the

Plaintiff's Complaint as can be construed to allege that this Defendant manufactured and sold the

subject tow dolly to Defendant Car Shop Trailer Services, LLC in the State of North Carolina,

thereby making any express or implied warranty with respect to said tow dolly subject to the laws

and provisions of the Commercial Code of the State of North Carolina.  Further, any act by this

Defendant placing the subject tow dolly into the stream of commerce occurred pursuant to a

"reseller's agreement" which contained a choice of law provision mandating the application of

the laws of North Carolina to any warranty or agreement made thereunder.  This Defendant

denies the remaining allegations of Paragraph 33.

30.     This Defendant admits as much of the allegations of Paragraph 34 of the
Plaintiff's Complaint as can be construed to allege that Defendant Elite Metal Performance, LLC,
made warranties of the manufacture and design of the subject tow dolly subject to the
Commercial Code of the State of North Carolina and its "reseller's agreement" with Defendant
Car Shop Trailer Services, LLC.  This Defendant denies the remaining allegations of Paragraph
34 of the Plaintiff's Complaint.

31.     This Defendant denies the allegations of Paragraph 35 of the Plaintiff's
Complaint.

32.     This Defendant denies the allegations of Paragraph 36 of the Plaintiff's
Complaint, to include the applicability of S.C. Code § 36-2-318 to this matter, the sale or transfer
of the subject tow dolly between any of the Defendants, or any warranties accompanying said
transfers.

33.     As to the allegations re-alleged in Paragraph 37 of the Plaintiff's Complaint, this
Defendant denies said allegations not expressly admitted herein and similarly incorporates
hereinafter each allegation or response set forth above.

34.     Paragraph 38 of the Plaintiff's Complaint requires no response from this Plaintiff.

### FOR A THIRD DEFENSE (INTERVENING / SUPERSEDING ACTS OF CO-
### DEFENDANTS)

35.     This Defendant adopts the allegations contained hereinabove, where relevant, as
fully as if repeated herein verbatim.

36.     Further and affirmatively responding to the Plaintiff's Complaint, this Defendant
would allege and assert that the injuries and damages, if any, received by the Plaintiff were due to

5

22

and caused by and were the direct and proximate result of the intervening and/or superseding negligence of the co-Defendants Robert W. Murphy and / or Car Shop Trailer Sales, LLC; therefore this Defendant is not liable.

## FOR A FOURTH DEFENSE (SOLE ACTS OF THIRD PARTY)

37.    This Defendant adopts the allegations contained hereinabove, where relevant, as fully as if repeated herein verbatim.

38.    Any injuries and damages sustained by the Plaintiff arising out of the accident referred to in the Complaint, if any, resulted, upon information and belief, from the sole acts and omissions of a third party, which sole acts or omissions or intervening acts or omissions were the proximate cause of any injuries or damages alleged to have been sustained by the Plaintiff and by reason thereof, the Plaintiff is not entitled to recover from this Defendant.

## FOR A FIFTH DEFENSE (INDUSTRY CUSTOM AND STATE OF THE ART)

39.    This Defendant adopts the allegations contained hereinabove, where relevant, as fully as if repeated herein verbatim.

40.    With respect to Plaintiff's claim of strict liability against Defendant Elite Metal Performance, LLC, this Defendant would allege and assert that its design and manufacture of the tow dolly referenced in the Plaintiff's Complaint met with industry customs and practice at the time it was introduced into the stream of commerce and met all regulatory requirements and standards applicable to the industry then and there existing.

## FOR A SIXTH DEFENSE (PUNITIVE DAMAGES)

41.    This Defendant adopts the allegations contained hereinabove, where relevant, as fully as if repeated herein verbatim.

42.    This Defendant alleges that an award of punitive damages would constitute an

6

23

impermissible and excessive fine under the Eighth Amendment of the Constitution of the United States, and such damages would further be a violation of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments, respectively, of the United States Constitution, as well as the applicable corresponding sections of the Constitution of the State of South Carolina, Article 1, § 3.

43.    The Plaintiff's claim for punitive damages violates this Defendant's right to access to the Courts guaranteed by the Seventh and Fourteenth Amendments because the threat of an award of unlimited punitive damages interferes with the Defendant's exercise of that right.

44.    The Plaintiff's claim for punitive damages violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment for the following reasons:

  a. the standard or test for determining the requisite mental state of this Defendant for imposition of punitive damages is void for vagueness; and

  b. insofar as punitive damages are not measured against actual injury to the Plaintiff and are left wholly to the discretion of the jury, there is no objective standard that limits the amount of such damages that may be awarded, and the amount of punitive damage that may be awarded is indeterminate at the time of this Defendant's alleged conduct.

WHEREFORE having fully answered, this Defendant prays the Plaintiff's Complaint against it be dismissed with costs, for attorneys' fee and such other and further relief as this court deems just and proper.  Further, this Defendant prays for a jury trial.

**(SIGNATURE ON FOLLOWING PAGE)**

7

24

BRAITHWAITE TIMMERMAN, LLC

BY:    _____
Taylor S. Braithwaite, Fed Bar No.  12219
Robin A. Braithwaite, Fed Bar No.  1449
Counsel   for   Defendant   Elite   Metal
Performance, LLC
Post Office Box 324
Aiken, South Carolina 29802-0324
(803)649-4144

Aiken, South Carolina
February ___ 2 ___, 2016

8

25

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF SOUTH CAROLINA**

**BEAUFORT DIVISION**

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.:  9:16-cv-318-RMG |
| PLAINTIFF, | |
| V. | **MOTION IN LIMINE OF DEFENDANT ELITE METAL PERFORMANCE** |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS | **(Exclusion of Testimony of Robin Hanger)** |
| DEFENDANTS. | |

---

<u>**NOTICE OF MOTION AND MOTION IN LIMINE**</u>

**COMES NOW** Defendant Elite Metal Performance, LLC (hereinafter "Elite Metal"), by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 26(a)(2) and 37(c), Fed. R. Evid. 701 and 702, and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), respectfully moves this Court to exclude certain testimony of Robin Hanger, owner of Defendant Car Shop Trailer Sales,  upon the grounds that it exceeds the scope of admissible lay testimony permitted under Fed. R. Evid. 701, and that the Plaintiff, as the proponent of said testimony, has failed to satisfy the procedural and substantive requirements for use of expert testimony at trial.

In support thereof, Defendant Elite Metal relies upon its Memorandum in Support, which is filed contemporaneously herewith, the pleadings and disclosures of the parties, and the depositions of Robin Hanger, Walter Gouveia, Michelle Beck, and D'Jaris Moore.

**SIGNATURE ON FOLLOWING PAGE**

26

BRAITHWAITE TIMMERMAN, LLC

BY:__//s// Taylor S. Braithwaite_____
    Taylor S. Braithwaite, Fed Bar No. 12219
    Robin A. Braithwaite, Fed Bar No. 1449
    Counsel for Defendant Elite Metal
    Performance, LLC
Aiken, South Carolina    Post Office Box 324
October 26, 2016    Aiken, South Carolina 29802-0324
    (803)649-4144

27

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE,<br><br>PLAINTIFF,<br><br>V.<br><br>ROBERT W. MURPHY, ELITE METAL<br>PERFORMANCE, LLC, and CAR SHOP<br>TRAILER SALES, LLC d/b/a BEST PRICE<br>TRAILERS<br><br>DEFENDANTS. | CASE NO.: 9:16-cv-318-RMG<br><br><br>**MEMORANDUM IN SUPPORT OF<br>DEFENDANT ELITE METAL<br>PERFORMANCE'S MOTION IN LIMINE**<br><br>**(Exclusion of Testimony of Robin Hanger)** |

      **COMES NOW** Defendant Elite Metal Performance, LLC (hereinafter "Elite Metal"), by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 26(a)(2) and 37(c), Fed. R. Evid. 701 and 702, and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), respectfully moves this Court to exclude certain testimony of Robin Hanger, owner of Defendant Car Shop Trailer Sales, upon the grounds that it exceeds the scope of admissible lay testimony permitted under Fed. R. Evid. 701, and that the Plaintiff, as proponent of said testimony, has failed to satisfy the procedural and substantive requirements for use of expert testimony at trial.

## I. FACTUAL SUMMARY

      1.      On or about June 9, 2015, the Plaintiff was operating a vehicle in the southbound lane of Interstate 95 in Jasper County, South Carolina. Defendant Murphy was operating a recreational vehicle traveling in the northbound lanes of Interstate 95. Defendant Murphy's recreational vehicle was towing a loaded vehicle tow dolly. As the Plaintiff and Defendant Murphy approached one another in opposing directions, a tire detached from the subject tow

1

28

dolly, crossed the median of Interstate 95, and struck the front of Plaintiff's vehicle.

2.    The subject tow dolly was manufactured by Defendant Elite Metal in Mooresville, North Carolina and then sold to Defendant Car Shop Trailer Sales, located in Holly Hill, Florida for retail under a reseller agreement.  The subject tow dolly was transported for more than 500 miles between Mooresville, North Carolina and Holly Hill, Florida by "Big Hoss's Haulin," a transport company contracted by Car Shop Trailer Sales to tow the subject tow dolly behind a pickup truck with two additional dollies purchased by Car Shop Trailer Sales stacked on top of the subject dolly.  W. Gouveia Dep. 43:19-44:8; Hanger Dep. 78:18-80:1, 115:1-24.  Upon receipt of the three tow dollies, Defendant Car Shop Trailer Sales repaired a broken bolt on the subject dolly before selling the dolly to Defendant Murphy.  Hanger Dep. 46:18-48:8.  Defendant Murphy in turn towed the dolly from Car Shop Trailer Sales' location to his home in Bradenton, Florida, a distance of approximately 175 miles.  Defendant Murphy attached the trailer to his recreational vehicle, loaded a motorcycle and Ford Explorer sports utility vehicle onto the trailer, and then towed the dolly in such configuration for nearly 400 miles before the wheel detachment incident occurred in the vicinity of Hardeeville, South Carolina. Def. Robert Murphy's Answers to Def. Elite Metal Performance's Interrogatories.

3.    After the wheel detached from the tow dolly, Defendant Murphy maneuvered his vehicle to the side of the road and stopped.  Upon inspection, Defendant Murphy discovered that a tire, wheel hub, and drum assembly were missing from the tow dolly, and that the remaining wheel spindle was damaged.  While at the scene of the accident, Defendant Murphy allegedly used his cell phone to take a photograph of the damaged wheel spindle that remained on the tow dolly and sent this picture to Robin Hanger, owner of Defendant Car Shop Trailer Sales.  Hanger Dep. 119:18-120:17

4.    On or about August 5, 2016, Robin Hanger sent an email to Defendant Elite Metal

2

29

stating that, based upon the photograph sent to him from Defendant Murphy's cell phone, he believed that the wheel detachment had occurred as a result of a bearing failure, which in turn was caused by a failure to properly pack the drum bearings with grease.  Hanger Dep. 91:24-97:21.

5.    Plaintiff has testified that she does not know what portion of the wheel – be it the tire, wheel hub, or wheel drum, or any other part – struck her vehicle.  Moore Dep. 26:19-27:8, 31:11-33:14.

6.    To date, no portion of the missing wheel, tire, hub, or wheel drum involved in this accident has ever been recovered or produced.  Hanger Dep. 30:13-22; Moore Dep. 31:23-33:14; Beck Dep. 47:11-48:22.

7.    Plaintiff's Complaint fails to identify a specific act or omission of negligence, or defect in the design or manufacture of the subject tow dolly, as the causation of the wheel detachment.

8.    This Court set for its original scheduling order, ECF 5, on February 5, 2016, ordering the identification of Plaintiff's experts and Plaintiff's compliance with Fed. R. Civ. P. 26(a)(2) by June 3, 2016 and completion of discovery by August 2, 2016.

9.    Upon consent and motion of the parties, this Court ordered an amended scheduling order, ECF 33 on June 2, 2016, ordering the identification of Plaintiff's experts and compliance with Fed. R. Civ. P. 26(a)(2) by August 3, 2016 and completion of discovery by October 15, 2016.

10.    To date, Plaintiff has never identified an expert witness or sought to satisfy the other requirements of Fed. R. Civ. P. 26(a)(2).

11.    Prior to the close of discovery on October 15, 2016, depositions were taken of Defendant Elite Metal's 30(b)(6) representatives (Michelle Beck, Ryan Gouveia, and Walter

Gouveia), Defendant Car Shop Trailer Sale's owner Robin Hanger, and Plaintiff J'Daris Moore.

12.    The deposition of Robin Hanger was noticed as a 30(b)(6) deposition by the Plaintiff and was taken on August 19, 2016.

13.    At no point during Robin Hanger's deposition did the Plaintiff seek to qualify Mr. Hanger as an expert, lay a foundation for expert opinion or testimony, or ask Mr. Hanger whether he held any such opinion to a reasonable degree of scientific, engineering, or technical certainty. Still, Plaintiff - over the repeated objections of Defendant Elite Metal and, occasionally, Defendant Car Shop Trailer Sales - repeatedly sought to illicit a conclusion from Mr. Hanger as to the ultimate cause of the wheel detachment based upon his previous email and his technical experience as a mechanic.    Hanger Dep. 72:18-76:24, 96:21-97:12, 102:17-104:8, 107:14-108:25.

14.    Upon examination by Counsel for Defendant Elite Metal, Mr. Hanger admitted that the opinion expressed both in his earlier email and at the deposition was based solely upon his interpretation of the photograph obtained from Defendant Murphy.  He stated that (1) he had never seen the wheel hub, wheel drum, or any other missing part of the wheel following the accident; (2) he lacked knowledge regarding the road conditions or distances traveled by the tow dolly prior to the wheel detachment, or the distance traveled by the tow dolly from the time that the wheel detached from the dolly until Defendant Murphy brought his vehicle to a stop; and (3) he lacked any information regarding the type of bearings, drum assembly, or grease / lubricant used on the subject tow dolly.  Further, Mr. Hanger summarily dismissed the possibilities that (1) the spindle had been damaged and the wheel hub destroyed or torn off of the spindle by the force of the spindle dragging against the road surface and dirt following the wheel detachment; or (2) the wheel had separated from the dolly due to his employee's failure to properly torque lug nuts on the wheel.  When asked to explain his dismissal of these possibilities, Mr. Hanger stated that

4

the absence of the wheel drum and wheel hub made it impossible to determine their occurrence. Hanger Dep. 118:15-134:1.

## II. ARGUMENT

**A. Robin Hanger's opinions and conclusions concerning the proximate cause of the wheel detachment exceed the scope of admissible lay testimony established by Fed. R. Evid. 701.**

Fed. R. Evid. 701 clearly delineates and limits lay testimony from the types of opinions and conclusions typically provided by an expert by requiring that

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule.

The purpose of Fed. R. Evid. 701 and its delineation is "to eliminate the risk that the reliability requirements set forth in Fed. R. Evid. 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Committee Notes on Rules, 2000 Amendment, Fed. R. Evid. 701. Under the framework of Fed. R. Evid. 701 and Fed. R. Evid. 702, "a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Fed. R. Evid. 702." Id., citing Asplundh Mfg. Div. v. Benton Harbor Eng'g, 57 F.3d 1190 (3d Cir. 1995). A secondary purpose stated by the committee notes for the 2000 Amendment of Fed. R. Evid. 701 is to enforce the procedural requirements of the Federal Rules

5

32

of Civil Procedure pertaining to expert witnesses: "by channeling testimony that is actually expert testimony to Fed. R. Evid. 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson." Committee Notes on Rules, 2000 Amendment, Fed. R. Evid. 701.

In the present case, Robin Hanger's opinions and conclusions exceed the bounds of his own physical perceptions and are clearly reliant upon his personal technical knowledge. To permit him to testify as a lay person regarding the wheel drum, wheel bearings, and any opinion or conclusions as to their relation to the proximate cause of the wheel detachment would necessarily violate Fed. R. Evid. 602 and the underlying principles of Fed. R. Evid. 701 set forth above. Accordingly, this court must subject those portions of Robin Hanger's testimony which exceed his personal perceptions to the degree of scrutiny outlined in Fed. R. Evid. 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., and the progeny of rulings expounding upon the Daubert requirements and the Court's gatekeeping function. Should the testimony fall short of the requirements and qualifications of relevant and reliable expert testimony, it should be excluded pursuant to Fed. R. Evid. 602 as speculation or conjecture.

**B. The procedural requirements of Fed. R. Civ. P. 26(a)(2) warrant exclusion of Robin Hanger's testimony containing opinions or conclusions as to the causation of the wheel separation.**

Should the Plaintiff seek to introduce Robin Hanger's opinions and conclusions as expert testimony at trial, she would do so in violation of the procedural requirements set forth in Fed. R. Civ. P. 26(a)(2). While Defendant Elite Metal does not contend that the expert report requirements of Fed. R. Civ. P. 26(a)(2)(B) are applicable to Mr. Hanger, as he has not been retained by the Plaintiff or specially employed to provide expert testimony, the disclosure and

6

33

notice requirements of Fed. R. Civ. P. 26(a)(2), subsections (A), (C), and (D) are still required of the any party intending to use his testimony at trial. Notes of Advisory Committee on Rules - 1993 Amendment, Fed. R. Civ. P. 26. Thus the pertinent portions of Fed. R. Civ. P. 26(a)(2) require under subsection (A) "that a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705;" and under subsection (C) ("Witnesses Who Do Not Provide a Written Report"), that the disclosure state "the subject matter on which the witness is expected to present evidence under Fed. R. Evid. 702, 703, or 705; and a summary of facts and opinions to which the witness is expected to testify." Finally, Fed. R. Civ. P. 26(a)(2)(D) requires that expert witness disclosures be made "at the times and in the sequence that the court orders," such as the deadlines imposed by the Court's original and amended scheduling orders in the present case.

In the present case, where no notice or disclosure of expert witnesses has been made whatsoever, and where Plaintiff, should she intend to use Robin Hanger as an expert witness, failed to notice Mr. Hanger as an expert prior, during, or subsequent to his deposition, it is clear that the procedural requirements for expert testimony have not been met. Further, given that the purpose of expert disclosure under Fed. R. Civ. P. 26(a)(2) is to ensure that "opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses," it goes without saying that Defendant Elite Metal would suffer unfair prejudice if Plaintiff is allowed to circumvent these requirements and employ the "surprise expert" testimony obtained from Hanger's deposition at trial. Notes of Advisory Committee on Rules - 1993 Amendment, Fed. R. Civ. P. 26. To cure this inequity, Fed. R. Civ. P. 37(c) provides a simple remedy of exclusion: "If a party fails to provide information or identify a witness as required by Fed. R. Civ. P. 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  Accordingly, Defendant Elite Metal would move this Court to apply the Fed. R. Civ. P. 37(c) remedy of exclusion to all portions of Robin Hanger's testimony which set forth a conclusion, hypothesis, or opinion as to how or whether the wheel bearings were greased, how or whether the wheel bearings failed or caused any portion of the wheel to separate, or the proximate cause of the wheel separation.

**C. Robin Hanger's opinions and conclusions fail to satisfy the substantive requirements for expert testimony as set forth in Fed. R. Evid. 702, <u>Daubert</u> and <u>Kuhmo Tire</u>.**

Fed. R. Evid. 702 acts as a gatekeeper to prevent parties from employing irrelevant, unreliable, or erroneous testimony under the guise of "expert witness" testimony by permitting a witness to testify to an opinion if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In its present form Fed. R. Evid. 702 is intended to encapsulate the holdings and effects of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, which reinforced the court's gatekeeping function and set forth a non-exclusive list of factors by which courts are to evaluate the reliability of expert witness testimony, and the litany of factors derived in subsequent case law from the principles set forth in <u>Daubert</u>.  Committee Notes on Rules, 2000

8

35

Amendment, Fed. R. Evid. 702; <u>Daubert,</u> 509 U.S. 579; <u>Kumho Tire v. Carmichael</u>, 526

U.S. 137 (1999).

      <u>Daubert</u> specifically identified five factors for evaluating the reliability of proposed expert

testimony:  whether the expert's technique or theory can be or has been objectively tested, or

whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed

for reliability; whether the expert's theory has been subject to peer review and publication; the

known or potential rate of error of the theory when applied; the existence and maintenance of

standards and controls in the expert's testing of his theory; and whether the technique or theory

has been generally accepted in the relevant scientific community.  509 U.S. at 593-594.  <u>Kumho</u>

<u>Tire</u> extended the application of these factors and the court's evaluation to technical (as opposed

to scientific) experts where relevant and appropriate as well.  526 U.S. 137. Since <u>Daubert</u>,

courts faced with evaluating new and different forms of expert testimony have raised additional

factors relevant to this Court's assessment in the present case, such as whether the field of

expertise claimed by the expert is known to reach reliable results for the type of opinion the

expert would give (<u>Kuhmo Tire</u>, 526 U.S at 150-151); whether an expert has unjustifiably

extrapolated from an accepted premise to an unfounded conclusion, creating "too great an

analytical gap between the data and the opinion proffered" (<u>General Elec. Co. v. Joiner</u>, 522 U.S.

136, 146 (1997)); whether he is "proposing to testify about matters growing naturally and directly

out of research [he has] conducted independent of the litigation, or whether [he has] developed

[his] opinions expressly for purposes of testifying" (<u>Daubert v. Merrell Dow Pharmaceuticals,</u>

<u>Inc.,</u> 43 F.3d 1311, 1317 (9th Cir. 1995)); and whether the expert has adequately accounted for

obvious alternative explanations (<u>Claar v. Burlington N.R.R.</u>, 29 F.3d 499 (9th Cir. 1994)).

      In the present case, Mr. Hanger's opinions and conclusions are derived not from a tactile

or visual inspection of the subject matter of his testimony (the spindle and wheel assembly), but

from simply viewing a photograph of a damaged spindle after the accident. Hanger Dep. 119:18-122:12. Mr. Hanger (or any known witness, for that matter) has never attempted to test his bearing failure hypothesis using the same manufacturers or models of spindle, bearings, drum, or wheel assembly involved, nor applied to such test the necessary factor that the tow dolly traveled approximately 1,000 miles under different load weights prior to his theoretical bearing failure. Hanger Dep. 119:18-125:12; W. Gouveia Dep. 43:19-44:8; Def. Robert Murphy's Answers to Def. Elite Metal Performance's Interrogatories.    Further, Mr. Hanger admitted that his conclusions were formed without knowledge of essential facts applicable to the subject matter and its history, such as the speed and distance which the spindle was dragged along the road surface (or other unknown / un-factored surfaces) after the wheel separated, the manufacturer and model of the parts involved, the type of lubricant or grease used by Defendant Elite Metal to grease the spindle and wheel assembly, or Defendant Elite Metal's procedures for manufacture and inspection of spindles and wheel assemblies. Hanger Dep. 31:1-4, 128:15-17, 122:6-125:12. Finally, Mr. Hanger was unable or unwilling to adequately account for reasonable alternative theories for the events his hypothesis assumes, such as the substantial possibility that the wheel's lug nuts were not torqued sufficient to prevent loosening and vibration of the wheel hub, or that the wheel drum may have been damaged and shorn from the spindle after the wheel separated as a  result of being dragged against the asphalt roadway at approximately 70 miles per hour under the weight of a Ford Explorer and Harley Davidson motorcycle.  Hanger Dep. 126:3-129:30. Because Mr. Hanger's testimony fails under so many of these factors proposed by case law to elaborate upon Fed. R. Evid. 702's requirements, it cannot reasonably be argued that his hypothesis and conclusions regarding any defect or the proximate cause of the wheel separation are reliable, relevant, or assistive to a jury.

## IV.  CONCLUSION

Therefore, because Robin Hanger's testimony clearly exceeds the permissible scope of "lay testimony" as defined in Fed. R. Evid. 701, Plaintiff has never sought to satisfy the procedural requirements to employ Mr. Hanger as her expert at trial, and because the basis and methods utilized by Mr. Hanger in arriving at his speculative conclusions fail to satisfy the substantive requirements of reliability set forth under Fed. R. Evid. 702 and the explicating case law derived therefrom, this Court should exclude any hypothesis or conclusion rendered by Robin Hanger regarding any theoretical act of negligence, defect, or event which proximately caused the wheel separation.   Defendant Elite Metal Performance requests oral argument in support of this motion.

                                    BRAITHWAITE TIMMERMAN, LLC


                              BY:__//s// Taylor S. Braithwaite_____ __
                                    Taylor S. Braithwaite, Fed Bar No.  12219
                                    Robin A. Braithwaite, Fed Bar No.  1449
                                    Counsel   for   Defendant   Elite   Metal
                                    Performance, LLC
Aiken, South Carolina                 Post Office Box 324
October 26, 2016                      Aiken, South Carolina 29802-0324
                                    (803)649-4144

11

38

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE,<br><br>                    PLAINTIFF,<br><br>        V.<br><br>ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS<br><br>                    DEFENDANTS. | CASE NO.:  9:16-cv-318-RMG<br><br><br>**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT ELITE METAL PERFORMANCE** |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant Elite Metal Performance, LLC (hereinafter "Elite Metal"), by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 56, respectfully moves this Court to grant summary judgment in its favor as to all claims and causes of action set forth against Defendant Elite Metal in the Plaintiff's Complaint upon the grounds that considering all the evidence in the light most favorable to the Plaintiff, there is no genuine or material issue of fact which would entitle the Plaintiff to a recovery against Defendant Elite Metal.

In support thereof, Defendant Elite Metal relies upon its Memorandum in Support, which is filed contemporaneously herewith, the pleadings and disclosures of the parties, and the depositions of Robin Hanger, Walter Gouveia, Ryan Gouveia, Michelle Beck, and D'Jaris Moore.

**SIGNATURE ON FOLLOWING PAGE**

39

BRAITHWAITE TIMMERMAN, LLC


BY:__//s// Taylor S. Braithwaite_____
    Taylor S. Braithwaite, Fed Bar No.  12219
    Robin A. Braithwaite, Fed Bar No.  1449
    Counsel  for  Defendant  Elite  Metal
    Performance, LLC
    Post Office Box 324
    Aiken, South Carolina 29802-0324
    (803)649-4144

Aiken, South Carolina
October 26, 2016

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.: 9:16-cv-318-RMG |
| PLAINTIFF, | |
| V. | |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS | **MEMORANDUM IN SUPPORT OF DEFENDANT ELITE METAL PERFORMANCE'S MOTION FOR SUMMARY JUDGMENT** |
| DEFENDANTS. | |

**COMES NOW** Defendant Elite Metal Performance, LLC (hereinafter "Elite Metal"), by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 56, respectfully moves this Court to grant summary judgment in its favor as to all claims and causes of action set forth against Defendant Elite Metal in the Plaintiff's Complaint upon the grounds that considering all the evidence in the light most favorable to the Plaintiff, there is no genuine or material issue of fact which would entitle the Plaintiff to a recovery against Defendant Elite Metal.

**I. FACTUAL SUMMARY**

1.    On or about June 9, 2015, the Plaintiff was operating a vehicle in the southbound lane of Interstate 95 in Jasper County, South Carolina. Defendant Murphy was operating a recreational vehicle traveling in the northbound lanes of Interstate 95. Defendant Murphy's recreational vehicle was towing a loaded vehicle tow dolly. As the Plaintiff and Defendant Murphy approached one another in opposing directions, a tire detached from the subject tow dolly, crossed the median of Interstate 95, and struck the front of Plaintiff's vehicle.

1

41

2.      After the wheel detached from the tow dolly, Defendant Murphy maneuvered his vehicle to the side of the road and stopped.  Upon inspection, the subject tow dolly was missing the left tire, wheel hub, and drum assembly, and the remaining wheel spindle was damaged.  Def. Robert Murphy's Answers to Def. Elite Metal Performance's Interrogatories.

3.      Plaintiff has testified that she does not know what portion of the wheel - be it the tire, wheel hub, or wheel drum, or any other part - struck her vehicle.  Moore Dep. 26:19-27:8, 31:11-33:14.

4.      To date, no portion of the missing wheel, tire, or wheel drum involved in this accident has ever been recovered or produced.  Hanger Dep. 30:13-22; Moore Dep. 31:23-33:14; Beck Dep. 47:11-48:22.

5.      The subject tow dolly was manufactured by Defendant Elite Metal in Mooresville, North Carolina and then sold to Defendant Car Shop Trailer Sales, located in Holly Hill, Florida for retail under a reseller agreement.  The subject tow dolly was transported for more than 500 miles between Mooresville, North Carolina and Holly Hill, Florida by "Big Hoss's Haulin", a transport company contracted by Car Shop Trailer Sales to tow the subject tow dolly behind a pickup truck with two additional dollies purchased by Car Shop Trailer Sales stacked on top of the subject dolly.  W. Gouveia Dep. 43:19-44:8; Hanger Dep. 78:18-81:11, 115:1-24.

6.      Upon receipt of the three tow dollies, Defendant Car Shop Trailer Sales repaired a broken bolt on the subject dolly before selling the dolly to Defendant Murphy. Hanger Dep. 46:18-48:8.  Undisputed testimony and discovery to date indicate that the subject bolt is used to attach a fender to the tow dolly and that the repair was made before the tow dolly left the custody and control of Car Shop Trailer Sales.

7.      Defendant Murphy in turn towed the dolly from Car Shop Trailer Sales' location to his home in Bradenton, Florida, a distance of approximately 175 miles.  Defendant Murphy attached

2

42

the trailer to his recreational vehicle, loaded a motorcycle and Ford Explorer sports utility vehicle onto the trailer, and then towed the dolly in such configuration for nearly 400 miles before the wheel detachment incident occurred in the vicinity of Hardeeville, South Carolina. Def. Robert Murphy's Answers to Def. Elite Metal Performance's Interrogatories.

8.    Plaintiff's Complaint sets forth three products liability-related causes of action against Defendant Elite Metal alleging negligence, strict liability for product defect, and breach of warranty to a third-party.

9.    Plaintiff's Complaint fails to identify a specific act or omission of negligence, or defect in the design or manufacture of the subject tow dolly, as the causation of the wheel detachment.

10.    The warranty cause of action set forth in Plaintiff's Complaint alleges that Plaintiff is entitled to judgement against Defendant Elite Metal pursuant to S.C. Code §36-2-318 ("Third party beneficiaries of warranties expressed or implied"), which extends express or implied warranties created pursuant to a sales contract "to any natural person who may be expected to use, consume or be affected by the goods and whose person or property is damaged by breach of the warranty." Title 36, Chapter 2 constitutes the Sales portion of the South Carolina Commercial Code.

11.    No portion of the stream of commerce related to the subject tow dolly occurred within the State of South Carolina. Defendant Elite Metal's sole place of business is located in Mooresville, North Carolina. All of Defendant Elite Metal's design, manufacturing, and sales activities are conducted at this location, and Defendant Elite Metal has never contracted with a reseller or other distribution entity in South Carolina. Beck Dep. 112:1-23. Defendant Car Shop Trailer Sales' sole place of business is located in Holly Hill, Florida. Rule 26(a) Disclosures of Def. Car Shop Trailer Sales. Defendant Murphy, a resident of Bradenton, Florida, purchased the

3

trailer from Defendant Car Shop Trailer Sales.  Rule 26(a) Disclosures of Def. Robert Murphy.

12.    The corollary sections of the Florida and North Carolina Commercial Codes, §672.318 Fla. Stat. Stat. (2005) and N.C.G.S. §25-2-318, respectively, differ from South Carolina's enactment of the Commercial Code in that they extend warranties only to:

> Any natural person who is *in the family or household of his or her* [the seller's] *buyer, who is a guest in his or her home or who is an employee, servant or agent of his or her buyer* if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty (emphasis added).

13.    The Court published its original scheduling order, ECF 5, on February 5, 2016, ordering the identification of Plaintiff's experts and Plaintiff's compliance with Fed.R.Civ.P. 26(a)(2) by June 3, 2016 and completion of discovery by August 2, 2016.

14.    Upon consent and motion of the parties, the Court ordered an amended scheduling order, ECF 33 on June 2, 2016, ordering the identification of Plaintiff's experts and compliance with Fed.R.Civ.P. 26(a)(2) by August 3, 2016 and completion of discovery by October 15, 2016.

15.    To date, Plaintiff has never identified an expert witness or sought to satisfy the other requirements of Fed. R. Civ. P. 26(a)(2)**.**

16.    Plaintiff's Complaint fails to identify a specific allegation of defect in the design or manufacture of the subject tow dolly as the causation of the wheel detachment.

17.    Prior to the close of discovery on October 15, 2016, depositions were taken of Defendant Elite Metal's 30(b)(6) representatives (Michelle Beck, Ryan Gouveia, and Walter Gouveia), Defendant Car Shop Trailer Sales' 30(b)(6) representative (Robin Hanger), and Plaintiff J'Daris Moore.  Documentary evidence in the possession of Defendants Elite Metal, Car Shop Trailer Sales, and Robert Murphy was produced pursuant to requests for production from

44

the Plaintiff, to include the production of Defendant Elite Metal's parts lists, blueprints and build specifications for the subject model tow dolly.

18.    Neither the depositions nor documentary evidence obtained in discovery have produced relevant or admissible evidence indicating that these alleged defects were the proximate cause of the wheel detachment, or, for that matter, that a bearing defect or failure ever existed.  Barring the speculative opinions given by Robin Hanger, owner of Defendant Car Shop Trailer Sales (Hanger Dep. 72:18-76:24, 96:21-97:12, 102:17-104:8, 107:14-108:25, 118:15-134:1), which is the subject of a separate Motion in Limine by Defendant Elite Metal pending before the Court, there is also a complete absence of direct or circumstantial evidence that any negligence or defect alleged against this Defendant was the proximate cause of the wheel detachment. See R. Gouveia Dep. 29:19-30:10, 37:2-39:11; W. Gouveia Dep. 26:23-29:7, 43:19-45:3; Moore Dep. 26:19-27:8, 31:11-33:14.

## II.  STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   In evaluating a motion for summary judgment, the Court must view the record in the light most favorable to the non-moving party.  Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990). While the court is required to construe the facts and all reasonable inferences arising therefrom in the light most favorable to the non-moving party, wholly speculative and/or conclusory assertions are insufficient to withstand a motion for summary judgment. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  The moving party is entitled to judgment as a matter of law if the non-moving party fails to make a sufficient showing on an essential elements of its case. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Further, "the mere

5

existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1985). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

### III. ARGUMENT

**A. Plaintiff is not a third party beneficiary under the statutes of either the Florida or North Carolina Commercial Code applicable to the stream of commerce and all underlying contracts in this action.**

Plaintiff's action for breach of warranty is predicated upon the location of the injury in this matter and the South Carolina Commercial Code's extension of a manufacturer or dealer's express or implied warranties to "any natural person who may be expected to use, consume or be affected by the goods and whose person or property is damaged by breach of the warranty." S.C. Code Ann. §36-2-18 (1977). However, an action for breach of warranty is an action in contract (Myrtle Beach Pipeline v. Emerson Electric Co., 843 F.Supp. 1027 (D.S.C. 1993)), and all underlying contracts for the sale of the subject tow dolly in the present case occurred in North Carolina and Florida between entities residing or located in those states. As both North Carolina and Florida have enacted a "Third Party Beneficiary of Warranties" commercial code section which differs from South Carolina's enactment by limiting beneficiaries to families, households, household guests, employees, and agents of a product's buyer, the facts of this case present a conflict of laws.

The District Court of South Carolina has previously held that "this Court must follow the choice of law rules applicable in South Carolina State Courts" (Thornton v. Cessna Aircraft Co., 703 F. Supp. 1228, 1230 (D.S.C. 1988)), and that "in contract actions, South Carolina courts

apply the substantive law of the place where the contract at issue was formed." <u>Witt v. American Trucking Assn., Inc.</u>, 860 F. Supp. 295, 300 (D.S.C. 1994); citing <u>O'Briant v. Daniel Const. Co.</u>, 279 S.C. 254, 305 S.E.2d 241, 243 (1983).   As all sales contracts in this case occurred in either North Carolina or Florida, and no commercial activity related to the subject tow dolly occurred in South Carolina, the commercial code of the former should govern the scope of warranties and definition of beneficiaries applicable to this case.  See generally <u>Thornton v. Cessna Aircraft Co.</u>, 886 F.2d 85, 89 (4th Cir. 1989).  Accordingly, because Plaintiff falls outside of the limited class of third-party beneficiaries defined by Florida and North Carolina, she lacks privity of contract and standing to assert a claim for breach of contract against Defendant Elite Metal.

**B. Discovery has failed to yield direct or circumstantial evidence from which negligence or defect operating as the proximate cause of the wheel detachment can be inferred.**

Under all theories of products liability asserted in this case, the Plaintiff must establish that she was injured by the product; that the product, at the time of the accident, was in essentially the same condition as when it left the hands of Defendant Elite Metal; and that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." <u>Allen v. Long Mfg. NC,Inc.</u>, 505 S.E.2d 354, 356 (S.C. Ct. App. 1998).  Further, to prevail on her negligence claim, the Plaintiff must additionally show that Defendant Elite Metal failed to exercise due care.  <u>Bragg v. Hi-Ranger, Inc.</u>, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995).

During the course of discovery, Plaintiff sought to establish two conditions as negligent manufacture or defect existing at the time that the subject tow dolly left Defendant Elite Metal's custody and control:  the above-referenced broken fender bolt and an alleged failure to grease bearings in the wheel drum.  As stated in the facts above and evidenced by the cited depositions, however, there is no testimony that suggests that the broken fender bolt, in and of itself, would

have caused the wheel detachment, and it is clear from the evidence that the fender bolt was replaced prior to Defendant Murphy's receipt of the tow dolly. With respect to Plaintiff's allegation that the wheel detached as a result of improperly greased or ungreased bearings, discovery yielded no more than the purely speculative and inadmissible opinion of Robin Hanger (who Plaintiff has never noticed or attempted to qualify as her expert) to indicate that a bearing failure occurred, or that said failure was due to negligence or a manufacturing defect on the part of Defendant Elite Metal. Quite to the contrary, it would appear less likely than not from discovery that the wheel bearings were improperly greased, as discovery has revealed that the subject tow dolly was towed a distance of over 1000 miles under three separate loads prior to the wheel detachment incident. W. Gouveia Dep. 43:19-44:8; Def. Robert Murphy's Answers to Def. Elite Metal Performance's Interrogatories. Further complicating Plaintiff's allegations concerning any defect or negligence concerning the wheel drum bearings is the fact that the suspect wheel – including the wheel hub, drum, and tire – were never recovered from the accident scene and thus never subjected to inspection, analysis, or testing.

Plaintiff's contentions of negligence or defect in the present case bear comparison to those presented to this Court in Brown v. Ford Motor Company in 1968. 287 F. Supp. 906. Applying South Carolina substantive law pursuant to the *Eerie* doctrine in a grant of summary judgment to a defendant car manufacturer, the Court made clear that although South Carolina "upholds generally the liability of a car manufacturer for injuries sustained as a result of a defect in the car's installed mechanism or construction, a plaintiff's right of recovery in such case may not rest on the presumption arising from the mere accident itself or on any doctrine of *res ipsa loquitur*." Id at 910. Further, the Plaintiff's right of recovery

> must be predicated upon proof, either direct or circumstantial, that there
>
> was a defect in the mechanism or its design and that it was reasonably

8

48

probable that such defect was the cause of the injuries; and the burden of
establishing both such defect and its causal connection with the accident
rests on the plaintiff. Moreover, his proof must rise above surmise,
conjecture or speculation. Id.

The principles articulated above and in South Carolina's substantive law would also preclude Plaintiff's reliance upon Robing Hanger's testimony as evidence of a defect in the wheel bearings. In Graves v. CAS Medical Systems, the South Carolina Supreme Court addressed proffers of circumstantial evidence similar to Robin Hanger's "expert" testimony which, paraphrased, amounts to "my opinion is based upon a photo of the alleged defect, and the damage reflected in the photo appears similar to past incidents in which I have observed a bearing failure." 401 S.C. 63, 735 S.E.2d 650, 657 (2012). The South Carolina Supreme Court held that such testimony would be admissible

"where there is some special relation between the accidents tending to prove or
disprove some fact in dispute…[however] a Plaintiff bears the burden of
demonstrating that the products are 'substantially similar to the accident at issue'
by demonstrating that the products are similar, the alleged defect is similar, the
defect caused the other accidents, and there are no other reasonable secondary
explanations." Id.

Finding that the plaintiff in Graves had failed to carry this burden, the Supreme Court upheld the exclusion of this testimony and a grant of summary judgment to the defendant on the basis that Plaintiff's case, inclusive of the excluded testimony, was predicated upon illusory conjectures of defect unsupported by evidence tying them to the proximate cause of the plaintiff's injury, and thus required the application of res ipsa loquitor. Id at 657-659. Because the Plaintiff in the present case has similarly failed to demonstrate relevance, reliability, or substantial similarity in

9

49

Robin Hanger's testimony, has failed to name Mr. Hanger as her expert witness or comply with the procedural requirements of Fed. R. Civ. P. 26(a), and has failed to otherwise produce evidence supporting a claim of defect or tying such defect to the proximate cause of the wheel detachment, her claims should similarly be denied for their reliance upon res ipsa loquitor.

## IV.  CONCLUSION

Accordingly, because Plaintiff is not a third-party beneficiary of any warranties, express or implied, under the commercial codes of North Carolina and Florida applicable to the contracts present in this case, and because Plaintiff has also failed to notice or qualify any expert – to include Mr. Hanger - or produce evidence supporting a defect or negligence attributable to this Defendant, Defendant Elite Metal Performance is entitled to summary judgment in its favor as to all causes of action alleged against Elite Metal in the Plaintiff's Complaint.  Defendant Elite Metal Performance requests oral argument in support of this motion.


BRAITHWAITE TIMMERMAN, LLC


BY:____//s// Taylor S. Braithwaite_____
      Taylor S. Braithwaite, Fed Bar No.  12219
      Robin A. Braithwaite, Fed Bar No.  1449
      Counsel for  Defendant  Elite  Metal
      Performance, LLC
Aiken, South Carolina                  Post Office Box 324
October 26, 2016                       Aiken, South Carolina 29802-0324
                                       (803)649-4144

10

50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION
CIVIL ACTION NO. 9:16-cv-318RMG

D'JARIS A. MOORE,

        Plaintiff,

v.

ROBERT W. MURPHY, ELITE METAL
PERFORMANCE, LLC, and CAR SHOP
TRAILER SALES, LLC, d/b/a
BEST PRICE TRAILERS,

        Defendants.
_____/

30(b)(6) DEPOSITION OF

ELITE METAL PERFORMANCE, LLC

MICHELLE BECK, DESIGNATED REPRESENTATIVE

* * * * *

Taken By Plaintiff

Davidson, North Carolina

August 2, 2016

* * * * *

Reported by:
LINDA D. CRANE, RMR, CRR
Registered Merit Reporter
Certified Realtime Reporter
_____

*Cain & Crane Court Reporters, LLC*

*Post Office Box 23833*
*Charlotte, North Carolina 28227*
*Phone (704) 545-3510 * Fax (704) 545-3950*
*www.cainandcrane.com*



COPY

51

47

```
 1   to have them towed to a safe place, which wound up
 2   being the Holiday Inn Express and Suites in
 3   Hardyville, South Carolina.  We also had the tow
 4   dolly towed to that location so that it was not on
 5   the side of the road.
 6           I then communicated back to Robin and
 7   Jeanine the following morning because at that point
 8   it was after 11:00 at night before they were back
 9   to the hotel, that everyone was safe and well for
10   the evening.  Then we picked up the next day.
11      Q.    Did Mr. Murphy tell you that he had any
12   of the parts of the trailer that weren't still
13   attached?
14      A.    As a matter of fact, we were told from
15   the very beginning that there was no tire, nothing,
16   that it was in the woods, that they had walked up
17   and down the highway, and no one could find it.
18      Q.    And to this day, do you know if it's
19   ever been recovered?
20      A.    We've always been told that it was not
21   recovered.
22      Q.    Do you know if Mr. Murphy has any other
23   parts other than the tire?
24      A.    All of the parts that were removed from
25   the trailer when we did the repair work, Mr. Murphy
```

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

48

```
1    and Mrs. Murphy asked if we could put them in a box
2    and give them back to them.  So to the best of my
3    knowledge, they have that box.
4         Q.    Do you know what's in the box?
5         A.    Yes.
6               MS. WITHROW:  If we could go off the
7    record for just a moment, please?
8               (There was a discussion off the record.)
9    BY MS. WITHROW:
10        Q.    So we were talking about the box that
11   the Murphys have.  To the best of your knowledge,
12   what is contained in the box?
13        A.    Any items that were removed during the
14   repair work are in that box.  The remnants of the
15   broken spindle are in that box.  Any nuts and bolts
16   are in that box.
17        Q.    Do you know if the hub is in the box?
18        A.    No, it is not.
19        Q.    Have you ever seen a picture of the hub?
20        A.    No.
21        Q.    Could it be with the wheel?
22        A.    No idea.
23        Q.    And the parts that were in the box, that
24   was returned to the Murphys after you all got the
25   trailer back, or was it something that they have
```

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

1    follow-ups, some clarification things.

2                    CROSS-EXAMINATION

3    BY MR. BRAITHWAITE:

4        Q.    Ms. Beck, where is Elite Metal

5    Performance's primary place of business, its shop,

6    wherever you manufacture these things?

7        A.    211 McKenzie Road, Mooresville,

8    North Carolina.

9        Q.    To your knowledge, does Elite Metal

10   Performance manufacture or own any manufacturing

11   facilities other than that location?

12       A.    Absolutely not.

13       Q.    Car Shop Trailer Sales, where was their

14   business located?

15       A.    Holly Hill, Florida.

16       Q.    I think you mentioned three other

17   retailers at the time.  Were any of those located

18   in the state of South Carolina?

19       A.    No.

20       Q.    Do you know where they were located?

21       A.    Yes.  Trailer Sales is in Cairo, New

22   York.  Harvest Trailers is in Amarillo, Texas.  And

23   Mountaineer is in Vienna, West Virginia.

24       Q.    With regards -- these things all have

25   Vehicle Identification Numbers.  Who assigns

122

```
 1   STATE OF NORTH CAROLINA)
                            )   CERTIFICATE OF TRANSCRIPT
 2   COUNTY OF MECKLENBURG  )

 3

 4          I, Linda D. Crane, RMR, CRR, and Notary

 5   Public in and for the aforesaid county and state,

 6   do hereby certify that the foregoing pages are an

 7   accurate transcript of the deposition of Michelle

 8   Beck, which was reported by me, on behalf of the

 9   Plaintiff, in machine shorthand and transcribed by

10   computer-aided transcription.

11          The deponent and parties did waive the

12   signing of the deposition by the deponent.

13          I further certify that I am not financially

14   interested in the outcome of this action, a

15   relative, employee, attorney or counsel of any of

16   the parties, nor am I a relative or employee of

17   such attorney or counsel.

18          This 10th day of August, 2016.

19          _____

20          Linda D. Crane, RMR, CRR
            Registered Merit Reporter
21          Certified Realtime Reporter
            Notary Public 19932390064
22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

55

Copy and Index

D'Jaris A. Moore

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

- - -

D'JARIS A. MOORE,                    :    CASE NO.
                                     :    9:16-CV-318-RMG
                Plaintiff,           :
                                     :
        vs.                          :
                                     :
ROBERT W. MURPHY, ELITE METAL        :
PERFORMANCE, LLC, and CAR SHOP       :
TRAILER SALES, LLC d/b/a BEST        :
PRICE TRAILERS,                      :
                                     :
                Defendants.          :


───────────────────────────────────────────
          DEPOSITION OF D'JARIS MOORE
───────────────────────────────────────────


DATE TAKEN:         WEDNESDAY, SEPTEMBER 21, 2016
TIME BEGAN:         11:00 A.M.
TIME ENDED:         1:43 P.M.
LOCATION:           WEST OLIVETTI, LLC
                    2 CORPUS CHRISTI PLACE, SUITE 105
                    HILTON HEAD, SOUTH CAROLINA   29938


REPORTED BY:        DEIRDRE J. WEYER, RPR
                    EVERYWORD, INC.
                    P.O. BOX 1459
                    COLUMBIA, SOUTH CAROLINA   29202
                    803-212-0012

56

D'Jaris A. Moore

1   out to be the wheel, came into my windshield.

2       Q    Okay.  Is it your understanding that this

3   accident involved a recreational vehicle of some

4   sort?

5       A    Yes, that's my understanding.

6       Q    Okay.  And then that recreational vehicle

7   was towing some sort of tow dolly or trailer; is that

8   right?

9       A    Yes.

10      Q    Okay.  Prior to any sort of impact with

11  your vehicle, did you see -- do you recall seeing the

12  RV in question?

13      A    Prior to the impact, no.  I was focused on

14  ahead of me in the left lane.  And at that part of

15  95, there's a very wide median.  So you really -- if

16  you're paying attention to traffic, you're not

17  conscious of what's going on on the other side of the

18  road.  I was not.

19      Q    So you didn't see anything separate from

20  that RV or the trailer it was pulling, correct?

21      A    I only saw what came across the road to

22  hit the car in front of me.  That's when I became

23  aware of it.

24      Q    Okay.  Did you see it when it was in the

25  median or when it was on your side of the road?

D'Jaris A. Moore

1      A      I saw it as it whizzed across and went in
2   front of me, hit the other car.
3      Q      So you did not see the separation of
4   anything from the RV or trailer?
5      A      I did not.
6      Q      Okay.  And you did not see the -- whatever
7   hit you until it was on your portion of the roadway?
8      A      It was in my face.
9      Q      Okay.  So you saw it make -- did you see
10  it make contact with the vehicle in front of you?
11     A      Yes.
12     Q      And you don't know, I guess, the distance
13  between you and that vehicle at the time, do you?
14     A      I can't estimate it.  I could tell that it
15  hit the other vehicle hard enough to knock him off to
16  the side.
17     Q      Okay.  When you say "off to the side" --
18     A      His car veered off.
19     Q      Okay.  Did he go to the left or to the
20  right?
21     A      He went to the right.
22     Q      Okay.  Did his vehicle make any sort of
23  contact with anyone else?  Did you see that?
24     A      I did not see his vehicle make contact
25  with anyone else.

D'Jaris A. Moore

1    Q    Okay.  Did you at any point make contact

2 with the vehicle -- with that vehicle that you're

3 referring to?

4    A    No.

5    Q    All right.  Did any other vehicle contact

6 you during this accident?

7    A    After the wheel hit me, I pulled off of

8 the road into the median --

9    Q    Okay.

10    A    -- out of traffic.

11    Q    All right.  So no other vehicle struck

12 your vehicle, correct?

13    A    No.

14    Q    All right.  So after the object hit your

15 car, you said you were able to maneuver your vehicle

16 safely off to the side of the road?

17    A    Yes.

18    Q    How long were you on the side of the

19 road -- actually, let me back that up.

20         When you say the side of the road, you

21 mean the left-hand side of the road?  I guess the

22 median?

23    A    The median.

24    Q    So you were able to maneuver off to the

25 left-hand side.  How long were you there before

D'Jaris A. Moore

1   anyone approached your vehicle?

2       A    I can't estimate that.  It wasn't a long

3   time.  A couple who set -- approached my car, opened

4   my door on the driver's side, unbuckled my seat belt,

5   and took me out of the car and laid me down on the

6   ground.  The lady -- I don't know her name -- she

7   said they saw the accident and realized as I pulled

8   off that I might be hurt.  She was, she said, a

9   trained EMT.  Her husband picked me up out of the car

10  and laid me on the ground, got towels to wipe the

11  blood off my face, and then they cleaned out the back

12  seat of my car and laid me down on my back seat.

13      Q    Okay.  Did you lose consciousness during

14  this?  Do you recall losing consciousness?

15      A    I'm not sure.  She said, to her, it looked

16  like I was in shock.  I don't know.

17      Q    All right.  After you laid down in the

18  back seat, did you ever get out of the vehicle, walk

19  around the accident scene?

20      A    No.

21      Q    Okay.  Who's the next person that you

22  spoke with after that couple?

23      A    The man who was in the car, I believe, in

24  front of me that was hit came back to check on me.

25  He -- he pointed down the road to say someone had

EveryWord, Inc. Court Reporting        Page: 29        www.EveryWordInc.com

D'Jaris A. Moore

1   pulled off.

2        Q        When you say he pointed down the road, are

3   you referring to the northbound lane?

4        A        He pointed north to say someone had pulled

5   off.  Later, after that, the ambulance came.  Two EMT

6   professionals loaded me into the back of the

7   ambulance.  The back door was open.  I was facing

8   north.  And then the policeman came.

9        Q        Okay.  Do you know if it was a -- what

10  agency the policeman was from?

11       A        He was from the City of Harleyville, I

12  believe.

13       Q        Did you ever see a South Carolina Highway

14  Patrol officer out there?

15       A        No, I did not.

16       Q        Did the officer from the City of

17  Harleyville speak with you at all?

18       A        He came into the back of the

19  ambulance -- this was one that was a large one that

20  set up.  He asked me for my -- I had my handbag with

21  me.  He asked me for my driver's license and

22  insurance cards.  I gave those to him.  Ambulance

23  left and took me to the hospital.  And I saw the

24  officer again when he came back -- when he came to

25  the hospital to give me the accident report and

EveryWord, Inc. Court Reporting          Page: 30          www.EveryWordInc.com

D'Jaris A. Moore

```
 1   return my driver's license and insurance card.
 2        Q    Okay.  Let me ask you this -- we're going
 3   to backtrack a little bit here.  Do you know what
 4   part of the vehicle in front of you was struck by the
 5   object or the wheel?
 6        A    I cannot say exactly where.  It was on the
 7   driver's side that it was hit.  I don't know where.
 8   I just saw it hit.  The car went over.  And it
 9   happened so fast.  Within an instant, it was in my
10   face.
11        Q    And I know I'm asking you for, I guess, a
12   flash recall memory here.  Do you have any
13   recollection of what exactly you saw as this object
14   you saw was coming towards your window?  How would
15   you describe that for me?
16        A    Oh, God.  Moving very fast.  A large, dark
17   object.
18        Q    Okay.  Do you recall seeing any colors
19   that you can recall, anything in that object?
20        A    No.
21        Q    Okay.
22        A    It was dark, black.
23        Q    Okay.  Did you ever see the object after
24   you pulled over to the side of the road?
25        A    After the object hit me (indicating), hit
```

D'Jaris A. Moore

1   my car, the windshield, and the top of my car on my

2   side, it went across my roof and I did not see it

3   anymore.

4        Q      Okay.  Has anyone, either that morning or

5   in the time since, told you that they've seen the

6   object or that they found the object that struck you?

7        A      The accident occurred in the afternoon --

8        Q      Okay.

9        A      -- about 3, I guess, or so.  No, I've

10  never talked to anyone who's seen it.

11       Q      All right.  Have you yourself ever

12  returned to the scene of the accident to look for the

13  object or anyone done so on your behalf?

14       A      I don't go on 95 very often --

15       Q      Okay.

16       A      -- these days.  I avoid the road if I can,

17  unless I have to drive a distance.  I do not have

18  family here in this area, so there would be no one

19  that would go out looking for that object for me.

20       Q      Okay.  So no one -- neither you or anyone

21  on your behalf have looked for the object or found

22  the object, correct?

23       A      No.

24       Q      All right.  And as we sit here today, you

25  don't have any sort of independent knowledge

D'Jaris A. Moore

```
 1   regarding what caused the object to separate from
 2   another vehicle or strike your vehicle, correct?
 3           MS. WITHROW:  Object to the form.  You may
 4   answer.
 5           THE WITNESS:  The only knowledge I have is
 6   what I have heard and documents I have observed and
 7   the earlier depositions that I attended on Elite
 8   Metal and on Car Shop.
 9   BY MR. BRAITHWAITE:
10       Q    Yes, ma'am.  I asked for independent
11   knowledge, something you would have --
12       A    No.
13       Q    -- on your own.
14       A    No.  Those are the only.
15       Q    Thank you, ma'am.  All right.  So you said
16   that you were placed in the back of the ambulance and
17   that you saw the officer with the Harleyville City
18   Police at the hospital; is that correct?
19       A    Yes.
20       Q    Do you know which -- or can you tell me
21   which hospital they took you to?
22       A    The closest hospital to the accident is
23   Coastal Carolina.
24       Q    Okay.
25       A    It is part of Hilton Head Regional Medical
```

EveryWord, Inc. Court Reporting          Page: 33          www.EveryWordInc.com

64

D'Jaris A. Moore

```
 1              CERTIFICATE OF REPORTER

 2         I, Deirdre J. Weyer, Registered
    Professional Reporter and Notary Public for the State
 3  of South Carolina at Large, do hereby certify:
               That the foregoing deposition was taken
 4  before me on the date and at the time and location
    stated on page 1 of this transcript; that the
 5  deponent was duly sworn to testify to the truth, the
    whole truth and nothing but the truth; that the
 6  testimony of the deponent and all objections made at
    the time of the examination were recorded
 7  stenographically by me and were thereafter
    transcribed; that the foregoing deposition as typed
 8  is a true, accurate and complete record of the
    testimony of the deponent and of all objections made
 9  at the time of the examination to the best of my
    ability.
10         I further certify that I am neither
    related to nor counsel for any party to the cause
11  pending or interested in the events thereof.  Witness
    my hand, I have hereunto affixed my official seal
12  this 4th day of October 2016, at Moncks Corner,
    Berkeley County, South Carolina.

13

14

15         Deirdre J. Weyer
           Registered Professional Reporter
16         Notary Public
           State of South Carolina at Large
17         My Commission expires:
           May 15, 2023
18

19

20

21

22

23

24

25
```

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT W. MURPHY, ELITE | ) | **MOTION TO AMEND** |
| METAL PERFORMANCE, LLC | ) | **SCHEDULING ORDER** |
| CAR SHOP TRAILER SERVICES, | ) | |
| LLC d/b/a BEST PRICE TRAILERS | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

## <u>MOTION TO AMEND SCHEDULING ORDER TO EXTEND DEADLINE FOR IDENTIFYING EXPERT WITNESS AND FILING OF RECORDS CUSTODIAN WITNESSES</u>

The Plaintiff in the above-caption matter respectfully moves this Court to amend the Scheduling Order as set forth below. The grounds for said request for extension relate to numerous issues including Hurricane Matthew which was responsible for a seven (7) day mandatory evacuation of Hilton Head Island, from October 5, 2016 to October 12, 2016, where Plaintiff's counsel both works and resides. In addition, Plaintiff's counsel suffered greater than 40% destruction to her home, thus causing further emergency measures relative to habitability.

The mediation of this matter scheduled for November 2, 2016 was able to move forward and the Plaintiff and two Defendants (Robert W. Murphy and Car Shop Trailer Sales) were able to come together and settle in good faith.

1

66

Plaintiff requests that due to the hurricane and substantial aftermath as well the strategic changes related to the one remaining Defendant, Elite Metal Performance, after mediation, she be permitted to identify her expert witness(es) by November 11, 2016. Additionally, due to the continuing fluidity and continuing nature of the injuries as sustained by the Plaintiff, she request that she be given until December 23, 2016 to file and serve affidavits of records custodian witnesses.

Although Plaintiff and Defendants did agree to one previous Scheduling Order (Doc. No.33), the remaining defense counsel in this matter, Taylor Brathwaite, opposes the current extension request for extension.

WEST OLIVETTI, LLC


/s/ Daphne S. Withrow

Daphne S. Withrow RN, Esq.
Federal ID # 12151
Post Office Box 7906
Hilton Head, SC 29938
Telephone: 843-341-9260
Facsimile: 843-341-9261
daphne@westolivetti.com

*Attorney for the Plaintiff*

2

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH CAROLINA

## BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE,<br><br>PLAINTIFF,<br><br>V.<br><br>ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS<br><br>DEFENDANTS. | CASE NO.: 9:16-cv-318-RMG<br><br><br>**RESPONSE OF DEFENDANT ELITE METAL PERFORMANCE, LLC IN OPPOSITION TO PLAINTIFF'S MOTION TO AMEND SCHEDULING ORDER** |

**COMES NOW** Defendant Elite Metal Performance, LLC, by and through its undersigned attorneys, responding to Plaintiff's Motion to Amend Scheduling Order (Captioned "Motion to Amend Scheduling Order to Extend Deadline for Identifying Expert Witness and Filing of Records Custodian Witnesses") and respectfully moves this Court to deny said motions.

## I. FACTUAL SUMMARY

1.    The Court published its original scheduling order, ECF 5, on February 5, 2016, ordering the identification of Plaintiff's experts and Plaintiff's compliance with Fed. R. Civ. P. 26(a)(2) by June 3, 2016, Defendants' identification of expert witnesses and Fed. R. Civ. P. 26(a)(2) compliance by July 5, 2016, submission of records custodian affidavits by July 11, 2016, and completion of ALL discovery by August 2, 2016.  This order was consented to by all counsel at a Rule 26(f) conference held on February 19, 2016

2.    On June 1, 2016, the parties filed a Joint Motion for Amended Scheduling Order in order to address discovery delays caused by settlement negotiations between the Parties in

68

May 2016. Upon said consent and motion of the parties, the Court ordered an amended scheduling order, ECF 33 on June 2, 2016, ordering the identification of Plaintiff's experts and compliance with Fed. R. Civ. P. 26(a)(2) by August 3, 2016, Defendants' identification of expert witnesses and Fed. R. Civ. P. 26(a)(2) compliance by September 2, 2016, submission of records custodian affidavits by September 2, 2016, and completion of ALL discovery by October 15, 2016.

3.      Further, the Court ordered the filing of dispositive motions by November 6, 2016 under the Amended Scheduling Order.

4.      Plaintiff's deadline for expert witness identification and Fed. R. Civ. P. 26(a)(2) compliance ran two months prior to any emergency created by Hurricane Matthew. To date, Plaintiff has still failed to identify an expert witness or sought to satisfy the other requirements of Fed. R. Civ. P. 26(a)(2).

5.      Following the close of discovery, more than three months after Plaintiff's deadline to identify an expert, and prior to the Court's deadline for dispositive motions, Defendant Elite Metal Performance, LLC filed a Motion in Limine (ECF 37) on October 26, 2016 seeking to exclude Plaintiff from introducing certain speculative testimony of Robin Hanger, owner of Defendant Car Shop Trailer Sales, on both substantive grounds under Fed. R. Evid. 701, 702 and on procedural grounds under Fed. R. Civ. P. 37 for failure to comply with Fed. R. Civ. P. 26(a)(2).

6.      Defendant Elite Metal Performance filed a contemporaneous Motion for Summary Judgment (ECF 38) on October 26, 2016 seeking summary judgment on the basis that Plaintiff had failed to produce any admissible evidence supporting her products liability-based causes of action against Defendant Elite Metal Performance.

**II. ARGUMENT**

69

Plaintiff's request for an amended scheduling order should be denied not only because 1) the Plaintiff has failed to make any showing of good cause and is purposed solely to circumvent the motions timely filed by this Defendant; 2) such extension would substantially and unfairly prejudice Defendant Elite Metal Performance in the defense of this case; and 3) Plaintiff's motion presents an absolute lack of timeliness and failure to comply with both the local rules of this Court and the Federal Rules of Civil Procedure.

Plaintiff presents two justifications as "good cause" for an ex-post-facto extension of her deadline to name an expert, the first of which is that counsel's ability to comply with the amended scheduling order and timely name an expert was impeded by Hurricane Matthew.  Given the timeline of the amended scheduling order, the fact that the Plaintiff's deadline to identify an expert and satisfy the requirements of Fed. R. Civ. P. 26(a)(2) ran more than two months prior to any emergency or threat posed by Hurricane Matthew came to fruition, and the Plaintiff's failure to raise this concern until after Defendant Elite Metal Performance had filed its Motions (based in part on Plaintiff's failure to identify an expert), it appears clear that the Plaintiff's use of these emergent circumstances is disingenuous at best.

Plaintiff's second "good cause" justification is explicitly improper and unfair to Defendant Elite Metal Performance:  she wishes to address "strategic changes related to the one remaining Defendant, Elite Metal Performance" by being permitted to identify an expert by November 11, 2016.  Where Defendant Elite Metal Performance has reasonably and properly relied upon the discovery produced, or more importantly, not produced by the Plaintiff in the formulation of its defense, it would be gravely prejudiced and unfairly impaired if the Plaintiff is given leave to ignore the procedural rules applicable and adhered to by all parties to date and circumvent the very basis of Defendant Elite Metal Performance's motions.  Since August 3, 2016, the Plaintiff's deadline to identify an expert and provide notice or reports pursuant to Fed. R. Civ. P. 26(a)(2), Defendant Elite

70

Metal Performance has made numerous tactical decisions and gone to great expense to prepare a defense based upon the allegations and evidence presented by the Plaintiff. The Plaintiff's requested extension serves only do deny Elite Metal Performance of its rightful reliance on these representations and hamstring it into defending against a completely different "strategy" now that the other two named Defendants have been removed from this case.

## IV. CONCLUSION

Accordingly, Defendant Elite Metal Performance opposes the Plaintiff's Motion for an Amended Scheduling Order, would move this Court to deny the Plaintiff's Motion, and requests that this Court hear its Motion in Limine and Motion for Summary Judgment pending before the Court, both of which are predicated upon the matter of Plaintiff's failure to comply with the procedural rules of this Court and the Court's Scheduling Order. Further, Defendant Elite Metal Performance requests oral argument in support of this response.

**BRAITHWAITE TIMMERMAN, LLC**

BY:  s/ Taylor S. Braithwaite
Taylor S. Braithwaite, Fed Bar No. 12219
Robin A. Braithwaite, Fed Bar No. 1449
Counsel for Defendant Elite Metal
Performance, LLC

Aiken, South Carolina                                  Post Office Box 324
November 6, 2016                                        Aiken, South Carolina 29802-0324
                                                       (803)649-4144

71

RECEIVED
USDC CLERK, CHARLESTON, SC

2016 NOV 10   AM 9: 09

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

D'Jaris A. Moore,                                    )
                                                     )
            Plaintiff,                               )        Case No. 9:16-cv- 318-RMG
                                                     )
        vs.                                          )
                                                     )
Robert W. Murphy, Elite Metal                        )
Performance, LLC, and Car Shop                       )        **ORDER**
Trailer Sales, LLC d/b/a Best Price                  )
Trailers,                                            )
                                                     )
                                                     )
_____)

This matter comes before the Court on Plaintiff's motion to amend a scheduling order to allow Plaintiff additional time to name an expert witness and to submit the affidavits of records custodians.  By way of background, this action was removed from the Jasper County Court of Common Pleas on February 2, 2016.  The claim arises out of injuries suffered by Plaintiff when the wheel of a tow dolly owned by Defendant Murphy allegedly separated from the tow dolly on Interstate 95 in Jasper County on June 9, 2015 and struck Plaintiff.  Plaintiff asserted claims of negligence against Defendant Murphy and products defect claims against Defendants Best Price Trailers ("Best Price") and Elite Mental Performance LLC ("Elite").  (Dkt. No. 1-1).  Defendants Best Price and Elite were alleged to have distributed, sold and/or manufactured the allegedly defective product.  (*Id.* at ¶ 17).

A scheduling order was issued on February 5, 2016 requiring Plaintiff to identify her expert and provide an expert report by June 3, 2016.  The scheduling order further placed a deadline of July 11, 2016 for the submission of affidavits of records custodians.  (Dkt. No. 5).

-1-

72

An amended scheduling order was issued by the Court on June 2, 2016 following a joint motion of all parties. (Dkt. Nos. 30, 33). The amended scheduling order required plaintiff to identify her expert and to produce an expert report by August 3, 2016 and to file affidavits of records custodians by September 2, 2016.

Plaintiff failed to identify any expert witness to support its product defect claims by the August 3, 2016 deadline. Defendant Elite filed a motion for summary judgment on October 26, 2016, arguing that Plaintiff had failed to identify any expert witness by the deadline of the scheduling order or any specific defect in the design or manufacture of the allegedly defective product. (Dkt. No. 38-1). The remaining Defendants reached a settlement with Plaintiff in a November 2, 2016 mediation. (Dkt. No. 40).

Plaintiff filed the instant motion to allow a second amended scheduling order on November 4, 2016, advising the Court that Plaintiff's counsel was evacuated from her home October 5-12, 2016 due to Hurricane Matthew. Plaintiff's counsel also mentioned unspecified "strategic changes" as providing a basis for the amended scheduling order. (*Id.*). Plaintiff requested an extension until November 11, 2016 to identify an expert and until December 23, 2016 to file affidavits of records custodians. Defendant Elite opposed the motion for a second amended scheduling order, noting that the deadline for identifying experts expired on August 3, 2016, more than two months before Hurricane Matthew. (Dkt. No. 41). Defendant Elite argued that Plaintiff failed to demonstrate "good cause" for any further modification of the scheduling order. Defendant Elite also argued that it had incurred substantial expense in the defense of this case and the motion for summary judgment, and it would suffer prejudice if an additional extension were allowed.

-2-

73

A scheduling order may be "modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The explanation provided by Plaintiff's counsel bears no resemblance to "good cause" since the allegedly disrupting event, a hurricane, occurred two months *after* the deadline for identifying expert witnesses had expired and subsequent to Defendant Elite filing its motion for summary judgment. Further, Plaintiff has offered no reasonable explanation why affidavits of records custodians relating to documents in existence as of the date of the deadline of September 2, 2016 were not timely filed. The Court finds that Plaintiff has failed to demonstrate "good cause" for the modification of the amended scheduling order, and Plaintiff's motion (Dkt. No. 40) is, therefore, denied.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Judge

November 9, 2016
Charleston, South Carolina

-3-

74

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF D'JARIS A. MOORE'S** |
| | ) | **RESPONSE TO DEFENDANT'S MOTION** |
| ROBERT W. MURPHY, ELITE | ) | **IN LIMINE** |
| METAL PERFORMANCE, LLC | ) | |
| CAR SHOP TRAILER SERVICES, | ) | |
| LLC d/b/a BEST PRICE TRAILERS | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF D'JARIS A. MOORE'S RESPONSE TO DEFENDANT ELITE METAL
PERFORMANCE, LLC'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF
ROBIN HANGER, OWNER OF DEFENDANT CAR SHOP TRAILER SALES, LLC**

**COMES NOW** Plaintiff D'Jaris A. Moore (hereinafter "Ms. Moore"), by and through

her undersigned attorney and files her response to Defendant Elite Metal Performance, LLC's

(hereinafter "Defendant") Motion in Limine.

## I. INTRODUCTION

Defendant's Motion in Limine seeks to exclude certain testimony of Robin Hanger,

Owner of Defendant Car Shop Trailer Sales, LLC (hereinafter "Mr. Hanger"). To the extent that

Defendant claims certain testimony of Mr. Hanger's exceed the scope of admissible lay

testimony, Defendant can lodge objections at trial.

1

75

## II. STATEMENT OF FACTS

On June 9, 2015, Ms. Moore was driving her vehicle southbound on I- 95 in Hardeeville, South Carolina.  At the same time, Defendant Robert W. Murphy (hereinafter, "Mr. Murphy"). was traveling northbound on I-95 in his Recreational Vehicle (RV) which was towing a brand new tow dolly,[1] manufactured by Defendant, containing a Ford Explorer and a Motorcycle. As is specifically stated in the South Carolina Traffic Collision Report[2], "Unit 3 (Mr. Murphy) was traveling north on Jasper Highway when the wheel came off the trailer it was towing." "The wheel from Unit 3 crossed the median and collided with Units 1 (Ms. Moore) and 2" (another driver who was uninjured). The Officer concluded by stating "[T]the wheel struck Unit 2 on the driver's side then collided with the hood and windshield of Unit 1."  Mr. Murphy stopped along the side of the road to inspect the tow dolly and discovered that it was missing a wheel.[3] Ms. Moore, who suffered both immediate and long-term injuries when the wheel struck the windshield and roof of her vehicle, was taken to Coastal Carolina Hospital via ambulance.[4]

The subject tow dolly was manufactured by the Defendant in Mooresville, North Carolina. Through a contractual agreement, Defendant sold the tow dolly to Robin Hanger (hereinafter "Mr. Hanger") owner of Defendant Car Shop Trailer Sales, LLC (hereinafter "Car Shop") a dealer/distributor in Holly Hill, Florida.  In turn, Car shop sold the tow dolly to a third party, Mr. Murphy. As was the custom, after manufacture, the tow dolly was transported from Mooresville, N.C to Holly Hill, Florida via a transport company as contracted by the parties.

---

[1] A tow dolly is a two-wheeled non-motorized vehicle which is towed by a motorized vehicle, such as an RV, and is designed specifically to transport other motorized vehicles. The front wheels of the motorized vehicle to be towed are mounted on the tow dolly, while the other two wheels stay on the ground.
[2] Exhibit 1: South Carolina Traffic Collision Report Form, Hardeeville Police Department.
[3] Interrogatory Responses of Robert W. Murphy.
[4] Complaint.

2

76

On June 4, 2015, after the brand new tow dolly was received by Car Shop, it was discovered that it had incurred a broken fender bolt in transport. The repair was considered "minor" and Car Shop, as permitted, replaced the fender bolt, without ever having to remove the wheel.[5] The fender bolt replacement itself in no way impacted the wheel coming off the tow dolly.[6] Just days later, Mr. Murphy purchased his new tow dolly from Car Shop and on June 9, 2015, he attached it to his RV and headed from his home on his ill-fated trip to Charleston, S.C.

It is uncontested that the wheel and hub were not recovered after the wreck. However, in the hours directly after the wreck, Mr. Murphy took a photograph of the remaining axel and spindle and sent it via e-mail to Mr. Hanger.[7] When Mr. Hanger saw the picture taken by Mr. Murphy, he could immediately discern that both the wheel and hub were missing and that there had been a manufacturing defect causing the same. Moreover, in deposition testimony, Ryan Gouveia, who is in charge of quality control ("QC") for Defendant, clearly stated in response to questioning as to the failure of wheel and hub components, "[T]hat's out of my expertise level." [8]

### III. STANDARD

The purpose of a motion in limine is to obtain preliminary ruling on the admissibility of a particular evidentiary matter. Luce v. United States, 469 U.S. 38, 41(1984). A Court will exclude evidence in response to a motion in limine only if the evidence is "clearly inadmissible for any purpose." Wickersham v. Ford Motor Co., 2016 U.S. Dist. LEXIS 89064 (D.S.C. 2016). Lastly, a motion in limine should not be used to resolve factual disputes or weigh evidence as that is the exclusive province of the jury. Tompkins v. Eckerd, 2011 U.S. Dist. LEXIS 112214 (D.S.C., 2011).

---

[5] Deposition of Robin Hanger, Car Shop Trailer Sales, LLC, 57:7-12.
[6] Deposition Testimony of Walter Gouveia, Elite Metal Performance, LLC, 33:11-16.
[7] Deposition Testimony of Robin Hanger, Car Shop Trailer Sales, LLC, 120:1-12.
[8] Deposition Testimony of Ryan Gouveia, Elite Metal Performance, LLC, 39:2-11.

3

## IV. ARGUMENT

**A.    Defendant's Motion in Limine is Broad and Unspecific and does not Identify the Evidence it Seeks to Exclude.**

Motions in limine which seek to exclude broad and unspecific categories of evidence are generally disfavored.  Id. citing Sperberg v. Goodyear Tire and Rubber Co., 519 F. 2d 708, 712 (6th. Cir. 1975).  Courts have acknowledged that it "is almost always better situated during actual trial to assess the value and utility of evidence." Id. citing  Wilkins v. K-Mart Corp., 487 Supp. 2d 1216, 1218 (D. Kan. 2007).  Therefore, when weighing a determination on a motion in limine, it is "a better practice  to deal with questions of admissibility of evidence as they arise [in actual trial]." Sperberg at 712. As held in Mattison v. Dallas Carrier Corp., 947 F. 2d 95, 110 (4th. Cir. 1991) testimony need only be based on an observation made by the witness which serves to explain his testimony, more specifically what the witness claims he personally observed as a product of his senses.

Here, all of Defendant's arguments in its motion in limine seek to exclude Mr. Hanger's "opinions and conclusions" related to the wheel detachment and subsequent wreck which forms the basis of this action.  Defendant does not specify with any particularity which "opinions or conclusions" it believes should be excluded, rather it paints with a broad brush across an entire spectrum of testimony.  Further, the Defendant offers no reasons to support the contention that the "opinions and conclusions" Mr. Hanger should be excluded as "speculative."  In direct opposition to Defendant's untenable position, Ms. Moore points out that Mr. Hanger's opinions are a product of his senses, a photograph taken by Mr. Murphy after the wreck and sent to him via e-mail which shows the axel of the tow dolly with no wheel or hub.

Defendant is asking this Court to exclude any of Mr. Hanger's "opinions and conclusions" from trial as inadmissible under any Federal Rule of Evidence without any

4

78

citations of law. Additionally, Defendant has reminded the Court as to the requirements for expert testimony as set forth in Fed. R. Evid. 702 and the holdings in Daubert v. Dow Pharmaceuticals, Inc., 43 F. 3d 1311 (9th. Cir. 1995) even though Plaintiff has not named Mr. Hanger as an expert witness under Fed. R. Civ. P 26(a)(2). In his Daubert analysis, Defendant states that "Mr. Hanger's opinions and conclusions are derived not from a tactile or visual inspection of the subject matter of his testimony (the spindle and wheel assembly) but simply from viewing a photograph…" The photograph taken by Mr. Murphy was of the exact assembly in its damaged condition, minus the wheel and hub, after the wreck. Ms. Moore contends that Mr. Hanger's visual inspection of said photograph is none the less a visual inspection, capable of supporting the fact that the wheel came of the axel of the tow dolly, leaving behind it a trail of battered components which speak for themselves.

**B.    Mr. Hanger's Testimony, as Owner of Defendant Car Shop Trailer Sales, is Admissible under Fed. R. Evid. 701 as Opinion Testimony by a Lay Witness.**

    Defendant asserts that Mr. Hanger's lay testimony in this matter should be excluded as impermissible as it may provide an "expert in lay witness clothing." Lay opinion testimony is permissible "so long as the testimony is based on an investigatory findings and conclusions and was not rooted exclusively in [his or her] expertise in the industry." United States v. Chapman, 209 F. App'x 253, 267 (4th. Cir. 2006). Additionally, "such opinion is admitted not because of experience, training or specialized knowledge within the realm of the expert, but because of the particularized knowledge that the witness has by virtue of his position in the business." Id. at 267. A witness, who is not testifying as an expert, may give an opinion under Fed. R. Evid. 701 as long as it is limited to testimony that is:

5

(a)  rationally related to the witness's perception;

(b)  helpful to clearly understand the witness's testimony or

determine a fact or issue; and

(c)  not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702.

Lastly, the failure to identify a witness as an expert does not preclude permitting them to provide testimony as a lay witness. Indem. Insurance Co. of N. Am. V. Am Eurocopter LLC, 2005 U.S. Dist. LEXIS 6994.  Importantly, Courts have permitted lay witness testimony as long as the foundation of familiarity is established. [9]

Here, Defendant as a manufacturer of tow dollies, had a contractual business relationship with Mr. Hanger who as its dealer/distributor  would purchase the tow dollies to in turn sell them to a third party.  After the entire wheel and hub came off Mr. Murphy's brand new tow dolly as he was driving on I-95, Mr. Murphy took a photograph of the remaining part of the axel that had previously held the wheel and hub which were never found. As a lay witness, Mr. Hanger can plainly assess the photograph to determine that the wheel of the brand new tow dolly had come off the axel as it requires no scientific, technical or otherwise specialized knowledge to make such assessment. Moreover, as owner of a business that sells tow dollies to third parties, Mr. Hanger is visually familiar with the proper components of the tow dolly in both their working and non-working condition.

C.     **Mr. Hanger's testimony, as Owner of Defendant Car Shop Trailer Sales, is admissible under Fed. R. Evid. 602.**

Under Fed. R. Evid. 602, a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Moreover,

---

[9] Rule 701 Opinion Testimony by Lay Witness: Committee Notes on Rules 2000: stating that permitting owner of business permitted to testify so long as a "foundation of familiarity" is established.

6

80

a party need not identify a witness as an expert so long as the witness played a personal role in the unfolding of the events at issue and only seeks the witness's knowledge of those events. Gomez v. Rivera Rodriguez, 344 F. 3d 103 (1st. Circ.)

There is little doubt that Mr. Hanger, as owner of Defendant Car Shop Trailer Sales, LLC and seller of the tow dolly to Mr. Murphy, played a personal role in the unfolding of the events at issue. His business records indicate the worthiness of the brand new tow dolly that was sold to Mr. Murphy and the photograph sent to him after the wreck which clearly showed the condition of the tow dolly, minus the wheel and hub and the damage to the remaining components.

### D.     Mr. Hanger's Testimony as Owner of Defendant Car Shop Trailer Sales, is Relevant and Therefore Not Subject to Exclusion by a Motion in Limine.

Relevant evidence is defined under the Federal Rules of Evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of a consequence in determining the action." Fed R. Evid. 401(a)-(b).  Under, Fed. R. Evid. 403, the court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The only claim Defendant makes under Fed. R. Evid. 403 is of the potential for unfair prejudice should Mr. Hanger be allowed to testify due to Defendant's inability to prepare for an effective cross examination and potentially arrange for expert testimony from other witnesses. However, Defendant's Counsel was present at the deposition of Mr. Hanger, had the opportunity to depose Mr. Hanger and knows precisely what Mr. Hanger testified to as related to causation in this matter so there is ample ability to prepare for cross examination.  As there exists no claim for confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly

7

presenting cumulative evidence, the probative value of Mr. Hanger's testimony as to causation far outweighs any potential prejudice to the Defendant and should not be excluded.

Lastly, Ms. Moore points out that within both the Joint Local Rule 26.03 Report (Doc. No. 20) as well as in her individual responses to the Local Rule 26.01 Interrogatories (Doc. No. 22) she expressly contemplated that designees of Defendant Car Shop, such as Mr. Hanger, would be called as a fact witness in the trial of this matter.

## V. CONCLUSION

In its motion in Limine, Defendant seeks to exclude broad and unspecific categories of testimony from Mr. Hanger and has also provided the court with a false choice stating that Mr. Hanger's testimony should be inadmissible both as a lay expert and expert witness. Mr. Hanger's testimony is proper under Fed R. Evid. 602 and 701 as he played a personal role in the unfolding of the event at hand. Lastly, Mr. Hanger's testimony is relevant and its probative value far outweighs the danger for unfair prejudice. For all of the foregoing reasons, Ms. Moore respectfully requests the Defendant's motion in limine be DENIED.

/s/ Daphne S. Withrow
Daphne S. Withrow
South Carolina Bar No. 102117;
Federal Court I.D. No. 12151
WEST OLIVETTI, LLC
2 Corpus Christi; Suite 105
Hilton Head, SC 29928
P-(843) 341-9260
F-(843) 341-9261

Attorney for Plaintiff

November 14, 2016

8

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

D'JARIS A. MOORE,                              )        Case No.: 9:16-cv-318-RMG
                                               )
                    Plaintiff,                 )
                                               )
v.                                             )   **PLAINTIFF'S RESPONSE TO**
                                               )   **DEFENDANT ELITE METAL PERFORMANCE,**
ROBERT W. MURPHY, ELITE                        )   **LLC'S MOTION IN LIMINE**
METAL PERFORMANCE, LLC                         )
CAR SHOP TRAILER SERVICES,                     )
LLC d/b/a BEST PRICE TRAILERS                  )
                                               )
                                               )
                    Defendants.                )

---

        This is to certify that I, Daphne S. Withrow, have this day served a true and correct copy

of the within and foregoing Plaintiff's Response to Defendant Elite Metal Performance, LLC's

Motion in Limine upon counsel of record listed below by sending via electronic mail.

Via E-mail:
Taylor S. Braithwaite, Esq. Fed. Bar No. 12219
Robin S. Braithwaite, Esq. Fed Bar No. 1449
taylor@bfbtlaw.com
Braithwaite Timmerman, LLC
(803) 649-4144
Attorneys for Elite Metal Performance, LLC

                                               Daphne S. Withrow, Esq.
                                               South Carolina Bar No. 102117;
                                               Federal Court I.D. No. 12151
                                               WEST OLIVETTI, LLC
                                               2 Corpus Christi; Suite 105
This 14th day of November, 2016                Hilton Head, SC 29928
                                               (843) 341-9260
                                               Attorney for Plaintiff

83

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

### BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF D'JARIS A. MOORE'S** |
| | ) | **RESPONSE TO SUMMARY JUDGMENT** |
| ROBERT W. MURPHY, ELITE | ) | |
| METAL PERFORMANCE, LLC | ) | |
| CAR SHOP TRAILER SERVICES, | ) | |
| LLC d/b/a BEST PRICE TRAILERS | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF D'JARIS A. MOORE'S RESPONSE TO DEFENDANT ELITE METAL
PERFORMANCE'S MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Plaintiff D'Jaris A. Moore (hereinafter "Ms. Moore"), by and through

her undersigned attorney and files this Response to Defendant Elite Metal Performance, LLC's

(hereinafter "Defendant") Motion for Summary Judgment and shows this honorable Court as

follows:

## I. INTRODUCTION

Defendant is asking this Court to adjudicate this matter by Summary Judgment alleging

that there is no genuine issue of material fact. Defendant's position is wholly untenable as there

exists ample evidence upon which a jury could find in favor of Ms. Moore and thus the very

drastic remedy of Summary Judgment is not appropriate and Defendant's motion should be

denied.

1

84

## II. BACKGROUND

On June 9, 2015, Ms. Moore was driving her vehicle southbound on I-95 in Hardeeville, South Carolina. At the same time, Defendant Robert W. Murphy (hereinafter, "Mr. Murphy"). was traveling northbound on I-95 in his Recreational Vehicle (RV) which was towing a brand new tow dolly,[1] manufactured by Defendant, containing a Ford Explorer and a Motorcycle. As is specifically stated in the South Carolina Traffic Collision Report[2], "Unit 3 (Mr. Murphy) was traveling north on Jasper Highway when the wheel came off the trailer it was towing." "The wheel from Unit 3 crossed the median and collided with Units 1 (Ms. Moore) and 2" (another driver who was uninjured). The Officer concluded by stating "[T]the wheel struck Unit 2 on the driver's side then collided with the hood and windshield of Unit 1." Mr. Murphy stopped along the side of the road to inspect the tow dolly and discovered that it was missing a wheel.[3] Ms. Moore, who suffered both immediate and long-term injuries when the wheel struck the windshield and roof of her vehicle, was taken to Coastal Carolina Hospital via ambulance.[4]

The subject tow dolly was manufactured by the Defendant in Mooresville, North Carolina. Through a contractual agreement, Defendant sold the tow dolly to Robin Hanger (hereinafter "Mr. Hanger") owner of Defendant Car Shop Trailer Sales, LLC (hereinafter "Car Shop") a dealer/distributor in Holly Hill, Florida. In turn, Car shop sold the tow dolly to a third party, Mr. Murphy. As was the custom, after manufacture, the tow dolly was transported from Mooresville, N.C to Holly Hill, Florida via a transport company as contracted by the parties.

---

[1] A tow dolly is a two-wheeled non-motorized vehicle which is towed by a motorized vehicle, such as an RV, and is designed specifically to transport other motorized vehicles. The front wheels of the motorized vehicle to be towed are mounted on the tow dolly, while the other two wheels stay on the ground.
[2] Exhibit 1: South Carolina Traffic Collision Report Form, Hardeeville Police Department.
[3] Interrogatory Responses of Robert W. Murphy.
[4] Complaint

2

85

On June 4, 2015, after the brand new tow dolly was received by Car Shop, it was discovered that it had incurred a broken fender bolt in transport. The repair was considered "minor" and Car Shop, as permitted, replaced the fender bolt, without ever having to remove the wheel.[5] The fender bolt replacement itself in no way impacted the wheel coming off the tow dolly.[6] Just days later, Mr. Murphy purchased his new tow dolly from Car Shop and on June 9, 2015, he attached it to his RV and headed from his home on his ill-fated trip to Charleston, S.C.

It is uncontested that the wheel and hub were not recovered after the wreck. However, in the hours directly after the wreck, Mr. Murphy took a photograph of the remaining axel and spindle and sent it via e-mail to Mr. Hanger.[7] When Mr. Hanger saw the picture taken by Mr. Murphy, he could immediately discern that both the wheel and hub were missing and that there had been a manufacturing defect causing the same. Moreover, in deposition testimony, Ryan Gouveia, who is in charge of quality control ("QC") for Defendant, clearly stated in response to questioning as to the failure of wheel and hub components, "[T]hat's out of my expertise level."[8]

### III. STANDARD

Pursuant to Fed R. Civ. P. 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." If the evidence as a whole is susceptible to more than one reasonable inference, a jury issue is created and a motion for summary judgment as a matter of law should be denied. Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489-490 (4th. Cir. 2005). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.

---

[5] Deposition of Robin Hanger, Car Shop Trailer Sales, LLC, 57:7-12.
[6] Deposition Testimony of Walter Gouveia, Elite Metal Performance, LLC, 33:11-16.
[7] Deposition Testimony of Robin Hanger, Car Shop Trailer Sales, LLC, 120:1-12.
[8] Deposition Testimony of Ryan Gouveia, Elite Metal Performance, LLC, 39:2-11.

Reyazuddin v. Montgomery Cty., Md., 789 F 3d 407, 413 (4th. Cir. 2015). The court "cannot weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F. 3d 562, 569 (4th. Cir. 2015). Only when it is perfectly clear that there are no issues in the case is summary judgement proper. Pierce v. Ford Motor Co., 190 F. 2d, 1951 U.S. App. LEXIS 2513. This axiom is true even when there exists no dispute as to the evidentiary facts in the case but only as to the conclusions drawn therefrom. Id. In a Federal Court, it is for the jury, not the judge to say what evidence it will believe and what inferences or conclusions it will draw therefrom, even though it is susceptible of conflicting inferences. Id. Lastly, if the court finds evidence sufficient to sustain for strict product liability, it naturally follows that the action based on warranty should survive summary judgment. Livingston v. Noland Corp., 293 S.C. 521, 362 S.E. 2d 16, 18 (S.C. 1987).

## IV. ARGUMENT

Defendant has moved for summary judgment arguing: (1) Ms. Moore is not a third party beneficiary under either Florida or North Carolina Commercial Code relative to the contracts in this matter; (2) that discovery has failed to yield direct or circumstantial evidence from which negligence or defect as proximate cause of the wheel detachment. As shown by the following, the Defendant's arguments fail as a matter of law as there is genuine issue of material fact and ample evidence for the jury to find in favor of Ms. Moore.

### A.    Ms. Moore is entitled to a Breach of Warranty Claim under South Carolina Commercial Code Ann. §36-2-18.

Defendant asserts that Ms. Moore is not entitled to state a cause of action under S.C. Code Ann. §36-2-18 for breach of warranty which extends the manufacturer's express or implied warranties to "any natural person who may be expected to use, consume or be affected by the goods and whose person or property is damaged by the breach of the warranty." Generally,

4

87

failure of a product to work as expected is an inference of breach of warranty. Southeastern PVC
Pipe Mfg. v. Rothrock Constr. Co., 313 S.E. 2d 50, 52 (S.C. 1984).

Defendant's flawed reasoning is that a breach of warranty claim sounds in contract, not
tort, and as the underlying contract relative to the manufacture and sale of the subject tow dolly
occurred between the Defendant, a North Carolina manufacturer, and Defendant Car Shop, a
Florida distributor/dealer, the substantive law of either state should apply.  Conveniently, both
North Carolina and Florida have enacted a "Third Party Beneficiary of Warranties" which
specifically limits beneficiaries under this claim to "families, households, household guests,
employees and agents of a products buyer."  If this were the case, as Defendant incorrectly
claims, Ms. Moore would be precluded from making her claim for breach of warranty in this
action.

What Defendant has misconstrued is that this Federal Court, sitting in diversity, is guided
by the Erie doctrine which dictates that a Court sitting in diversity must apply the substantive law
of the state.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-80 (1938).  Application of the
substantive law as to the place where the contract was formed is only applicable where there is
an issue as it relates to the contract's formation, interpretation or validity. Witt v. American
Trucking Assn., Inc., 860 F. Supp. 295, 300 (D.S.C. 1994) citing O'Briant v. Daniel Constr. Co.,
279 S.C. 254, 305 S.E. 2d 241, 243 (1983).  That is not the case here. Additionally, the law of
the place governs when contract performance is at issue.  Livingston v. Atlantic Coast Line R.R.
Co., 176 S.C. 385, 180 S.E. 343, 345 (1935). Contract performance is not the issue here. As was
held in Pierce v. Ford Motor Co., it has long been discredited and found unduly restrictive to find
that a manufacturer would have obligation under a breach of warranty claim only to those in
privity of contract. 190 F. 2d, 1951 U.S. App. LEXIS 2513.

5

88

Ms. Moore contends further that there are also due process considerations in determining which state law applies. In order for a state's substantive law to apply, in a "constitutionally permissible manner," there must exist either a significant contact or aggregation of contacts to provide that the "choice of law is not arbitrary nor fundamentally unfair." Allstate Ins. v. Hague, 449 U.S. 302, (1981). Both the U.S. Supreme Court and this Court have held that a crash constituted a single contact which was sufficient to apply the law of the state where the crash occurred. Thornton v. Cessna Aircraft Co., 886 F. 2d 89, 85-90.

Defendant also argues in its "Factual Summary" that because no portion of the stream of commerce occurred within the State of South Carolina, there exists a choice of law conflict. This is not a valid argument. However, in the event that stream of commerce was a proper issue in this matter, the fact that the Defendant and Car Shop's contractual relationship clearly involved transport of tow dollies from Mooresville, North Carolina to Holly Hill, Florida. Ms. Moore would respectfully request that the Court take judicial notice, under Fed. R. Evid. 201, of the fact that the shortest geographical distance between those two points is directly through the State of South Carolina.[9] Moreover, it is reasonably foreseeable that Defendant, as manufacturer of tow dollies, with dealers located throughout the country, would certainly enter the stream of commerce in South Carolina which is precisely what happened here.

There is no issue here of contract formation, interpretation, validity or performance, therefore, there is no conflict of laws and the substantive law of South Carolina should control Ms. Moore's breach of warranty claim under S.C. Code Ann. §36-2-18. As a "natural person" affected by the goods manufactured by the Defendant, Ms. Moore has a proper claim for breach

---

[9] Federal Rule of Evidence 201 states in relevant part: a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial district of the trial court or (2) capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned.

of warranty with no need to show privity of contract. Additionally, as the situs of the wreck is in South Carolina, the single contact sufficient to supply the law of the place is duly satisfied.

    **B.**    **Discovery has provided both direct and circumstantial evidence from which negligence and product manufacturing defect can be established and provides proximate cause for the wheel and hub detachment, wreck and resultant injuries to Ms. Moore.**

Under South Carolina law, a plaintiff may bring a products liability claim under negligence, strict liability and breach of warranty. Miles v. DESA Heating, LLC, 2012 U.S. Dist. LEXIS 45433. Regardless of the theory put forth by the plaintiff, she must show the following elements: "(1) that he was injured by the product; (2) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant; and that the injury occurred because the product was in a defective condition unreasonably dangerous to the user." Id. at 8.

    **1.**    **Ms. Moore is not required to produce expert testimony in order to prevail.**

If the admissible evidence is sufficient to meet the burden of proof, South Carolina jurisprudence does not always require that a plaintiff present expert testimony in a manufacturing defect case. Morris v. Dorma Automatics, Inc., 2013 U.S. Dist. LEXIS 7864. It is a well-established general rule that expert testimony is only required when the "subject of the inference is so particularly related to some science as to be out of the ken of an average lay person." Virgil v. "Kash N' Karry" Service Corp., 61 Md. App. 23 (1984). In Virgil, the court held that expert testimony was "hardly necessary to establish that thermos bottles which explode or implode when coffee and milk are poured into it are defective." Id.

7

90

The case at bar is remarkably similar to Virgil as there exists a common corollary that widely used, everyday products sold to consumers such as tires and wheels do not routinely come off absent the existence of a defect.  Additionally, the Virgil Court, citing Heaton v. Ford Motor Co., 435 P. 2d 806 (1967), held that when a product fails to meet the reasonable expectation of the user, "the inference is that there was some sort of defect, a precise definition of which is unnecessary." Unlike this action where there exists direct evidence of a manufacturing defect, there is no  circumstantial evidence required to prove what sort of manufacturing flaw existed and Ms. Moore may recover by proving that the product did not perform in keeping with the reasonable expectation of the user. Id.  In Graves v. CAS, 2012 S.C. LEXIS 179, the South Carolina Supreme Court held that "[U]nless it is patently obvious that the accident would not have happened in the absence of a defect, a plaintiff cannot rely merely on the fact that the accident occurred." Citing Burley v. Kytec Innovation Sports Equip.Inc., 737 N.W. 2d 397, 407 (S.D.2007).  Moreover, as held in Graves, it is patently obvious here that a wheel would not have come off of a brand new tow dolly absent a manufacturing defect.

Defendant, as a manufacturer of tow dollies which are specifically designed to hold heavy items for transport such as cars and motorcycles behind recreational vehicles, owes the public a duty, irrespective of contract, to use reasonable care in manufacture and to make reasonable inspection of construction. This is the cornerstone of S.C. Code Ann. §36-2-18.  In evaluating whether summary judgment was proper in Pierce v. Ford Motor Company, without invoking res ipsa loquitor, the court held that as to the issue of negligence a jury could have found that a component of a vehicle was loose when it left the factory and therefore the cause of the wreck.  The decision in Pierce was based solely on the fact that the vehicle had been purchased only two weeks previous and had less than 900 miles on it at the time of the wreck.

8

Similarly here, the brand new tow dolly in question had been in the custody of Car Shop for a couple days before it was sold to Mr. Murphy who had it for only four days before he began his ill-fated trip in which it is patently obvious that a wheel come off.  Without expert testimony or any basis in fact, Defendant alleges that since the tow dolly had traveled nearly 1,000 miles at the time of the wreck, it would appear "less likely than not" that there existed an issue from manufacture.  Defendant's theory is speculative, conclusory and should not be permitted as a basis to argue in summary judgment.

Even if this evidence were considered circumstantial and thus admissible, the question of the sufficiency of evidence such that a causal connection can be supported, this Court has held that there must be evidence of a "reasonable and rational nature" upon which a jury can make an inference. Lorhmann v. Pittsburgh Corning Corp., 782 F. 2d 1156 (1986) citing Ford Motor Co. v. McDaniel, 259 F. 2d 261 (4th Cir. 1958).

Ms. Moore was clearly injured by the wheel which came off the brand new tow dolly manufactured by the Defendant which struck her vehicle as she was traveling on I-95.  At the time of the wreck, the product was essentially in the same condition as when it left the hands of defendant, and the injury to Ms. Moore occurred because the brand new tow dolly was in a defective condition.  It is both reasonable and rational to conclude, without invoking *res ipsa loquitor*, that absent a defect in the manufacturing of the brand new tow dolly, the wheel would not have spontaneous come off, flown across the highway median and strike Ms. Moore, causing her permanent injury.

92

2.    **Lay and Expert opinion supports manufacturing defect as cause of the wheel separation which caused the wreck and resultant injuries to Ms. Moore.**

In Ms. Moore's response to Defendants Motion in Limine,[10] she has fully vetted her contentions relative to Defendant's claim for exclusion of Mr. Hanger's lay testimony.

In the alternative, out of an abundance of caution, should there be any question regarding the Defendant's wholly unsupported allegations that this wreck could not have occurred due to a manufacturing defect because the brand new tow dolly had nearly 1,000 miles on it at the time, Ms. Moore has provided an expert affidavit as contemplated under Fed. R. of Evid. 702.[11]  Mr. Glennon, who reviewed the exact same photograph as Mr. Hanger, testified that excluding all other possibilities, to a reasonable degree of scientific certainty, it is more probable than not that the hub failure was caused by improper installation of the hub assembly on the axel thus causing the bearings to have a metal on metal contact, resulting in the total lock up of the outer bearing and separation of the hub, brake, drum, wheel and tire from the trailer.[12]  Moreover, this bearing failure caused metal components on the axel to melt and deform and produced scoring of the same which is clearly visible in the photograph.[13]  Importantly, Mr. Glennon has opined that this sort of failure can commonly occur in the first *1,500 miles* after service.[14]

### V. CONCLUSION

There exists a genuine issue of material fact for determination by a jury as to whether the Defendant, as manufacturer of the subject tow dolly, breached an express or implied warranty under S.C. Code Ann. §36-2-18.  It is axiomatic that an action based on a breach of warranty should survive summary judgment. There exists both direct and circumstantial evidence of

---

[10] Document No. 44.
[11] Exhibit  2, Affidavit of John Glennon;
[12] Exhibit  2, Affidavit of John Glennon, ¶ 51;
[13] Exhibit  2, Affidavit of John Glennon, ¶ 41, ¶ 46;
[14] Exhibit  2, Affidavit of John Glennon, ¶ 50.

10

93

negligence and product manufacturing defect which provides proximate cause in this matter. The deposition testimony transcripts, pleadings and affidavit have clearly created a factual issue for a jury, therefore, summary judgment must be **DENIED.**

<u>/s/ Daphne S. Withrow</u>
Daphne S. Withrow
South Carolina Bar No. 102117;
Federal Court I.D. No. 12151
WEST OLIVETTI, LLC
2 Corpus Christi; Suite 105
Hilton Head, SC 29928
P-(843) 341-9260
F-(843) 341-9261

Attorney for Plaintiff

November 14, 2016

11

94

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S RESPONSE TO** |
| | ) | **DEFENDANT ELITE METAL PERFORMANCE,** |
| ROBERT W. MURPHY, ELITE | ) | **LLC'S MOTION FOR SUMMARY JUDGMENT** |
| METAL PERFORMANCE, LLC | ) | |
| CAR SHOP TRAILER SERVICES, | ) | |
| LLC d/b/a BEST PRICE TRAILERS | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

This is to certify that I, Daphne S. Withrow, have this day served a true and correct copy
of the within and foregoing Plaintiff's Response to Defendant Elite Metal Performance, LLC's
Motion for Summary Judgment upon counsel of record listed below by sending via electronic
mail.

Via E-mail:
Taylor S. Braithwaite, Esq. Fed. Bar No. 12219
Robin S. Braithwaite, Esq. Fed Bar No. 1449
taylor@bfbtlaw.com
Braithwaite Timmerman, LLC
(803) 649-4144
Attorneys for Elite Metal Performance, LLC

/s/ Daphne S. Withrow
Daphne S. Withrow, Esq.
South Carolina Bar No. 102117;
Federal Court I.D. No. 12151
WEST OLIVETTI, LLC
2 Corpus Christi; Suite 105
This 14th day of November, 2016
Hilton Head, SC 29928
(843) 341-9260
Attorney for Plaintiff

95

# EXHIBIT 1

ORIGINAL

STAPLE HERE    JUL 14 2015 HARDEEVILLE POLICE DEPARTMENT

**SOUTH CAROLINA**
**TRAFFIC COLLISION REPORT FORM**
TR-310    (Rev. 11/2011)

SOUTH CAROLINA REPORTS A USE USE ONLY    Page #    1

15019750

| Date | Time of Collision | County | Collision Location | In / Near City or Town of: |
|---|---|---|---|---|
| 06/09/2015 | 1830 | 27 | 05 / JASPER HWY | HARDEEVILLE |

Base Intersection (Rt. # / Name): From 461 MAIN STREET
Second Intersection (Rt. # / Name): Toward 141 / JOHN SMITH ROAD

**C - 574773**    Driver/Pedestrian's Full Name: MOORE -- DJARIS ANN

| Unit # | Sex | Race | | |
|---|---|---|---|---|
| 1 | F | B | | |

Street: 35 COLLETON RIVER DR
City, State, & Zip: BLUFFTON, SC 29910
DOC Birth Date: 04/19/1948
State: SC    Driver's License #: 101098335    Class: D    Insurance Company: STATE FARM
Year: 2002    Body: 4S    Vehicle Make: MERZ    License Plate #: EGY 213    VIN #: WDBNG75J02A292074
State: SC    Year: 2015    Owner's D.L. #: 101098335 (D)
Home Telephone: (813) 420-2550    Owner's Full Name: DJARIS ANN MOORE
Bus. Telephone: Street: 35 COLLETON RIVER DR
City, State, & Zip: BLUFFTON, SC 29910
Contributed To Collision: Yes (NO)    Speed Limit: 70    C.D.L. Req. Yes No    Yrd B Req: Yes No    Alc/Drg Info (see back): Yes No    Code Towed by: BUTLERS TOWING

**C - 574774**    Driver/Pedestrian's Full Name: BRAUN -- JEFFREY WILLIAM

| Unit # | Sex | Race | | |
|---|---|---|---|---|
| 2 | M | W | | |

Street: 1219 10TH STREET BLVD N WEST #E
City, State, & Zip: HICKORY, NC 28601
DOC Birth Date: 11/09/1967
State: NC    Driver's License #: 38230221    Class: C    Insurance Company: USAA
Year: 2008    Body: MP    Vehicle Make: FORD    VIN #: 1FMCU59H28KA65844
State: NC    Year: 2016    License Plate #: GBR 1691    Owner's D.L. #: 38230221 (C)
Home Telephone: (828) 460-3654    Owner's Full Name: JEFFREY WILLIAM BRAUN
Bus. Telephone: Street: 1219 10TH STREET BLVD N WEST #E
City, State, & Zip: HICKORY, NC 28601
Contributed To Collision: Yes (NO)    Speed Limit: 70    C.D.L. Req. Yes No    Yrd B Req: Yes No    Alc/Drg Info (see back): Yes No    Code Towed By: NA

**C - 574775**    Driver/Pedestrian's Full Name: MURPHY -- ROBERT WADE

| Unit # | Sex | Race | | |
|---|---|---|---|---|
| 3 | M | W | | |

Street: 800 KAY ROAD NE LOT 5014
City, State, & Zip: BRADENTON, FL 34212
DOC Birth Date: 01/14/1983
State: FL    Driver's License #: MG102750550140    Class: E    Insurance Company: ALLIED
Year: 2016    Body: NH    Vehicle Make: ALLG    License Plate #: 1785F6DYSE0A07888    VIN #:
State: FL    Year: 2015    License Plate #: DV2858F    Owner's D.L. #: M610750550140 (E)
Home Telephone: (703) 927-4570    Owner's Full Name: ROBERT WADE MURPHY
Bus. Telephone: Street: PMB 24507428 CHILDERS ST
City, State, & Zip: PENSACOLA, FL 32534
Contributed To Collision: Yes (NO)    Speed Limit: 70    C.D.L. Req. Yes No    Yrd B Req: Yes No    Alc/Drg Info (see back): Yes No    Code Towed By: NA

Dir. of Travel: Unit 1: N S E W   Unit 2: N S E W   Unit 3: N S E W

| Unit 1 Dam. | Unit 2 Dam. | Unit 3 Dam. | Prop. Dam. 1 | Prop. Dam. 2 |
|---|---|---|---|---|
| $ 4000.00 | $ 1000.00 | $ 2000.00 | $ | $ |



Not To Scale

**Describe What Happened (Refer to Units by Number):**
Unit 3 was traveling north on Jasper Hwy in lane 1, when the wheel came off the trailer it was towing. Unit 2 was traveling south on Jasper Hwy in lane 1, and behind him was Unit 2. The wheel from Unit 3 cross the median and collided with Units 1 and 2. The wheel struck Unit 2 on the driver side then collided with the hood and windshield of Unit 1. All parties issued a SC FR 10 Form with instructions.

NOTICE - THE TR-310 IS FOR STATISTICAL REPORTING PURPOSES ONLY AND IS A REFLECTION OF THE OFFICER'S BEST KNOWLEDGE, OPINION, AND BELIEF COVERING THE COLLISION, BUT NO WARRANTY IS MADE AS TO THE FACTUAL ACCURACY THEREOF.

| Investigating Officer's Name | Rank | Badge # | Jurisdiction Code | Review Date | | Rank | Internal Agency Code | |
|---|---|---|---|---|---|---|---|---|
| KELVIN GRANT | PFC | 510 | SC0270100 | 08/09/2015 | GERRY BROWN | SERGEAN | SC0270100 | 15-00761 |

Mail Flat - Do Not Fold, Crease or Mutilate
Mail To: SC Department of Motor Vehicles PO Box 1498 Blythewood, SC 29016

97

## HARDEEVILLE POLICE DEPARTMENT

| Unit | Date of Birth | Sex | Race | Seat | R/SO | A/D | Ejct | LAt | Trm | Name | Street Address | Zip Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/16/1946 | F | W | 01 | 13 | 41 | 1 | 1 | 1 | MOORE – DJARIS ANN | 38 COLLETON RIVER DR, BLUFFTON SC | 29910 |
| 2 | 11/08/1967 | M | W | 01 | 13 | 41 | 1 | 2 | 1 | BRAUN – JEFFREY WILLIAM | 1210 10TH STREET BLVD N WEST #E, HICKORY | 28601 |
| 2 | 11/12/2006 | FA | W | 07 | 13 | 41 | 1 | 2 | 1 | BRAUN – RYAN | 1210 10TH STREET BLVD N WEST #E, HICKORY | 28601 |
| 2 | 12/17/2004 | M | W | 09 | 13 | 41 | 1 | 2 | 1 | BRAUN – WILL | 1210 10TH STREET BLVD N WEST #E, HICKORY | 28601 |
| 3 | 01/14/1953 | M | W | 01 | 13 | 41 | 1 | 1 | 1 | MURPHY – ROBERT WADE | PMB 24507428 CHILDERS ST, PENSACOLA FL | 32534 |
| 3 | 03/28/1963 | F | W | 03 | 13 | 41 | 1 | 2 | 1 | MURPHY – TAMMIE LOUISE | PMB 24507 428 CHILDERS STR., PENSACOLA | 32534 |



Mail To: SC Department of Motor Vehicles
PO Box 1498
Blythewood, SC 29016

Deposition of Robin David Hanger                                                    1

```
 1                        IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF SOUTH CAROLINA
 2                        BEAUFORT DIVISION

 3                        CIVIL ACTION NO:   9:16-CV-318RMG

 4      D'JARIS A. MOORE,

 5              Plaintiff,
        -vs-
 6
        ROBERT W. MURPHY, ELITE METAL
 7      PERFORMANCE, LLC, and CAR SHOP
        TRAILER SALES, LLC, d/b/a BEST
 8      PRICE TRAILERS,

 9              Defendants.
        _____/
10

11


12                  DEPOSITION OF ROBIN DAVID HANGER

13      (Noticed as Representative of Car Shop Trailer Sales, LLC)

14


15


16      DATE:                    Friday, August 19, 2016

17      TIME:                    9:50 a.m. until 1:29 p.m.

18      LOCATION:                Southern Reporting Company
                                 747 South Ridgewood Avenue
19                               Suite 107
                                 Daytona Beach, Florida
20
        REPORTED BY:             Lillybeth Hernandez
21                               Court Reporter
                                 Notary Public - State of Florida
22

23

24

25
```

Deposition of Robin David Hanger                                                    2

```
 1    APPEARANCES:

 2

 3          DAPHNE S. WITHROW, RN, ESQUIRE
            West Olivetti, LLC
 4          The Professional Building
            2 Corpus Christi Place, Suite 105
 5          Hilton Head Island, South Carolina   29938
            (843) 341-9260
 6          Daphne@westolivetti.com

 7          On behalf of the Plaintiff

 8

 9          L. DARBY PLEXICO, III, ESQUIRE    (Via Telephone)
            Brown & Brehmer, PA
            1720 Main Street, Suite 201
10          Columbia, South Carolina   29202
            (803) 771-6600
11
            On behalf of the Defendant, Robert W. Murphy
12

13          TAYLOR S. BRAITHWAITE, ESQUIRE
            Braithwaite Law Firm
14          759 Richland Avenue, West
            Aiken, South Carolina   29802
15          (803) 649-4144
            Taylor@bfbtlaw.com
16
            On behalf of the Defendant, Elite Metal Performance
17

18          J. RUFUS BRATTON, III, ESQUIRE
            Aiken, Bridges, Elliott, Tyler & Saleeby, PA
19          181 East Evans Street, Suite 409
            Florence, South Carolina   29506
20          (843) 669-8787

21          On behalf of the Defendant, Car Shop Trailer Sales

22

23    ALSO PRESENT:

24          D'Jaris A. Moore

25
```

**Southern Reporting Company (386)257-3663**

100

Deposition of Robin David Hanger                                                3

1                        I N D E X

2

3   TESTIMONY OF ROBIN DAVID HANGER

4           Direct Examination by Ms. Withrow                6
            Cross-Examination by Mr. Braithwaite           110
5           Cross-Examination by Mr. Plexico               134
            Redirect Examination by Ms. Withrow            139
6           Recross-Examination by Mr. Braithwaite         140
            Cross-Examination by Mr. Bratton               144
7
    CERTIFICATE OF OATH                                    148
8   CERTIFICATE OF REPORTER                                149

9

10

11

12

13

14                     E X H I B I T S

15  Plaintiff's Exhibit Number 1                          9
    Plaintiff's Exhibit Number 2                          16
16  Plaintiff's Exhibit Number 3                          27
    Plaintiff's Exhibit Number 4                          27
17  Plaintiff's Exhibit Number 5                          29
    Plaintiff's Exhibit Number 6                          31
18  Plaintiff's Exhibit Number 7                          33
    Plaintiff's Exhibit Number 8                          34
19  Plaintiff's Exhibit Number 9                          35
    Plaintiff's Exhibit Number 10                         35
20  Plaintiff's Exhibit Number 11                         35
    Plaintiff's Exhibit Number 12                         36
21  Plaintiff's Exhibit Number 13                         43
    Plaintiff's Exhibit Number 14                         45
22  Plaintiff's Exhibit Number 15                         52
    Plaintiff's Exhibit Number 16                         60
23  Plaintiff's Exhibit Number 17                         60
    Plaintiff's Exhibit Number 18                         66
24  Plaintiff's Exhibit Number 19                         66
    Plaintiff's Exhibit Number 20                         79

25

**Southern Reporting Company (386) 257-3663**

Deposition of Robin David Hanger                                    4

```
 1                     I N D E X
                      (Continued)
 2

 3

 4                  E X H I B I T S
                      (Continued)
 5
     Plaintiff's Exhibit Number 22                92
 6   Plaintiff's Exhibit Number 23                97
     Plaintiff's Exhibit Number 24                97
 7   Plaintiff's Exhibit Number 25               101
     Plaintiff's Exhibit Number 26               101
 8   Plaintiff's Exhibit Number 27               107
     Plaintiff's Exhibit Number 28               107
 9

10   Defendants' Exhibit Number 1               115
     Defendants' Exhibit Number 2               141
11

12

13

14

15

16

17

18              S T I P U L A T I O N

19       It is hereby stipulated and agreed by and

20   between counsel present at this deposition and by the

21   deponent that the witness review of this deposition would

22   be waived.

23

24

25
```

**Southern Reporting Company (386)257-3663**

102

Deposition of Robin David Hanger                                              5

```
 1    WHEREUPON,

 2                    ROBIN DAVID HANGER

 3    was called as a witness and, after having first been duly

 4    sworn, testified as follows:

 5                 (Whereupon, the witness responded to the oath

 6    as follows:)

 7                 THE WITNESS:  Yes, ma'am.

 8                 MS. WITHROW:  This will be the 30(b)(6)

 9         deposition of Robert Hanger as representative of

10         Car Shop Trailer Sales, LLC, doing business as

11         Best Price Trailers, taken by the Plaintiff in the

12         matter of D'Jaris A. Moore v. Robert W. Murphy,

13         Elite Metal Performance, LLC, and Car Shop Trailer

14         Sales, LLC, doing business as Best Price Trailers, a

15         case that's currently pending in the US District

16         Court, South Carolina, Beaufort Division.

17              This deposition is taken pursuant to notice and

18         agreement of counsel, and is to be used for all

19         purposes as allowed under the federal rules of civil

20         procedure, including the use at trial.

21              All objections, other than those relative to

22         the form of the question and the responsive answer,

23         please be reserved until such further use of this

24         deposition or at trial.

25                 MR. BRATTON:  Agreed.
```

Southern Reporting Company (386)257-3663

103

```
 1              MR. BRAITHWAITE:  Agreed.

 2              (Off the record.)

 3                   DIRECT EXAMINATION

 4   BY MS. WITHROW:

 5        Q     Good morning, Mr. Hanger.  You and I met prior

 6   to starting this deposition.

 7              This is Ms. Moore, the Plaintiff in this

 8   action.  And we have Darby Plexico on the phone as well,

 9   who's the representative or the attorney for Mr. Murphy.

10        A     Okay.

11        Q     Can you please state your full name for the

12   record, please?

13        A     Robin David Hanger.

14        Q     And the name of the company?

15        A     The Car Shop Trailer Sales, doing business as

16   Best Price Trailers.

17        Q     And the location?

18        A     950 Ridgewood Avenue, Holly Hill, Florida.

19        Q     Okay.  And as we did with previous

20   depositions -- the names of these companies are quite

21   lengthy, and we're trying to move things along a little

22   bit -- so Elite Metal Performance will be Elite Metal.

23   Car Shop Trailer Sales, doing business as Best Price, will

24   be Car Shop.

25              Have you been deposed before?
```

Deposition of Robin David Hanger                                          7

```
 1        A      Yes, I have.

 2        Q      So you are familiar with how this process

 3   works.  Excellent.

 4               The main thing that I personally have problems

 5   with -- and I'm trying to rein myself in -- is talking

 6   over each other.  So if you could please just remember

 7   that -- to let me finish, I will do the same for you.

 8   Also nodding and uh-huh and uh-uh don't work.  We need to

 9   verbalize everything so that the court reporter can take

10   everything down.

11        A      Okay.

12        Q      If you need a break, just speak up.  And if

13   there's anything that I say at any point, any question

14   that doesn't make sense to you or that you need further

15   clarification on, just let me know.

16               Okay?

17        A      Yes, ma'am.

18        Q      Mr. Hanger, are you currently on any

19   medications that make it difficult for you to sit through

20   this deposition?

21        A      No, ma'am.

22        Q      Okay.  The time that you've been deposed

23   before, what kind of action was it?

24        A      A product that we sold over-the-counter from

25   another manufacturer.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                          8

1        Q      Okay.  And was it relative to something with

2    wheels on it?  Did it have wheels on it as well?

3        A      No.

4        Q      Okay.  And were you successful in the outcome

5    of the trial or the proceedings?

6        A      I don't understand.

7        Q      Did it settle before going to court, or did you

8    have to go to trial?

9        A      No.  It settled.

10       Q      It settled prior to.  Okay.

11              Have you been involved in any personal

12   lawsuits?

13       A      No.

14       Q      Okay.  What did you do in preparation for this

15   deposition today?

16       A      Reviewed the past deposition reports saying --

17   just documents that are, I believe, all evidence that you

18   have or that my attorney has.

19       Q      Okay.  Documents, meaning that you've supplied

20   to us --

21       A      Yes.

22       Q      -- through discovery?

23       A      Yes.  The ones that were on record.

24       Q      Okay.  And by deposition reports, is that the

25   deposition from a couple of weeks ago with Elite Metal

Deposition of Robin David Hanger                                                9

```
1    Performance?  Did you look at those depositions?

2        A     Yes.

3        Q     All three?

4        A     Yes, I believe so.

5        Q     Okay.  So you read what they testified to?

6        A     I read through most of it, yes.

7        Q     Okay.  Exhibit 1, and this is just for

8    reference in case we need it, is a copy of the deposition

9    notice.

10             (Whereupon, document was premarked for

11   identification as Plaintiff's Exhibit Number 1.)

12   BY MS. WITHROW:

13       Q     Have you seen this notice?

14       A     Yes.

15       Q     And you brought all documents responsive to

16   that?

17       A     Yes.

18             MR. BRATTON:  And just for purposes of the

19        record, for clarification today, we provided counsel

20        some documents on Numbers 4 and, I believe, 23.

21             We would object to the request being overly

22        broad and ambiguous to the extent we've attempted to

23        be responsive and providing counsel with those

24        documents ahead of time.

25             MS. WITHROW:  Thank you.
```

Deposition of Robin David Hanger                                   10

```
1    BY MS. WITHROW:

2         Q    Mr. Hanger, have you ever been to Charleston?

3         A    Yes.

4         Q    Have you ever lived there?

5         A    No.

6         Q    Do you have family there?

7         A    No.

8         Q    Have you ever gone there on business, or just

9    personal?

10        A    Bit personal, pleasure.  Just a day away.

11        Q    And were you born and raised in Daytona?

12        A    Daytona Beach, yes.

13        Q    Tell me a little bit about your educational

14   background or technical training.

15        A    Education is:  I quit school in the seventh

16   grade.  I went to work to help my family.  I went to a

17   vocational school, learned auto mechanics and motor small

18   engines.

19             And then I started working on motorcycles and

20   small motors in, I think, '76.  And then I evolved into

21   working on Honda cars in the '80s, out in Texas, Houston.

22             I moved out there for about 9, 10 years.  And I

23   moved back here in '86, or somewhere in there.  I worked

24   for a dealership until '89.  And in December of '89, I

25   opened my own business, which is an automotive repair
```

1    business, and evolved from that into -- around 2001 --

2    2000 or 2001, I got into trailer sales.  And then the

3    trailer business just evolved, and both businesses are

4    still active.

5         Q      Excellent.  That's impressive.  Very

6    impressive.

7         A      Thank you.

8         Q      And your actual title or position with

9    Car Shop?

10        A      I am the managing member, owner.

11        Q      Is there any other owner or partners?

12        A      No.

13        Q      And that has been since the inception, correct?

14        A      Yes.

15        Q      And you said that was in 2001?

16        A      The Trailer Sales was 2000 or 2001.  I think it

17    was late 2000, but...

18        Q      And are there any members of your family that

19    are employed by Car Shop as well?

20        A      No.

21        Q      And as narrow as you can make this, I'm sure

22    it's difficult when you are the owner, tell me, generally,

23    your responsibilities on a day-to-day basis, as narrow as

24    you can make it.

25        A      Operations and purchasing -- I would say just

Deposition of Robin David Hanger                                    12

```
1    operations and purchasing and employees.
2         Q     Okay.  And you're there every day?
3         A     I'm there seven days a week.
4         Q     Seven days a week.  Okay.
5               How many employees do you have?
6         A     On the trailer side of the business, we have, I
7    believe, 14.
8         Q     When you say "trailer side of the business,"
9    what's the other side?
10        A     Well, there's two businesses, but on the same
11   property.  One business is called the Car Shop, and the
12   second business is the Car Shop Trailer Sales.
13        Q     Okay.  And are they distinguishable --
14        A     They're two separate businesses.  Two separate
15   federal IDs.  Two separate everything.  Except one owner.
16        Q     And you said you are the member manager.
17              Are there other member managers?
18        A     No.
19        Q     That's it.  Okay.
20              And it seems to me that you recently expanded
21   your business; is that correct?
22        A     I purchased property to the south of us and
23   expanded the lot size and the inventory size.
24        Q     Okay.  And tell me about the inventory that you
25   have currently.  What specifically do you have?
```

**Southern Reporting Company (386)257-3663**

110

Deposition of Robin David Hanger                                    13

1        A        Cargo trailers, race trailers, utility

2    trailers.  Pretty much anything to do with trailers.

3        Q        Okay.  Have you ever filed bankruptcy?

4        A        Yes, I have.

5        Q        And when was that?

6        A        2006.

7        Q        For which type?

8        A        The trailer sales.  And it was 11, and

9    everything was satisfied.

10       Q        2011, you said?

11       A        No.  '06.

12       Q        I'm sorry.

13       A        When the economy crashed, it devastated us.

14       Q        Yeah, I understand.

15                Right now, what is your annual sales?

16       A        I don't have that answer.

17       Q        Okay.  Can you give me an approximate?

18       A        I would say somewhere around six million a

19    year.

20       Q        And is it possible, say, for the year 2015 to

21    give me a figure in percentages, how much of that had to

22    do with any products related to Elite Metal?

23       A        5 percent.

24       Q        Tell me a little bit about your other

25    employees.  You said you had 14 approximately.  I don't

Deposition of Robin David Hanger                                14

```
 1    want you to have to list them.
 2            But are there any individuals that are in some
 3    type of managerial position or supervisory position that
 4    you can give me their names?
 5        A    No.  We don't call -- we don't classify anyone
 6    as a manager or supervisor.  They are coordinators, like a
 7    team coordinator.
 8            I am at only -- I am the stop.  It comes to me.
 9    But I do have people that I coordinate things with and I
10    pass on.
11        Q    Who is Jessica Gray?
12        A    She is in sales, but at the time she was in
13    service.
14        Q    At the time, meaning at the time of this
15    incident?
16        A    Yes.
17        Q    So she was in sales at the time, and now she is
18    in service?
19        A    Sales.  Sales.  She was in --
20        Q    Was in service, and now she's in sales.
21        A    (Witness nods head.)
22        Q    Got it.  Okay.
23            And Jeanine Piazza?
24        A    She is my office manager.
25        Q    Okay.  And Guy Gray?
```

Deposition of Robin David Hanger                                    15

1        A       He is in service.

2        Q       Is he related --

3        A       Husband and wife.

4        Q       Okay.  And if you could tell me anybody else

5    that is, say, the first line of individual you'd go to in

6    the event of needing some additional information or to

7    handle a particular problem.

8        A       Jeanine.

9        Q       Jeanine, as the office manager?

10       A       Uh-huh.  As a -- operations.  She's like the

11   comptroller.  She is the operations, a major part of the

12   economical part of the business.  So to get those answers,

13   it would be Jeanine.

14       Q       Okay.  Do you have any employees that you no

15   longer employ but that were employed at the time of the

16   incident being June 9th, 2015?

17       A       I had a sales -- I think two salespeople that

18   are no longer employed.  But simply because of better

19   opportunity.

20       Q       Okay.  Were they involved at all with any part

21   of this incident?

22       A       This incident?

23       Q       Yes.

24       A       No.

25       Q       Okay.  Are there any employees that are no

Deposition of Robin David Hanger                                          16

```
 1    longer employed but that left due to any -- anything
 2    having to do with this particular incident?
 3         A      No.
 4         Q      Mr. Hanger, I'm going to show you Exhibit 2,
 5    which is the bill of lading.
 6              (Whereupon, document was premarked for
 7    identification as Plaintiff's Exhibit Number 2.)
 8    BY MS. WITHROW:
 9         Q      Have you seen that document before?
10         A      Yes.
11         Q      And is it a document that you recognize as
12    being generated by Elite Metal?
13         A      Yes, ma'am.
14         Q      And to the extent that you would know, this is
15    a true and accurate copy of the bill of lading that you
16    recall seeing before?
17         A      Yes, ma'am.
18         Q      And it's relative to the shipment of the three
19    tow dollies that EMP sent to Car Shop?
20         A      Yes, ma'am.
21         Q      Okay.  And would you agree with me that there's
22    three vehicle identification numbers on there?
23         A      Yes, ma'am.
24         Q      And, again, for purposes of simplicity, the tow
25    dollies have a very extensive 17-digit letter ID, vehicle
```

Southern Reporting Company (386)257-3663

114

Deposition of Robin David Hanger                                    17

```
 1   identification number, and we're going to shorten them
 2   just by the three that are listed there, being 313, 321,
 3   and 322.
 4        A     Yes, ma'am.
 5        Q     And specifically the tow dolly implicated in
 6   this incident is which one?
 7        A     313.
 8        Q     And if you would tell me what type of -- well,
 9   strike that.
10              Two of the tow dollies listed are one style.  I
11   think they're called HD.
12        A     Right.
13        Q     And the other is HDXL.
14              Can you tell me the difference between those
15   two?
16        A     The HD has a four-foot deck on it, which is a
17   platform, and the HDXL would be a six-foot platform.
18        Q     So the 313 tow dolly is the one with the
19   six-foot platform?
20        A     Yes, ma'am.
21        Q     And the signature on the bottom that it's
22   received by, can you tell me whose signature that is?
23        A     Looks like Cory Merritt, which is the driver
24   for the delivery company -- one of the delivery companies
25   that I use.
```

Deposition of Robin David Hanger                                              18

1      Q      Okay.  And what delivery company is he with?

2      A      Big Hoss's Haulin'.

3      Q      Would you happen to know who the deliver-by

4   signature is?

5      A      No.

6             I would assume delivered by, being that this is

7   their bill of lading, is who delivered it to Cory.

8   Because Cory signed the bottom.  It looks like

9   Cory Merritt is at the bottom, received by.

10     Q      Mr. Hanger, are you a member of the NATDA?

11     A      Yes, ma'am.

12     Q      How long have you been a member?

13     A      Since its existence, which I think is six

14   years.

15     Q      Are there any compliance programs related to

16   being a member?

17     A      Not to being a member of that, no.

18     Q      Okay.  So in order to be a member, what are you

19   required to do?

20     A      Have a dealer's license and be in the trailer

21   business.

22     Q      And that's it?

23     A      That's it.

24     Q      Okay.  And are you also a member of the

25   National Association of Trailer Manufacturers?

**Southern Reporting Company (386)257-3663**

116

Deposition of Robin David Hanger                                    19

1         A      Yes, ma'am.

2         Q      How long have you been a member?

3         A      Five years, maybe.

4         Q      And is there a compliance program with the

5    NATM?

6         A      Just being in good compliance with the City,

7    local, and State licensing.

8         Q      Is there any inspections involved?

9         A      No, ma'am.

10        Q      The NATM, do they set any specific guidelines

11   on specifications for trailers?

12        A      Yes, ma'am.

13        Q      Do they provide you with a manual for those?

14        A      Yes, ma'am.

15        Q      And do you have such a manual?

16        A      Yes, ma'am.

17        Q      Do you know if they specifically set a

18   specification for the foot pound of the lug nut on the

19   wheel?

20        A      They give us guidance for that, yes.

21        Q      Okay.  Do you know, off the top of your head,

22   what that would be for a trailer similar to the one that

23   we're talking about here today?

24        A      Between 90 and 120 pounds.

25        Q      Okay.

Deposition of Robin David Hanger                                      20

```
 1        A      And that was, just recently within the last
 2   five years, increased.
 3        Q      So --
 4        A      It increased.  It used to be rated at 80 to
 5   100.
 6        Q      Okay.  And within the last five years, you
 7   said --
 8        A      I would say it's five years.
 9        Q      So what makes up the range?
10        A      The size of the wheel and the size of the stud.
11        Q      Does the pattern of the lug nut make a
12   difference as well?
13        A      No.
14        Q      Does the number, like if it's a five pattern or
15   six pattern, does that change --
16        A      Yes.  Because it would change the size of the
17   stud.
18        Q      So tell me how it goes up or down based on the
19   number.
20        A      The GVW of the wheel.
21        Q      What's the GVW?
22        A      Gross Vehicle Weight Rating.
23               As the wheel gets -- or as the GVW goes up, the
24   weight rating goes up, the pressure -- the torque goes up.
25        Q      Okay.  So do you keep any -- or create any
```

Deposition of Robin David Hanger                                    21

```
 1    manuals at Car Shop that incorporate these specs within
 2    your manuals or -- manuals being a checklist or any kind
 3    of reference for your employees?
 4         A    Yes.
 5         Q    And I believe we have a couple of checklists
 6    we'll get to in a couple of minutes about that.
 7              Do you -- with memberships to either of the
 8    two, either the NATM or the NATDA, do you have to notify
 9    them of any potential litigation?
10         A    No.
11         Q    Besides those two that I just mentioned, are
12    there any other professional organizations that you belong
13    to?
14         A    No, ma'am.
15         Q    Are you a member of the Better Business Bureau?
16         A    Yes, ma'am.
17         Q    And the regulating body -- I believe it's a
18    federal body that establishes regulations.  What is that
19    for you?
20         A    I don't understand.
21         Q    DOT?  Is that who you follow?
22         A    DOT is regulated -- or NATM is regulated by
23    DOT.  Okay.  And I don't know that I would say
24    "regulated."  They are -- NATM monitors DOT changes.
25              NATM is an organization that represents trailer
```

Deposition of Robin David Hanger                                    22

```
 1    manufacturers.  NATDA is an organization that represents
 2    trailer dealers.  All three of those kind of work
 3    together.  But DOT is the government.
 4         Q    Okay.  That's a good explanation.
 5              So you're not actually classified as a
 6    manufacturer, correct?
 7         A    No.
 8         Q    Not in any way?
 9         A    No.
10         Q    Okay.  Are you still a dealer for Elite Metal?
11         A    No.
12         Q    Prior to this incident, again, June 9th, 2015,
13    what was the relationship -- business relationship like
14    with Elite Metal?
15         A    Very good.  Very good.
16         Q    No problems?
17         A    No problems with the product or personally, no.
18         Q    Okay.  And up until this time, how long had you
19    been a dealer for them?
20         A    I don't -- well, Elite Metal was purchased from
21    Race City.  I think I was a dealer for Race City.  I think
22    I was a dealer for Race City two years, and then they sold
23    to Elite Metal.  And from whenever Elite Metal bought it,
24    I was a dealer with them from the time they started.
25         Q    Okay.  So it's from the inception of Elite --
```

120

Deposition of Robin David Hanger                                    23

```
 1        A      The inception of Elite.
 2        Q      And what was your relationship like with
 3   Walter Gouviea?
 4        A      With what?
 5        Q      With Walter.
 6        A      Good.
 7        Q      Did you speak with him on any regular basis?
 8        A      Spoke to him very much on a regular basis.
 9        Q      Easy to get in touch with?
10        A      Just like a regular owner, busy, but yes.
11        Q      Responsive?
12        A      Responsive.
13        Q      And your relationship with Elite Metal now?
14        A      There is none.
15        Q      You've purchased nothing from Elite Metal
16   anymore?
17        A      Nothing.
18        Q      You have no contractual relationship?
19        A      Nothing.
20        Q      And tell me how that contractual relationship
21   ended.
22        A      They decided to eliminate dealers and sell the
23   product themselves direct.
24        Q      And relative to the time of this incident, how
25   did you -- when did you learn that they were going to
```

Deposition of Robin David Hanger                                          24

1    change?

2         A      Say that again.

3         Q      This incident, which happened in June, when was

4    it that you learned -- you first learned that you would no

5    longer have a contractual relationship with Elite Metal?

6         A      I want to say it was about two months -- a

7    month or two months after the accident.

8         Q      Okay.  Did you personally draw any correlation

9    between this incident and the ending of that contract?

10               MR. BRAITHWAITE:  Object to the form.

11               MR. BRATTON:  Same objection.

12   BY MS. WITHROW:

13        Q      Was it related in your mind?

14        A      No.

15        Q      Prior to this incident, had you ever had any

16   kind of conversation with Walter wherein Walter said to

17   you, You know, we may decide to go direct and not use

18   dealers?

19        A      No.

20        Q      Never had that conversation?

21        A      No.

22        Q      Okay.  At this point today, would you ever buy

23   a trailer from them?

24        A      No.

25        Q      What reason?

Deposition of Robin David Hanger                                    25

```
1        A      I don't know how to answer that.

2        Q      Is it due to a quality issue?

3        A      No.

4        Q      Is it due to a professional relationship issue?

5        A      Yes.

6        Q      Do you have faith in the quality of the product

7    that they make?

8        A      Yes.

9        Q      But you have -- I'm not going to tell you what

10   you think.

11              But it's relative to the relationship --

12       A      Yes.

13       Q      -- that you had?

14       A      Yes.

15       Q      Is there bad blood between you?

16       A      No.

17       Q      Has there been any negative postings on any

18   form of social media?

19       A      No.  Not that I'm aware of.

20       Q      Okay.  And you, as a representative of Car

21   Shop, have not posted anything?

22       A      Have not posted nothing, no.

23       Q      As I understand it, every contract with every

24   dealer was a little bit different, the timing was a little

25   bit different.
```

1           So whenever the contract expired, then your

2    contract was not renewed; is that correct?

3        A    Correct.

4        Q    Your contract was not cut short; it just was

5    not renewed?

6        A    I believe that is correct.  I -- the contract

7    was, to me, so vague.  I don't remember if there was a

8    date on it, or if I was just notified that after this

9    date -- I think they had a right to give us 30 or 60 days

10   or 90 days to exit, either party.

11       Q    Okay.

12       A    I believe that's the way it was written.

13       Q    Okay.  So upon the notice of that --

14       A    Then they fulfilled that part of it, yes.

15       Q    Okay.  And do you know -- if you know, was that

16   the same for other dealers?

17       A    I don't know.

18       Q    Have you ever been in touch with any of the

19   other dealers?

20       A    No.

21       Q    Never talked to any of them?

22       A    No.

23       Q    Do you know if there are any dealers at all at

24   this point?

25       A    No.

1    Q    No, you don't know, or, no, there's no dealers?

2    A    No, I don't know that there was.

3    Q    Okay.  The trailers that you've bought from

4  Elite Metal, now who do you go to to buy that same or

5  similar type of trailer?

6    A    No one.

7    Q    So you don't offer any trailer that's similar

8  to what you sold that was manufactured by Elite Metal?

9    A    Not at this time.

10    Q    Okay.  Is that a gap in your product line, or

11  is that something you're just waiting to fill with another

12  manufacturer?

13    A    Yes.

14    Q    The latter?

15    A    Waiting to fill.

16    Q    Okay.  Mr. Hanger, I'm going to show you two

17  more exhibits that are Exhibit 3 and 4.

18         (Whereupon, documents were premarked for

19  identification as Plaintiff's Exhibit Number 3 and

20  Plaintiff's Exhibit Number 4.)

21  BY MS. WITHROW:

22    Q    You can see by the stamp on the bottom, it says

23  Car Shop 54, and then the next one will say Car Shop 55,

24  which means that these are photographs that were -- that

25  means that they are photographs provided to the Plaintiff

Deposition of Robin David Hanger                                                28

```
 1    by your attorney.
 2               Can you tell me what these pictures are of,
 3    please?
 4               Let's start with Exhibit 3.
 5       A     Okay.  I can tell you that it's of a tandem tow
 6    dolly at a show.  I cannot specify what model it is
 7    because I can't see the deck from the other side.  But
 8    this was on display at a show that we attended.
 9       Q     Okay.  And was this show prior to or after the
10    incident?
11       A     Prior.
12       Q     Okay.  So even though we all here have
13    excellent vision, can you see any fender bolts on either
14    one of these photographs?
15       A     No.  Not on these photos, no.
16       Q     And Exhibit 4, which is even a lovelier
17    picture, is that the same or a different tow dolly?
18       A     It is a different dolly.
19       Q     Can you tell what model it is?
20       A     No.
21       Q     And neither of these tow dollies were involved
22    in this incident?
23       A     No, ma'am.
24       Q     Were these photographs just taken as exemplars
25    of the types of trailers that you sold?
```

Deposition of Robin David Hanger                                    29

1        A     Yes.

2        Q     Okay.  And I'm going to give you Exhibit 5.

3              (Whereupon, document was premarked for

4    identification as Plaintiff's Exhibit Number 5.)

5    BY MS. WITHROW:

6        Q     And you can correct me if I'm wrong.  I

7    believe, again, it is not the tow dolly in question, but a

8    photograph of an example of a tow dolly that is just a

9    little bit clearer for us to look at.

10       A     Yes.

11       Q     So if we pretend that that is the tow dolly

12   that is similar to the one that was involved in this

13   incident, which wheel was involved?  Which is the wheel

14   that came off?

15       A     I would have to see the other exhibits to tell

16   you that.  But I'm assuming that it was the left wheel.

17   But I'm not positive.

18       Q     Left wheel meaning the driver's?

19       A     The driver's side, I think.  But I can tell you

20   that from the other exhibits you have somewhere.

21       Q     Okay.  That's fine.  We'll get to that.

22             How many wheels are on this tow dolly?

23       A     Two.

24       Q     Two that actually touch the ground?

25       A     Two.  Yes.

Deposition of Robin David Hanger                                    30

```
 1          Q      Okay.  And if you could mark for me on
 2   Exhibit 5 where the fender bolts are.
 3          A      (Indicating.)
 4          Q      Right there.  Okay.
 5                 Did you ever see the wheel after it came off
 6   the tow dolly?
 7          A      No, ma'am.
 8          Q      Never saw it?
 9          A      No, ma'am.
10          Q      Okay.  Did anyone that works for Car Shop ever
11   see it?
12          A      No, ma'am.
13          Q      Did anyone from Car Shop ever go to that
14   particular stretch of 95 where this incident occurred?
15          A      No, ma'am.
16          Q      Did you ever speak with Mr. Murphy, the
17   ultimate owner of the tow dolly, as to whether he saw the
18   wheel?
19          A      Yes, ma'am.
20          Q      Did he ever see the wheel?
21          A      No.  He looked for it.  He said he could not
22   find it.
23          Q      Did he ever tell you his opinion of what
24   happened or his contentions as to how this all occurred?
25          A      No.  Just that the wheel came off.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                          31

1       Q       So other than the pictures that we have, that

2    we'll get to, that show the tow dolly after this incident,

3    you have not seen the wheel on this tow dolly at all?

4       A       No.

5       Q       We'll go to Exhibit 6.

6               (Whereupon, document was premarked for

7    identification as Plaintiff's Exhibit Number 6.)

8    BY MS. WITHROW:

9       Q       Which is, I believe, a picture of the bolt.

10              And if you could tell me -- this is a picture

11   that was, again, given to us by Elite Metal.

12              And I just want to find out if you've ever seen

13   that picture before.

14      A       I've seen it yesterday in reviewing depositions

15   and stuff.

16      Q       Is that the first time you saw it?

17      A       Yes.

18      Q       So do you know if this is someone from Elite

19   Metal or is it someone from Car Shop?

20      A       I don't know.

21      Q       You have no idea of the history of this

22   photograph at all?

23      A       No.

24      Q       Do you know anything about that bolt?  Can you

25   tell by looking at it what it is?

Deposition of Robin David Hanger                                           32

1          A       No.

2          Q       So this was not a photograph taken, to the best

3     of your knowledge, by any employee of Car Shop?

4                  MR. BRAITHWAITE:  Object to the form.

5     BY MS. WITHROW:

6          Q       To your knowledge, was this taken by Car Shop,

7     or do you know?

8          A       I don't know.

9          Q       Do you all ever take pictures of broken -- any

10    parts that come to you that are -- or any items that come

11    to you that may have broken parts, do you take photographs

12    of them?

13         A       Yes, we do.

14         Q       As a matter of course do you do that regularly?

15         A       Yes.

16         Q       And you do that for what reason?

17         A       To provide visual information to the

18    manufacturer as to what we're talking about.

19         Q       Okay.  And this picture is not representative

20    of something that you recall that Car Shop took?

21         A       I don't recall.  But I can -- this is a broken

22    bolt.  That is the way that the bolts look when they

23    break.

24         Q       So is that the extent of the information that

25    you have about it?

Deposition of Robin David Hanger                                    33

1          A      Yeah.

2          Q      I want to show you Exhibit 7.

3                 (Whereupon, document was premarked for

4      identification as Plaintiff's Exhibit Number 7.)

5      BY MS. WITHROW:

6          Q      Have you seen this picture before?

7          A      I don't recall this exact picture, no.

8          Q      I know the picture is a little grainy.

9                 Is there anything that you can see in this

10     picture relative to the bolt, the fender bolt?

11         A      I'm not sure I understand exactly.

12         Q      Well, can you see -- if I were to tell you that

13     this is the tow dolly in question, after the incident

14     occurred, can you locate on this the bolt that was

15     replaced by Car Shop?

16         A      Yes.

17                (Indicating.)

18                MS. WITHROW:  Okay.  And just reflect for the

19           record that Mr. Hanger has circled the bolt.

20                THE WITNESS:  It's a shiny bolt that is showing

21           in the center of the picture, above the wheel

22           spindle that has been removed.

23     BY MS. WITHROW:

24         Q      Do you know who took this picture?

25         A      No.

**Southern Reporting Company (386)257-3663**

131

Deposition of Robin David Hanger                                    34

```
 1        Q       Prior to today or prior to yesterday, when you

 2   looked at some of the photographs and depositions, had you

 3   ever seen this picture before?

 4        A       No.

 5        Q       And Exhibit 8 is another photograph.

 6                (Whereupon, document was premarked for

 7   identification as Plaintiff's Exhibit Number 8.)

 8   BY MS. WITHROW:

 9        Q       I'd like you to identify if you've seen it

10   before.

11        A       I don't believe I have, no.  No, I have not.  I

12   didn't -- no.

13        Q       Can you tell me -- if you orient it, can you

14   tell me what it appears to be?

15        A       It is a picture of a backing plate, what's left

16   of it, the spindle and the fender and fender bolts.

17        Q       And the fender bolt again...

18        A       Is circled right here at the top right, shiny

19   (indicating).

20        Q       All right.  Is there a hub on the spindle?

21        A       No, ma'am.

22        Q       You said you hadn't seen the wheel after the

23   tow dolly left your custody and control.

24                Did you ever see a hub?

25        A       No, ma'am.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    35

1         Q      Go to Exhibit 9.

2                (Whereupon, document was premarked for

3    identification as Plaintiff's Exhibit Number 9.)

4    BY MS. WITHROW:

5         Q      If you could, again, tell me what it is we're

6    looking at here.

7         A      We are looking at a fender bolt that was

8    replaced.

9         Q      Have you ever seen this picture before?

10        A      No, ma'am.

11        Q      Does it appear to be the fender bolt that was

12   replaced by Car Shop, to the extent that you could tell?

13        A      It's a fender bolt -- or a bolt that has been

14   replaced.  That's all I could tell from the picture.

15        Q      Okay.  And we'll do 10 and 11 together since

16   those are pretty similar.

17               (Whereupon, documents were premarked for

18   identification as Plaintiff's Exhibit Number 10 and

19   Plaintiff's Exhibit Number 11.)

20   BY MS. WITHROW:

21        Q      Have you ever seen either of those two pictures

22   before?

23        A      No, ma'am.

24        Q      And, again, do you have any idea what is

25   depicted in them?

Southern Reporting Company (386)257-3663

133

Deposition of Robin David Hanger                                    36

1        A      That looks like a nut and washer.  I really

2    can't tell from where, but -- no.

3        Q      Okay.  When you made the repair, did you take

4    any photographs after the repair was made on the tow

5    dolly, 315?

6        A      Probably not.

7        Q      Okay.  So as a matter of course, you do take a

8    picture prior to but not always of the end product?

9        A      Not always, no.

10       Q      Okay.  All right.  This is Exhibit 12.  This is

11   what's been given to us as an invoice created by Car Shop.

12              (Whereupon, document was premarked for

13   identification as Plaintiff's Exhibit Number 12.)

14   BY MS. WITHROW:

15       Q      Do you recognize this?

16       A      Yes, I do.

17       Q      Recognize this document?

18       A      Yes, I do.

19       Q      Was it indeed generated by Car Shop?

20       A      Yes, it was.

21       Q      Who created it specifically?

22       A      Would have been my service department, which at

23   that time would have probably been Jessica.

24       Q      And you have no reason to question the

25   authenticity of this document?

Deposition of Robin David Hanger                                    37

1          A      No, ma'am.

2          Q      And would you agree with me that this invoice

3    shows a total of 36.50 that is being invoiced for some

4    repair work that was done?

5          A      Yes, ma'am.

6          Q      And specifically what is indicated as the

7    repair?

8          A      Removal and replace the broken bolt.

9          Q      And after "bolt," it says curbside, correct?

10         A      Correct.

11         Q      And the relevance of that term, "curbside" --

12         A      Curbside would be the right-hand side, the

13   passenger's side.

14         Q      So now we know the location.

15         A      Yes.

16         Q      So prior to creating this invoice, did Car Shop

17   have permission to make the repair?

18         A      Yes.

19         Q      So you got permission to make the repair?

20         A      Yes.

21         Q      And then created the invoice?

22         A      Yes.

23         Q      And from whom did you receive authorization to

24   make the repair?

25         A      I'm not sure.

Deposition of Robin David Hanger                              38

```
 1        Q        Do you know who requested authorization from
 2   Car Shop?
 3        A        It would have been Jessica.
 4        Q        Jessica.  Okay.
 5                 And did she get this in the form -- verbally
 6   over the phone, or was it through e-mail?  What method
 7   of --
 8        A        Verbally and then e-mail.
 9        Q        Okay.  So the e-mail -- strike that.
10                 Is this a typical course of business when you
11   have to do a repair to get the authorization and then
12   create the invoice?
13        A        Correct.
14        Q        And had you ever submitted an invoice to
15   Elite Metal for any kind of repair -- any kind of repair
16   that you've made in the past --
17        A        Yes.
18        Q        -- prior to this?
19        A        Yes.
20        Q        Did Elite Metal pay this invoice?
21        A        No, they did not.
22        Q        And did you ever find out why they didn't?
23        A        I asked several times.  And after this
24   happened -- the day after is when the accident happened
25   and correspondences stopped.
```

Deposition of Robin David Hanger                                            39

```
 1        Q      Okay.  So there was no correspondence after
 2   June 9th, 2015?
 3        A      No.  No.  Except, Where are we at; what are we
 4   doing?  Trying to help Mr. Murphy.
 5        Q      And that was --
 6        A      From us.
 7        Q      From Car Shop?
 8        A      Correct.
 9        Q      So help me understand here.  This is an area I
10   need some clarification.
11               Who is responsible for minor repairs when you
12   receive a product from Elite Metal and it needs a minor
13   repair?  Whose responsibility is it?
14        A      To do the work?
15        Q      To do the work, yes.
16        A      It is ours.  It's not a responsibility.  It's
17   business.  It's a service business.  And if there's an
18   issue, we contact Elite.  Elite tells us what to do, and
19   we do it.
20        Q      Okay.  So when Elite tells you what to do, then
21   you create the invoice, and you do the work?
22        A      Correct.
23        Q      If it's a minor repair, that -- let me go back
24   to that.  Sorry.
25               If it's minor, is that something that is the
```

Deposition of Robin David Hanger                                          40

1    cost -- say, the cost of the bolt or whatever, whatever

2    cost, the labor, the bolt, is that incurred exclusively by

3    the manufacturer?

4            MR. BRATTON:  Object to the form.

5            THE WITNESS:  I'm not sure I...

6    BY MS. WITHROW:

7        Q    I'll try to clarify that a little bit.

8            It's my understanding that dealers are

9    responsible for minor repairs; is that correct?

10       A    Very minor.  When it becomes anything other

11   than very minor, it would, of course, warrant a warranty

12   or a phone call to the manufacturer.

13           MR. BRATTON:  I'm going to object to that last

14       question.

15   BY MS. WITHROW:

16       Q    What, in your mind, is a definition of "minor"

17   or "very minor"?  Are they the same?

18       A    Definition of "very minor" would be a light

19   that may not work.  "Minor" would be just a connection.

20       Q    Connection meaning...

21       A    A wire connection.

22           Something that needs approval would be

23   something that is broken.

24       Q    So that would not be minor, then, something

25   that was broken?

Deposition of Robin David Hanger                                        41

1              MR. BRATTON:  Object to the form.
2              THE WITNESS:  No.
3    BY MS. WITHROW:
4        Q    I'm sorry.  Something that is minor is not
5    something that is broken; is that correct?
6              MR. BRATTON:  Same objection.
7              MR. BRAITHWAITE:  Same objection.
8    BY MS. WITHROW:
9        Q    I'm just trying to understand what your
10   definition of "minor" is so that I'm clear on what you
11   consider minor and non-minor.
12       A    Minor is a light that doesn't work.
13       Q    Okay.
14       A    Something that needs to be repaired, would be
15   something that needs to be replaced.
16       Q    And that is non-minor?
17             MR. BRATTON:  Objection.  Form.
18             THE WITNESS:  That is non-minor.
19   BY MS. WITHROW:
20       Q    So this matter right here -- this fender bolt
21   that was broken, is it minor or non-minor?
22       A    Non-minor.
23       Q    Okay.  If it's non-minor, then it requires an
24   invoice; is that correct?
25       A    Correct.

Deposition of Robin David Hanger                                                    42

1        Q        And a minor issue, then, for Car Shop, would be

2    no invoice?

3        A        Correct.

4        Q        Okay.  Got it.

5                 Did you ever speak with Walter specifically

6    about paying this invoice?

7        A        Yes.

8        Q        And tell me about that conversation.

9        A        Have you submitted a bill?  Yes.

10       Q        Who is that speaking?

11       A        Walter.

12                We submitted a bill.  We then received an

13   e-mail from Michelle:  Submit the bill, and I will enter

14   it for payment.

15       Q        So this conversation with Walter was prior

16   to --

17       A        Prior to repairing it.

18       Q        Prior to repairing it and prior to submitting a

19   bill?

20       A        Correct.

21       Q        Okay.  And after submitting the bill, did you

22   ever speak with Walter about the invoice?

23       A        No.  Because the incident happened the next

24   day, I believe.

25       Q        Okay.  Did anyone from Elite Metal ever say to

Southern Reporting Company (386)257-3663

140

Deposition of Robin David Hanger                                    43

1    you, We're not going to pay that invoice?

2        A    No.

3        Q    Did they ever say, Our insurance company has

4    advised us not to pay the invoice?

5            MR. BRAITHWAITE:  Objection.  Form.

6            THE WITNESS:  No.  Not to me.

7    BY MS. WITHROW:

8        Q    To anyone else in Car Shop?

9        A    No.

10           (Whereupon, document was premarked for

11   identification as Plaintiff's Exhibit Number 13.)

12   BY MS. WITHROW:

13       Q    Let's go to Exhibit 13.  If you could describe

14   to me what this document is, please.

15       A    This is off of QuickBooks.  This is how

16   QuickBooks sends an estimate.  This is just a little

17   notice ahead of time to let you know what you're looking

18   at.

19       Q    So would this have come before or after the

20   invoice in Exhibit 12?

21       A    The invoice -- yeah, the invoice is e-mailed.

22   This is like a cover letter that goes with it.

23       Q    All right.  So if we look at Exhibit 12, it has

24   a date of 6/5/2015.  And if we look at this e-mail, the

25   date stamp is June 10th, 2015.

Deposition of Robin David Hanger                                      44

1              Is the time stamp the date that this invoice

2    was sent?

3         A    Correct.

4         Q    So how do these correlate if they're five days

5    apart?

6         A    Maybe from the time my office -- or one

7    department enters it and it gets into accounting, and

8    accounting sends it off or something.  You know, we don't

9    e-mail invoices the minute it happens or the moment,

10   unless the customer is there for payment.  Otherwise, we

11   send it off, which is what we did.

12        Q    Okay.  So these two -- these two documents,

13   these two invoices complement each other.

14             They are both typically generated when you do a

15   repair?

16        A    This is generated.  The invoice is generated.

17        Q    Number 12.

18        A    Number 12.

19             And then Number 13 goes out when Number 12 is

20   e-mailed.  13 is basically, like I said, a cover letter

21   letting you know what that is.

22        Q    Okay.  So when would -- if you know, when would

23   both documents have been received?

24        A    By Elite?

25        Q    Yes.

**Southern Reporting Company (386)257-3663**

142

Deposition of Robin David Hanger                                    45

```
 1        A      It would have been received on the 10th.

 2        Q      So both documents came together on the 10th?

 3        A      Yes.

 4        Q      And this is one day after the wreck?

 5        A      I'm not sure of the exact date.

 6        Q      The wreck date was June 9th.  And this one is

 7   dated June 10th.

 8        A      Okay.

 9        Q      So if we trust those two, this was sent out a

10   day after.

11        A      Yeah.

12               But there is an e-mail somewhere from Elite

13   saying to submit the invoice.

14        Q      Yes.  And we will get to that.  I promise you.

15               (Whereupon, document was premarked for

16   identification as Plaintiff's Exhibit Number 14.)

17   BY MS. WITHROW:

18        Q      And this is another invoice, Exhibit 14.  And

19   as with Exhibit 12, this is -- or is this a document,

20   again, that's generated by Car Shop?

21        A      Yes, it is.

22        Q      And this one was generated, to the best of your

23   knowledge, by Jessica as well?

24        A      To the best of my knowledge.

25        Q      And there's no question as to the authenticity
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    46

1   of this document, correct?

2        A     No.

3        Q     And this invoice reflects repairs for $73 from

4   Car Shop to Elite Metal to remove two broken fender bolts;

5   is that correct?

6        A     That's what the invoice says, yes.

7        Q     And as opposed to Exhibit 12, this one doesn't

8   say "curbside," correct?

9        A     No.

10       Q     So these -- if I'm making the right connection

11  here, this was on the driver's side?

12       A     I'm not sure which one this one is.  It doesn't

13  indicate which side it was on.  But it was on a separate

14  dolly.

15       Q     Okay.  Yes.  It is on a separate dolly.  And

16  that tow dolly, if we go by the three digit --

17       A     321.

18       Q     321.  Okay.

19             So when you received 313 and 321, 313 had one

20  broken fender bolt and 321 had two broken fender bolts?

21       A     Correct.

22       Q     But we're not sure on what side these 321

23  fender bolts were on?

24       A     No.

25       Q     But "curbside," I believe you said to me,

Deposition of Robin David Hanger                                    47

```
 1    indicates that it's on the passenger's side?
 2         A    Yes.
 3         Q    Okay.  As with 313, did you get permission from
 4    Elite Metal to make this repair?
 5         A    A verbal.
 6         Q    A verbal from Elite Metal?
 7         A    Yes.
 8         Q    Do you know who that person was?
 9         A    Walt.
10         Q    And when was the verbal, to the best of your
11    recollection?
12         A    I would say the 5th, the day the repair was
13    done.
14         Q    So was the verbal authority given before the
15    repair was made or after?
16         A    No.  After.  The repair was made after.
17         Q    The repair was made after the authorization to
18    repair?
19         A    Uh-huh.
20         Q    Was there anything put in writing other than --
21         A    No, ma'am.
22         Q    Were the repairs that were done to 313 and 321,
23    were they done the same day?
24         A    Yes, ma'am.
25         Q    By the same person?
```

Deposition of Robin David Hanger                    48

```
 1        A     Yes.

 2        Q     And who would that person be?

 3        A     I don't know.  Let's see.

 4        Q     Who's the person that did the repair on the tow

 5   dolly?

 6        A     Greg Mentzer.

 7        Q     He did the repair on both?

 8        A     Yes.

 9        Q     And what size bolt was broken that he removed?

10        A     I don't know that.

11        Q     Do you know the grade?

12        A     I don't know what theirs was.

13        Q     Of the one that Greg removed?

14        A     The one that broke, yeah, I don't know what

15   grade it was.

16        Q     Did you keep the broken bolts?

17        A     No.

18        Q     What size was replaced by Greg?

19        A     I don't know that answer.

20        Q     Do you know the grade?

21        A     Grade 8.

22        Q     And how do you know that specifically?

23        A     The product that we buy, the manufacturer, the

24   bolt.

25        Q     Is Grade A [sic] the only kind you carry in
```

Deposition of Robin David Hanger                                    49

```
 1    your shop?

 2         A     No.

 3         Q     You carry other types?

 4         A     Yes.

 5         Q     And I'm going to take a stab at it here.

 6               A is the best grade?

 7         A     8 is the strength.

 8         Q     And it would go down as we go to B, C, D --

 9         A     It's Number 8.  Grade 8.

10         Q     Oh, 8, okay, as in Number 8.

11         A     Number 8.

12         Q     Got it.

13               So where does that fall in the scale of --

14         A     The higher the number, I believe, is the

15    stronger.  I think.  I'm not sure.

16         Q     Do you know the scale or the range?  From 1 to

17    10 or 1 to 20?

18         A     No, I don't.

19         Q     Okay.  So it's 8.  There was some confusion on

20    that one on my part.  I apologize.

21               The cause that's listed on both Exhibit 12 and

22    14 on the invoices indicates that it was a manufacturing

23    defect.

24               Do you know who specifically would have typed

25    in that that was a manufacturing defect?
```

Southern Reporting Company (386)257-3663

147

Deposition of Robin David Hanger                                    50

1        A      It would have been Jessica.

2        Q      And how was it that Jessica made the

3   determination that it was a manufacturing defect?

4        A      I don't know how to answer that.  I -- I guess

5   when you purchase something and it breaks, what do you

6   call it?

7        Q      I don't know.

8        A      I mean --

9        Q      That's why I'm asking you.

10              Is it like -- is there like a pull-down and

11  there's choices to make?

12       A      No.

13       Q      It actually has to be actively written in?

14       A      Yes.

15       Q      Okay.  So when something is labeled on your

16  invoices as "manufacturing defect," that's a call that's

17  made by you at that point in time, correct?

18       A      Yes.  It's something that's broken.

19       Q      And that's the extent?  Something that's broken

20  that's received by you?

21       A      Yes.

22       Q      When you make a repair, is there a difference

23  if you have -- on a fender bolt, in this situation that

24  Greg made, is the repair in any way different between 313

25  that had one broken fender bolt and 321 that had two

1    broken fender bolts?

2        A    No, ma'am.

3        Q    The method of removing and replacing the fender

4    bolts is exactly the same?

5        A    Correct.

6        Q    Okay.  Did Elite Metal pay this invoice on 321?

7        A    Does not appear that that was paid.

8        Q    What would --

9        A    It would have paid -- QuickBooks puts "paid"

10   across it.

11       Q    Got it.

12            Okay.  So, to the best of your knowledge, this

13   invoice was not paid?

14       A    No.

15       Q    Any discussions with anyone from Elite Metal on

16   this one as well?

17       A    No.

18       Q    Ultimately, did you just let it go, that they

19   didn't pay these two invoices?

20       A    For now.

21       Q    For now?

22            Do you have intentions of recouping the amounts

23   on the invoices at some point in time?

24       A    I doubt that will happen.

25       Q    Is there some plan to get the invoices paid?

Deposition of Robin David Hanger                                      52

```
1        A      No.

2        Q      Did you sell this tow dolly, 321, that's listed

3   on Exhibit 14?

4        A      Yes, ma'am.

5        Q      You did.

6               Was there any problems with that tow dolly

7   ever?

8        A      No, ma'am.

9        Q      And, to the best of your knowledge, no wheels

10  fell off of that one?

11       A      No, ma'am.

12       Q      Okay.  I'm going to show you Exhibit 15.

13              (Whereupon, document was premarked for

14  identification as Plaintiff's Exhibit Number 15.)

15  BY MS. WITHROW:

16       Q      This is an e-mail, I believe, from Jessica and

17  Michelle Beck from Elite Metal Performance.

18              Have you ever seen this e-mail?

19       A      Yes.

20       Q      Do you know what it's referring to when it says

21  "corrected invoice"?

22       A      No.

23       Q      Okay.  If I were to tell you that there was an

24  invoice sent by Car Shop to Elite Metal indicating that a

25  tow dolly with a vehicle number of the last three digits
```

Deposition of Robin David Hanger                                         53

```
 1    of 318 had a broken fender bolt, would that refresh your
 2    memory as to what this e-mail is referring to?
 3         A    It wouldn't refresh my memory.  But I would say
 4    that it's a possibility that someone looked at 318
 5    thinking it was 313, and there really was no 318, and
 6    that's why the correction was asked.
 7         Q    All right.  Fair enough.  That makes sense to
 8    me.
 9              All right.  I'd really like to get down to as
10    much as we can to how the repair was made.  And we'll
11    start with the removal of the fender bolts.  And when we
12    talk about this, since you've testified that these were
13    both made, the repairs, on the same day, by the same
14    person, we're going to make an assumption that -- at this
15    point, that we're talking about the same methods that were
16    utilized to remove the fender bolts.
17         A    Okay.
18         Q    So how is the broken fender bolt removed?
19         A    How we removed it --
20         Q    By you.  This is all I want to hear from you,
21    yes.
22         A    -- is that we take a punch, which I believe is
23    a three-eighths punch, and a fairly large hammer, and we
24    knock it loose from the tack weld.  That is done.  And we
25    knock it out.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    54

1        Q       Okay.

2        A       And then we take a long pair of needle-nose

3   pliers, which is the long, thin pliers, and we take -- and

4   we put a bolt up to that hole, put it in place, hold it,

5   and put a nut on it and a stud.

6        Q       Okay.  Let's back up.  Because I'm not nearly

7   as technically oriented as you are.

8        A       You're fine.

9        Q       A flat punch, describe what kind of tool that

10  is.

11       A       A flat punch is like a -- like a round piece of

12  steel that is tapered and tempered for strength, and it

13  fits in the hole, the size of the bolt.  And you smack it

14  with a hammer pretty hard.

15       Q       So you physically hit --

16       A       The punch.

17       Q       And then the punch --

18       A       Pushes.

19       Q       -- is having contact with the bolt --

20       A       With the broken bolt, and it breaks it loose.

21  Because the welds that they weld the bolt in are not

22  welded all the way around.  They're welded on the sides.

23  And, you know, you can -- they're thin.

24       Q       Okay.

25       A       Because all they're designed to do is to hold

Southern Reporting Company (386)257-3663

152

Deposition of Robin David Hanger                                    55

1    the bolt.

2         Q     All right.  And I'm going to go back because I

3    need to see -- we're going to go back to 5 because that's

4    the clearest picture.  And I believe you have previously

5    circled here in your version of Exhibit 5 of the fender

6    bolt that was --

7         A     Correct.

8         Q     The area, the sequence of four bolts there.

9         A     Correct.

10        Q     So if you could orient to me where the flat

11   punch would make contact with the bolt.

12              Was it on this (indicating)?

13        A     On the -- what I would call the inside of the

14   dolly.

15        Q     Inside meaning interior of --

16        A     Of the dolly.

17        Q     The holding area of the dolly?

18        A     The outside of the fender.

19        Q     Okay.  So the flat punch --

20        A     The silver shiny portion there is the nut and

21   the bolt.

22        Q     Okay.

23        A     Imagine one of those missing and being a black

24   area.

25        Q     Okay.

Deposition of Robin David Hanger                                        56

```
 1        A      The remainder part of that bolt is inside of
 2   that assembly, and you can knock it out of there.
 3        Q      Okay.  Excellent.
 4               So what -- is this also the side it's welded?
 5        A      No.  The other side of the nut head -- or the
 6   bolt head is welded.
 7        Q      The bolt head is welded, so it's on --
 8        A      On the inside of the fender, between the fender
 9   and the wheel.
10        Q      Okay.  All right.  So the force of the --
11        A      Punch.
12        Q      -- punch undoes the weld that's on the other
13   side?
14        A      Correct.
15        Q      It has sufficient strength to undo that weld?
16        A      Correct.
17        Q      And then after the bolt is removed, then how
18   does the replacement work?
19        A      The replacement works by taking another new
20   bolt with a pair of long pliers and reaching up between
21   the wheel and the fender, and placing it through the hole.
22   Holding it while you put a nut on the other side.
23        Q      Okay.  So we're talking about not this interior
24   side, but the bolt replacement is inside here
25   (indicating)?
```

Deposition of Robin David Hanger                                                57

```
 1        A        Correct.

 2        Q        Meaning like the street side of the fender?

 3        A        Right.  Correct.

 4        Q        So it's not in the same area where the punch

 5   came; it's on the other side?

 6        A        Correct.

 7        Q        Okay.  In this process is -- and in this

 8   scenario, were the wheels ever taken off to remove or

 9   replace the fender bolt?

10        A        No, ma'am.

11        Q        They were not taken off?

12        A        No, ma'am.

13        Q        Were any other --

14                 MR. BRATTON:  Do you need a break?

15                 THE WITNESS:  Restroom break.

16                 MS. WITHROW:  Oh, yeah.  Absolutely.

17                 (Off the record.)

18   BY MS. WITHROW:

19        Q        All right.  Mr. Hanger, before we took a break

20   we were talking about the repairs of the fender bolt as it

21   was actually done on Tow Dolly 313 and 321.  And you had

22   described to us the process that was utilized on both of

23   those tow dollies.

24                 And just to kind of back up again, the wheel

25   that was related to that particular area of the fender
```

Deposition of Robin David Hanger                                    58

```
 1    bolt was never taken off to do the repair; is that
 2    correct?
 3         A     Yes, ma'am.
 4         Q     Okay.  And was the wheel taken off for any
 5    other reason at any point in time that you are aware of?
 6         A     No, ma'am.
 7         Q     Was the wheel taken off to change the tire?  To
 8    put on a different tire?
 9         A     No, ma'am.
10         Q     So the tires that the tow dolly arrived -- the
11    two tow dollies arrived with stayed on that particular tow
12    dolly the entire time?
13         A     Yes, ma'am.
14         Q     All right.  Were there any other parts that
15    were taken off the tow dolly and then put back on?
16         A     No, ma'am.
17         Q     Do you agree with Elite Metal's contention that
18    it is not possible to replace these fender bolts without
19    taking the wheel off?
20         A     No, ma'am.
21         Q     You do not agree?
22         A     No, ma'am.
23         Q     And tell me, as succinctly as you know how, how
24    you disagree with that contention?
25         A     Our method of removing it is based on
```

Deposition of Robin David Hanger                                     59

1    experience in our field, and it knocks right off.  The

2    broken bolt knocks right off.

3         Q    And the replacement, as you described, occurs

4    without the wheel coming off?

5         A    Yes, ma'am.

6         Q    Have you had this or similar conversations

7    about methodology used for change these broken bolts with

8    Walter Gouviea?

9         A    Yes, I have.

10        Q    Tell me about that conversation?

11        A    It was just stated as to how we were able to

12   remove it --

13        Q    Stated by you?

14        A    By my tech.

15        Q    Which one was that?

16        A    Steve -- or Greg Mentzer.

17        Q    The one that actually did the --

18        A    Uh-huh.

19        Q    And he spoke with Walter?

20        A    I believe so, yes.

21        Q    Okay.  And he explained --

22        A    That we were able to get in there to do that.

23        Q    Okay.  And do you know what Walter's response

24   was to that, if any?

25        A    No, I don't.

Deposition of Robin David Hanger                                                60

```
 1      Q      Have you personally ever talked to him
 2  specifically about the repair, how it was done?
 3      A      How it was done?  No, I haven't.
 4      Q      So the fact that Tow Dolly 321 had two broken
 5  fender bolts, it was done exactly the same way?
 6      A      Yes, ma'am.
 7      Q      And it too did not have the wheel taken off?
 8      A      No, ma'am.
 9      Q      I'm going to show you Exhibit 16 and 17.
10             (Whereupon, documents were premarked for
11  identification as Plaintiff's Exhibit Number 16 and
12  Plaintiff's Exhibit Number 17.)
13  BY MS. WITHROW:
14      Q      And I'm going to show them to you together
15  because in my thinking -- and, again, these are Car Shop
16  discovery documents to 42 and 41.
17             They appear to be checklists of sorts that are
18  done with the tow dolly in question, being 313.
19             Are you familiar with these documents?
20      A      Yes, ma'am.
21      Q      And they're the ones you produced to us?
22      A      Yes, ma'am.
23      Q      And if you could orient me to which document is
24  filled out first.
25             Is it 16 or 17?
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                        61

1        A       17 is filled out first.

2        Q       Okay.  And the timing, when is that -- when is

3   this one --

4        A       When it first -- when it first comes in.

5        Q       Okay.  So this is something that a technician

6   uses to check the --

7        A       Check the incoming.

8        Q       Okay.  All right.  And was this individual --

9   GM, is that the same person that did the repair?

10       A       Greg Mentzer, yes.

11       Q       Okay.  And it appears that to the far right on

12  Exhibit 17, it says under Warranty, broken bolt on right

13  rear fender; is that correct?

14       A       Correct.

15       Q       Okay.  And this is for Tow Dolly 313?

16       A       Correct.

17       Q       So Greg also at that time -- if we go down the

18  checklist -- checked the tire and tire pressuring.  He

19  checked the torque on the lug nuts.

20       A       Correct.

21       Q       Is there a tool that you can determine the

22  amount of foot pounds that are on a lug nut?

23       A       Yes, ma'am.

24       Q       And what's that foot pound?

25       A       Torque wrench.

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    62

1        Q        Torque wrench.   Okay.

2                 And will it demonstrate or give you a visual of

3    what the torque is?

4        A        It mechanically clicks.

5        Q        So it clicks on?

6        A        It clicks when it reaches the desired setting.

7        Q        There's a setting on this wrench?

8        A        Yes.

9        Q        Okay.   So you put the setting on --

10       A        Whatever it's supposed to be, and then it

11   clicks.

12       Q        Okay.   So on this particular document, on the

13   intake, it says that all lug nuts to 80 foot pounds.

14                So this would've been checked --

15       A        Correct.

16       Q        -- to see that's where it was?

17                And then you also checked the safety chains and

18   hooks, electrical connections, tag bracket bolts --

19       A        Correct.

20       Q        -- the jack and the ball and coupler; is that

21   correct?

22       A        Correct.

23       Q        Anything else that he checked that isn't

24   documented in this particular document?

25       A        No, ma'am.

**Southern Reporting Company (386)257-3663**

160

Deposition of Robin David Hanger                                    63

```
1        Q      Okay.  So this is on the intake?  Number 17 is

2   on the intake?

3        A      Correct.

4        Q      And then Exhibit 16, tell me the history of

5   when this one is filled out.

6        A      16 is when the unit is sold and is going out to

7   the customer.

8        Q      Okay.  So we see at the top, Murphy, and I'm

9   assuming that would be for Robert Murphy, the purchaser.

10       A      Correct.

11       Q      And 6/5/15, 10:30 a.m., what does that

12  indicate?

13       A      What do you mean?

14       Q      At the top it has --

15       A      That's the date of when this is produced, and,

16  generally, when it's going out.

17       Q      Okay.  Was that the case here?

18       A      I would assume, because I believe this unit

19  went out on the 5th.

20       Q      Okay.  And who is Mike?

21       A      He's the salesman.

22       Q      Okay.  But the GM that we see, the initials,

23  again, on inspection, is that --

24       A      Greg Mentzer.

25       Q      So for the second time, this is an inspection
```

Deposition of Robin David Hanger                                              64

1    that's done on the tow dolly, correct?

2        A    Correct.

3        Q    And am I correct in assuming that this

4    inspection was done after the repair of the fender bolts?

5        A    Correct.

6        Q    So there's a visual inspection?

7        A    Correct.

8        Q    What is being looked for in that visual?

9        A    To make sure there's -- nobody has scratched

10   it, broken anything, like a light or -- so those things.

11       Q    Just things that are generally --

12       A    Imperfections.

13       Q    And this is done with the buyer?

14       A    Yes.

15       Q    And the tire pressure is checked?

16       A    Yes, ma'am.

17       Q    And the wheel nuts for proper torque; is that

18   correct?

19       A    Yes, ma'am.

20       Q    Okay.  What is proper?

21       A    Depending on the size of the stud and of the

22   wheel.

23       Q    Okay.  So is there a number specifically that's

24   associated with -- on this particular checklist, on this

25   particular dolly, is there a number, a foot pound number?

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    65

1          A      It's not indicated on this particular

2     checklist, no.  It's just indicated that it was checked.

3          Q      So do we know what the foot pound was?

4          A      Based on Exhibit 17, it's marked as 80 on the

5     type that the print -- the type of print is marked as 80.

6          Q      And is that sufficient torque?

7          A      Yes, it is.

8          Q      Okay.  If we go back to what we were talking

9     about earlier about the specs from the NATM, I believe you

10    mentioned that the specs are between 90 and 120.

11         A      The specs just -- depending on what spec sheet

12    you look at -- there were discrepancies years ago,

13    conflicting discrepancies.  Some people say 80 to 100.

14    Some people say 90 to 120.

15                We have, since and before this was done, gone

16    by the NATM since we became a member of the NATM and the

17    NATDA.  We've gone by their specs.

18                But at the time, it was not brought to our

19    attention until actually just a week or -- a couple of

20    weeks ago, that we had never updated the checkout to

21    say -- to specs provided, which we provide a copy of the

22    specs to the customer.

23         Q      Okay.  So if I'm understanding you correctly,

24    tell me if I'm wrong, even though this says proper torque,

25    there's no number, but internally you all go by the specs

1    as denoted by NATM?

2         A    NATM, yes.

3         Q    And those specs are 90 to 120?

4         A    Yes.  Which I believe there's a copy somewhere

5    of that.

6         Q    Copy of...

7         A    The specs for a lug nut to work.

8         Q    From the NATM?

9         A    Yes.

10        Q    Okay.  Have you ever seen the manual that

11   Elite Metal has regarding the specifications?

12        A    The owner's manual for the customer?

13        Q    Yes.

14        A    Yes, I've seen those.

15        Q    Are you familiar -- and I'll show you -- and

16   we'll get back to 16 and 17.

17             We're going to look at 18 and 19 for just a

18   minute here.

19             (Whereupon, documents were premarked for

20   identification as Plaintiff's Exhibit Number 18 and

21   Plaintiff's Exhibit Number 19.)

22   BY MS. WITHROW:

23        Q    These are two separate pages produced by

24   Elite Metal from the manual.

25             And can you tell me from looking at these -- is

Deposition of Robin David Hanger                                                   67

```
1    this a document or a page you've seen from this manual?

2         A     Uh-huh.

3         Q     Okay.  And what is the foot poundage

4    recommended --

5         A     On this particular one, it's 90 to 120.

6         Q     And that is based on...

7         A     Axle rating pounds.

8         Q     On Exhibit 19, that table that says 3,500 to

9    7,000?

10        A     Yes.

11        Q     Okay.  So 90 to 120.

12              And that's where you get the number?

13        A     Yes.

14        Q     On page -- on Exhibit 18, at the bottom in the

15   blue highlighted area, it says recommended torque 15 [sic]

16   foot pounds.

17              What is that, if anything -- what does that

18   mean to you?

19        A     You mean recommended torque is 115?

20        Q     Yes.  115.  Excuse me.  Yes.

21        A     That means that they're saying to torque it in

22   that realm of 90 to 120.

23        Q     Okay.  All right.  So to go back to what you

24   were telling me earlier -- and I'm not asking to trick you

25   up, but just to make sure that I'm clear on it.
```

Deposition of Robin David Hanger                                        68

```
 1              Even though there's no number on here, you
 2    all --
 3        A     We go by the specs.
 4        Q     You go by the specs.
 5        A     That are on here.
 6        Q     Okay.
 7        A     That as of our inception in NATM is this spec
 8    here, internally (indicating).
 9              MR. BRATTON:  Just for reference, he was
10         holding Exhibit 19.
11              THE WITNESS:  Holding 19.
12              MS. WITHROW:  Holding 19.  Got it.  Thank you.
13    BY MS. WITHROW:
14        Q     So do you have any documents that would be
15    similar to either of the Exhibit 16 or 17 checklists that
16    indicate that that is what your practice is when you check
17    the torque on these lug nuts before the tow dolly is given
18    to the end user?
19        A     Yes, we do.
20        Q     And which document is that?
21        A     I don't know where it's at, but it's our
22    checklist.
23        Q     It's not either of these two checklists?
24        A     Well, it will be identical to 19, because it's
25    the same scale.  We just reprinted Number 19, Exhibit 19.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    69

1        Q      Okay.  And you have a document that's like

2   Exhibit 19 that is --

3        A      Yes.

4        Q      Is there initials by it as well?

5        A      Yes.

6        Q      Can you produce a copy of that to us?

7        A      Sure.

8        Q      Do you know if you have that document relative

9   to this specific tow dolly?

10       A      No, I don't.

11       Q      Is it a document that was created after?

12       A      After.

13       Q      After.  Okay.  Got it.

14              So there would not have been anything relative

15  to this tow dolly that said it's between 90 and 120?

16       A      No, ma'am.

17       Q      Do you have any reason to believe that Greg

18  would have known that that was the proper torque for this

19  tow dolly, 90 to 120?

20       A      I don't quite know how to answer that.

21       Q      Well, if I'm looking at something that says

22  "proper torque," and it doesn't have a definition of what

23  "proper" is -- your technicians, do they know what

24  "proper" is?

25       A      They do off of the scale that I give them now.

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                    70

```
1         Q      Okay.
2         A      But, like I said, prior to us joining NATM and
3  obtaining this type of scale -- and right now, if you were
4  to Google "torque specs," you will find a discrepancy of
5  some people saying they're 80 to 100, and some people,
6  like this, say 90 to 120.  But we implement the 90 to 120
7  at the time we joined the NATM because we follow their
8  guidelines.
9         Q      And you joined the NATM way prior to this
10 incident occurring, correct?
11        A      Yes.
12        Q      So that was your procedure at that time?
13        A      At that time.
14               (Witness nods head.)
15        Q      Okay.  I just want you to assume something for
16 one moment.
17               If the technician had not had the lug nuts
18 torqued between 90 and 120 and they were at 80, as one of
19 the checklists say -- as Exhibit 17 says, what would be --
20 if you can even imagine, what would be the effect of
21 having those lug nuts torqued at 80 and then putting that
22 tow dolly in operation?
23        A      No effect.
24        Q      No effect?
25        A      None.
```

**Southern Reporting Company (386)257-3663**

168

Deposition of Robin David Hanger                                          71

```
 1        Q       It wouldn't make the wheel come off?

 2        A       No, ma'am.

 3        Q       Would it make it loose?

 4                MR. BRAITHWAITE:  Object to the form.

 5                THE WITNESS:  No, ma'am.

 6   BY MS. WITHROW:

 7        Q       So in your professional opinion, then, it would

 8   not have caused the wheel to come off --

 9                MR. BRATTON:  Object to the form.

10                MR. BRAITHWAITE:  Same objection.

11   BY MS. WITHROW:

12        Q       -- if it had been torqued to only 80 instead of

13   90 to 120?

14                MR. BRATTON:  Objection.

15                THE WITNESS:  I'm sorry.

16   BY MS. WITHROW:

17        Q       That's okay.  All the objections --

18        A       I'm not sure --

19        Q       Would having the lug nuts torqued only to 80,

20   would that have made the wheel come off?

21                MR. BRATTON:  Object to the form.

22                MR. BRAITHWAITE:  Same objection.

23                THE WITNESS:  I'm sorry.  I have to ask the

24           question.  What does that mean when you say that?

25                MR. BRAITHWAITE:  You're allowed to answer the
```

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                    72

1          question.

2                    MS. WITHROW:  Yeah.  Let's go off the record

3          for just a second.

4                    (Off the record.)

5                    THE WITNESS:  No.  That would not make the

6          wheel come off.

7    BY MS. WITHROW:

8          Q      Okay.  That's what I wanted to know.

9          A      And I -- not to elaborate here.  But there's a

10   difference between the wheel and the hub.

11         Q      Yes.

12         A      Okay.

13         Q      Yes.

14         A      The wheel, it would not make the wheel come

15   off.

16         Q      Correct.  Yes.  Yes.  I'm with you on that one.

17         A      Okay.

18         Q      And just to change to a slightly different part

19   of the tow dolly, do you know anything about the type of

20   bearings that are used by Elite Metal on their tow

21   dollies?

22         A      Not the -- well, the type of bearing is a

23   10-pin bearing, 10-pin style bearing.  But the model or

24   the brand of the bearings, no.

25         Q      Okay.  Do you know if the type of bearings are

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                    73

```
 1    the kind that are attached with the hub, or are the

 2    bearings and the hubs separate of each other?

 3         A     I do not -- I know that they're offered both

 4    ways.  I don't know how they purchase them.

 5         Q     So you don't have any recollection as to

 6    specifically what style was used for 313?

 7         A     No, ma'am.

 8         Q     When your technicians do a visual inspection,

 9    do they look at the bearings as well to see if they're

10    properly lubricated?

11         A     No, ma'am.

12         Q     Is that something that you anticipate that when

13    the manufacturer sends you the product, that these

14    bearings are properly lubricated?

15         A     Yes, ma'am.

16         Q     But it's not something you'd double check?

17         A     No, ma'am.

18         Q     Okay.  Have you ever had a discussion with

19    Walter Gouviea about the bearings on this particular tow

20    dolly?

21         A     No, ma'am.

22         Q     You had no discussion with Walter?

23         A     Explain a little better.

24         Q     After this incident occurred, and we'll get to

25    your e-mail of August 25th, did you speak with Walter
```

Deposition of Robin David Hanger                                          74

1   about the bearings on this particular tow dolly?

2        A     Yes, I did.

3        Q     And what was that conversation about?

4        A     When he asked me what happened, and I said,

5   Based on the pictures that I see, we have a lubricant

6   problem.  There was no lubricant on one of the bearings.

7        Q     Okay.

8        A     And he denied that that was possible.

9        Q     Okay.  And tell me from what you saw -- and

10  we'll get to the pictures here shortly too as well.

11             What honed you in exactly to the fact that

12  there was no lubrication on that bearing?

13             MR. BRAITHWAITE:  Object to form.

14             MR. BRATTON:  Same objection.

15             THE WITNESS:  The outer bearing has obvious

16        evidence of no lubrication on it.  Even the portion

17        of the spindle where the bearing for the inner

18        bearings rides, in my opinion, has indication of

19        some lubricant that was on it.

20  BY MS. WITHROW:

21       Q     I'm sorry.  If you could say that again one

22  more time for me.

23       A     The outer bearing has indication of being dry

24  and having no lubricant on it.  Thus caused it to burn up.

25  And the inner bearing is a different shade and has dirt

Southern Reporting Company (386)257-3663

172

Deposition of Robin David Hanger                                      75

```
 1    around it, which means that there was some lubricant on it
 2    when everything failed.
 3         Q    Okay.  So the inner bearing had --
 4         A    Lubricant.
 5         Q    Had lubricant.
 6              And the outer --
 7         A    Did not.
 8         Q    -- did not.
 9              And what is -- when you say "indication," is
10    there --
11         A    Dry, burnt.
12              MR. BRAITHWAITE:  Objection.
13              MR. BRATTON:  Same objection.
14    BY MS. WITHROW:
15         Q    Burnt on the spindle?  Or is it --
16         A    On the picture of the spindle, yes.
17         Q    Okay.  And did you convey this to Mr. Gouviea?
18         A    Yes, I did.
19         Q    And what did he say?
20         A    He didn't see how that was possible.  But let's
21    get it back and -- let's work on getting it back here and
22    determining what happened.
23         Q    Okay.  So at the point in time that you had
24    that conversation with him, he did not have the tow dolly
25    in his possession?
```

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                    76

```
1        A      No.

2        Q      And you did?

3        A      No.  It was on the side of the road, and I was

4    trying to help Mr. Murphy.  In a panic of not knowing,

5    What do I do -- he was closer to Elite than I was, so I

6    called Elite to see if they wanted to go and get it.

7               And I didn't know -- I was unaware of the

8    impact of what all happened with your client and anything

9    else at the time.  I asked if everybody was okay, and he

10   indicated that everyone -- he was off the side of the road

11   and everything was okay.  So my conversation was trying to

12   get everybody off the road.

13       Q      Did you have a photograph sent to you from

14   Mr. Murphy who was at the side of the road of specifically

15   what we're talking about?

16       A      Not specifically on the side of the road.  But

17   he sent me pictures once he got it into a parking lot and

18   got it off the road.  He sent me pictures, yes.

19       Q      Okay.  And it was based on the pictures that

20   you saw that Mr. Murphy sent you that you had this

21   conversation with Mr. Gouviea?

22               MR. BRAITHWAITE:  Object to the form.

23               MR. BRATTON:  Same objection.

24               THE WITNESS:  Yes.

25   BY MS. WITHROW:
```

**Southern Reporting Company (386)257-3663**

174

Deposition of Robin David Hanger                                    77

1        Q        Did you have any conversations with Mr. Murphy

2    about what you thought perhaps had happened based on the

3    pictures that he showed you?

4        A        No.

5        Q        Okay.  Did you ever tell Mr. Murphy that -- how

6    the repair to the tow dolly was made?

7        A        What do you mean?  How the repair was made?

8        Q        Let me put it another way.

9                 Did Mr. Murphy ever question you as to how the

10   broken fender bolt had been replaced?

11       A        No.

12       Q        Did he know prior to purchasing the tow dolly

13   that a repair had even been made?

14       A        No.  Because it was minor.  No.

15       Q        So did -- subsequent to this incident then, did

16   you ever have conversation with Mr. Murphy indicating that

17   during the repair that you had taken the wheel off to do

18   the repair of the fender bolt?

19       A        No.

20       Q        Okay.

21       A        They never took it off.

22       Q        Did any of your technicians?

23       A        No.  Because we never took it off.

24       Q        Okay.  Did anyone from Car Shop help Mr. Murphy

25   load what he ultimately had on the tow dolly?

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    78

```
 1        A     I believe that he -- yes.  We loaded his -- I
 2   believe it was just -- we loaded his car or his truck on
 3   it.  And I'm not -- if I'm not mistaken, he had to go and
 4   get his motorcycle.  But I'm not sure of that.
 5        Q     Okay.
 6        A     If anybody did anything more than that, it
 7   would have been Greg.
 8        Q     Okay.  And you referenced a truck.
 9              What kind of truck?  Do you recall?
10        A     I'm not 100 percent sure.  I believe it was a
11   Ford Explorer or something like that.  I'm not sure.
12        Q     Do you have any reason to suspect that there
13   was too much weight for the tow dolly?
14        A     No.
15        Q     Do you know what the weight capacity is of the
16   HDLX?
17        A     5,000 pounds, I believe.
18        Q     Okay.  And you mentioned earlier in the
19   deposition that Big Hoss's Haulin' is the one that brought
20   the tow dolly from Elite Metal to the Car Shop; is that
21   correct?
22        A     (Witness nods head.)
23        Q     And who between the manufacturer and the dealer
24   makes the determination as to how the tow dolly -- this
25   particular tow dolly was to be shipped to you?
```

Southern Reporting Company (386)257-3663

176

Deposition of Robin David Hanger                                    79

```
 1        A      Me.

 2        Q      You?  That's your call?

 3        A      Yes.

 4        Q      Okay.  I can show you -- or we can talk about

 5   it.

 6               But have you read what's labeled as Exhibit 20

 7   as the reseller agreement before?

 8        A      Uh-huh.  I've read it.

 9               (Whereupon, document was premarked for

10   identification as Plaintiff's Exhibit Number 20.)

11   BY MS. WITHROW:

12        Q      Okay.  Would you agree with me that it says

13   under the shipping services that Tandem-Tow will utilize

14   its selected carrier?  Or would you prefer to take a look

15   at it?

16        A      Oh, no.  I mean, there's -- like the carrier

17   was people -- Big Hoss's was -- that I recommended and I

18   join them together.

19        Q      Okay.

20        A      Yeah, they had the option of towing it any way

21   they wanted to, but they didn't have anybody.  They were a

22   small company.

23        Q      Okay.

24        A      They used who I recommended -- or who I -- not

25   recommended.  They used who I introduced them to.  Which
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                              80

1    Big Hoss's Haulin' hauls the majority of my product.

2         Q      All right.  Do you make the request as to

3    specifically how that's done?  Either by stacking or by

4    putting it on a wedged trailer?

5         A      No.

6         Q      That's not your call?

7         A      No.

8         Q      So when you say, I need three tow dollies, they

9    determine how they're gonna get those tow dollies to you,

10   in what configuration?

11        A      They make the determination to stack them, yes.

12   That was their engineering.

13        Q      Okay.  Is there any difference between the two

14   methods of either stacking them or putting them on a

15   trailer and getting them to you?

16        A      No.

17        Q      Cost variable between the two?

18        A      A cost variable, yes.  You can single pull

19   something or put them on a wedge.

20        Q      If you could give me a ballpark of the

21   difference.

22        A      Probably $100 per unit cheaper.

23        Q      To stack?

24        A      To stack them.

25        Q      Okay.  And to go back, "stacking" means,

178

```
 1   literally, to put each tow dolly on top of the other,
 2   correct?
 3        A      Correct.
 4        Q      And do you know how these three were stacked
 5   that came to you?
 6        A      What do you mean?  In order?
 7        Q      Yes.  In order.
 8        A      Well, the HDLX was on the bottom.  The biggest
 9   unit always goes on the bottom.  And the other two were on
10   top.
11        Q      Okay.
12        A      But as far as numerical, I don't know how the
13   other two -- top, second or third, I wouldn't know that.
14        Q      Okay.  So Tow Dolly 321 that had two broken
15   fender bolts, you don't know if that was on the top or in
16   the middle?
17        A      No.
18        Q      Okay.  Did anyone from Elite Metal ever tell
19   you that the tow dollies are not designed to be stacked
20   and shipped?
21        A      No.
22        Q      Okay.  And did you talk to Walter at all about
23   the stacking of the tow dollies?
24        A      Yes.
25        Q      Tell me about that.
```

Deposition of Robin David Hanger                                    82

1       A       It was very difficult to -- it was very time

2   consuming -- not difficult -- time consuming to unstack

3   them.  And we were getting them in with broken bolts on

4   the fenders, which was not a major issue, but an issue.

5       Q       Okay.  So you conveyed this to Walter?

6       A       Yes.

7       Q       And what did he do in response to your

8   statements about receiving broken tow dollies?

9       A       Nothing.  Because it was, well, minor.

10      Q       So did he make any changes in the stacking

11  procedure that you are aware of?

12      A       A little bit more bracing to try to keep them

13  from moving.

14      Q       Did you have any input as to that design of the

15  bracing?

16      A       No.

17      Q       You said that there had been broken fender

18  bolts prior to the shipment of tow dollies.

19              When did that occur?

20      A       Couple of dollies before.

21              And then that's when we decided to write a

22  ticket and charge for it.  Because it was beginning to

23  be -- you know, one time, not a problem, we'll fix it.

24  Two times, well, let's look and see what's going on.

25  Three times, I'm going to charge you to fix it.

180

Deposition of Robin David Hanger                                      83

```
 1        Q     So was this the third time?

 2        A     Oh, thereabouts.

 3        Q     Do you have any records of the first or second

 4   time?

 5        A     No.

 6              They were verbal.

 7        Q     They were all verbal?

 8        A     Yeah.

 9        Q     So there was no --

10        A     No.

11        Q     -- ticket written up on previous --

12        A     No.

13        Q     Any other notes that you have in your files

14   that indicate you received shipments with broken fender

15   bolts?

16        A     Not that we could find.

17        Q     Okay.  So the change that was made in terms of

18   the stacking to distribute the weight a little bit

19   differently, that was done prior to this shipment?

20        A     Correct.

21        Q     Was there any other damage other than the

22   broken fender bolts?

23        A     Not that I can remember.

24        Q     Okay.

25        A     When?
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    84

1          Q      To any of the previous tow dollies that came

2    prior to this load with 321, 322, and 313.

3          A      Prior to these?

4          Q      Yes.

5          A      There was a brake line on -- one of the dollies

6    came with search brakes, and there was a brake line that

7    was pinched due to the stacking.  And the way they put the

8    brake line -- they put the stacking material over the top

9    of the brake line and tightened it up on top of it.  So

10   there's a picture of that somewhere.

11         Q      So you had to do the repair on that as well?

12         A      Yes.

13         Q      Did you talk with Walter about that particular

14   incident?

15         A      Yes.

16         Q      And what did he say in response to that?

17         A      There was no way that happened.  So we took a

18   picture and sent it to him.  He indicated that we must

19   have done that when we were unstacking them.

20               The unit was sold, so I needed to hurry up and

21   get it done.  So I just -- we fixed it.  And I don't know

22   if we ever wrote a ticket and they paid it.  I don't know

23   that.

24               In some cases we -- we -- for minor things,

25   like I said, we would fix in a time -- you know, customers

Deposition of Robin David Hanger                                    85

```
 1   were going on vacation.  A lot of people that buy these
 2   are people that are interested in vacationing, not
 3   waiting.  So it was fixed.  And I don't remember if we
 4   ever billed them or if they paid it or what.
 5        Q     And brake line repair, would that be considered
 6   a minor repair?
 7        A     A little bit more than that.
 8        Q     But you don't recollect whether they were
 9   invoiced?
10        A     I don't.
11        Q     The stacking and towing, does that have any --
12   does it cause any stress on the bearing of the tow
13   dollies?
14              MR. BRAITHWAITE:  Object to the form.
15              THE WITNESS:  I wouldn't say any more than what
16         having a car or motorcycle on there would.
17   BY MS. WITHROW:
18        Q     But would you agree with me, by the time you
19   obtained the tow dollies that had been towed from
20   Elite Metal to you, the bottom tow dolly had incurred some
21   additional stress on the bearings as a result of the
22   towing?
23              MR. BRAITHWAITE:  Object to the form.
24              MR. BRATTON:  Objection.
25              THE WITNESS:  No.
```

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                    86

```
1    BY MS. WITHROW:

2         Q    It does not?

3         A    Does not.

4         Q    Do you have any reason to believe that the

5    damage to the fender bolts was caused by anything other

6    than the stacking?

7         A    No.

8         Q    With the other damages to the brake line and

9    the other two broken fender bolts prior to this, did you

10   request authorization to make the repairs, or did you just

11   make the repairs?

12        A    Say that one more time.

13        Q    With the items that were broken on this prior

14   tow dolly prior to this incident, did you request

15   authorization to make the repairs, or did you --

16        A    Yes.

17        Q    You did.

18             And was that verbal or written?

19        A    Verbal.

20        Q    Would that have been between Jessica as well?

21        A    Yes.

22        Q    And do you know who the person at the other end

23   at Elite would have been?

24        A    Michelle.

25        Q    Michelle.  Okay.
```

184

1              And Michelle authorized the repairs?

2      A      Yes.

3      Q      Does doing a repair at your end, does it in any

4  way invalidate the warranty on the tow dolly?

5              MR. BRATTON:  Object to the form.

6              THE WITNESS:  It should not because we were an

7        authorized dealer.

8  BY MS. WITHROW:

9      Q      Okay.  So if you're an authorized dealer, in a

10  perfect world, what is the best way to get authority to

11  make the repair?

12      A      Document pictures, call them, get approval.

13  But, in the meantime, you really can't hold up your

14  customer.  So you take the chance that you're dealing with

15  a reputable manufacturer and they're dealing with a

16  reputable dealer.

17      Q      Would that include starting to work on the

18  repair prior to receiving authorization?

19      A      It would be a normal -- it would be normal in

20  the manufacturing industry -- or in the trailer industry,

21  yes.

22      Q      Okay.

23      A      It would be known that you deal with a --

24  they're dealing with a reputable dealer that's not going

25  to do something that's false.  And so the normal in this

Deposition of Robin David Hanger                                88

```
 1   industry would be, yes, to go ahead and do it.
 2        Q    What if they said, No, you're not authorized to
 3   do it; you should ship the tow dolly back instead of
 4   repairing it?
 5        A    We would know that -- there, again, as a
 6   reputable dealer, I believe that that is something that
 7   you -- what do you call -- a business or gentlemen's
 8   agreement or an understanding of what's that nature --
 9        Q    Of what the dividing line is, so to speak?
10        A    Yeah.  We have a sense of respect -- not
11   theirs, but in this industry.
12        Q    Okay.  And that was based on your professional
13   opinion, that there was something beyond what you as the
14   dealership repaired?
15        A    Yes.
16        Q    Have you ever spoken with Michelle Beck?
17        A    Oh, yes.
18        Q    Is she your primary contact if there's a need
19   for authorization or repair?
20        A    Since she became office manager there, yes.
21        Q    And was there someone prior to Michelle?
22        A    Yes.
23        Q    Who was that?  Do you recall?
24        A    I don't recall her name.  When she hears this,
25   she'll be upset.  But it's Michelle's mother.  But I can't
```

186

Deposition of Robin David Hanger                                    89

1    recall her name right off the bat.

2         Q    That's okay.  We can just call her Michelle's

3    mother.

4         A    Yeah.

5         Q    So she was in Michelle's position prior to

6    Michelle being there?

7         A    Yes.

8         Q    Okay.  And she too had authority to give you --

9    to make the repairs?

10        A    Yes.  It was stated, obviously, with --

11   obviously, let's take care of the problem, and we'll worry

12   about what we're going to do with payment and everything

13   later.  Let's get the customer satisfied.

14        Q    Okay.  That's fair.

15             Is there anyone specifically at Elite Metal

16   that you knew did not have authority to give you?  Is

17   there someone, say, that they picked up the phone at the

18   other end, you knew that was not the proper person to give

19   you authority?

20        A    No.  I only ever dealt with Walter or -- he had

21   a partner when they first started, Ed.  And he also has

22   another partner now.  There's three of them.  And I can't

23   give you -- the guy that's still there, I can't remember

24   his name.  But, no.

25        Q    Okay.  Did you ever speak with Ed Darland

Deposition of Robin David Hanger                                    90

```
 1   (phonetic)?
 2       A    Yes.
 3       Q    And did you ever speak with Ed specifically
 4   about this incident?
 5       A    Not that I know of.
 6       Q    So to go back to something you said recently
 7   about sending them a picture, we looked at a previous
 8   exhibit of a bolt.  I believe it's Exhibit 10.  And this
 9   has a stamp on it indicating that this was produced to us
10   by Elite Metal.
11            And in connection with the repair that was
12   made, this picture does not -- is not familiar to you as
13   something that Greg took and forwarded to Elite Metal at
14   any point?
15            MR. BRATTON:  Can we clarify?  I think you said
16       10.  It's actually Exhibit 6.
17            MS. WITHROW:  Oh, so, I'm sorry.  Yeah.  We
18       need no more confusion.  Sorry.
19   BY MS. WITHROW:
20       Q    It's Exhibit 6.
21       A    No.  But Greg would be able to determine if
22   that was our picture.
23       Q    Or his hand?
24       A    And his hand.  And it's very possible that that
25   is the -- because that is what the -- that is what a bolt
```

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                                91

```
 1    looks like that breaks.  So that may be the bolt that they
 2    popped out.  And Greg would know that.
 3         Q    Okay.
 4         A    That is -- when you pop it out, that is what it
 5    looks like right there.
 6         Q    Did anyone from Elite Metal ever categorize the
 7    type of repair as minor to you?
 8         A    I can't recall.
 9         Q    Any conversation with Walt implicating that
10    this was a minor repair?
11         A    On our end.
12         Q    On your end it was considered a minor repair?
13         A    Minor repair, yeah.
14         Q    But no time in your recollection did you have
15    that discussion with Walt that it was a minor repair?
16         A    I can't recall that.
17         Q    Okay.  When Mr. Murphy drove off with the tow
18    dolly, was his tow dolly under warranty?
19         A    Yes.
20         Q    Okay.  Has anyone ever made the contention to
21    you that that tow dolly was not under warranty due to the
22    repair that you had made?
23         A    No.
24         Q    Okay.  I'm going to show you Exhibit 22, which
25    is a copy of an e-mail on August 25th, 2015.
```

Deposition of Robin David Hanger                              92

```
 1              (Whereupon, document was premarked for
 2    identification as Plaintiff's Exhibit Number 22.)
 3    BY MS. WITHROW:
 4        Q      And if you could tell me what had occurred
 5    prior to this e-mail to have you sit down and send this.
 6        A      Say that again.
 7        Q      It's in regard to this specific tow dolly, 313.
 8    But what had transpired prior to this e-mail for you to
 9    sit down and write this e-mail?
10        A      What transpired prior to this e-mail?
11        Q      Yeah.  What happened that made you sit down and
12    write this e-mail?
13        A      All right.  Give me just a second to read this.
14        Q      Sure.  Take your time.
15        A      I would assume that based on this date and that
16    this is directed to Mr. Murphy, that his accident had
17    happened by then.  And we're explaining to him maybe
18    that -- from reading this, I would say that someone may
19    have told Mr. Murphy that we did something that caused the
20    accident, and so we're explaining to Mr. Murphy that we
21    didn't do anything to cause the accident and we're trying
22    to help him get the situation resolved.
23              Not knowing at that time then, like I said,
24    that anyone else was involved.  Up until -- I don't know
25    when it was.  But after all of this, that I even remember
```

**Southern Reporting Company (386) 257-3663**

190

Deposition of Robin David Hanger                                    93

```
 1    hearing that anyone else was involved in the accident.
 2    Because when I talked to him, I asked if everybody was
 3    okay and was he okay.  And outside of being shook up, he
 4    indicated that he was.
 5              And so I would say this was an e-mail that we
 6    sent out -- that Jeanine sent out.  Because she's my
 7    office manager, and I don't spell real good and I don't
 8    punctuate real good, so she doesn't like me to send
 9    e-mails off.
10         Q    Okay.  So did you dictate this e-mail?
11         A    I didn't dictate it.  But I would say I sat and
12    we discussed it and told her the procedures of what we did
13    and how we did it, and to let him know that we're -- this
14    is what we did.  And, you know, moreover, we had
15    permission from the manufacturer to replace the bolt and
16    get things done.
17         Q    Okay.  And you said that this was sent to Mr.
18    Murphy, to the best of your knowledge?
19         A    Yes.  To the best of my knowledge, this would
20    go to Mr. Murphy -- or -- no.  I would say this went to
21    Walt, my insurance agent -- no.  This did not go to
22    Mr. Murphy.  This is explaining to Elite what happened
23    because they wanted to know what happened and what we did.
24         Q    Okay.  All right.  That's fine.  It's been a
25    little over a year.
```

Southern Reporting Company (386)257-3663

191

Deposition of Robin David Hanger                                    94

```
 1        A       I have to read things three or four times.  I'm
 2   sorry.
 3        Q       Not a problem.
 4        A       I have people that help me.
 5        Q       That's fine.  I just need to know the context
 6   in which it was written and by whom.
 7        A       Yeah.  It was to inform Elite what happened and
 8   how we've arrived to this point.
 9        Q       All right.  And it says here that -- in
10   parenthesis, Elite has been informed of other incidents,
11   plural, of other bolts breaking in the past.
12        A       Right.
13        Q       And this is in reference to what you said
14   earlier with two other tow dollies?
15        A       Two or so.
16        Q       Two or so.
17                Is it possible it's more than two?
18        A       It's possible.  But I don't remember.
19        Q       Okay.  You just know that there was multiple
20   prior to this incident?
21        A       (Witness nods head.)
22        Q       It also -- on the second paragraph, it says:
23   We contacted Michelle at Elite.  See attached
24   conversation.
25                And I don't see an attached conversation.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    95

1              Is there an additional part to this e-mail?

2      A     I don't know.

3      Q     To the best of my knowledge, I've never seen

4 another conversation.

5              Did you have an e-mail exchange?

6      A     This -- this -- I'm going to assume again that

7 that means those other -- the invoice and send me the

8 corrected one so that I could submit it for payment.  I

9 would assume that that's what that means.

10     Q     Okay.  So to your knowledge there's not another

11 e-mail --

12     A     No.

13     Q     -- explaining specifically what was done --

14     A     No.

15     Q     -- or seen by you?

16     A     No.

17     Q     Okay.  It was more about the invoicing?

18     A     Yeah.  Invoicing, that's what that is.

19     Q     It also says that a photo was sent.

20     A     Uh-huh.

21     Q     Okay.  Do you know --

22     A     That was -- then, there again, I would have to

23 ask Greg if that's his hand and feet and did he take the

24 bolt picture.  And then it would have been that picture

25 that was sent of this broken bolt.

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                    96

```
 1        Q     Okay.  That's an assumption you're making --

 2        A     Correct.

 3        Q     -- based on having seen this photograph?

 4        A     Yeah.  Exhibit 6.

 5              And, I'm sorry, but I have to go to the

 6   restroom again.

 7              MS. WITHROW:  Not a problem.

 8              (Off the record.)

 9              (Whereupon, the last question was read back by

10   the reporter.)

11   BY MS. WITHROW:

12        Q     So to continue with some of the points that

13   were highlighted in your e-mail, you described the use of

14   a flat punch, which we've already talked about earlier,

15   which punched the hole out and you'd insert a new bolt and

16   that it does not require the removal of the tire.

17        A     Right.  Correct.

18        Q     That's precisely what you told me before,

19   correct?

20        A     Correct.

21        Q     Okay.  And then there's a paragraph that says:

22   In further review of the photos, it is our opinion that

23   the outside bearing had insufficient lubricant, causing

24   the bearing to fail and thus allow the hub to come apart

25   from its spindle and causing the damage.
```

Southern Reporting Company (386)257-3663

Deposition of Robin David Hanger                                    97

```
 1              Is that the same as what you described to me
 2    earlier?
 3         A      Correct.
 4         Q      And then it was your opinion at that point in
 5    time that the fender bolt location that was repaired had
 6    nothing to do with the wheel bearing failure, correct?
 7         A      Correct.
 8         Q      Have you in any way changed your position from
 9    this e-mail of 8/25/15?
10              MR. BRAITHWAITE:  Objection.  Form.
11              MR. BRATTON:  Same objection.
12              THE WITNESS:  No, ma'am.
13    BY MS. WITHROW:
14         Q      That is still your contention, that it started
15    with the failure of the bearing?
16              MR. BRAITHWAITE:  Same objection.
17              MR. BRATTON:  Same objection.
18              THE WITNESS:  Yes, ma'am.
19    BY MS. WITHROW:
20         Q      I want to direct your attention to Exhibit 23
21    and 24.
22              (Whereupon, documents were premarked for
23    identification as Plaintiff's Exhibit Number 23 and
24    Plaintiff's Exhibit Number 24.)
25    BY MS. WITHROW:
```

**Southern Reporting Company (386)257-3663**

```
1          Q      And, specifically, my questions revolve around
2    the numbers at the bottom that say DOT Numbers 1, 2, and
3    3.
4          A      Where do you see that?
5          Q      On the bottom of the page.
6                 MR. BRATTON: (Indicating.)
7                 THE WITNESS:  Okay.  I'm sorry.
8    BY MS. WITHROW:
9          Q      That's okay.  There's a lot of things on there.
10         A      Okay.
11         Q      So specifically -- number, have you seen either
12   one of these documents before?
13         A      No.
14         Q      Do you know what they are?
15         A      They look like they're some sort of a checklist
16   or an assembly.
17         Q      Okay.  And if I were to tell you that they
18   are -- to assume that they are from Elite Metal.
19         A      Okay.
20         Q      So on the bottom where we see DOT Numbers 1, 2,
21   and 3, do you have any idea what those are reflective of?
22         A      Those are tire DOT numbers.
23         Q      Tire DOT numbers?
24         A      Yes.
25         Q      And both these pages, even though it's very
```

1   light, refer to Tow Dolly 313.

2           Do you agree?

3           If you look up at the very, very top --

4           MR. BRATTON: (Indicating.)

5   BY MS. WITHROW:

6       Q    -- it's very light.

7       A    Yes.

8       Q    Okay.  So can you explain to me, if we're

9   talking about the same tow dolly --

10          MR. BRATTON:  I mean, if you can't tell --

11  BY MS. WITHROW:

12      Q    Yes.  If we are, indeed, talking about the same

13  tow dolly, why the numbers between 1, 2, and 3 are

14  different on these two documents, if you know?

15      A    And we are assuming that Exhibit 24 is for 313?

16      Q    Yes, sir.

17      A    Then I wouldn't have an answer.

18      Q    Okay.  Car Shop did not change out any tires on

19  313 after it arrived at your location?

20      A    No.  They would have no reason to do that.

21      Q    And on Exhibit 24, where there's a circle of

22  Number 3, and it says, Not installed by EMP, do you have

23  any idea who installed that?

24      A    That would be an indication of the spare tire.

25  And the spare tires are purchased.  I believe we purchased

Deposition of Robin David Hanger                                    100

```
 1   the tires from them so that they would match the wheels.
 2        Q      From "them" meaning Elite?
 3        A      From EMP, Elite.
 4               They're not attached to the dolly when we get
 5   them.  They're actually set on the deck.  Because, for
 6   stacking purposes, the tire mount is not on the dolly.
 7   So, yes, they're installed by us, but they're just like --
 8   they're mounted on the spare tire mount is all.
 9        Q      So it's equipment --
10        A      So it is a possibility that the spare tire
11   number may not match up with what leaves their plant, but
12   that's no big -- that's fishing.
13        Q      That's not a tire that's actually touching the
14   ground ever?
15        A      No.
16        Q      Okay.  But as to 1 and 2 on Exhibit 23 and 1
17   and 2 on Exhibit 24, you will agree with me that those
18   numbers do not match, correct?
19        A      I agree.
20        Q      Okay.  So somewhere --
21        A      Somebody wrote down the wrong numbers.
22               MR. BRATTON:  Object to the form.
23   BY MS. WITHROW:
24        Q      Let me show you Exhibit 25 and 26.  And we're
25   getting to the end of the line here.
```

Southern Reporting Company (386)257-3663

198

1              (Whereupon, documents were premarked for

2    identification as Plaintiff's Exhibit Number 25 and

3    Plaintiff's Exhibit Number 26.)

4    BY MS. WITHROW:

5         Q     Have you seen either of those?

6         A     I have seen pictures that look like these.  And

7    I will assume that they are those pictures.

8              But, actually, from looking at the background,

9    I have not seen these particular pictures.  But I have

10   seen pictures that resemble these.  And I know what this

11   is.

12        Q     Okay.  Tell me what this is.

13        A     This is a picture of the spindle that still has

14   the race -- still has the locking net on it, still has the

15   race --

16        Q     Tell me what --

17        A     The bearing race is the outside bearing race --

18        Q     If you could --

19        A     -- that I'm circling that 26.

20        Q     Okay.

21        A     That's the outer bearing.

22              And inner bearing race and seal are still

23   there.

24        Q     Okay.  If you could put outer and inner on

25   there as well, so that we'll know.

Deposition of Robin David Hanger                                    102

```
 1        A      (Indicating.)

 2        Q      Okay.  And I'm sorry.  Which is the race?

 3        A      The race is the part that I circled on 26.

 4        Q      Okay.  The upper or lower?

 5        A      This one (indicating).

 6        Q      You can write "race" on there, if you want to.

 7   That's fine.

 8               Okay.  And finish with your description.

 9        A      I don't know...

10        Q      Was there anything else?

11        A      No.

12        Q      Okay.  And 25, that's a slightly different

13   angle.

14        A      25 is just a different angle of the spindle.

15        Q      Is there a hub on either one of those pictures?

16        A      No hub on it.

17        Q      Okay.  What does that indicate to you, that

18   there's no hub on there?

19               MR. BRAITHWAITE:  Object to the form.

20               THE WITNESS:  Well, it would indicate to me

21          that the bearing froze up and -- the outer bearing

22          froze up, disintegrated, came apart, and the hub and

23          wheel went off.

24   BY MS. WITHROW:

25        Q      So it's passed over that end?
```

Deposition of Robin David Hanger                              103

```
 1      A      Yes.
 2             The hub -- the inner bearing is bigger than the
 3   outer bearing.
 4      Q      Okay.
 5      A      When the outer bearing fails, it lets the hub
 6   drop down.  When that happens, it starts wobbling all over
 7   the place and breaks up the inner bearing, thus allowing
 8   the wheel and hub and drum to come off and go down the
 9   road.  Which unless you can show me the wheel and hub --
10   from looking at these pictures, the wheel and hub are
11   missing.
12             MR. BRAITHWAITE:  Same objection.
13   BY MS. WITHROW:
14      Q      Okay.  Is there any other possible scenario
15   that you can -- from your history in this industry, that
16   you could surmise that occurred that would allow the hub
17   and the wheel to separate?
18             MR. BRAITHWAITE:  Object to the form.
19             MR. BRATTON:  Objection.
20             THE WITNESS:  No.
21   BY MS. WITHROW:
22      Q      Have you seen any actual parts associated with
23   either of those two pictures?
24      A      No.
25      Q      Do you know if Mr. Murphy has any parts?
```

**Southern Reporting Company (386)257-3663**

201

Deposition of Robin David Hanger                                          104

```
 1        A      I recommended to him that no matter what
 2   happens to the dolly, whether it be repaired or --
 3   anything, that he retain all the old parts that they --
 4   Elite replaces, repairs, or anything.
 5        Q      Okay.
 6        A      But I do not know if he has done that.  I
 7   didn't -- I was not even aware that he had the dolly back,
 8   which I'm assuming is correct, that I've heard.
 9        Q      Okay.  Who told you that he had the dolly back?
10               MR. BRATTON:  Objection.
11               THE WITNESS:  I don't know.
12   BY MS. WITHROW:
13        Q      So between the manufacturer and the dealer,
14   whose responsibility is it to make sure that the bearing
15   is properly lubricated?
16               MR. BRAITHWAITE:  Object to the form.
17               THE WITNESS:  The manufacturer.
18   BY MS. WITHROW:
19        Q      Now, is this on any document that you know?
20        A      No.
21        Q      Is it an industry standard?
22               MR. BRAITHWAITE:  Object to the form.
23               THE WITNESS:  Yes.
24   BY MS. WITHROW:
25        Q      So with any trailer that you receive now that
```

**Southern Reporting Company (386)257-3663**

202

Deposition of Robin David Hanger                                   105

1    has bearings, it is your assumption that the bearings are

2    lubricated when you take the trailer in?

3        A    Yes.

4        Q    Have you ever had a situation where you had a

5    wheel come off from any of your trailers from any of your

6    manufacturers?

7        A    No.

8        Q    So this is a first?

9        A    Yes.

10       Q    And the only?

11       A    Yes.

12       Q    Have you had an expert look at any of the

13   pictures that you received from the wreck?

14           MR. BRAITHWAITE:  Object to the form.

15           MR. BRATTON:  Same objection.

16           THE WITNESS:  No.

17   BY MS. WITHROW:

18       Q    Did you see any pictures of the tow dolly once

19   it was disassembled?

20       A    No.

21       Q    Did you see any after it was disassembled and

22   then reassembled?

23       A    No.

24       Q    So you've seen nothing of it?

25       A    (Witness shakes head.)

Southern Reporting Company (386)257-3663

203

Deposition of Robin David Hanger    106

```
1        Q     Okay.  Do you know how long it took before
2   Mr. Murphy got his tow dolly back?
3        A     No.  And I'm assuming that he got it back.  I
4   think I heard that.  I don't know.
5        Q     Do you know if any of his expenses were covered
6   for anything?
7        A     I don't know.
8        Q     Was Car Shop involved with paying any of his
9   expenses or covering any of his expenses?
10       A     No.  Not at this time.
11       Q     Once the trailer left your custody and control
12  and went to Mr. Murphy, that's the last time you saw of
13  that trailer?
14       A     (Witness nods head.)
15       Q     And you've made no reparations to Mr. Murphy,
16  financially, for the loss of the trailer?
17       A     I told Mr. Murphy that if he got the trailer
18  repaired and that he was unhappy with it, that we would be
19  glad to sell the trailer for him or make arrangements to
20  get him something else if he'd like.  Because we had no
21  problems with the dollies, you know.  I would sell them
22  tomorrow.
23       Q     Okay.  But he never came back to you with his
24  trailer?
25       A     We have not -- no.  We have not had any
```

1    contact.  I think he turned it over to his insurance, and

2    that was the end of it.

3        Q    And that was the last --

4        A    That was the last I've heard of anything.

5        Q    Okay.  Last two photographs here:  Exhibit 27

6    and 28.

7             (Whereupon, documents were premarked for

8    identification as Plaintiff's Exhibit Number 27 and

9    Plaintiff's Exhibit 28.)

10   BY MS. WITHROW:

11       Q    That was produced to us in the last deposition.

12       A    These (indicating)?

13       Q    Yes.

14            Have you seen either of those photographs

15   before?

16       A    Yes, I have.

17       Q    Tell me when you saw them.

18       A    Mr. Murphy took these and sent these to me

19   right after it happened, the accident.

20       Q    Okay.  I would have to say Exhibit 27 is

21   probably the clearest photograph that I've seen.

22       A    The clearest of the spindle, yes.

23       Q    Okay.  And if you would be so kind as to

24   indicate what you see, and if you could circle in and

25   write in so we have it.

Deposition of Robin David Hanger                                          108

```
 1        A    On Exhibit 27, I'm looking at a spindle with a
 2   nut, a washer, and what is remaining of the bearing race
 3   for the outer bearing.  I'm looking at a spindle that's
 4   got a deep groove in it where the hub has been riding on
 5   it for a length of time.  And the inner bearing race that
 6   has indications of having some lubricant on it, because
 7   it's not burnt, and an inner seal that is still on it with
 8   no hub.
 9        Q    All right.  And if you could kindly do as you
10   did before to kind of name the part that you're referring
11   to.
12        A    (Indicating.)
13        Q    All right.  Thank you.
14             Mr. Hanger, who do you think is responsible to
15   Ms. Moore for her injuries?
16             MR. BRAITHWAITE:  Object to the form.
17             MR. BRATTON:  Same objection.
18             THE WITNESS:  Whoever assembled this -- whoever
19        assembled this spindle.
20   BY MS. WITHROW:
21        Q    And what is the -- whoever assembled --
22        A    Whoever put the hub assembly together and put
23   it on the spindle.  It has no grease -- or had
24   insufficient grease, and thus allowed the outer bearing to
25   fail.
```

Deposition of Robin David Hanger                                        109

```
1        Q      Okay.  Were there any questions that I posed to
2    you today that you did not understand?
3        A      No, ma'am.
4        Q      Is there any additional information that came
5    to you after we've talked about anything here today that
6    you would like to fill in or add to?
7        A      I don't believe so.
8        Q      Are there any additional e-mails that were
9    passed between you and anyone from Elite Metal that we
10   have not either received this morning or talked about
11   today?
12       A      I don't believe so.
13       Q      Are there any documents that would further
14   support your position in what you believe caused the
15   failure?
16       A      Like...
17       Q      Any reference material or anything else that
18   would support your contention.
19       A      No.
20       Q      Okay.  Is there anyone other than the named
21   defendants in this case that you believe might have
22   liability for this incident?
23              MR. BRATTON:  Object to the form.
24              THE WITNESS:  No.
25              MS. WITHROW:  Then that's all I have.
```

Deposition of Robin David Hanger                                    110

```
 1              Thank you.
 2              MR. BRATTON:  Do you have any?
 3              MR. BRAITHWAITE:  I do.
 4              Mr. Plexico, are you on the phone?
 5              MR. PLEXICO:  Yes.
 6              MR. BRAITHWAITE:  Do you want to go first?  I
 7        need some time to organize things here, these papers
 8        in front of me.
 9              MR. PLEXICO:  Yeah.  Just take what you need.
10        Whenever you're finished, I'll go.
11              MR. BRAITHWAITE:  Okay.  Let's go off the
12        record for about five minutes, so that I could get
13        myself oriented here.
14              (Off the record.)
15                        CROSS-EXAMINATION
16   BY MR. BRAITHWAITE:
17        Q     All right.  Sir, my name is Taylor Braithwaite.
18   We haven't really had the opportunity to talk because I
19   came in, I think, the last minute for this deposition.
20              I represent Elite Metal Performance.  So I'm
21   the shadowy figure at the end of the table for this today.
22              Same rules apply as your earlier deposition.  I
23   just have a couple of questions for you.  Some of this may
24   be a second time around for you, if they were asked at the
25   beginning.  I just have to clarify a lot of your testimony
```

Deposition of Robin David Hanger                                    111

```
 1    from earlier.
 2              All right.  Sir, first, were you actually
 3    present at Car Shop Trailer Sales the day that this
 4    trailer, 313, was sold?
 5         A    Yes, I was.
 6         Q    Did you have any part or role in selling this
 7    trailer, in the actual sale to the customer?
 8         A    No, sir.
 9         Q    Did you have any interaction with Mr. Murphy
10    the day that this thing was sold?
11         A    No, sir.
12         Q    All right.  And I believe you testified earlier
13    that there may be some process where the trailer is loaded
14    or attached to a vehicle; is that correct?
15         A    Can you explain?
16         Q    Did you observe Mr. Murphy's trailer be -- or
17    this trailer, 313, being attached to Mr. Murphy's vehicle?
18         A    Yes.
19         Q    All right.  Can you tell us what vehicle it
20    was?
21         A    What it was attached to?
22         Q    Yes, sir.  What type of vehicle is Mr.
23    Murphy's?
24         A    Just a motor home.
25         Q    Motor home?
```

209

Deposition of Robin David Hanger                                        112

```
1        A     Yeah.  I don't know.
2        Q     All right.  Did Mr. Murphy operate the vehicle
3   or tow the trailer for any period of time in your
4   presence?
5        A     No.
6        Q     And to kind of clarify that, was there any sort
7   of test run done with the trailer?
8        A     No.
9        Q     Was the trailer disconnected from Mr. Murphy's
10  vehicle before he departed on the date of sale?
11       A     No.
12       Q     And I think you said the Car Shop Trailer Sales
13  employees would have assisted with connecting that trailer
14  to the vehicle; is that right?
15       A     Correct.
16       Q     Did you observe or hear anything from
17  Mr. Murphy regarding concern for the handling of the
18  trailer?
19       A     No.
20       Q     Either on the day of sale or anytime
21  afterwards?
22       A     No.
23       Q     All right.  Has any employee of yours, past or
24  present, mentioned that Mr. Murphy complained about the --
25  or felt that the trailer was wobbling behind the vehicle?
```

**Southern Reporting Company (386)257-3663**

210

Deposition of Robin David Hanger                                      113

1        A        No.

2        Q        Do you recall what type of vehicle -- strike

3    that.

4              Was there a vehicle loaded onto the trailer --

5    onto the tow dolly, while the tow dolly was at Car Shop

6    Trailer Sales?

7        A        I believe it was -- like I said, I believe it

8    was a Ford Ranger or Explorer or something like that.  I

9    don't remember.  But it was a vehicle, yes, an automobile.

10       Q        All right.  And it's my understanding that the

11   Tandem-Tow trailers have a feature where -- a tongue that

12   bears the weight onto the hitch --

13       A        Uh-huh.

14       Q        -- that can be adjusted for different weights;

15   is that correct?

16       A        The tongue can't be adjusted.  The platform for

17   the car can be adjusted to eliminate -- or increase or

18   decrease the tongue weight.

19       Q        All right.  Sir, do Car Shop Trailer Sales

20   employees typically make that adjustment while the

21   customer is there present with the tow dolly and the

22   things they intend to tow?

23       A        Yes, we do.

24       Q        Do you know if it was done in this case with

25   Mr. Murphy's vehicle?

Deposition of Robin David Hanger                                      114

```
 1        A     I would assume that it was done correctly,

 2   based on how the vehicle has to be loaded.

 3        Q     Did you observe this being done, sir?

 4        A     No.

 5        Q     And I think you stated that Mr. Murphy only

 6   brought the vehicle, but he -- it was your understanding

 7   he also intended to tow a motorcycle of some sort?

 8        A     Yes.  But I don't remember if he rode the

 9   motorcycle and we ended up putting it on or if he had to

10   go get it.  I don't remember.

11        Q     Would the motorcycle's addition to this trailer

12   change the platform settings?

13        A     No.

14        Q     And why is that, sir?

15        A     The car could only go on, based on the size of

16   the car, in a couple of different positions.  And the

17   motorcycle wouldn't have anything to do with it.  Because

18   the deck is in front of the car.

19        Q     All right.  Sir, I think you also mentioned

20   that the spare tires on these trailers, when you receive

21   them, they're stacked.  The spare tires are not attached

22   to the trailers?

23        A     Correct.

24        Q     Not mounted; is that right, sir?

25        A     I believe so, yes.
```

1        Q     And you've worked with Big Hoss's Haulin' a few

2    times; is that right?

3        A     Correct.

4        Q     Do you know what type of vehicle they use -- or

5    usually use to tow?

6        A     Yeah.  Generally a one-ton dually.

7        Q     Is there a particular, like, make or model or

8    color that you can recall?

9        A     Sure.  Yeah.  A light blue Chevrolet.

10       Q     Have you ever seen a red truck?

11       A     Yes.

12       Q     Big Hoss's Haulin' would use it?

13       A     (Witness nods head.)

14             MR. BRAITHWAITE:  Let me show this -- and we'll

15          actually get this marked.

16             But, Mr. Plexico, for your benefit, this has

17          previously been marked -- or provided as EMP53 from

18          those photos.

19             (Whereupon, document was marked for

20    identification as Defendant's Exhibit Number 1.)

21    BY MR. BRAITHWAITE:

22       Q     All right.  Sir, tell me if you recognize the

23    truck in that vehicle -- or in that photograph.

24       A     That is my truck.  And those spares are mounted

25    on the tongue mounts on those -- or on the spare tire

1   mounts on those two.

2       Q    All right.  Sir, so I'm going to ask:  Is that

3   the condition that you recall the trailer arriving at your

4   shop?

5       A    I do not recall all of them coming like this.

6   I recall the majority of the dollies, which I was the --

7   this is unusual that they would come mounted.  They

8   normally came with the spares off, and we set them in the

9   back of the truck.  But I could see how they would come

10  mounted like this.

11      Q    Okay.  So you do not dispute that sometimes

12  some trailers do come with a --

13      A    Based on this picture, I would not dispute

14  that, no.

15      Q    And, sir, I know we're trying to get through

16  this.  But if you'll just let me finish the question

17  before you answer.

18      A    Okay.  I'm sorry.

19      Q    Yes, sir.  It just makes it a lot easier for

20  her, and the record won't make me sound like I only do

21  half sentences.

22      A    I'm sorry.

23      Q    That's fine, sir.

24           All right.  Sir, if, arguendo, a trailer were

25  to arrive with spares mounted onto the vehicle, would you

Deposition of Robin David Hanger                                    117

1    or any of your employees have any reason to take the

2    spares off the mounts while they were in Car Shop Trailer

3    Sales' possession?

4        A    Yes.  You would have to take the spare off the

5    mount in order to put the stone guard on them.

6        Q    And is it just the spares that are taken off?

7        A    Yes.

8        Q    All right.  Do you have any record or anything

9    that basically -- any document that establishes when

10   spares are taken off, or any way to match the spare back

11   to the vehicle that it was on?

12       A    No.

13       Q    Where do you store the spares when they are

14   taken off?

15       A    We have a tire barn that we put them in with a

16   VIN number on them.

17       Q    Okay.  You don't maintain any documentation

18   regarding those -- the DOT numbers, maybe, on the tires or

19   what's going back onto which trailer?

20       A    Yeah.  The VIN number -- let me rephrase that.

21            We take the spares off when we're assembling

22   the stone guards and reassembling the trailer from being

23   on the stacks, yes.

24            If the trailer stays on our lot for sale, we

25   don't leave the spare tire on it.  At the time of -- in

```
 1   incoming inspection, we take any pieces and parts that go

 2   to that model, and tag it with that VIN number and put it

 3   in the spare tire barn.  When it's sold, we take those

 4   pieces back out and put it on that unit.

 5        Q    Okay.  So there's some way of matching that to

 6   the individual --

 7        A    Yes.

 8        Q    -- trailer?

 9        A    Yes.

10        Q    So if that documentation or that process were

11   to work, then all of the tires -- all of the equipment

12   that came with a tow dolly or trailer would go back on

13   that same tow dolly or trailer?

14        A    Correct.

15        Q    All right.  Sir, I know we talked briefly about

16   your background.

17             But you do not have any sort of training or

18   experience in mechanical engineering, correct?

19        A    Correct.

20        Q    Do you have any sort of experience in

21   hydraulics or lubrication or anything like that?

22   Lubricants?

23        A    None.

24        Q    And I think you stated that you personally have

25   never seen the trailer or the spindle or any part of this
```

Deposition of Robin David Hanger    119

```
1    trailer since it's left your lot; is that right?
2         A       Correct.
3         Q       And that would go to any Car Shop Trailer
4    employees as well?  To your knowledge, no Car Shop Trailer
5    employees have seen the trailer since it's left your lot
6    on the 5th; is that right?
7         A       Correct.
8         Q       You've also never seen the wheel, hub, or drum
9    that came off of this trailer?
10        A       Correct.
11        Q       Same for any Car Shop Trailer Sales employees,
12   they've never seen any of these parts as well?
13        A       Correct.
14        Q       All right.  You've never been to the accident
15   scene, and none of your representatives or employees have
16   been to the accident scene?
17        A       Correct.
18        Q       And the only thing you've seen from the
19   accident scene, prior to today, was, I think, a photo that
20   was identified as Exhibit 27, where, I believe, you stated
21   this was taken from the scene?
22              MR. BRATTON:  Object to the form.
23   BY MR. BRAITHWAITE:
24        Q       You can go ahead and answer, sir.
25        A       Correct.
```

Deposition of Robin David Hanger                                    120

```
 1        Q      And you stated that it is your belief that
 2   Mr. Murphy sent you this photo?
 3        A      Yes.
 4        Q      All right.  Sir, same for Number 28.
 5               You believe that this was taken at the
 6   roadside?  You recall this coming to you on the day of the
 7   accident?
 8        A      Yes.
 9        Q      All right.  How did it come to you, sir?  Did
10   it come on a phone?  Was it e-mailed to you?  How did it
11   get into your possession?
12        A      E-mail.
13        Q      E-mail?
14        A      Uh-huh.
15        Q      And do you believe it was on the day of the
16   accident or do you know when --
17        A      It was the day of the accident.
18        Q      Do you still have the e-mail that these photos
19   arrived in?
20        A      Yes, sir.
21        Q      Do you know if that e-mail has been produced,
22   sir?
23               MR. BRATTON:  I'll check on that.
24   BY MR. BRAITHWAITE:
25        Q      Okay.  So other than -- and then we discussed
```

**Southern Reporting Company (386)257-3663**

219

Deposition of Robin David Hanger                                   121

1    these two photographs.

2            Did Mr. Murphy send you any other photographs,

3    to your recollection?

4        A    No.  It was just a couple -- I mean, one or

5    two.  I mean, I don't remember.

6        Q    Okay.  Aside from these photographs, did you

7    review or look at anything else, any other document, any

8    other photos from anyone, regarding this accident, before

9    you spoke with Walter Gouviea about this incident?

10       A    I spoke to Mr. Murphy.

11       Q    Okay.  So you spoke to Mr. Murphy and you

12   looked at the photographs --

13       A    No.

14       Q    -- and then you spoke to Walter Gouviea?

15       A    I would say I spoke to Mr. Murphy, and then we

16   called Michelle.  Michelle is the one I spoke to first in

17   regards to this.  Because Walt was out of town, I believe,

18   on a delivery for another -- something.

19            And then at the same time -- the correspondence

20   was back and forth real quick because it was obviously an

21   emergency.  I got Mr. Murphy to calm down and was able to

22   get pictures, just so I could visualize what he was going

23   through and what was happen ing, what he was talking

24   about.

25       Q    Okay.  So your knowledge of the accident -- or

Deposition of Robin David Hanger                                    122

```
 1    the incident was based off of Mr. Murphy's statements to
 2    you, these photographs, and nothing else, correct?
 3                MR. BRATTON:   Object to the form.
 4                THE WITNESS:   Nothing else.
 5    BY MR. BRAITHWAITE:
 6         Q     All right.  Did you ever see any other
 7    photographs of the accident scene where this allegedly
 8    happened?
 9         A     No.
10         Q     Have you ever seen a police report or incident
11    report of any type related to this incident?
12         A     No.
13         Q     All right.  Sir, so is it fair to say that you
14    have no idea how far this trailer was driven after a wheel
15    detached from it?
16         A     Correct.
17         Q     Is it fair to say that you have no ability --
18    or no understanding of what may have happened to this
19    spindle or any part of the trailer after the wheel
20    separated from the trailer?
21         A     Say that again.
22         Q     Do you have any knowledge or any -- have you --
23    is there anything you're relying on to say -- strike that.
24                I'm going to try to simplify this as much as
25    possible.
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                     123

1              Do you have any understanding of what happened

2    to this trailer after the wheel came off?

3         A     No.

4         Q     All right.  Did Mr. Murphy at any point ever

5    state to you whether or not the vehicle tilted to one side

6    or the other -- if the trailer tilted to one side or the

7    other after the wheel came off?

8         A     Mr. Murphy didn't do that.  But it is common

9    sense knowledge that if a vehicle only has two wheels and

10   one comes off, it's going to tilt.

11        Q     All right.  Sir, that's based on common sense

12   knowledge that that would happen?

13        A     Yeah.

14        Q     All right.  And are you basing that off of any

15   experience or anything you've ever seen before?

16        A     I'm basing it on the experience that if you

17   lift up your right leg, you're going to tilt to the right.

18              I mean, I don't understand how to answer that.

19        Q     Let me ask you this, sir:  How far would a

20   spindle or the center of the wheel ride off the ground --

21   if both wheels are attached to the trailer, normal

22   operation, how high off the ground is that spindle?

23        A     Four inches.

24        Q     And if a wheel separates from the spindle as

25   you're going down the roadway, or a wheel comes off that

Deposition of Robin David Hanger                               124

```
1   trailer, is it possible that it would drag to the -- or to

2   make contact with the surface, whether it be the road

3   surface or whatever surface you're operating the trailer

4   on?

5        A      Yes, it is.

6        Q      Okay.  But you don't know how long that

7   happened in this case?

8        A      No.

9               How far it went?

10       Q      Yes, sir.

11       A      No.

12       Q      Okay.  You don't know or have any idea -- and

13  let's just call it what it is.

14              You don't know how long this thing was

15  drug [sic] through the dirt or through the asphalt?

16       A      Correct.

17       Q      Okay.  You also don't know about any of the

18  road conditions that Mr. Murphy operated the vehicle on --

19  or while he was driving that trailer from -- from between

20  your shop and the date of the incident?

21       A      No, I don't.

22       Q      So with all this absence of information, sir,

23  is it fair to say that, I guess, your -- your

24  understanding of the incident or your opinion of the

25  incident that you set forth in the e-mail that you talked
```

Southern Reporting Company (386)257-3663

223

Deposition of Robin David Hanger                                    125

```
 1   about here today, that that is speculation?  That's what
 2   could happen; is that fair?
 3                MR. BRATTON:  Object to the form.
 4                THE WITNESS:  Say that again.
 5   BY MR. BRAITHWAITE:
 6        Q     Is it fair to say that your opinion regarding
 7   bearings, grease, whatever, in this accident, that it's
 8   based -- it's just an opinion?  It's based off something
 9   that could happen; is that right?
10                MR. BRATTON:  Object to the form.
11                THE WITNESS:  I think it's based on the obvious
12        picture.
13   BY MR. BRAITHWAITE:
14        Q     All right.  Sir, is there any sort of
15   scientific evidence that you're basing that opinion on?
16        A     I feel like that's a trick question because
17   I -- I mean, I'm looking at a picture, and you're asking
18   me if it's black.  And I'm telling you the picture is
19   black.  Now you're -- I mean, I don't understand.  I'm
20   sorry.
21        Q     Well, sir, you've indicated because, just based
22   off of this photograph alone, that you can tell exactly
23   what happened with the bearings and with the drum and with
24   the hub on this wheel; is that right?
25                MR. BRATTON:  Object to the form.
```

224

Deposition of Robin David Hanger                                    126

```
 1                 THE WITNESS:  Yes.
 2     BY MR. BRAITHWAITE:
 3         Q      Okay.  And you're able to deduce that just from
 4     looking at a photograph of a damaged piece of equipment, a
 5     damaged spindle?
 6         A      Yes.
 7         Q      All right.  Sir, and that opinion does not
 8     account for how far this thing was drug; is that correct?
 9         A      Correct.
10         Q      Does not account for any damage that might have
11     occurred to the spindle as a result of going through
12     asphalt, correct?
13         A      Correct.
14         Q      Does not account for how far it may have been
15     drug through the dirt; is that right?
16         A      Correct.
17         Q      Does not account for the fact that it's a
18     photograph and not something where you may be able to
19     find -- could you not find -- do you think you could have
20     a better understand of what happened if you were holding
21     it in your hand, the actual spindle?
22         A      No.
23         Q      You can base your entire opinion on --
24         A      On that picture.
25         Q      -- just this photograph?
```

Deposition of Robin David Hanger                                    127

```
 1        A     Yes.

 2        Q     All right.  Sir, let's talk about Number 19.

 3              While we're looking at that, I'd also like you

 4   to look at Exhibit 17.

 5        A     So much for trying to keep these together.

 6        Q     Yes, sir.

 7        A     Okay.

 8        Q     All right.  Sir, now, looking at Number 17, we

 9   have 80 foot -- torque all lug nuts to 80 foot pounds of

10   pressure.

11        A     Correct.

12        Q     When a trailer comes to your shop, do you

13   simply check the torque on each lug nut, or are the lug

14   nuts set to -- or do you put a torque setting into a

15   torque wrench and then you torque everything?

16        A     Yes.  We torque -- we torque.  And if it's

17   already torqued, then the tool will click.

18        Q     Okay.  And in this instance, there's 80 foot

19   pounds of pressure, is what is indicated on this thing.

20   And I know we had a question about the discrepancy between

21   what is an industry standard and what was done in this

22   case.  So I just want you to clear this up for me.

23        A     All right.

24        Q     Would your employees have torqued the lug nuts

25   in this case according to the specs on the sheet of 80
```

226

Deposition of Robin David Hanger                                                128

```
 1    foot pounds of pressure or, according to Exhibit 19, the

 2    90 to 120?

 3         A    It was torqued to Exhibit 19.

 4         Q    Exhibit 19?

 5         A    Correct.

 6         Q    And how do you know that, sir?

 7         A    I just -- because of our experience, or our

 8    affiliation with NATM, and this is what we went to.

 9              But I have to say, we don't have the wheel.

10    The wheel -- the spindle is missing -- or the hub is

11    missing from the spindle.  So the lug nut torque, we don't

12    have it.

13         Q    Sir, I guess I'm trying to figure out what

14    you're basing this --

15         A    There's no hub on there, so we don't know that

16    the wheel came off of the hub.  The hub is gone.  The hub

17    came off the spindle.

18         Q    Sir, is it possible that the hub could have

19    been stripped off as this vehicle was been drug through

20    the dirt?

21         A    No.

22         Q    You're saying it's your opinion that it's not

23    possible?

24         A    It's my opinion, yes.

25         Q    All right.  And it's your opinion that -- is it
```

**Southern Reporting Company** (386)257-3663

227

Deposition of Robin David Hanger                                    129

1    your opinion that no damage would have been done to this

2    after the wheel came off?  No damage would be done to the

3    spindle after the wheel came off?

4         A    It would be my opinion that if the hub was

5    still on there, you mean?

6         Q    No, sir.

7              If the wheel -- if any portion of the wheel

8    came off of this spindle, if it was just the hub and the

9    tire, is it your opinion that no damage would be done to

10   this spindle as it's going down the road?

11        A    If the hub were still on there?

12        Q    Yes, sir.

13        A    If the hub came off?

14        Q    Yes, sir.

15        A    If the hub comes off of there, yes, that's --

16   that's -- I mean, from me looking at that picture, what

17   made that hub come off is that bearing failure.  That's

18   just my opinion.

19        Q    That's just your opinion?

20        A    Yes.

21        Q    And, sir, I think you stated earlier you've

22   never seen this actually happen before, correct?

23        A    Oh, I've seen it happen on vehicles -- or on

24   trailers and cars that have been, you know, used or not

25   been maintained.  But I've not seen it happen on anything

Southern Reporting Company (386)257-3663

228

Deposition of Robin David Hanger    130

```
1   brand new.
2        Q    Okay.  So you've never seen a bearing failure
3   or anything brand new, or never seen a bearing failure at
4   all?
5        A    Never seen a bearing failure on something brand
6   new.
7        Q    Okay.  So how many times have you dealt with a
8   spindle or a wheel coming off of a spindle?
9        A    Hundreds of times.
10       Q    Hundreds of times.  All right.
11            In those hundreds of times, have you seen
12   damage to a spindle?
13       A    Yes.
14       Q    In those hundreds of times, was the drum still
15   intact, or was the drum still on the spindle?
16       A    Not all the time.
17       Q    Okay.  So is it possible then, based on what
18   you just told me, that the drum could have been stripped
19   off of this spindle as it's being drug along the asphalt
20   or the dirt?
21       A    No.
22       Q    All right.  Sir, explain.
23       A    Well, I don't know how to explain that.  I
24   don't know how -- I'm still confused on your question.
25   Somebody needs to elaborate a little differently.
```

Deposition of Robin David Hanger                              131

```
 1        Q      Sir, if a wheel supporting this spindle,
 2   keeping it off the ground -- let's talk about that for a
 3   second.
 4              You have a hub and a tire.  Those separate from
 5   the spindle.
 6        A      Uh-huh.
 7        Q      We've agreed that that would cause a
 8   two-wheeled vehicle to tilt to one side or the other.
 9        A      Correct.
10        Q      And that tilt would cause this spindle to go
11   towards the surface and possibly make contact with the
12   surface; is that correct?
13        A      The drum, yes.
14        Q      And it's possible, operating this vehicle at
15   any speed, that that would cause damage to any equipment
16   or any part of the trailer making contact with the
17   surface, with the road surface?
18        A      You would not -- if the wheel came off of that
19   hub -- and you're indicating that if the hub was dragging
20   on the ground, could the dragging on the ground cause the
21   hub to come off and fail --
22        Q      Yes, sir.
23        A      Correct?
24        Q      Yes, sir.
25        A      All right.  You would not be able to drive.  If
```

**Southern Reporting Company (386)257-3663**

230

Deposition of Robin David Hanger                                    132

1    the wheel came off of that hub, you would not be able to

2    drive that thing down the road for any distance at all.

3    Enough to cause that -- in my opinion, enough to cause

4    that drum to come off of that spindle.

5         Q    All right.  But you've never been out to the

6    accident scene, and you've never seen it that way?

7         A    Correct.  Correct.

8         Q    And we said we don't know how far this thing

9    was drug.

10        A    Correct.

11        Q    And you're kind of doing this as a, say -- if I

12   were to call it a "bank shot" -- I mean, that's the kind

13   of math we're doing on this thing about what floor force

14   is beyond this, right?

15             MR. BRATTON:  Object to the form.

16   BY MR. BRAITHWAITE:

17        Q    Do you have any -- have you done any sort of

18   calculations on this?

19        A    No.

20        Q    Okay.  And I think we've already covered this.

21             No one -- you haven't had anyone else review

22   these documents or formulate an opinion on this, correct?

23        A    Right.  No.

24        Q    This is just --

25        A    My opinion.

231

Deposition of Robin David Hanger                                        133

```
 1        Q       -- Robin Hanger, and it's based off of his
 2   personal opinion?
 3        A       Correct.
 4                MR. BRATTON:  Object to the form.
 5   BY MR. BRAITHWAITE:
 6        Q       All right.  Sir, and you don't know, I guess,
 7   about anything that might have taken or stripped anything
 8   else, any additional equipment or any additional
 9   lubricant, off of this spindle, right?  You don't have any
10   background information on those facts?
11        A       Say that again.
12        Q       You don't have any information about -- strike
13   that.
14                Your opinion is not based off of any
15   information about the -- anything else at the accident
16   scene, as far as what was stripped or other parts of this
17   vehicle, right, other parts of this trailer?
18        A       I believe I understand what you're saying.  And
19   no.
20        Q       Okay.  You also don't have any information
21   about the type of lubrication that was on this spindle?
22        A       No.
23        Q       And you don't have any information about what
24   might have come in contact with this spindle before it
25   came to a rest?
```

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                   134

```
1        A     No.

2        Q     Mr. Hanger, would you tell me who Jim, I guess,

3   Bolton is?

4        A     Jimmy Berton (phonetic).

5        Q     Jimmy Berton, yes, sir.

6        A     He's a salesman -- or was a salesman.

7        Q     Is he still employed with Car Shop Trailer

8   Sales?

9        A     No.

10       Q     Do you know if he had any involvement in

11  selling this Unit 313 to Mr. Murphy?

12       A     No.  He had none.

13             MR. BRAITHWAITE:  All right.  That's all the

14        questions I have at this time.

15             MR. BRATTON:  Darby?

16             MR. PLEXICO:  Can we take two minutes here?

17        I'll get situated.

18             (Off the record.)

19                    CROSS-EXAMINATION

20  BY MR. PLEXICO:

21       Q     Mr. Hanger, my name is Darby Plexico.  I

22  represent Mr. Murphy in this lawsuit.  And I just have a

23  few follow-up questions for you.

24             This trailer in this case was pretty much brand

25  new when this accident happened; is that correct?
```

Deposition of Robin David Hanger                                                    135

```
 1          A       Correct.
 2          Q       And Mr. Murphy had only had the trailer for a
 3    few days before the accident?
 4          A       Correct.
 5          Q       You may have mentioned this earlier, but what
 6    was the maximum weight for this trailer?
 7          A       I believe it was 5,000 pounds.  I believe.
 8          Q       Is that including the actual weight of the
 9    trailer or what could be added in addition to the weight
10    of the trailer?
11          A       Let me think for just a second here.
12                  I'm looking at Exhibit 17 to see if -- it would
13    be the weight of the trailer -- or it would be the GVWR,
14    which is the Gross Vehicle Weight Rating of 5,000 pounds,
15    minus the weight of the trailer, and then the difference
16    gives you what you could put on the trailer.
17          Q       Do you know how much the trailer weighed?
18          A       I believe it was 1200 pounds.
19          Q       And Car Shop did a delivery receipt inspection
20    when they received the trailer from EMP a few days before
21    the accident?
22          A       Correct.
23          Q       And in that delivery receipt inspection,
24    Car Shop checked for proper tire pressure on the trailer?
25          A       Correct.
```

Deposition of Robin David Hanger    136

 1        Q        And during that delivery receipt inspection,

 2    Car Shop checked the wheel nuts for proper torque?

 3        A        Correct.

 4        Q        And Car Shop did a second pre-delivery

 5    inspection for Mr. Murphy when he picked up the trailer a

 6    few days before the accident?

 7        A        Correct.  Exhibit 16.

 8        Q        And Car Shop checked for proper tire pressure

 9    on the trailer when Mr. Murphy picked it up?

10        A        Correct.

11        Q        Car Shop checked the wheel nuts for proper

12    torque when Mr. Murphy picked up the trailer a few days

13    before the accident?

14        A        Correct.

15        Q        Was Mr. Murphy ever told of the fender bolt

16    repaired by Car Shop before he purchased the trailer?

17        A        Probably not.

18        Q        Why would Car Shop not have told Mr. Murphy

19    about that repair before the purchase?

20        A        Because it was as minor as -- equivalent to a

21    marker light being out and us just repairing the marker

22    light.

23        Q        Mr. Hanger, does Car Shop have any evidence

24    that the trailer was misused by Mr. Murphy before the

25    accident?

Deposition of Robin David Hanger                                    137

```
1        A    No.
2        Q    Does Car Shop have any evidence that the
3   trailer was improperly or abnormally used by Mr. Murphy
4   before the accident?
5        A    No.
6        Q    Does Car Shop have any evidence that the
7   trailer was abused by Mr. Murphy before the accident?
8        A    No.
9        Q    Does Car Shop have any evidence that the
10  trailer and all of its component parts were not properly
11  maintained in a safe and appropriate manner by Mr. Murphy
12  before the accident?
13       A    No.
14       Q    Does Car Shop have any evidence that Mr. Murphy
15  didn't adequately perform safety inspections on the
16  trailer and all of its component parts before entering it
17  onto the public roadway before the accident?
18       A    No.
19       Q    Does Car Shop have any evidence that Mr. Murphy
20  didn't keep the trailer under proper control as he was
21  driving it down I-95 during the accident?
22       A    No.
23       Q    Does Car Shop have any evidence that the
24  trailer had too much weight on it at the time of the
25  accident?
```

1     A     No.

2     Q     Would Mr. Murphy be responsible for the bearing

3  not being properly lubricated and failing in the accident?

4     A     No.

5     Q     Do you have any evidence showing any fault,

6  liability, negligence, or wrongdoing on Mr. Murphy's part

7  for the accident?

8     A     No.

9     Q     Other than what you had previously discussed in

10  your deposition, did you have any other written or verbal

11  communication with Mr. Murphy at any time before or after

12  the accident?

13     A     Just a follow-up to see what was happening --

14  because all the -- the different parties involved,

15  insurance company-wise, being ours, his, and Elite's, had

16  not corresponded and no one had been to Elite to look at

17  the trailer.  So we stayed in touch with Mr. Murphy to

18  assist him because he was our client.

19     Q     And what time frame are you talking about here?

20     A     Within over -- from the time of the accident to

21  the next three or four weeks.  And then we learned that

22  other insurance companies and people, one adjuster, wanted

23  to come look at it, and we pretty much didn't have any

24  correspondence after that.

25     Q     Did you ever have any conversations with

1  Mr. Murphy about why he thought that the wheel and the hub

2  came off the trailer?

3       A    No, sir.

4       Q    Mr. Hanger, I don't have any more questions.

5  Thank you very much for your time.  We appreciate your

6  patience.

7       A    Thank you.

8            MS. WITHROW:  I have just some quick follow-up.

9            MR. BRATTON:  I may have one or two.

10                    REDIRECT EXAMINATION

11 BY MS. WITHROW:

12      Q    Okay.  We're getting there.

13           Mr. Hanger, just a couple of quick questions.

14           Have you ever seen a video that was taken of

15 the tow dolly after this incident?

16      A    No.

17      Q    Have you ever heard of a video being produced?

18      A    No.

19      Q    Okay.  The invoices that we've talked about

20 today, specifically about Tow Dolly 313, the fact that you

21 invoiced Elite Metal for the minor repair, the fender

22 bolt, was there any other reason for invoicing them other

23 than Car Shop had been absorbing the cost of the repair of

24 the fender bolts on at least two occasions prior to this?

25      A    No.

Deposition of Robin David Hanger                                    140

```
 1              MS. WITHROW:  Okay.  That's all.
 2                     RECROSS-EXAMINATION
 3   BY MR. BRAITHWAITE:
 4        Q     Sir, I know you said you're a member of both
 5   the National Trailer Dealers Association and also the
 6   National Trailer Manufacturer Association.  I might have
 7   missed a word or two.
 8        A     Yeah.
 9        Q     Have you ever had an occasion to manufacture
10   any sort of trailer?  Ever been in that line of business?
11        A     Prior to this?
12        Q     Yes, sir.  Prior to this.
13        A     No.
14        Q     So you've never manufactured a trailer
15   yourself?  Never assembled any of the wheel assemblies,
16   correct?
17        A     Oh, I've assembled wheel assemblies thousands
18   of times on repairs and maintenance in my business, yes.
19        Q     Okay.  So when you do a wheel assembly, do you
20   also check the spindle tolerance?  Are you familiar with
21   that process?
22        A     Yes.
23        Q     All right.  Sir, while you were -- I guess,
24   speaking with regard to this trailer specifically, when
25   this trailer was brought in or brought down from the
```

239

Deposition of Robin David Hanger                                        141

1    Elite Metal shop, did any of your employees have an

2    occasion to conduct a spindle tolerance on the trailer?

3        A    No need to.  No.

4        Q    Is that something that a Car Shop employee has

5    ever done on any trailer?

6        A    No, sir.

7        Q    All right.  Sir, do you think that looking at a

8    spindle tolerance sheet -- or maybe a record of a spindle

9    tolerance, you'd be able to explain what that means, what

10   the numbers mean on a spindle tolerance sheet?

11       A    I believe so, yes.

12            (Whereupon, document was marked for

13   identification as Defendants' Exhibit Number 2.)

14            MR. BRAITHWAITE:  For Mr. Plexico's benefit,

15        we're looking at EMP000031.

16   BY MR. BRAITHWAITE:

17       Q    Okay.  And looking at that record, does that

18   look familiar to you, that format at all?

19       A    No.

20       Q    Okay.  And you've never conducted a spindle

21   tolerance or filled out a spindle tolerance record that

22   looked like that?

23       A    My assumption of a spindle tolerance would be

24   the tolerance of where the spindle -- the bearing slides

25   onto the spindle.

**Southern Reporting Company (386)257-3663**

240

Deposition of Robin David Hanger                                            142

```
 1              What you're showing me here is really not
 2     called a Spindle Tolerance Check Sheet, although it's
 3     titled that.  This is a camber and toe specification.
 4         Q    That's showing that everything is --
 5         A    This is an alignment specification sheet.
 6         Q    Okay.  Now, if you're testing the alignment
 7     and, I guess, the movement -- the alignment involves the
 8     spindle as well, correct, sir?
 9         A    The alignment aligns the spindle -- the
10     alignment allows the left tire to travel the same angle as
11     the right tire and also the camber to change upon the load
12     that is put on the trailer.
13         Q    And all of that is done to make sure that
14     there's not any excessive wear on the spindle, correct?
15         A    No.  Incorrect.
16         Q    All right.  Sir, how would you describe it?
17         A    A spindle wear is the spindle which would be
18     referenced -- best picture would be -- Exhibit 26 is the
19     spindle.
20              What you're giving me here on this Exhibit
21     EMP000031 is an alignment tolerance, not a spindle
22     tolerance.
23              A spindle tolerance would be the tolerance of
24     the spindle in stages.  Because the inner bearing is
25     bigger than the outer bearing.  And the spindle is pushing
```

Deposition of Robin David Hanger                    143

1   down to a different tolerance to allow the outer bearing

2   to slide on and for the seal to seal on it.  That is a

3   spindle tolerance.

4        Q     And that's how you've conducted them in the

5   past, sir?  Have you measured and tested that yourself in

6   the past?

7        A     Yeah.

8        Q     You have?

9        A     Yeah.

10        Q     Do you know what Elite Metal Performance's

11   testing procedures are?

12        A     No.  Because they don't machine that spindle.

13   That spindle is purchased.

14        Q     All right.  Sir, do you know what is done as

15   far as testing the vehicle -- excuse me -- testing the

16   trailer's tolerance before it leaves their shop?

17        A     No.  I do not know.

18              But, like I said, the sheet that you've given

19   me, you're referencing to a spindle tolerance, and it is

20   not.  It is not a spindle tolerance sheet.

21        Q     Yes, sir.  Okay.  You're saying that talks

22   about camber and toe?

23        A     Camber and toe.  That's alignment.

24        Q     Okay.  Would you agree with me that camber and

25   alignment can affect, I guess, the wear on the parts of

Deposition of Robin David Hanger                                                    144

1    the wheel and on the bearings on the spindle, and I guess

2    the bearings inside the drum?

3        A      Say that again.

4        Q      I'm sorry.

5               Would you agree with me that the camber and

6    cant (phonetic) of the axle -- the measurements there,

7    would impact any sort of wear on the wheel and the axle

8    and portions attached to it?

9        A      I don't understand the question.

10       Q      All right.  Sir.

11       A      I'm sorry.

12       Q      We'll strike that out.

13              All right.  Sir, did you receive any sort of

14   message or do you have any information from Big Hoss's

15   Haulin' that there was any problem transporting these

16   trailers between the Elite Metal Performance shop in

17   North Carolina and your shop in Daytona Beach?

18       A      No.

19       Q      All right.  Sir, that's all I have.

20              MR. BRATTON:  Just a couple of quick

21       clarifications on a few things we discussed earlier.

22                      CROSS-EXAMINATION

23   BY MR. BRATTON:

24       Q      You were asked about some e-mails and invoices

25   that were sent from Car Shop to -- back to Elite after --

1    or after the dolly was received by Car Shop on or around

2    June or the early part of June.

3              Do you recall reviewing those documents,

4    e-mails and invoices?

5        A     Yes.

6        Q     All right.  There was an e-mail that was

7    generated on -- I think it was June 10th, which

8    Plaintiff's counsel referenced that being the day after

9    the accident.

10             And if I recall correctly, that indicated --

11   that e-mail indicated sending a corrected invoice.

12       A     Correct.

13       Q     So in your opinion, would that show you that an

14   invoice had previously been sent to Elite regarding that

15   same issue?

16       A     It would indicate to me that, yes.

17       Q     And I think we went through the issue with the

18   numbering.

19       A     Yeah.

20       Q     I just want to clarify that an invoice would

21   have been sent to Elite prior to this accident regarding

22   the fender bolt repair.

23       A     Correct.

24       Q     And that it was you-all's practice to obtain

25   approval to do such repairs, correct?

Deposition of Robin David Hanger                                          146

1          A       Correct.

2          Q       And that was done in this case?

3          A       Correct.

4          Q       All right.  And just for clarification --

5    because I think we've talked about the actual fender bolt

6    repair numerous times, and sometimes there's been the word

7    "minor" used or different terminology used to describe the

8    type of repair.

9                  And I think you would agree -- or would you

10   agree that it is a minor repair?

11         A       I would.

12         Q       But it is a repair that is invoiced?

13                 I think that's how you explained it earlier.

14         A       Correct.

15         Q       And I think for clarification on Exhibit 17,

16   which was the checklist, just to make sure I understand

17   you correctly, the torque all lug nuts to 80 foot pounds,

18   that is not necessarily indicative of what would have been

19   done in this case, because you all adhered to the NATM

20   standards and specifications for this specific tow dolly?

21         A       Correct.

22                 MR. BRATTON:  All right.  That's all we have.

23             Thank you.

24                 THE COURT REPORTER:  Would you like to read or

25             waive?

**Southern Reporting Company (386)257-3663**

Deposition of Robin David Hanger                                                147

```
 1               THE WITNESS:  I'll waive.

 2               THE COURT REPORTER:  Counsel, would you like me

 3       to type this up or just wait?

 4               MS. WITHROW:  Transcribe it.  I'll take an

 5       e-tran, and send me a hard copy with the original

 6       exhibits.

 7               MR. PLEXICO:  I do not need a copy at this

 8       time.

 9               MR. BRAITHWAITE:  I'll take a copy.  Hard copy

10       and e-mail.

11               MR. BRATTON:  I'll take a copy.

12               (Whereupon, at approximately 1:29 p.m., the

13  proceeding was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Deposition of Robin David Hanger                                148

```
 1                      CERTIFICATE OF OATH

 2    STATE OF FLORIDA        )

 3    COUNTY OF VOLUSIA       )

 4

 5             I, Lillybeth Hernandez, Court Reporter,

 6    Notary Public, State of Florida, certify that

 7    Robin David Hanger appeared before me and was duly sworn

 8    on the 19th day of August, 2016.

 9

10             WITNESS my hand and official seal this 24th

11    day of August, 2016.

12

13

14

15

16             _____

17             LILLYBETH HERNANDEZ
               Notary Public - State of Florida
               My commission No.:  EE864473
18             Expires:  May 11, 2017

19             Digital Certificate Authenticated
               By Symantec

20

21

22

23

24

25
```

Southern Reporting Company (386)257-3663

247

Deposition of Robin David Hanger                                          149

```
 1                   CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA      )

 3   COUNTY OF VOLUSIA     )

 4

 5            I, Lillybeth Hernandez, Court Reporter and

 6   Notary Public, State of Florida, certify that I was

 7   authorized to and did stenographically report the

 8   foregoing proceedings; that a review of the transcript was

 9   not requested; and that the transcript is a true and

10   complete record of my stenographic notes.

11

12            I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties, nor

14   am I a relative or employee of any of the attorneys or

15   counsel connected with the action, nor am I financially

16   interested in the action.

17

18            Dated this 24th day of August, 2016.

19

20

21

22   _____

23   LILLYBETH HERNANDEZ
     Court Reporter
     Notary Public - State of Florida

24
     Digital Certificate Authenticated
25   By Symantec
```

**Southern Reporting Company (386)257-3663**

248

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

CIVIL ACTION NO. 9:16-cv-318RMG


D'JARIS A. MOORE,

        Plaintiff,

v.

ROBERT W. MURPHY, ELITE METAL

PERFORMANCE, LLC, and CAR SHOP

TRAILER SALES, LLC, d/b/a

BEST PRICE TRAILERS,


        Defendants.

_____/

30(b)(6) DEPOSITION OF

ELITE METAL PERFORMANCE, LLC

WALTER GAVIN GOUVEIA, DESIGNATED REPRESENTATIVE

* * * * *

Taken By Plaintiff

Davidson, North Carolina

August 2, 2016

* * * * *

Reported by:

LINDA D. CRANE, RMR, CRR

Registered Merit Reporter

Certified Realtime Reporter

2

```
 1                A P P E A R A N C E S

 2

 3    COUNSEL FOR PLAINTIFF:

 4             DAPHNE S. WITHROW, RN, ESQUIRE

 5             WEST OLIVETTI, LLC

 6             The Professional Building

 7             2 Corpus Christi Place, Suite 105

 8             Hilton Head Island, South Carolina 29928

 9             843/341-9260

10             daphne@westolivetti.com

11

12    COUNSEL FOR DEFENDANT
      ELITE METAL PERFORMANCE, LLC:

13

14             TAYLOR S. BRAITHWAITE, ESQUIRE

15             BRAITHWAITE LAW FIRM

16             759 Richland Avenue, West

17             Aiken, South Carolina 29801

18             803/649-4144

19             taylor@bfbtlaw.com

20

21

22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

```
 1    COUNSEL FOR DEFENDANT

      CAR SHOP TRAILER SALES, LLC:

 2

 3            RUFUS BRATTON, ESQUIRE

 4            AIKEN, BRIDGES, ELLIOTT, TYLER & SALEEBY

 5            181 East Evans Street, Suite 409

 6            Florence, South Carolina 29506

 7            843/669-8787

 8            jrb@aikenbridges.com

 9

10    COUNSEL FOR DEFENDANT ROBERT W. MURPHY:

11            L. DARBY PLEXICO III, ESQUIRE

12            BROWN & BREHMER

13            1720 Main Street, Suite 201

14            Columbia, South Carolina 29201

15            803/771-6600

16            ldp@brownandbrehmer.com

17            * appeared via telephone conference call

18

19    ALSO PRESENT:

20            D'JARIS A. MOORE, PLAINTIFF

21

22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

4

```
 1                    C O N T E N T S

 2                                              PAGE

 3   DIRECT EXAMINATION BY MS. WITHROW . . . . . .    7

 4   CROSS-EXAMINATION BY MR. BRATTON  . . . . . .   52

 5   CROSS-EXAMINATION BY MR. PLEXICO  . . . . . .   65

 6   CROSS-EXAMINATION BY MR. BRAITHWAITE  . . . .   67

 7

 8

 9

10                         *  *  *

11

12   REPORTER'S NOTE:

13   IF THIS TRANSCRIPT CONTAINS QUOTED

     MATERIAL, SUCH MATERIAL IS REPRODUCED

14   AS READ OR QUOTED BY THE SPEAKER.

15

16

17

18

19

20

21

22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

```
 1                    E X H I B I T S
 2   PLAINTIFF

     EXHIBIT              DESCRIPTION              PAGE
 3
 4      4        Copy of Photograph of Trailer      25
 5     31        Copy of Photograph                 27
 6     22        Assembly Build Sheet               29
 7      8        Copy of Photograph,
 8               Bates Number EMP000060             30
 9     25        Car Shop Trailer Sales Check List  34
10     26        Car Shop Trailer Sales
11               Pre-Delivery Inspection Checklist  34
12
13   REPORTER'S NOTES:
14   *  Original exhibits were retained by Ms. Withrow
15   and are not attached to original transcript.
16   *   Hard copies of exhibits were sent with
17   Mr. Braithwaite's copy of the transcript.
18   *   Exhibits were scanned and sent to Mr. Bratton.
19
20
21
22
23
24
25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

```
 1              On August 2, 2016, commencing at
 2    2:50 p.m., the 30(b)(6) deposition of ELITE
 3    METAL PERFORMANCE, LLC, WALTER GAVIN GOUVEIA as
 4    Designated Representative, was taken pursuant to
 5    notice and agreement, and pursuant to the Federal
 6    Rules of Civil Procedure, on behalf of the
 7    Plaintiff, at The Business Center, South Main
 8    Square, 442 South Main Street, Davidson, North
 9    Carolina.
10                         * * *
11                 P R O C E E D I N G S
12              MS. WITHROW:  As with previous, same
13    stipulations for this deposition?
14              MR. BRAITHWAITE:  I agree.
15              MR. BRATTON:  Agreed.
16              MS. WITHROW:  Darby, I will not neglect
17    to introduce you.
18              There is another attorney on the phone
19    that I don't think we ever told Ryan about until
20    the very end, and we apologize.
21                         * * *
22              Whereupon, WALTER GAVIN GOUVEIA, having
23    been first duly sworn, was examined and testified
24    as follows:
25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

```
 1                    DIRECT EXAMINATION
 2   BY MS. WITHROW:
 3        Q.    You and I just met a few minutes ago.
 4   My name is Daphne Withrow, and I am Ms. Moore's
 5   attorney, the plaintiff's attorney in this matter.
 6   As you may know, Ms. Moore's vehicle was hit by the
 7   wheel that came off the tow dolly that Mr. Murphy
 8   was towing on I-95 back on June 9 of 2015.
 9              Just for the record, I mean no
10   disrespect by calling you Walt.  We have agreed
11   that that's okay?
12        A.    Uh-huh.
13        Q.    If you could state your full name for
14   the record, please.
15        A.    Full name is Walter Gavin Kalei Gouveia.
16        Q.    The location, the address of your --
17        A.    Shop?
18        Q.    Yes.
19        A.    It's 211 McKenzie Road, Mooresville,
20   North Carolina.
21        Q.    And how long have you been located
22   specifically there?
23        A.    We have been there probably a little
24   over a year at that location.
25        Q.    Where were you prior to that?
```

1    A.    We were on -- shoot -- 117 Infield

2    Court.

3    Q.    Just for purposes of ease and

4    convenience, Elite Metal Performance, LLC, I will

5    refer to oftentimes as Elite Metal, sometimes just

6    Elite.  Car Shop Trailer Sales, doing business as

7    Best Price Trailers, I am going to call it Car

8    Shop, just to make it easier.

9         Have you ever been deposed before?

10   A.    Excuse me?

11   Q.    Have you ever been deposed before?

12   A.    No.

13   Q.    No.  Okay, three newbies today.  So I'm

14   sure that Taylor has explained to you the process

15   of just questions and answers?

16   A.    Briefly, yes.

17   Q.    The court reporter is going to be taking

18   down everything that we say.  The main thing is to

19   remember not to speak over each other.  I think

20   we've done pretty well today trying to maintain

21   that.  When you respond, you have to say yes or no

22   or I don't know, but she can't record a head shake

23   or an uh-huh or an uh-uh.

24   A.    Okay.

25   Q.    If anything I ask you is unclear, just

1    ask me to repeat it or clarify it or say it again

2    or whatever.  Just ask me for some kind of

3    clarification.  I know it's been a very long day,

4    so if at any point you need a break, please just

5    speak up.

6              Are you taking any medications today

7    that would make it difficult for you to sit still

8    for any length of time?

9         A.    No.

10        Q.    So as you say, you've never been deposed

11   before.  Have you ever been involved with a lawsuit

12   as Elite Metal Performance?

13        A.    No, ma'am.

14        Q.    When did Elite Metal come into being?

15        A.    April of 2012.

16        Q.    And as has been made clear to us, you

17   are the president of Elite Metal Performance?

18        A.    Yes, and half owner.

19        Q.    And half owner.  And your other half

20   owner is?

21        A.    Ed Dona.

22        Q.    He didn't want to join the party with us

23   today?

24              Did you, in preparation for this

25   deposition, did you review any documents?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

10

1      A.      Very briefly.

2      Q.      What specifically did you review?

3      A.      Some of these pictures and just our

4    warranty policies and stuff.

5      Q.      As to your understanding as to why we're

6    having this deposition today, do you have a good

7    understanding of why we're here?

8      A.      Sure.

9      Q.      What is that, in your mind?

10     A.      Just the case, in the injury case with

11   Ms. Moore.

12     Q.      Walt, have you ever been to Charleston?

13     A.      Yes.

14     Q.      You have.  As a visitor?

15     A.      Yes.

16     Q.      You have not lived in Charleston?

17     A.      No.

18     Q.      Any family there?

19     A.      No.

20     Q.      No dealers located in Charleston?

21     A.      No.

22     Q.      And tell us a little bit about your

23   education.

24     A.      I went to -- I graduated high school and

25   went to a year in college.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

258

1    Q.    What did you study in college?

2    A.    Just liberal arts.

3    Q.    Do you have any technical training?

4    A.    OJT.  I got 10-plus years in heavy

5    equipment technician, 10-plus years in the waste

6    industry with trucks and compactors.

7    Q.    So how did it come to pass that you and

8    Ed developed Elite Metal Performance?

9    A.    I was formerly partners with another

10   gentleman who normally took care -- because our

11   businesses, we have three lines of business.  We

12   have the trailers.  We also have the machine shop

13   and the compactor business, which is mainly what I

14   kind of take care of, anything in the back shop.

15   So we got three lines of business.  My -- my first

16   partner kind of handled the trailers and the

17   machine shop.  He moved on.  And then Ed and I went

18   to high school together in Hawaii, so that's how --

19   he was on the financial side, so I brought him on

20   board as a partner.

21   Q.    What was the name of the gentleman that

22   handled the trailers prior to you taking over?

23   A.    His name was Dave Ault.

24   Q.    When did he relinquish as --

25   A.    I think, if I remember correctly, 2014

1    -- the end of 2013, 2014.

2        Q.    So then would it be safe to say that you

3    took over the trailers after Dave left?

4        A.    Yes.

5        Q.    Are there, aside from Ryan, are there

6    other family members that work for Elite Metal?

7        A.    Yes, I have another nephew that just

8    does general maintenance, cleanup.

9        Q.    And what is his name?

10        A.    His name is Derren.

11        Q.    If you can -- I know it's probably

12    difficult, being the president of the company and

13    half-owner -- tell me specifically what your

14    responsibilities are.

15        A.    My responsibility, like I say, I handle

16    more of the back -- back of the business, the shop

17    side, dealing with the compactors and whatever

18    machine shop issues come up, to help the people

19    that I got in charge, you know, help them make

20    decisions on a few things.

21        Q.    So when you say, back business, you are

22    talking about the compactors and the machine shop;

23    correct?

24        A.    Yes.

25        Q.    What would you call the trailer side,

1   just trailers?

2        A.    Yes.

3        Q.    Okay, so we are talking about back

4   business and trailers.  I'm just trying to make

5   sure I understand your terminology.

6              How many employees do you have right

7   now?

8        A.    Nine.

9        Q.    Nine, okay.  Kind of correlating with

10  the back business, Tandem Tow, is that the division

11  of the trailers exclusively?

12       A.    Yes.

13       Q.    Elite Metal is still open for business;

14  correct?

15       A.    Yes.

16       Q.    What was it called when you first took

17  it over?

18       A.    It was Race City RV.

19       Q.    Did they make trailers then as well?

20       A.    Yes.

21       Q.    Are they of similar or the same design

22  as the ones now?

23       A.    Exactly.

24       Q.    Do you know if Race City was ever

25  involved in any lawsuits?

1    A.    No.

2    Q.    Have you all ever filed for bankruptcy?

3    A.    No.

4    Q.    And your annual sales number?

5    A.    Annual sales is about, anywhere from

6    eight to nine hundred thousand.

7    Q.    And the percentage of that that is

8    attributed to trailers?

9    A.    Trailers would probably be 20 percent,

10    maybe.

11    Q.    And you've got no pending litigation

12    other than this matter at this point in time?

13    A.    Yes, ma'am.

14    Q.    Alan Fink, his name came up one time.

15    Can you tell me what his position was with your

16    company?

17    A.    He was our marketing -- marketing guy

18    that handled the dealer agreements and anything

19    dealing with the dealers.

20    Q.    And I believe Michelle testified that he

21    was what she called nonactive.  Does that mean he

22    is not employed with you all?

23    A.    Yes, he's not employed with us.

24    Q.    Is there anyone besides Ed and yourself

25    in a kind of member-manager position?

```
 1        A.     No, ma'am.

 2        Q.     So between you and Ed.  Then everybody

 3   else is underneath you?

 4        A.     Yes.

 5        Q.     Do you know Chip James?

 6        A.     No.

 7        Q.     Former employees that were employed at

 8   the time of this incident, June 9, 2015, that are

 9   no longer in your employ, could you give me some

10   names?

11        A.     No, not offhand.

12        Q.     If I give you some names, could you tell

13   me if they are --

14        A.     Sure.

15        Q.     William Corey Parker?

16        A.     Yes.

17        Q.     He's no longer there?

18        A.     No longer.

19        Q.     Matthew Beaumont?

20        A.     Yes, no longer.

21        Q.     Chris, with a long name that begins with

22   a J?

23        A.     Yes, no longer.

24        Q.     Is their departure from your company,

25   does it have anything to do with this matter at
```

1    all?

2        A.    No.

3        Q.    None?

4        A.    None at all.

5        Q.    Again, for simplification, because we

6    are all getting very lazy -- I'm getting very lazy

7    towards the end of the day.

8            We recognize there were three tow

9    dollies in question that were stacked, that were

10   transported from your facility to Car Shop.  And

11   for purposes of ease, we are going to refer to them

12   by the last three digits of their Vehicle

13   Identification Number.  So the tow dolly in

14   question -- if you'd like to look at this to make

15   it easier.  This is the bill of lading -- it's

16   Exhibit Number 2 -- more or less lays out that the

17   tow dolly in question that we are discussing today

18   is number 313, the HDXL trailer.  Then there were

19   two other trailers, VIN 321 and 322, that were

20   stacked on top of that.

21       A.    Yes.

22       Q.    That's correct.  And it is our

23   understanding -- or it's my understanding at this

24   point, after Michelle's testimony, that she

25   generates the bill of lading; is that correct?

1        A.      Yes.  Just so you know -- and you

2   probably already know that Michelle kind of took

3   care of all my trailer department needs.

4        Q.      Okay.

5        A.      Which you probably figured that out.

6        Q.      We're getting there.  And that's kind of

7   a broad term, so maybe we can --

8        A.      Okay.

9        Q.      -- drill down on that a little bit.

10  When you say, took care of that, tell me the role

11  that you have given her.

12       A.      She was my office manager, so she

13  managed -- she managed the trailer department, as

14  far as taking in the work, getting the billing

15  done.  Whatever issues our customer had, she took

16  care of.

17       Q.      Does she have the ability to authorize

18  repairs done by dealers?

19       A.      Sure.

20       Q.      So if somebody calls her and says, Look,

21  we've got a broken fender bolt --

22       A.      Right.

23       Q.      -- she can say, fix it?

24       A.      Yes, and she runs it through Ed and

25  myself.

1          Q.    I have a couple questions regarding the

2    National Association of Trailer Manufacturing.   Are

3    they a regulating body?

4          A.    Yes.

5          Q.    They are?  And you are a member?

6          A.    Yes, ma'am.

7          Q.    And as I understand it, there is a

8    compliance verification program that's done every

9    two years; is that correct?

10         A.    Yes.

11         Q.    And what do you have to show in terms of

12   compliance?

13         A.    What do we show?

14         Q.    Yes.  What do they look at when they

15   come?  Do they look at processes and procedures

16   that you have in place?

17         A.    Yes, and if we're using the right

18   lights, all the proper equipment.

19         Q.    Do they provide guidance, or do they

20   mandate that you use them?

21         A.    I'm sure it's a mandate.  You need to

22   use certain quality of parts to go -- to be part of

23   their association.

24         Q.    All right.  Have they ever cited you for

25   anything that you were not using properly or that

1    you made a change as a result of?

2        A.    From my understanding, we had one issue

3    of lighting, just a certain type of lighting that

4    we needed to switch over to.

5        Q.    Do they allow you a grace period to make

6    a change?

7        A.    Yes.

8        Q.    And then you are fully still under their

9    membership?

10       A.    Yes, uh-huh.

11       Q.    Do you also have to speak to them or

12   alert them to any pending litigation?

13       A.    I'm not sure.

14       Q.    What about if, in the event that there

15   is a settlement or something goes to trial

16   involving Elite Metal?

17       A.    I'm not sure.

18       Q.    Is there a contact person that tells you

19   specifically what you need to do, or do you have a

20   book?

21       A.    That would be Michelle.

22       Q.    Did you have to notify them about this

23   incident?

24       A.    No.

25       Q.    As far as federal DOT guidelines, is

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

267

```
 1    there any specific regulations that you need to

 2    review to stay in good manufacturing processes?

 3         A.    Just with the NATM Guidelines, the DOT

 4    regs.

 5         Q.    Okay.  Would it affect your business if

 6    you were not a member of the NATM?

 7         A.    I'm not sure.  But I think, being

 8    associated with that type of affiliation, it's a

 9    plus because we know what we are doing, what we

10    need to do properly.

11         Q.    Do you currently have any dealers?

12         A.    No, we do not.

13         Q.    You do not.  Why did you switch your

14    model?

15         A.    It was a business decision, financial,

16    and it was easier for us to deal with our customers

17    up front and knowing what's going on, better to

18    control our product.

19         Q.    So did this incident have any bearing on

20    that?

21         A.    It did not.  It just -- we were already

22    in the process of doing it.  This just helped us to

23    --

24         Q.    Did it push you along a little bit?

25         A.    No, because we already had dates that we
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

268

1    were going to get it done.

2        Q.    And you had to alert your dealers?

3        A.    Yes.

4        Q.    How much notice did you give them?

5        A.    I need to look -- it's on there,

6    whenever their contract expired.  There was a

7    contract expired date on there for the dealership.

8        Q.    Did you cut all your dealers at one

9    time?

10       A.    No.  Everyone had their -- whenever

11   their contract was up was when their time ended.

12       Q.    So you knew within a window of time that

13   that was --

14       A.    Yes.

15       Q.    So when in the whole process did Car

16   Shop not become a dealer any longer?

17       A.    I think it was -- I think they expired

18   in November.

19       Q.    Of 2015?

20       A.    Yes.

21       Q.    So they were notified --

22       A.    Prior.

23       Q.    -- a couple months after this incident?

24       A.    Yeah.

25       Q.    Did you ever speak to Mr. Hanger about

 1  that?

 2      A.    Yeah, we spoke about it.  I mean, we

 3  just told him what the reasons were that we'd

 4  rather sell up front.

 5      Q.    This is for lack of a better way of

 6  putting it.  Was there any bad blood between you

 7  two because of that?

 8      A.    No, not for me anyway, there wasn't bad

 9  blood.

10      Q.    Was Mr. Hanger unhappy?

11      A.    I think he was a little disappointed

12  because I know he liked the trailers.  But, you

13  know, that's it.

14      Q.    Can you still sell him trailers even,

15  say as a one --

16      A.    Yeah, we would not cut him off from

17  buying our trailers and doing what he needs to do.

18      Q.    That's what I was wondering.

19      A.    Yeah.

20      Q.    So he could, if he wanted to call you up

21  and buy --

22      A.    Yes.  He could individually purchase

23  trailers from us, yes.

24      Q.    Could he resell them?

25      A.    He could do whatever he wants once he

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1   buys the trailer, yes.

2        Q.    Dumb question.  Sorry.

3        A.    Yes.

4        Q.    So your relationship with Car Shop prior

5   to this, how would you characterize it?

6        A.    I think it was like an owner

7   relationship type, where you'd have with any owner

8   of a business.  It was cordial.  I mean, we're --

9   we're friends.

10       Q.    Did that change after this incident?

11       A.    I don't -- I don't think it changed.

12  It's just, the communication stopped.

13       Q.    Okay.

14       A.    I mean, there was no -- since we weren't

15  -- they were not our partners anymore, there were

16  no need to have dialogue back and forth.

17       Q.    Was there ever any finger-pointing

18  between the two of you as to this incident

19  specifically?

20       A.    No.  Not on my end, no.

21       Q.    What about on Mr. Hanger's end?  You

22  can't --

23       A.    Yes.

24       Q.    I guess what I am trying to find out is

25  if there was any conversations where there was any

1    discord between the two of you?

2        A.    No.

3        Q.    Were they a good dealer?

4        A.    They were one of our best dealers, yes.

5        Q.    And you would still characterize them

6    that way?

7        A.    Sure.

8        Q.    Other than the National Association of

9    Trailer Manufacturers, are there any other

10   professional organizations to which you belong?

11       A.    No.

12       Q.    I can't imagine there is a whole variety

13   of other --

14       A.    There is -- I just can't remember what

15   -- it's the manufacturer -- I can't think of it

16   right now.

17       Q.    Is it specific to trailers, or would it

18   be --

19       A.    It is over manufacturing.

20       Q.    Manufacturing, generally?

21       A.    Yes.

22       Q.    We had Ryan's testimony as to the

23   quality-control issues.  And I am going to try to

24   steer clear of the quality-control issues, but I

25   still want to make sure that I'm understanding all

```
1    this because this was kind of a complex area.
2              (Exhibit Number 4 was marked for
3    identification prior to the deposition.)
4    BY MS. WITHROW:
5        Q.    I am going to show you Exhibit Number 4,
6    which is, to the best of my understanding, an
7    example of one of your trailers.
8        A.    Yes, ma'am.
9        Q.    I believe Ryan has testified previous to
10   this -- and you can see somewhat, because it's so
11   difficult to tell, that he has circled -- if you
12   want to look at it closer, you can see the pen
13   mark -- that these are the fender bolts that we
14   were talking about when we talk about fender bolts
15   in this.
16       A.    Correct.
17       Q.    I just want to make sure we are on the
18   same page.  Walt, do you know where the wheel is
19   that came off?
20       A.    No.
21       Q.    Did anyone from Elite ever go on I-95 to
22   look for the wheel?
23       A.    No, ma'am.
24       Q.    What, if anything, do you know about
25   Mr. Murphy's attempts to locate the wheel?
```

26

```
 1     A.    I don't.
 2     Q.    Did you ever have any conversation
 3  directly with Mr. Murphy?
 4     A.    I have, once.
 5     Q.    And when was that?
 6     A.    That was after the fact.  I think it was
 7  in -- it was taking a while to get his trailer
 8  completed because of insurance situations.  And he
 9  was wondering why it was taking so long.
10     Q.    Was he a little unhappy about the
11  situation?
12     A.    Yes, rightfully so.
13     Q.    It was approximately what, about a
14  four-month wait that he had?
15     A.    Yes, ma'am.
16     Q.    So did he have any conversations with
17  you as to what he thought had happened that day?
18     A.    Not that I can remember.  But I would
19  say no.
20     Q.    Did you have any conversations with
21  Robin as to what -- between the two of you?
22     A.    Yes.
23     Q.    Tell me what you know to be Robin's
24  contention, if you can.
25     A.    Robin's side, he thinks that the wheel
```

27

```
1    was not greased, the bearings were not greased,
2    causing the bearings to fail.
3            Q.    Do you agree with that?
4                  MR. BRAITHWAITE:  Object to the form.
5            A.    It's all speculation because we don't
6    have -- we don't have all the pieces of the puzzle
7    put together.
8            Q.    Do you have enough pieces to suggest
9    that the bearings failed?
10                 MR. BRAITHWAITE:  Object to the form.
11           A.    No.
12                 (Exhibit Number 31 was marked for
13   identification in a previous deposition.)
14                 (Scan of only one photo was provided to
15   the court reporter.)
16   BY MS. WITHROW:
17           Q.    I want to show you what's been listed as
18   Exhibit 31.  And it's previously in Michelle's
19   deposition been referenced as two pictures that
20   were sent to her by Mr. Murphy.
21           A.    Yes.
22           Q.    This is apparently the picture that was
23   sent by Mr. Murphy after the incident occurred.
24                 Do you see any bearings on that picture?
25           A.    I see bearing races.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1     Q.    Okay.  You see no bearings?

2     A.    No bearings.

3     Q.    Do you see a hub?

4     A.    I don't see no hub.

5     Q.    Do you see a castle --

6     A.    I see a castle nut, yes.

7     Q.    -- nut?  Would the hub be behind the

8  castle nut?

9     A.    Yes.

10    Q.    Do you see damage to the castle nut?

11    A.    Yes.

12    Q.    Do you have any idea what could have

13  caused the damage to the castle nut?

14          MR. BRAITHWAITE:  Object to the form.

15    A.    It's all speculation.  From being drug.

16    Q.    Could the hub have come over the top of

17  the castle nut?

18          MR. BRAITHWAITE:  Object to the form.

19    A.    Yes.

20    Q.    Could it be with the wheel?

21          MR. BRAITHWAITE:  Same objection.

22    A.    Could the hub be with the wheel?

23    Q.    Yeah.

24    A.    Speculation, it could be, yes.

25    Q.    So if we --

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1      A.    Not necessarily in that order.

2      Q.    Okay, I understand that.  Since we don't

3  have the wheel, and the wheel has not been

4  recovered, there's no way to determine if the lug

5  nuts had been properly torqued, is there?

6          MR. BRAITHWAITE:  Object to the form.

7      A.    No.

8      Q.    Do you know if they were properly

9  torqued before they left Elite?

10     A.    Yes.  In QC they are, yes.

11     Q.    Is there any specific document that

12  shows us the fact that they were torqued prior to

13  leaving?

14     A.    It should be on the QC report.

15     Q.    Does the QC report go by another name?

16  Could that be the Assembly Build Sheet?

17     A.    Assembly Build Sheet.

18     Q.    I don't want to put words in your mouth.

19  But if there is another QC report that would

20  adequately reflect if the torque on the lug nuts

21  was checked, you can let me know.

22          (Exhibit Number 22 was marked for

23  identification prior to the deposition.)

24  BY MS. WITHROW:

25     Q.    You've got Exhibit 22 in front of you?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

277

1    A.    Yes.

2    Q.    Okay.

3    A.    I don't see it.

4    Q.    Do you have another QC form that might

5  have it on there?

6    A.    That would be a Ryan question.

7    Q.    Okay.  I think I had a Ryan question.

8  I am not going to paraphrase his testimony, but I

9  don't believe that he had something that

10 specifically showed that the torque was checked --

11 or that it was reflected in any document --

12           MR. BRAITHWAITE:  Objection.

13    Q.    -- at least not that we've seen.

14           (Exhibit Number 8 was marked for

15 identification prior to the deposition.)

16 BY MS. WITHROW:

17    Q.    Getting back to the fender bolts, look

18 at Exhibit 8.  It's grainy, so I don't know if

19 you'll be able to discern.  But can you see the

20 bolt that was replaced?

21    A.    If anything, it would be the shiny spot.

22    Q.    Why would that one be shiny?

23    A.    Because it's either missing or cut off.

24    Q.    So a shiny one would be indicative of a

25 different bolt that's been placed in that area?

1      A.    Yes.  Bolts get powder-coated along with

2   the trailer.  They are welded on.

3      Q.    They are welded on as well?

4      A.    Yes.

5      Q.    Where are they welded?

6      A.    They're welded on the inside of the

7   bracket.

8      Q.    On the inside of the bracket?

9      A.    Yeah.  So, see the bolt sticking out

10  here?

11     Q.    Yes.

12     A.    It's on the back side of that flange,

13  and it's welded on the flange.  It's on this flange

14  here.

15     Q.    Okay.

16     A.    It's welded.

17     Q.    So in order to make a repair of a broken

18  fender bolt, how is that done?

19     A.    You would need to cut those welds off to

20  get it off.

21     Q.    Is that the only way to do that?

22     A.    That would be the only way -- yeah, cut

23  it off to get it off, yes.

24     Q.    Do you have to take the wheel off to do

25  that?

1        A.      Yes.

2        Q.      Is that the only way to do that?

3        A.      If you just wanted to get the bolt --

4                MR. BRAITHWAITE:  Object to the form.

5        A.      If you just wanted to get the bolt out,

6    you don't need to take the wheel off.  But if you

7    wanted to replace it, you would need to.  It would

8    not fit up in between the tire and the bracket.

9        Q.      So are you familiar with Mr. Hanger's

10   contention that the wheel was not taken off to make

11   this repair?

12       A.      Yes.

13       Q.      Do you agree with that?

14       A.      No.

15       Q.      Have you worked with a flat punch?

16       A.      Yes.

17       Q.      Would a flat punch be able to extract

18   the bolt, in your experience?

19       A.      If it wasn't welded, yes.

20       Q.      Okay.  And all the bolts, the fender

21   bolts, are welded before they leave your shop?

22       A.      Yes, before they even get powder-coated,

23   so they come back -- the powder coat is over the

24   weld and the bolt.

25       Q.      Do you have a document that indicates

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

280

1    that the bolts are welded as part of your process?

2         A.    I don't have -- I don't have a document

3    saying that.  But that is one of our steps before

4    they go to powder coat, yes.

5         Q.    I know this sounds like a stupid

6    question, but how exactly are they welded?  Is

7    that something that one of your employees does?

8         A.    Yes.

9         Q.    And that's with an actual welding --

10         A.    Yes, with a mig welder.

11         Q.    Do you think that the replacement of

12    this fender bolt had anything to do with what

13    ultimately happened with the tire, the wheel coming

14    off?

15         A.    I don't think that bolt itself does, but

16    the process getting to the bolt could have.

17         Q.    What specific process getting to the

18    bolt?

19         A.    Taking the tire off.

20         Q.    So then, in putting the tire back on,

21    what would need to have been done wrong in order

22    for it to have potentially caused this incident?

23              MR. BRAITHWAITE:  Object to the form.

24         A.    Not being properly torqued, causing the

25    tire to come off, and steps -- one step leads to

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1    the next.

2         Q.    Do you have any photographs that you can

3    point to that would support the theory that the lug

4    nuts that were put back on were not properly

5    torqued?

6         A.    No.

7         Q.    Do you have any document that may have

8    been given to you by Mr. Hanger or anyone from Car

9    Shop, indicating that the bolts -- the lug nuts

10   were not properly torqued?

11        A.    No.

12             (Exhibit Numbers 25 and 26 were marked

13   for identification prior to the deposition.)

14   BY MS. WITHROW:

15        Q.    I have two documents that are Car Shop

16   documents, and they are Exhibits 25 and 26.  We'll

17   take a look at them.  And they are specific to what

18   we were just talking about, with the torque of the

19   lug nuts.  Take a minute to look over those.

20        A.    (The witness complied.)  Okay.

21        Q.    Would you agree with me that between

22   these two documents, check sheets, if you will,

23   that they would argue against the fact that proper

24   torque wasn't given to the wheel nuts?

25        A.    It says -- it checks proper torque, but

1    it doesn't give the torque specs.  You could put it

2    on with an impact gun and say that it's torqued.

3        Q.    What about Number 25, when it says, "to

4    80FP"?  Would that be within --

5        A.    Where did you see that?  I'm sorry.

6        Q.    That's the third line item down on

7    Exhibit 25, that says:

8                    "Torque all lug nuts to 80FP."

9        A.    I'm hoping that they didn't -- 80

10   foot-pounds?

11       Q.    Uh huh.

12       A.    They normally need to be torqued to 115

13   foot-pounds, not 80.

14       Q.    Okay.  So if they torqued it to 80FP,

15   that would not be sufficient?

16       A.    No.

17       Q.    And would that be the same for all

18   wheels?

19       A.    Yes.

20       Q.    Do you know the lug pattern on these

21   wheels?

22       A.    5-bolt pattern.

23       Q.    Would it differ with a 6-bolt pattern?

24       A.    I'm sorry, it's a -- yeah, it's -- no,

25   it should be a star pattern on the torque sequence.

1    Q.    So 80 would not be sufficient, is what

2    you are saying?

3    A.    No.

4    Q.    Have you seen either of these two

5    documents before?

6    A.    No.

7    Q.    If they were torqued to 80, is it

8    possible that the lug nut could come loose?

9    A.    Sure.

10   Q.    Walt, there's been testimony from

11   Michelle that -- Ms. Beck, excuse me -- regarding

12   the invoices.

13   A.    Yes, ma'am.

14   Q.    And she has testified that -- and

15   there's e-mail to support -- that she had requested

16   from Car Shop the invoices for repair of the two

17   tow dollies.  We will get back into that.  But two

18   tow dollies, as you recollect, had broken fender

19   bolts in that stack shipment.

20        Do you want me to backtrack?

21   A.    No.  I just -- I thought it was just one

22   trailer with broken bolts on it.

23   Q.    There actually were two.  There were two

24   invoices generated.  Actually, there were three

25   invoices generated that we received.  One had the

1    wrong VIN, and then a new one was generated some

2    five days later with the correct VIN.    Ms. Beck

3    has testified that she -- and it's in the e-mails

4    again -- that she requested an invoice from Car

5    Shop.

6              Are you familiar with the process that

7    she goes through?

8         A.    No.  But knowing Michelle, she's very

9    thorough, and she wanted to probably match

10   everything up with the VIN, for our record, if

11   anything.

12        Q.    Do you have to approve those invoices?

13        A.    Not necessarily.

14        Q.    So do you know if these invoices for

15   these repairs to these two separate tow dollies

16   were ever paid?

17        A.    No, they were not paid.  We found out --

18   my partner Ed and I found out about those invoices

19   after the accident, after we found out about the

20   trailer.  And we were advised not to pay them yet.

21        Q.    And who advised you not to pay them?

22        A.    Our insurance company.

23        Q.    Was there a reason given not to pay

24   them?

25        A.    No.

1      Q.     Which insurance company -- I'm sorry,

2   because there are several involved here.  Which

3   insurance company or which individual?

4      A.     Cincinnati.

5      Q.     Cincinnati.  What was the individual --

6      A.     I'm not -- I'm not sure.

7      Q.     It wasn't Chip?

8      A.     I'm not sure.

9      Q.     Have you ever met Chip?

10     A.     I might have.  I'm just not sure.  I

11  can't remember.

12     Q.     So it was an individual representing

13  Cincinnati that advised you not to pay the

14  invoices?

15     A.     Yes.

16     Q.     Was that communicated to Michelle?

17     A.     I think so.

18     Q.     So did you communicate in return to

19  Mr. Hanger and say:  We are not going to pay this

20  invoice?

21     A.     No.

22     Q.     You just let it go?

23     A.     Yes.

24     Q.     Did he ever call you and say:  Hey,

25  Walt, you owe me for this?  Pay the invoice.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1      A.     No, he never called me on it.  And I
2  guess a lot of that was with the dealer agreement.
3  You know, those minor things should be covered by
4  the dealer.
5      Q.     So a fender bolt replacement is minor?
6      A.     Should be, yes.
7      Q.     That was one of the questions I had for
8  you, how you discern a minor repair from a nonminor
9  repair?
10     A.     As long as it's not structural.  A
11 fender is not a structural repair.  Minor repairs,
12 lights, little cosmetic things.
13            Anything to do with welds, structural
14 stuff, is considered major.
15     Q.     That makes sense.  So a fender bolt is
16 not a major repair?
17     A.     No.
18     Q.     And Michelle can authorize repair of
19 that?
20     A.     Yes.
21     Q.     I know we talked some before about
22 Mr. Hanger's contention about the failure of the
23 bearings.  Tell me who your bearing manufacturer is
24 at this point in time.
25     A.     We get our bearings from a company

1    called Redneck Trailers.

2        Q.    That's a great name.  Okay.  Is that

3    your single manufacturer?

4        A.    No, we also get bearings from TexTrail.

5        Q.    The difference between the two

6    manufacturers is what?

7        A.    TexTrail offers hub bearing assembly

8    already as a unit.

9        Q.    The hub and the bearing are together?

10       A.    Yes.

11       Q.    Are they also packed?

12       A.    Yes.

13       Q.    So then Redneck is just, the hub and the

14   bearing are separate?

15       A.    Separate.

16       Q.    And who does the packing of the

17   bearings?

18       A.    The technician.

19       Q.    Technician meaning Elite Metal?

20       A.    Yes.

21       Q.    So what bearings were -- if you can tell

22   by Exhibit 31 -- were utilized in the manufacture

23   of 313?

24       A.    These bearings were probably from

25   Redneck.

41

1        Q.    How do you make that distinction?

2        A.    I don't.  Just the dates when that

3  happened.

4        Q.    Okay.  So when was Redneck your single

5  supplier, so to speak?

6        A.    I'm not sure on the dates.

7        Q.    But TexTrail --

8        A.    We were going through TexTrail on -- on

9  assemblies, so that was already in the works with

10  TexTrail.  Redneck does not offer that.  And it was

11  a lot cheaper to get the assembly than it was to

12  get each individual piece.

13        Q.    Okay.  But at the time of the wreck,

14  Redneck was your sole distributor -- I mean, the

15  sole manufacturer of your bearings?

16        A.    No.  I mean, we still got bearings and

17  stuff from TexTrail.

18        Q.    How did you decide who got what?

19        A.    It was just -- just pricing.

20        Q.    Oh, I'm sorry.  That was a bad question

21  on my part.  I'll put it another way.

22              How do you determine, when you're

23  building the tow dolly, who got which bearings?

24        A.    It's what we had in stock at the time.

25  If we had those bearings in stock, we'd use them.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

289

1        Q.      "Those" meaning Redneck?

2        A.      Yes.

3        Q.      So your technicians, do they know the

4    difference when they get a Redneck versus a

5    TexTrail?

6        A.      Yes.

7        Q.      They do?  Would it stand to reason that

8    they would know, if a Redneck hub with bearings

9    came, that they would have to pack those bearings?

10       A.      Not those bearings.

11       Q.      Not those bearings?

12       A.      No.

13       Q.      They would only pack the TexTrail ones?

14       A.      Individual, yes.

15       Q.      Is there a possibility for confusion as

16   to having those bearings packed?

17       A.      No, because they come all in an

18   assembled box.

19       Q.      Which ones are you referring to?

20       A.      TexTrail, the assembly stock.

21       Q.      But the Redneck ones, they would have to

22   pack the bearings?

23       A.      Yes.

24       Q.      Is there any documentation that you can

25   point to that tells us exactly which bearings were

1    utilized for specifically this tow dolly 313?

2        A.    Probably be a Michelle question.  She

3    has the build sheet, and she would know what

4    bearings went in what trailer.

5        Q.    Would that have been produced to us

6    already?

7        A.    I don't know.

8            MR. BRAITHWAITE:  Off the record.

9            (There was a discussion off the record.)

10   BY MS. WITHROW:

11       Q.    I'm sorry.  Michelle would have the

12   records that indicate which bearings were utilized

13   for --

14       A.    I'm pretty sure.

15       Q.    Just for clarification, you did have

16   both these manufacturers' bearings at this

17   particular point in time?

18       A.    I think so, yes.

19       Q.    If you had Redneck's bearings and they

20   were not lubricated, what would happen?

21           MR. BRAITHWAITE:  Object to the form.

22       A.    They would not have made it to Florida.

23       Q.    Where would they have made it?

24       A.    Not very far.  The trip from

25   North Carolina to Florida is 500 miles.  My

44

1    opinion, that's just my opinion --

2         Q.    I'm just asking your opinion.

3         A.    -- the bearings would not make it that

4    long on a load.

5         Q.    Is it possible to have been -- the

6    bearings have been lubricated but not sufficient?

7              MR. BRAITHWAITE:  Object to the form.

8         A.    Still would not have made it.

9         Q.    Do you know if you have a checklist -- I

10   believe we looked at the Tow Dolly Checklist

11   numerous times -- that indicates anything about the

12   bearings that are checked before they leave Elite

13   Metal?

14        A.    It's more of a visual inspection, see

15   the grease on the outside bearing.

16        Q.    Do you have anything that indicates a

17   visual inspection was done that shows that there is

18   lubrication on the outside of the bearing?

19        A.    Not that I can see, no.

20        Q.    Is it part of the process, or is that

21   just not a document that you have?

22        A.    It's part of the process that Ryan knows

23   to check.

24        Q.    So it's something that he visually

25   inspects --

1      A.      Yeah.

2      Q.      -- and makes a mental note of?

3      A.      Yes.

4      Q.      He doesn't use a checklist, say, similar

5    to Exhibit 18 with -- you may have looked at this

6    one before -- with the order verification and tire

7    pressure and lights in working order?

8      A.      Don't have it on there.

9      Q.      You would agree with me, there is

10   nothing as to a visual inspection of the bearings?

11     A.      No.

12     Q.      Did you personally look at the tow

13   dollies before they left?

14     A.      No.

15     Q.      Were you part of the stacking procedure

16   to stack the three tow dollies?

17     A.      No.

18     Q.      That was all Ryan's?

19     A.      Yes.

20     Q.      In terms of the transportation after the

21   tow dollies are stacked, is that something that you

22   all dictate as the manufacturer of the tow dollies?

23     A.      Excuse me?

24     Q.      Do you tell your dealers how they are

25   going to receive their tow dollies after they have

1    been stacked --

2        A.    No.

3        Q.    -- and they're ready for delivery?

4        A.    No.

5        Q.    That's a choice made by the dealers?

6        A.    Yes.

7        Q.    Did you ever have any problems with

8    broken fender bolts prior to this incident?

9        A.    It happened once, going to Florida.

10       Q.    So it was going to Car Shop?

11       A.    Yes.

12       Q.    Do you know the window of time when this

13   occurred?

14       A.    No, ma'am.

15       Q.    Did it concern you that there was a

16   problem with the --

17       A.    Yes.  We did -- we did -- Robin called

18   me and told me that they broke a bolt and was

19   asking if we used grade A bolts.

20            I said, yes, on the fender mount.

21            And we made an adjustment to the bracket

22   to try to relieve some of the weight on the bolts

23   that hold those brackets that we made.

24       Q.    So those brackets --

25       A.    So we made an adjustment.

1    Q.    Tell me again the name of the brackets

2    used for stacking.

3    A.    It's angle iron brackets.

4    Q.    Angle iron, yes.  So you made

5    adjustments in the angle iron brackets?

6    A.    To support some of the weight.

7    Q.    And do you know if that eliminated the

8    fender bolt breakage?

9    A.    It happened again the second time.  But

10   it probably took care of the weight issue, but not

11   the twist issue.

12   Q.    So there's two forces at work?

13   A.    Yes.

14   Q.    And those angle irons, is that a device

15   used within this industry to stack?

16   A.    No, it's -- Tandem Tow Trailers, it's

17   unique.  So it's not made to be stacked, so we

18   modify brackets to make them work.

19   Q.    I see.  So you can't open a catalog and

20   --

21   A.    Yeah, I can't order a stacking bracket

22   for a Tandem Tow Trailer.

23   Q.    So you fabricate these angle irons

24   yourself?

25   A.    Yes, ma'am.

1      Q.     Okay.  So when this happened the first

2      time, did you speak with Robin directly about it,

3      or was that --

4      A.     Yes.

5      Q.     And then you made -- I'm not trying to

6      paraphrase -- you made some changes to the angle

7      iron to relieve the pressure?

8      A.     The weight, yes.

9      Q.     The weight, okay.

10     A.     Where the weight was supported by

11     another -- by a frame on the existing trailer.

12     Q.     So what is your opinion as to how the

13     fender bolts broke?

14     A.     Speculation, twisting, shifting.

15     Q.     Okay.  On the 500-mile trip?

16     A.     Yes.

17     Q.     Does anyone assist Ryan with stacking

18     these tow dollies?

19     A.     Yes, another employee.

20     Q.     Was it anyone specifically?

21     A.     Just who we got available.

22     Q.     Do you find the transport company Big

23     Hoss responsible for any of the damage to the --

24            MR. BRAITHWAITE:  Object to the form.

25     Q.     -- fender bolts?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

49

1      A.    I don't know.

2      Q.    Did you ever put in a complaint or a

3   request for payment for repairs to Big Hoss?

4      A.    No.

5      Q.    Have you ever had a wheel fall off

6   before this?

7      A.    No, ma'am.

8      Q.    And none since?

9      A.    No.

10      Q.    In terms of the warranty as it applied

11   to Mr. Murphy, was his warranty valid when he

12   received the tow dolly from the Car Shop?

13      A.    Not -- not through us, not through the

14   manufacturer.

15      Q.    So what did he have?

16      A.    He had a one-year warranty on -- on

17   parts and labor on the trailer.

18      Q.    Okay, he did have -- that was in place?

19      A.    Yes.

20      Q.    Okay, that's fine.

21      A.    His trailer was repaired.

22      Q.    Correct.

23      A.    Yes.

24      Q.    And he received it back?

25      A.    Yes.

297

```
 1        Q.    And you all did the repair work?

 2        A.    Yes, ma'am.

 3        Q.    Did you do any inspection, any other

 4   testing on it, once you got it back?

 5        A.    No.

 6        Q.    Walt, is there any question that I asked

 7   you that didn't make sense that you answered?

 8        A.    No.

 9        Q.    So you understood every question?

10        A.    Yes, ma'am.

11        Q.    Is there anything, based on what we've

12   already talked about, that maybe came to you in a

13   light bulb moment, that you'd like to add to

14   anything that we --

15        A.    No.

16        Q.    Do you believe that there is someone

17   other than the defendants that have been named in

18   this action, which is Mr. Murphy, Elite Metal

19   Performance, and Car Shop Trailer Sales, that is

20   responsible to Ms. Moore for the injuries that

21   she's suffered?

22            MR. BRAITHWAITE:  Object to the form.

23            MR. BRATTON:  Object to the form.

24        A.    I know the trailer has been touched

25   since it left the shop.  That's all I can say.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

298

51

1    Q.   Do you feel like there is another body
2  or another company or another individual that's
3  responsible?
4            MR. BRAITHWAITE:  Same objection.
5            MR. BRATTON:  Same objection.
6    A.   I don't know.
7    Q.   Is there any additional documents -- and
8  we've gone through plenty of them -- any additional
9  documents that you may have in another place at
10  Elite Metal that may be helpful in this matter at
11  all, that we haven't seen already?
12            THE WITNESS:  Have they got everything?
13    A.   I don't know what you have and what you
14  don't have.  My understanding, you have everything
15  that we have.
16    Q.   Okay.  Well, we had a few documents
17  today that came up that we didn't have.  So that's
18  why I'm throwing it out there one more time.
19    A.   Yeah.
20    Q.   Some people do this; some people don't.
21  Did you take any notes or records or anything on
22  your own?
23    A.   No, ma'am.
24    Q.   Did you advise anybody to take notes?
25    A.   Michelle normally takes care of all the

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

299

```
 1   note-taking and recordkeeping, documentation.
 2               MS. WITHROW:  Very good.  Thank you very
 3   much.
 4               THE WITNESS:  Thank you.
 5               MR. BRATTON:  Take a quick break.
 6                    CROSS-EXAMINATION
 7   BY MR. BRATTON:
 8        Q.    May I call you Walt as well?
 9        A.    Yeah, that's fine.
10        Q.    Walt, my name is Rufus Bratton.  I
11   represent Car Shop Trailer Sales in this case.
12   I've just got a few more follow-up questions.  If
13   I ask you anything you've already been asked, I
14   apologize.  If you don't understand my question,
15   just let me know.  If you answer my question, I'm
16   going to assume you understood it.  Is that fair?
17        A.    Okay.
18        Q.    Going back to -- and I may jump around
19   because she's covered a lot, but I kind of want to
20   go through some of the things she's covered.
21               The conversations you had with
22   Mr. Hanger about broken fender bolts, you indicated
23   there was one prior occasion where you had -- I say
24   prior occasion -- prior to this incident, where you
25   all were notified of a broken fender bolt.  Is that
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

300

```
 1   right?
 2        A.    Yes, one.  Robin and I, yes.
 3        Q.    That was communication between you and
 4   Robin?
 5        A.    Yes.
 6        Q.    So there may have been others?
 7        A.    Ever since I've known Robin, I mean, he
 8   called me direct on stuff.
 9        Q.    Right.  You said you all changed the
10   stacking assembly because of the bolts -- the bolts
11   were breaking?
12        A.    We didn't change the stacking; we just
13   added an extra bracket to support the weight.
14        Q.    So you --
15        A.    We stacked it the same.
16        Q.    Something was done differently.  It
17   might not have been the stacking?
18        A.    Yes.
19        Q.    But you all changed how it was all done
20   before they were transported; correct?
21        A.    Yes.
22        Q.    I mean, is it your belief that there was
23   just this one occasion, or could there have been
24   others where there were broken fender bolts?
25        A.    No, that was it.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

301

1     Q.    And you all would have just changed that

2  off of one time?

3     A.    Yes.  Well, like I say, these brackets

4  weren't something you could order.  So it was -- it

5  was as we go.  We made adjustments as we went.

6     Q.    So Robin calls Elite -- or does he call

7  you directly on that occasion?

8     A.    He either calls me or Michelle, yes.

9     Q.    Do you recall speaking to him?

10    A.    On the broken -- the first time, yes.

11    Q.    What did he inform you?  What did he

12  say?

13    A.    From my recollection, he asked me if we

14  used grade A bolts on the fenders.  And I said yes.

15    Q.    And he was asking that.  I guess, did he

16  first tell you that he had a broken fender bolt?

17    A.    Yes.

18    Q.    And he asked you what type of bolt you

19  all used?

20    A.    Yes.

21    Q.    And you told him, the same kind that he

22  asked you about?

23    A.    Right, if we used grade A bolts.  I said

24  yes.

25    Q.    Was there a discussion about fixing that

1    bolt?

2        A.    No.    There was no -- oh, fixing, no.    I

3    assumed that he already took care of it.

4        Q.    So you didn't have any problem with him

5    fixing the fender bolt that was broken?

6        A.    No.    That was part of our -- I mean,

7    minor repairs was something that they normally took

8    care of anyway.

9        Q.    So there would have been no issue with

10   him doing that?    Elite would have had no concern

11   with that being the case?

12       A.    No.

13       Q.    And they would have had permission from

14   you all to do such repairs such as replacing the

15   fender bolt; correct?

16       A.    Yes.

17       Q.    So moving forward to the same -- the

18   incident that we are here for today, or at least

19   the communication about a broken fender bolt, were

20   you involved in that at all?

21       A.    I didn't find out about the broken

22   fender bolt till after.

23       Q.    And that was when an insurance company

24   told you not to do anything about it?

25       A.    It was somewheres along the line.    I was

56

1   -- I was -- I was just surprised we had an invoice

2   about the broken fender bolt.

3        Q.    But if you had learned about it the day

4   that someone from Car Shop called, whether it be

5   Michelle, you, or someone else, there would not

6   have been an issue with that bolt being repaired?

7        A.    No.

8        Q.    You were asked some questions about the

9   torque of the lug nuts, and I think you were shown

10  an exhibit about that.  Has Elite ever provided Car

11  Shop with any documentation that reflects the

12  proper torque of the lug nut?

13       A.    I think it's in the maintenance manual.

14       Q.    What does that maintenance manual

15  reflect?

16       A.    I can't remember -- I can't remember,

17  offhand.

18       Q.    So your comment about 115, you don't

19  have any basis for that?  You just --

20       A.    115 is off the NATM specs.

21       Q.    Are those provided to Car Shop?

22       A.    They should be.  They are a member.

23       Q.    Is it specific to the type of trailer

24  that it is, or does torque vary on types of

25  trailers?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

304

1      A.    Yes, depends on the size.

2      Q.    Would you know with any certainty

3    without referring to these manuals, or was that

4    simply a speculation when you commented earlier

5    about the 115?

6      A.    That's what we used for our trailers,

7    that the size of wheel nuts that we use for our

8    trailers requires a 115 wheel torque.  Because we

9    don't deal with any other trailers in any other

10   sizes, we know it's 115.

11     Q.    You were shown documents that showed

12   that Car Shop checked off:

13              "Torque all lug nuts . . ."

14         Correct?

15     A.    Yes.

16     Q.    And you don't know with any specificity

17   what the foot-pounds were when that would have

18   taken place, do you?

19     A.    Are you talking about their chart?

20     Q.    I'm asking, assuming they torqued the

21   lug nuts, you would have no way of knowing with any

22   specificity what the torque was in foot-pounds that

23   they did, if they did that?

24     A.    No.

25     Q.    You were asked about a visual inspection

1    that Ryan completes, I believe you said.  Does that

2    sound right?

3        A.    Yes.

4        Q.    Is that something that's done after the

5    entire trailer is assembled?

6        A.    Yes.

7        Q.    Are there any inspections done in I

8    guess what's previously been referred to as packing

9    of the bearings, or anything in that regard?

10       A.    Not an inspection per se, but the techs

11   know how to pack bearings.  But that's what I mean.

12   He just used the visual inspection on the outer

13   part to see that it's properly, it's lubed

14   properly, greased properly.

15       Q.    That's only on the outside?

16       A.    That's only on the outside, correct.

17       Q.    You don't know what's on the inside?

18       A.    Don't know what's on the inside, no.

19       Q.    There is nothing done in the process to

20   determine that you've documented a checklist for

21   the inside?

22            MR. BRAITHWAITE:  Object to the form.

23       A.    No, sir.

24       Q.    So you had no way of knowing whether the

25   inside was properly greased; is that fair?

```
 1                    MR. BRAITHWAITE:  Object to the form.
 2         A.    I don't know.
 3         Q.    There is no document that shows that;
 4    correct?
 5         A.    Correct.
 6         Q.    And a visual observation can't tell
 7    that; correct?
 8                    MR. BRAITHWAITE:  Object to the form.
 9         A.    I don't know.
10         Q.    You don't have any knowledge of how Car
11    Shop would have repaired the fender bolt, do you?
12         A.    No.
13         Q.    Other than -- I take that back.  Other
14    than, you have received communication from Robin
15    about how he did that; correct?
16         A.    Yes.
17         Q.    And he informed you that he took a flat
18    punch, punched out the bolt --
19         A.    And put another one in.
20         Q.    -- and replaced the bolt.  And he did
21    all that without taking --
22         A.    Without taking off the tire.
23         Q.    Say that again.
24         A.    He did all that without taking off the
25    tire.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1          Q.     You don't have any reason to dispute

2    that that could be done, do you?

3          A.     I don't think it can be done.  I know it

4    can't be done.

5          Q.     You know it can't be done?

6          A.     We tried it.

7          Q.     Just because you can't do something

8    doesn't mean somebody else can't do it; correct?

9          A.     Correct, you're right.

10         Q.     Obviously, there are various tools out

11   there that may be able to punch out bolts, insert

12   bolts, tighten bolts, et cetera.  Would you agree

13   with that?

14         A.     Sure, unless he's got a tool that can

15   shrink a bolt and put it in and let the bolt expand

16   again, that would be the only way to do it.  But,

17   yes.

18         Q.     I understand you are saying you don't

19   think it can be done.  But, again, you would -- if

20   it can be done, you wouldn't have any reason to

21   dispute that?

22              MR. BRAITHWAITE:  Object to the form.

23         A.     Yes.

24         Q.     And I think we talked about this

25   earlier.  You commented that the fender bolt issue

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

308

1   is just a minor repair; correct?

2       A.      Yes.

3       Q.      Because those bolts just simply hold on

4   the fender.  They don't attach to anything

5   structural; correct?

6       A.      Yes.

7       Q.      Were you informed by Michelle prior to

8   -- strike that.

9               When were you informed by Michelle about

10  the broken bolt that's at issue in the case?

11      A.      When we received an invoice.

12      Q.      So there was -- it's my understanding

13  there was an invoice that was sent the day, or the

14  day after, and she requested an additional -- a

15  revised invoice be sent.  Does that sound accurate

16  to you?

17      A.      I'm not sure.

18      Q.      At that time, was it your intention to

19  pay the invoice?

20      A.      No.

21      Q.      Why not?

22      A.      Because I was going to have a

23  conversation with Robin about that invoice.

24      Q.      But ultimately, your decision not to pay

25  it was a result of an insurance company telling you

```
 1    not to pay it?
 2              MR. BRAITHWAITE:  Object to the form.
 3         A.    As much as I can remember.
 4         Q.    So I guess the issue with the invoice is
 5    more over whether you should be charged for it as
 6    opposed to not whether it should be done; correct?
 7         A.    Yes.
 8         Q.    Did you ever have that conversation with
 9    Robin?
10         A.    No.
11         Q.    How was the decision to stack these
12    units reached?
13         A.    How was the decision to stack -- let me
14    think about this.  We needed to find a way to stack
15    the trailers, and this is the way we came up with
16    stacking the trailers.  I spoke to Robin about how
17    we were going to do it, and he agreed:  Let's give
18    it a shot.
19         Q.    So that was something you all wanted to
20    do was stack, that Elite wanted to do, was stack
21    them?
22         A.    No, we did not want to stack trailers.
23    It was easier to have them pulled on a wedge
24    trailer.  The decision to stack the trailers was to
25    save freight.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

310

63

1       Q.     And that was a decision made by Elite?

2       A.     No.

3       Q.     That was a decision made by the dealer?

4       A.     Yes.

5       Q.     But you all approved that decision and

6  went forward with delivering them in that fashion?

7       A.     Yes.

8       Q.     There has been some discussion about, I

9  guess, observing the pictures and comments about

10  powder coating.

11       A.     Yes.

12       Q.     When does that take place?

13       A.     When all the fabrication is done.  So it

14  will go down in pieces and get powder-coated and

15  get reassembled back at the shop.

16       Q.     So it is taken down there -- it's never

17  -- is it assembled, disassembled, and reassembled?

18       A.     No, it's fabricated in pieces, sent to

19  the powder shop.  They get powder-coated, brought

20  back, and we assemble the trailer back at the shop.

21       Q.     And Ryan's visual inspection takes place

22  after the powder coating?

23       A.     It starts there because you start with

24  the powder coating, the quality of the powder

25  coating.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

311

1      Q.     Other than Robin, have you dealt with or

2   had any communications with anyone at Car Shop?

3      A.     Yeah.  I think it was his partner at the

4   time.  I just can't remember his name.  I can't

5   remember the gentleman's name.  But it was nothing

6   in the lines of this situation.  It was just

7   another contact that I dealt with.  I think his

8   name was Jeff, first name was Jeff.

9      Q.     Do you know if he was involved in sales?

10     A.     Yes.

11     Q.     Someone in sales --

12     A.     Sales.  My understanding -- my

13  understanding, that he was a partner or someone up

14  there.

15     Q.     But no conversations about broken fender

16  bolts with Jeff?

17     A.     No.

18     Q.     Were you involved at all with the

19  repairs that were made to this trailer when it came

20  back to the shop?

21     A.     No.

22     Q.     Did you make any observations of the

23  trailer when it returned to the shop?

24     A.     I looked at the trailer, yes.

25     Q.     Did you make any notations, discuss

Appeal: 17-1303    Doc: 11    Filed: 06/01/2017    Pg: 317 of 455

65

```
 1    anything with your employees?
 2         A.    No.
 3         Q.    Was there any discussion about the
 4    trailer itself and what was presented to you all?
 5         A.    We were hoping that we would get the
 6    other pieces of it.
 7         Q.    What other pieces were you looking for?
 8         A.    The wheel, the hub.
 9         Q.    So the entire hub is missing; is that --
10         A.    It's gone.
11         Q.    Have you understood all the questions
12    I've asked?
13         A.    Yes, sir.
14         MR. BRATTON:  That's all I've got.
15    Thank you.
16         MR. BRAITHWAITE:  Mr. Plexico, do you --
17         MR. PLEXICO:  Do you want to keep going,
18    or do you need a quick break?
19         MR. BRAITHWAITE:  Let's go ahead.
20         MR. PLEXICO:  Mine won't last long.
21                CROSS-EXAMINATION
22    BY MR. PLEXICO:
23         Q.    I represent Mr. Murphy, who is also one
24    of the defendants in this lawsuit.  My name is
25    Darby Plexico, and I've got a few questions for
```

313

66

1    you, and these will pertain to Mr. Murphy, mainly.

2          Do you have any evidence that the

3    trailer was misused by Mr. Murphy before the

4    accident?

5          A.    No, I don't.

6          Q.    Do you have any evidence that the

7    trailer was improperly or abnormally used by

8    Mr. Murphy before the accident?

9          A.    No, I don't.

10         Q.    Do you have any evidence that the

11   trailer was abused by Mr. Murphy before the

12   accident?

13         A.    No, I don't.

14         Q.    Do you have any evidence that the

15   trailer and all of its component parts were not

16   properly maintained in a safe and appropriate

17   manner by Mr. Murphy before the accident?

18         A.    I don't know.

19         Q.    Do you have any evidence that Mr. Murphy

20   did not adequately perform safety inspections on

21   the trailer and all of its component parts prior to

22   entering it onto the public roadway before the

23   accident?

24         A.    I don't know.

25         MR. PLEXICO:    I told you I'd be quick.

314

```
 1        That's all.  Thank you for your time.
 2                   THE WITNESS:  Thank you.
 3                       CROSS-EXAMINATION
 4   BY MR. BRAITHWAITE:
 5        Q.    Sir, I believe you described mig
 6   welding?
 7        A.    Yes.
 8        Q.    Am I correct, m-i-g?
 9        A.    Yes.
10        Q.    Okay.  Do you guys use any other type of
11   welds on the Tandem Tow Trailers?
12        A.    No, we don't.
13                   MR. BRAITHWAITE:  That's all I have.
14                   (Mr. Plexico was disconnected.)
15                   (There were comments off the record.)
16                   MR. BRAITHWAITE:  Did you get the last
17   of mine, or did you click out?
18                   MR. PLEXICO:  That's fine.  Don't worry
19   about it.
20                   MR. BRAITHWAITE:  It was about welding,
21   probably beyond anyone in this room.  I don't think
22   anyone has any welding background.
23                   No other questions?
24                   MS. WITHROW:  No.
25                   MR. BRAITHWAITE:  You're done, sir.
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

315

68

```
 1            MR. PLEXICO:  I do not need any

 2    transcript right now, but I'll let you know if I do

 3    in the future.

 4            (Reading and signature were waived.)

 5            (The deposition was concluded at 4:15

 6    p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

69

```
 1    STATE OF NORTH CAROLINA)
                            )  CERTIFICATE OF TRANSCRIPT
 2    COUNTY OF MECKLENBURG  )

 3

 4         I, Linda D. Crane, RMR, CRR, and Notary
 5    Public in and for the aforesaid county and state,
 6    do hereby certify that the foregoing pages are an
 7    accurate transcript of the deposition of
 8    Walter Gavin Gouveia, which was reported by me on
 9    behalf of the Plaintiff in machine shorthand and
10    transcribed by computer-aided transcription.
11         The deponent and parties did waive the
12    signing of the deposition by the deponent.
13         I further certify that I am not financially
14    interested in the outcome of this action, a
15    relative, employee, attorney or counsel of any of
16    the parties, nor am I a relative or employee of
17    such attorney or counsel.
18         This 17th day of August, 2016.
19

                         _____
20                       Linda D. Crane, RMR, CRR
                         Registered Merit Reporter
21                       Certified Realtime Reporter
                         Notary Public 19932390064
22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

317

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

CIVIL ACTION NO. 9:16-cv-318RMG

D'JARIS A. MOORE,

      Plaintiff,

v.

ROBERT W. MURPHY, ELITE METAL
PERFORMANCE, LLC, and CAR SHOP
TRAILER SALES, LLC, d/b/a
BEST PRICE TRAILERS,

      Defendants.

_____/

30(b)(6) DEPOSITION OF

ELITE METAL PERFORMANCE, LLC

RYAN KEOLA GOUVEIA, DESIGNATED REPRESENTATIVE

* * * * *

Taken By Plaintiff

Davidson, North Carolina

August 2, 2016

* * * * *

Reported by:

LINDA D. CRANE, RMR, CRR

Registered Merit Reporter

Certified Realtime Reporter

```
 1                    A P P E A R A N C E S

 2

 3   COUNSEL FOR PLAINTIFF:

 4           DAPHNE S. WITHROW, RN, ESQUIRE

 5           WEST OLIVETTI, LLC

 6           The Professional Building

 7           2 Corpus Christi Place, Suite 105

 8           Hilton Head Island, South Carolina 29928

 9           843/341-9260

10           daphne@westolivetti.com

11

12   COUNSEL FOR DEFENDANT

     ELITE METAL PERFORMANCE, LLC:

13

14           TAYLOR S. BRAITHWAITE, ESQUIRE

15           BRAITHWAITE LAW FIRM

16           759 Richland Avenue, West

17           Aiken, South Carolina 29801

18           803/649-4144

19           taylor@bfbtlaw.com

20

21

22

23

24

25
```

3

```
 1   COUNSEL FOR DEFENDANT
     CAR SHOP TRAILER SALES, LLC:
 2
 3            RUFUS BRATTON, ESQUIRE
 4            AIKEN, BRIDGES, ELLIOTT, TYLER & SALEEBY
 5            181 East Evans Street, Suite 409
 6            Florence, South Carolina 29506
 7            843/669-8787
 8            jrb@aikenbridges.com
 9
10   COUNSEL FOR DEFENDANT ROBERT W. MURPHY:
11            L. DARBY PLEXICO III, ESQUIRE
12            BROWN & BREHMER
13            1720 Main Street, Suite 201
14            Columbia, South Carolina 29201
15            803/771-6600
16            ldp@brownandbrehmer.com
17            * appeared via telephone conference call
18
19   ALSO PRESENT:
20            D'JARIS A. MOORE, PLAINTIFF
21
22
23
24
25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

320

4

                    C O N T E N T S

                                              PAGE

DIRECT EXAMINATION BY MS. WITHROW . . . . . .    6

CROSS-EXAMINATION BY MR. BRATTON  . . . . .    55

CROSS-EXAMINATION BY MR. PLEXICO  . . . . . .   71



                         * * *


REPORTER'S NOTE:

IF THIS TRANSCRIPT CONTAINS QUOTED

MATERIAL, SUCH MATERIAL IS REPRODUCED

AS READ OR QUOTED BY THE SPEAKER.

```
 1                    E X H I B I T S

 2    PLAINTIFF

      EXHIBIT              DESCRIPTION              PAGE

 3

 4       2     Bill of Lading                        15

 5       4     Copy of Photograph of Trailer         19

 6      10     Copy of Photograph, EMP000073         25

 7      31     Copy of Photograph                    37

 8      15     06/05/15 Invoice, Car Shop Trailer

 9             Sales, Invoice Number 31893           42

10      20     Elite Metal Performance, LLC,

11             Tandem Tow Dolly Limited Warranty     43

12      22     Assembly Build Sheet                  44

13      27     04/13/15 Spindle Tolerance

14             Check Sheet                           49

15      28     10/04/15 Spindle Tolerance

16             Check Sheet                           49

17

18    REPORTER'S NOTES:

19    *  Original exhibits were retained by Ms. Withrow

20    and are not attached to original transcript.

21    *  Hard copies of exhibits were sent with

22    Mr. Braithwaite's copy of the transcript.

23    *  Exhibits were scanned and sent to Mr. Bratton.

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

322

1             On August 2, 2016, commencing at

2    1:15 p.m., the 30(b)(6) deposition of Elite Metal

3    Performance, LLC, RYAN KEOLA GOUVEIA as Designated

4    Representative, was taken pursuant to notice and

5    agreement, and pursuant to the Federal Rules of

6    Civil Procedure, on behalf of the Plaintiff, at

7    The Business Center, South Main Square,

8    442 South Main Street, Davidson, North Carolina.

9                         * * *

10                  P R O C E E D I N G S

11             MS. WITHROW:  If we could agree to the

12    same stipulations as the previous deposition?

13             MR. BRAITHWAITE:  I agree.

14             MR. BRATTON:  Agreed.

15                         * * *

16             Whereupon, RYAN KEOLA GOUVEIA, having

17    been first duly sworn, was examined and testified

18    as follows:

19                  DIRECT EXAMINATION

20    BY MS. WITHROW:

21        Q.    Mr. Gouveia, my name is Daphne Withrow.

22    You and I met briefly before we started this

23    deposition.  I am a plaintiff's attorney, and I am

24    with West Olivetti in Hilton Head.  I represent

25    Ms. Moore in this action.  Ms. Moore is one of the

```
 1    individuals that was hit, or her vehicle was hit by
 2    the errant tire and wheel that came off of the tow
 3    dolly on 6/9/15 on I-95.  And that's going to be
 4    the topic of this deposition.
 5              If you could state your full name for
 6    the record, please.
 7        A.    Ryan Keola Gouveia.
 8        Q.    And the name of the company you
 9    represent in this matter?
10        A.    Elite Metal Performance.
11        Q.    And the location?
12        A.    211 McKenzie Road, Mooresville,
13    North Carolina.
14        Q.    And as we did with Ms. Beck, Elite Metal
15    Performance, LLC, and Car Shop Trailer Sales, doing
16    business as Best Price Trailers, will leave us
17    nothing else to be able to say.  So I will refer to
18    Elite Metal Performance often as Elite Metal, and
19    the same with Car Shop Trailer Sales, I will call
20    Car Shop, just for clarity purposes.
21              Have you ever been deposed before for
22    any reason?
23        A.    No.
24        Q.    No, okay.  So you understand the process
25    we are going to be going through today?  I'm sure
```

1   your attorney has explained to you?

2         A.    (The witness nodded affirmatively.)

3         Q.    It's just a series of questions and

4   answers.  The court reporter will be taking down

5   everything that we say.  So the main issue there is

6   to make sure that we don't talk over each other.

7   And I will respectfully try not to do that as well.

8   Also, just keep in mind that she can't record head-

9   shaking, so it is either a yes or a no to the

10  questions.

11        A.    I understand.

12        Q.    If anything that I ask you needs

13  clarification or doesn't make sense, just tell me:

14  I need clarification.  Or:  Please repeat the

15  question.  Ask me and not your attorney, and I will

16  do my best to formulate the question in a different

17  way so that it makes sense.  If you need a break

18  for any reason, just let us know.  This is not a

19  marathon.  If you need to use the restroom or get a

20  drink, just let us know.

21              Have you ever been involved personally

22  with a lawsuit?

23        A.    No.

24        Q.    You have not been involved in a lawsuit

25  in terms of Elite Metal?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

325

1      A.    No.

2      Q.    How long have you worked for Elite

3  Metal?

4      A.    Since 2012.

5      Q.    And your position there?

6      A.    Quality control.

7      Q.    Has it always been quality control?

8      A.    No, ma'am.  Well, I do many other

9  aspects within the company as well besides quality

10  control.

11      Q.    Did you review any specific documents

12  prior to this deposition in preparation for the

13  deposition?

14      A.    Yes.

15      Q.    What did you look at specifically?

16      A.    I referred back to our assembly things,

17  and I also read whatever information was provided

18  to our company.

19      Q.    Did you look at any pictures?

20      A.    Yes, I did.

21      Q.    Do you remember specifically what

22  pictures you looked at?

23      A.    Just the ones that we received from

24  whoever sent it to us.

25      Q.    Okay.  Did you review the pictures that

1    Mr. Murphy sent on the day of the incident?

2         A.    I don't know which pictures Mr. Murphy

3    sent.

4         Q.    That's fair, a fair point.  This

5    document here is what Michelle brought in, is

6    representative of the file from Elite Metal.  And I

7    will refer to a couple of these because we were not

8    given these pictures initially.  These, we were.

9    These, we were not.

10              MR. BRAITHWAITE:  I believe those were

11    also included --

12              MS. WITHROW:  These too, just not in

13    color?

14              MR. BRAITHWAITE:  Not in color, but I

15    believe they were originally in our initial

16    disclosures.

17              MS. WITHROW:  That's totally fair.  I

18    just don't see any EMP numbers, so I don't have

19    anything to relate to.

20    BY MS. WITHROW:

21         Q.    I just wanted to bring those to your

22    attention.  We will talk about them more in a

23    minute.

24              Ryan, have you ever been to Charleston?

25         A.    No.

1      Q.     Do you have any friends there or family

2   that lives there?

3      A.     No.

4      Q.     No dealers that you've worked with as an

5   employee of Elite Metal?

6      A.     No.

7      Q.     Tell me a little bit about your

8   educational or technical background.

9      A.     I graduated high school, had some

10  vocational school in machining and CAD work, some

11  college, and US military.

12     Q.     What branch of the military?

13     A.     The Army.

14     Q.     Is that what brought you to Hawaii?

15     A.     No, ma'am, I was born and raised in

16  Hawaii.

17     Q.     So when you say, CAD training, is that

18  computer-assisted design?

19     A.     Yes, ma'am.

20     Q.     And how do you utilize that training

21  with Elite Metal?

22     A.     I don't utilize any of that training

23  with Elite Metal.

24     Q.     Okay.  So is there specifically training

25  that you received that is specific to what you do

1     for Elite Metal?

2         A.    Yes.

3         Q.    What would that be?

4         A.    When we purchased the original company,

5     the original employees that were in those roles

6     that I fill now gave me on-the-job training.

7         Q.    Okay.  What was the name of the company

8     before it was bought out by Elite Metal; do you

9     know?

10        A.    I want to say it was Race City RV.

11        Q.    And when did that transition happen?

12        A.    April of 2011.

13        Q.    And you were not an employee at that

14    time?

15        A.    No, ma'am.

16        Q.    But you became an employee in 2012?

17        A.    Yes.

18        Q.    And other members of your family that

19    are also employees of Elite Metal, who would they

20    be?

21        A.    My uncle is the president of the

22    company, and my brother is an employee of the

23    company.

24        Q.    And your brother's name?

25        A.    Derren.

1       Q.      And the total number of employees?

2       A.      Eight of us.

3       Q.      And the products made?

4       A.      Radiation therapy for medical work,

5  trailers, racing equipment.  There is trash

6  compactors and balers that are refabricated.

7  I believe I hit everything.

8       Q.      Quite a diverse line of products.

9       A.      Yes, ma'am.

10      Q.      And Ms. Beck told us that the annual

11 sales of Elite Metal was about 1.2 million.  Is

12 that accurate?

13      A.      I can't answer that question.

14      Q.      You don't know, okay.

15              Of all those items that you mentioned,

16 what percentage of tow dollies or trailers is that?

17      A.      I can't answer that as well.

18              MR. BRAITHWAITE:  Off the record.

19              (There was a discussion off the record.)

20 BY MS. WITHROW:

21      Q.      I think we have the structure of the

22 company down.  Your Uncle Walter is the president

23 of the company; correct?

24      A.      Yes, ma'am.

25      Q.      And Ed Dona is the CEO; is that correct?

1      A.      Yes, ma'am.

2      Q.      Do you know of anyone that was with

3   Elite Metal at the time of this incident that is

4   now no longer an employee?

5      A.      Yes, ma'am.

6      Q.      Who would that be?

7      A.      Chris Jazwinsky --

8      Q.      Okay.

9      A.      -- Corey Parker, Matthew Beaumont.  I

10  believe that's it.

11     Q.      The fact that those gentlemen were

12  employees and are no longer employees, does this

13  incident play into the fact that they are no longer

14  employees?

15     A.      No.

16     Q.      Nothing to do with this at all?

17     A.      Not at all.

18     Q.      As we did with Ms. Beck as well, the VIN

19  is a very long, complex number.  But we've narrowed

20  it down to the last three digits with the three

21  specific tow dollies that we are talking about

22  today, number one being 313.  Is that your

23  recollection, that that is the Vehicle

24  Identification Number of the tow dolly

25  specifically?

15

1      A.    Yes, ma'am.

2            (Exhibit Number 2 was marked for

3      identification prior to the deposition.)

4      BY MS. WITHROW:

5      Q.    And then there's two other tow dollies

6      involved.  If you need to see the bill of lading

7      for that, I can give that to you.  That's Exhibit

8      2.  If you could tell me the numbers of the two

9      other tow dollies listed?

10     A.    321 and 322.

11     Q.    The difference between 321 and 322 and

12     313, 313 being an HDXL.  Can you tell us, specwise,

13     what is the difference between the HD and the HDXL?

14     A.    That would be the deck size.

15     Q.    And the difference in --

16     A.    This particular HDXL had a deck size of

17     6x8.  And the two HDs were 4x8s.

18     Q.    Okay.  And I believe, on the bill of

19     lading, at the bottom of the page, it says,

20     "Delivered By."  Can you tell me if that is your

21     signature or the signature of another individual?

22     A.    That is my signature on the top.

23     Q.    On the top, as "Delivered By"?

24     A.    Yes.

25     Q.    Do you know the bottom --

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

332

```
1        A.      That would be the hauling company.

2        Q.      Do you know who that was?

3        A.      No, ma'am.  Can I go back for a second?

4        Q.      Sure.

5        A.      The individual, I don't know who the

6    individual was.  But the hauling company I believe

7    was Boss Hogs or Big Hoss Hauling.

8        Q.      Okay.  So, to the best of your

9    knowledge, this "Received By" is from the hauling

10   company?

11       A.      Yes.

12       Q.      Ryan, do you deal with any federal rules

13   and regulations in the quality control aspect of

14   building or manufacturing these trailers?

15       A.      Can you ask that question to me in a

16   different way?

17       Q.      Sure, sure.  I'm just looking for any

18   rules or regulations that you go by or refer to in

19   determining proper quality control of the vehicles

20   or the trailers.

21       A.      Everything that we do is based off of

22   the NATM, who is overseen by the DOT.

23       Q.      The DOT oversees the NATM?

24       A.      From my understanding, yes.

25       Q.      Is becoming a member of NATM, is that
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1    voluntary or is that mandatory?

2        A.    I thought you said not to say, I can't

3    answer that question.

4        Q.    If you don't know the answer --

5        A.    I don't know.

6        Q.    There you go.  If you don't know, that's

7    the right answer.

8              Have you ever been involved in one of

9    their compliance verification programs?

10       A.    No.

11       Q.    Have you heard anything about it?

12       A.    That is something that the front office

13   would be better able to answer.

14       Q.    So you have never actually taken part in

15   the NATM's compliance?

16       A.    No.

17       Q.    Would you have any knowledge as to the

18   relationship -- and I'm talking up until the point

19   of this incident -- the relationship between Elite

20   Metal and Car Shop?

21       A.    No.

22       Q.    What about after this incident, from

23   June 9, 2015, forward?

24       A.    No.

25       Q.    You know nothing about that?

1           Have you ever communicated with anybody
2    directly from Car Shop?
3           A.    I've only spoken to Robin a handful of
4    times, and that was only when deliveries were going
5    through.  Other than that, no.
6           Q.    Did you ever speak with them
7    specifically about this incident?
8           A.    No.
9           Q.    So you never had any conversations with
10   Car Shop specifically about this incident?
11          A.    No, I haven't.
12          Q.    Do you know if Car Shop's contract with
13   Elite Metal was terminated due to this incident or
14   as part of this incident?
15          A.    No, ma'am, I am not aware of any of
16   that.
17          Q.    What is your understanding as to why the
18   contract was terminated approximately two months
19   after this incident occurred?
20          A.    That's a front-office question.
21          Q.    So you have -- I guess, to sum it up,
22   you've had no relationships with the dealers?
23          A.    No.  That is correct.
24          Q.    Do you have any dealers currently?
25          A.    No, we don't.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

```
 1              (Exhibit Number 4 was marked for
 2    identification prior to the deposition.)
 3    BY MS. WITHROW:
 4         Q.    I want to show you Exhibit 4, which is a
 5    color photograph of the trailer -- of a trailer.
 6    Can you identify that specific trailer?
 7         A.    From the way this picture is taken, I
 8    can't identify this trailer.
 9         Q.    Can you tell if it is HD or HDXL?
10         A.    It looks like an HD.
11         Q.    Okay.  If you could, if you could point
12    out -- and you can -- I don't know if this will
13    work.  I've got all different colors here.   If you
14    could point out to me where the fender bolts are?
15         A.    These are the fender bolts here.
16         Q.    I am going to ask you to just -- if this
17    will work --
18              MR. BRAITHWAITE:  Red pen?
19              MS. WITHROW:  Yes, red is good.
20         Q.    If you could circle where the fender
21    bolts are on this, please.
22         A.    (The witness complied.)
23         Q.    And there are four fender bolts on each
24    side?
25         A.    Yes.
```

1    Q.    Have you ever heard of a tow dolly wheel

2    coming off of any Elite Metal Performance trailer?

3    A.    Since we have owned the company, a wheel

4    has never come off a trailer.

5    Q.    Other than this one?

6    A.    Other than this one.

7    Q.    Have you ever seen the wheel that came

8    off?

9    A.    No.

10    Q.    Has anybody at Elite seen the wheel

11    that's come off?

12    A.    No.

13    Q.    To your knowledge, has it ever been back

14    at Elite since it came off and was --

15    A.    To my understanding, it's never been

16    found.

17    Q.    So what is your understanding as to the

18    repair that was made by Car Shop to the trailer,

19    VIN 313, when it was received by Car Shop?

20    MR. BRATTON:  Object to the form.

21    You can answer.

22    A.    The only thing that I know is what I

23    seen from an invoice that was sent to us, that a

24    bolt was replaced.

25    Q.    Do you know specifically which bolt was

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

337

1    replaced?

2        A.    No.

3        Q.    Did you ever learn after the fact which

4    bolt was replaced?

5        A.    I can't recall.

6        Q.    Do you know how it was replaced?

7        A.    No.

8        Q.    You have no idea?

9        A.    No.

10       Q.    No one, as quality control person, said:

11   This is how this should be done?  This is the

12   protocol for replacing this bolt?

13       A.    Now, say that to me again, please.

14       Q.    Let's go back.  How should a bolt be

15   replaced, a broken fender bolt?  What is the

16   proper, as far as Elite Metal is concerned, what

17   is the proper method of replacing a broken fender

18   bolt?

19       A.    We would remove the fender -- remove the

20   wheel and replace that fender bolt.

21       Q.    Is that the only way to do it?

22       A.    We would cut the welds off that bolt.

23       Q.    At which side is the weld -- the bolt

24   welded, if you could show that to me?

25       A.    It's welded here, which would be on the

1    inside.

2        Q.    On the inside of this?

3        A.    Behind this wheel and behind this

4    backing plate.

5        Q.    Okay.  I do have a picture of that.

6    That would be more helpful.

7            MR. BRAITHWAITE:  Do you want to take a

8    look at EMP 55?

9            MS. WITHROW:  Would 56 work as well, and

10   60?  I think both would --

11           MR. BRAITHWAITE:  We have plenty of

12   pictures.

13   BY MS. WITHROW:

14       Q.    Okay, so we are going to show you EMP --

15   EMP meaning these are documents that have been

16   produced by Elite Metal, so these are not something

17   that I just pulled out of nowhere.  These are

18   pictures that you produced to us.  If you can

19   orient these for me, show me where the bolt is and

20   where it would be welded.

21       A.    Behind this backing plate, you have two

22   other bolts, and you have two other bolts up top

23   here.

24       Q.    Okay.  And that correlates with the ones

25   --

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1      A.    With these bolts here.

2      Q.    All right.  Let's see.  This photograph

3   is 60.  Do you see the same, or is that a little

4   more difficult to discern?

5      A.    This one looks like a fresh bolt here

6   because I can see that one without any powder coat,

7   which I guess would be something close to this,

8   which looks like the welds were cut here.

9      Q.    Welds cut, how are welds cut?

10      A.    With a cutting wheel.

11      Q.    So, in order to take that bolt off, the

12   cutting wheel needs to cut the weld?

13      A.    Yes, ma'am.

14      Q.    And the way to access that is how?

15      A.    To remove that wheel.

16      Q.    Is there any way to use the cutting

17   wheel and leave the wheel on?

18      A.    With the equipment that we have, no.

19      Q.    What about a flat punch?

20      A.    It's welded.

21      Q.    So a flat punch couldn't pull it out?  I

22   am going to ask you to assume that this is the

23   other side of it that they are accessing.  Correct?

24      A.    Yes.

25      Q.    So could a flat punch, approaching it

1    from the area that you've circled, could it remove

2    the bolt?

3              MR. BRAITHWAITE:  Can we just clarify

4    before he responds?

5              MS. WITHROW:  Yes.

6              MR. BRAITHWAITE:  I don't want to take

7    over this, by any means.  But when we talk about,

8    the bolt faces on the inside of the fender, towards

9    the wheel, correct, the bolt head?

10             THE WITNESS:  Yes.

11             MR. BRAITHWAITE:  You are saying that is

12   welded?

13             THE WITNESS:  Yes.

14             MR. BRAITHWAITE:  We'll refer to that as

15   the back side of the fender, or I guess the inside

16   area of the trailer, that does not have a bolt

17   head; correct?

18             THE WITNESS:  Correct.

19             MR. BRAITHWAITE:  So maybe if we say the

20   inside fender and outside fender instead of left

21   and right, let's just say inside and outside fender

22   when we talk about orientation --

23   BY MS. WITHROW:

24        Q.    So if a flat punch was used, it would be

25   on the outside orientation of the fender?

1        A.      On this side.  Is that what you are

2    referring to?

3        Q.      Yes.

4        A.      Trying to punch this way?

5        Q.      I'm not sure which way it would punch,

6    as long as it would remove.  Have you utilized a

7    tool like that?

8        A.      No, ma'am.  We have never used a punch.

9        Q.      Have you ever utilized a flat punch at

10   all, generally?

11       A.      To break a weld, that's a pretty good

12   flat punch.

13       Q.      Okay.  So do you have an opinion either

14   way as to whether a flat punch could be utilized to

15   remove the fender bolt?

16       A.      I am speculating at that point.

17       Q.      But it's your contention that the wheel

18   would have to be taken off in order to do, to

19   replace the bolt; is that correct?

20       A.      We would take the wheel off.

21       Q.      Is there another way to do it, that you

22   know of, that doesn't involve taking the wheel off?

23       A.      No, ma'am.

24               (Exhibit Number 10 was marked for

25   identification prior to the deposition.)


CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

342

1    BY MS. WITHROW:

2        Q.    I am going to show you what's been

3    marked as Exhibit 10, which is a picture of a bolt.

4    Have you seen that picture before?

5        A.    Yes.

6        Q.    Where have you seen that?

7        A.    From whoever sent it to us.

8        Q.    Do you know where that bolt is from?

9        A.    It looks like the fender bolt.

10       Q.    Can you tell from looking at that

11   picture if it's broken or if it's still in its

12   original form?

13       A.    Yes, it appears broken over here.

14       Q.    And you are pointing to the tail end of

15   it?

16       A.    Yes.

17       Q.    Not the end with the nut, but the other

18   side?

19       A.    Yes.

20       Q.    Do you have any recollection as to what

21   this bolt related to, how this bolt fit in the

22   whole scheme of this particular matter?

23       A.    No.

24       Q.    You have no idea, okay.

25            MR. PLEXICO:  Daphne, are you referring

```
 1   to EMP 73?
 2              MS. WITHROW:  Yes, that is correct.
 3              MR. PLEXICO:  That is Exhibit 10?
 4              MS. WITHROW:  Yes.
 5              MR. PLEXICO:  Thank you.
 6   BY MS. WITHROW:
 7       Q.    Not to muddy the waters too much, but
 8   these two particular pictures which -- I have no
 9   reason to believe that they have not been produced,
10   but they are a little more colorful than the
11   pictures that have been produced to us.  Ms. Beck
12   has testified that these were taken by Mr. Murphy.
13   Do you have any knowledge about that?
14       A.    No.
15       Q.    Okay.  Tell me what you see in this
16   picture.
17       A.    A wheel is missing.
18       Q.    Okay.  Anything else missing?
19       A.    The drum.
20       Q.    Is the drum missing, the hub?
21       A.    Yes.
22       Q.    The hub is missing?
23       A.    Yes.
24       Q.    Where is the hub?
25       A.    I have no idea.
```

1        Q.    You don't know.  Could the hub be with

2    the wheel?

3        A.    Possible.

4        Q.    With your experience, what would make

5    the hub come off with the wheel?

6        A.    I can't speculate on that, ma'am.

7        Q.    Would this -- I'm sorry if I sound very

8    simplistic.  But, this nut, in order for the hub to

9    come off, wouldn't this have to come off as well?

10            MR. BRAITHWAITE:  Object to the form.

11        A.    No comment.

12        Q.    No comment?

13            Is this called a spindle?

14        A.    That is a spindle, yes.

15        Q.    This whole unit is called a spindle?

16        A.    Uh-huh.

17        Q.    What name do you give this --

18        A.    That's a castle nut.

19        Q.    Castle nut, okay.  And the hub sits

20    somewhere between the base of the spindle and the

21    castle nut?

22        A.    That's correct.

23        Q.    And it's gone?

24        A.    The hub is gone, yes.

25        Q.    Did it do any damage to the castle nut,

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

345

1    that you can tell in this picture?

2        A.    It did, the bottom part of this castle

3    nut is kind of rubbed in.

4        Q.    Could you infer from that damage that

5    the hub escaped over the top of that castle nut?

6            MR. BRAITHWAITE:  Object to the form.

7        Q.    I'm sorry.  Do you want me to repeat

8    that?

9        A.    No, no, no.  I'm thinking.

10        Q.    Okay.

11        A.    I can't say how the wheel came

12    dislodged, but it did come off, and it did pass

13    through there.

14        Q.    But you have no theory as to how it

15    happened?

16            MR. BRAITHWAITE:  Same objection.

17        A.    I'm -- I'm throwing something out there.

18    I don't want to do that.

19        Q.    Okay.  Do you have any theories as to

20    how this wheel separated from the tow dolly?

21            MR. BRAITHWAITE:  Object to the form.

22    He is not an expert.

23        A.    No.

24        Q.    Do you have any opinion as to whether

25    the proper torque of the lug nuts on the wheel had

```
 1   anything to do with the wheel coming off?

 2              MR. BRAITHWAITE:  Object to the form.

 3       A.    (The witness shook his head.)

 4       Q.    Do you check the torque of the lug nuts

 5   prior to --

 6       A.    Yes, we do.

 7       Q.    You do?  Do you have a document that

 8   shows that you checked for torque?

 9       A.    We don't have a written document.  It is

10   done visually with another person.

11       Q.    But there is no document that indicates

12   --

13       A.    No.

14       Q.    So as we sit here today, you can't hand

15   me a document that says:  Oh, we checked the torque

16   on those lug nuts prior to this tow dolly being

17   stacked and shipped to Car Shop.  Is that correct?

18              MR. BRAITHWAITE:  Object to the form.

19       A.    No comment.

20              MR. BRAITHWAITE:  Just a second.  Just

21   off the record.

22              (There were comments off the record.)

23       A.    Just ask it to me again, please.

24              MS. WITHROW:  I'm sorry.  Could you read

25   back my question?
```

1          (The question was read back by the
2    reporter.)
3                         "QUESTION:  So as we sit here
4                         today, you can't hand me a
5                         document that says:  Oh, we
6                         checked the torque on those
7                         lug nuts prior to this tow
8                         dolly being stacked and
9                         shipped to Car Shop.  Is
10                        that correct?"
11         A.    I can't physically hand you something.
12         Q.    Okay, that's fine.  So in terms of Elite
13    Metal's SOP, in a final inspection of the product
14    before it leaves -- and I am saying, even after
15    it's been stacked, because we will get to the
16    stacking in a minute with all the transport -- is
17    there any inspection that's done at that point in
18    time prior to it leaving?
19         A.    Yes, an inspection is done from the
20    front of the trailer to the rear of the trailer.
21    All the nuts and bolts are checked, wheels are
22    checked, brakes are checked, and lights are
23    checked.
24         Q.    I think we have a document that speaks
25    to that.  So nuts and bolts being fender bolts as

1   well?

2       A.    Yes.

3       Q.    And this is even after the products have

4   been stacked?

5       A.    Yes.

6       Q.    Do you know the particular stacking

7   order of these three tow dollies that were part of

8   this shipment?

9       A.    I know for sure the XL is on the bottom.

10  But whatever order the other HD's are, I can't tell

11  you.

12      Q.    Who does the stacking?

13      A.    I do.

14      Q.    You do.  All right, tell me how that's

15  done.

16      A.    Every stack is going to be different,

17  based on the size of the trailers that are being

18  requested.  But you are going to utilize 2x3x

19  1/4-inch angle irons with holes punched in certain

20  locations so you can put bolts through to secure

21  the trailers in the front and the rear.

22      Q.    And these angle irons, are they attached

23  to certain parts of the trailer that already have

24  holes that can accept that?

25      A.    Yes, ma'am.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1    Q.    So these angle irons then just secure

2    the stacked tow dollies together?

3    A.    Yes.

4    Q.    To each other?

5    A.    Yes.

6    Q.    And then to something else?

7    A.    They are all to each other.

8    Q.    Have you ever seen a fender bolt that's

9    been broken as a result of stacking?

10    A.    I have never seen one.

11    Q.    Is it physically possible?

12    MR. BRAITHWAITE:  Objection.

13    Q.    I mean not -- I mean -- let me strike

14    that.

15    Is it physically possible, based on the

16    act of stacking, that there is contact between the

17    tow dollies and their fender bolts?

18    A.    The trailers are connected to each other

19    by the fender bolts.

20    Q.    Okay.  Is that where the angle iron is?

21    A.    Yes, it's welded with gussets that are

22    on the angle iron sitting on top of the spindles.

23    Q.    Okay.  When the tow dollies are

24    transported and they arrive at their final

25    destination, are they considered to be in working

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1  order?

2      A.    They are in working order when they

3  leave my shop.

4      Q.    Okay.  And then they are given to

5  transport and arrive at their location.  And with

6  all things remaining equal, they should be in

7  working order by the time they reach their

8  destination at the dealer?

9      A.    Yes.

10     Q.    Do you all manufacture bearings?

11     A.    No.

12     Q.    Who manufactures bearings?

13     A.    Redneck Trailer Supply and TexTrail

14  Trailers.

15     Q.    And who did you utilize at the time that

16  tow dolly 313 was manufactured?

17     A.    I can't recall.

18     Q.    Who do you utilize now?

19     A.    TexTrail.

20     Q.    Was there a change --

21     A.    It's still the same; it's still TexTrail

22  and Redneck.  We utilize the same two manufacturers

23  of our bearings.

24     Q.    So those two different names are the

25  same company?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1          A.      No, ma'am.

2          Q.      They are two different companies?

3          A.      Yes.

4          Q.      So am I understanding you that you

5    inventory bearings from both those manufacturers,

6    or just one manufacturer currently?

7          A.      We inventory both.

8          Q.      You inventory both?

9          A.      Yes.

10         Q.      How do you determine which bearings to

11   use for what product?

12         A.      Because one bearing, the TexTrail

13   bearing already comes inside the drum and the hub,

14   so it's counted as one piece, so they don't get

15   interchanged.

16         Q.      And the Redneck version?

17         A.      It's single.

18         Q.      So who packs the bearings then?  Is the

19   Tex product -- I'll be quiet.  Who packs the

20   bearings?

21         A.      TexTrail packs.  Redneck's, we had

22   packed.

23         Q.      Remind me again.  Which bearings were

24   utilized for this particular --

25         A.      I don't recall.

36

```
 1        Q.     You're not sure.  Is there a document
 2   that you could point to that would give you that
 3   information?  Would the Assembly Build Sheet give
 4   you that information?
 5        A.     No, ma'am, it won't.
 6        Q.     Is there anything that would?
 7        A.     I don't think there is.
 8        Q.     So there's no document you can go back
 9   and put your hands on and say:  Okay, in trailer
10   313, these are the bearings that we utilized?
11        A.     No.
12        Q.     So you don't know if it was Redneck or
13   the other company?
14        A.     That's correct, I don't recall.
15        Q.     Would it make a difference in this case?
16        A.     No.
17        Q.     If it had been a Redneck product, as I
18   understand it, you would have to be packing the
19   bearings with a Redneck product; correct?
20        A.     Uh-huh.
21        Q.     So would you have a record that you
22   packed bearings on this product if it indeed was a
23   Redneck bearing that was used?
24        A.     No.
25        Q.     You'd have no record of it?
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1      A.    No.

2      Q.    How would somebody that comes behind you

3 know?

4      A.    Visually looking at which hub and drum

5 is on there.

6      Q.    So when you look at the hub and the

7 drum, then you can determine which bearings have

8 been utilized?

9      A.    Yes.

10      Q.    So if you have a picture such as was

11 produced by Mr. Murphy to Michelle, such as this

12 one -- and we don't have a number on it, but we can

13 put a number on it.  We will put this as Exhibit

14 31.

15           (Exhibit Number 31 was marked for

16 identification.)

17 BY MS. WITHROW:

18      Q.    If the hub is missing, how do you know

19 what bearings were used on this wheel?

20      A.    I can't.

21      Q.    You don't know?

22      A.    No.

23      Q.    So it could be either Redneck or -- tell

24 me the name of the other one again.

25      A.    TexTrail.

38

1    Q.    TexTrail.  So you don't know.  So if
2   there was a problem with the bearings, you sitting
3   here today couldn't tell me which manufacturer of
4   bearings it was?
5         MR. BRAITHWAITE:  Object to the form.
6    A.    You can only tell which ones you are
7   putting on when they are brand new and not used.
8   You can tell who hand-packed, manually hand-packed
9   the bearing and who didn't hand-pack the bearing.
10   And it was like a machine or whatever they use.
11   Q.    Right.  But when you are looking at this
12   as we are after the fact, is there anything on here
13   that could tell you whose manufacturing bearings
14   were used?
15   A.    No.
16   Q.    And that's because the hub is missing?
17   A.    I can't tell.
18   Q.    So we have no way of knowing if there
19   was a failure of those bearings or not; correct?
20         MR. BRAITHWAITE:  Object to the form.
21   A.    I can't tell.
22   Q.    You can't tell.  I mean, I sure as heck
23   can't.  If you can't tell and I can't tell, can
24   anybody tell?
25         MR. BRAITHWAITE:  Object to the form.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

355

1        A.      (There was no response.)

2        Q.      I am not asking because I know the

3  answer; I'm asking because I truly don't know.  And

4  that's all I am trying to determine.  If there was

5  a failure with the bearings, which has been

6  suggested in this matter, is there something that

7  we could look at after the fact to determine if

8  indeed there was problems with the bearings?  And

9  I'm just asking your expertise as someone who knows

10 --

11       A.      That's out of my expertise level.

12       Q.      Okay, that's fine.

13               To the best of your knowledge, had there

14 ever been any broken fender bolts prior to this?

15       A.      I believe there was only one other

16 occasion.

17       Q.      Do you know any details of that?

18       A.      No.

19       Q.      Was it while you were --

20       A.      Yes.

21       Q.      Do you know who the dealer was?

22       A.      I'm going to say it was Best Price

23 Trailers.

24       Q.      Do you have any recollection as to how

25 the fender bolt was repaired?

1      A.    No, I don't.

2      Q.    I believe you've testified that you

3 don't have the communications with the dealers as

4 to how to make repairs?

5      A.    That's correct.

6      Q.    Do you have an opinion as to what a

7 minor repair on a tow dolly would be?

8      A.    Replacing a light.

9      Q.    A light, okay.  Anything that would be

10 not minor, in your opinion, in terms of repair?

11      A.    Anything that has to do with that axle

12 is not minor.

13      Q.    Anything else?

14      A.    Or structural integrity.  That's about

15 it.

16      Q.    When the tow dollies are transported and

17 they are stacked, who makes that determination as

18 to whether they will be stacked or not?

19      A.    Our dealer, on what they want.

20      Q.    So they make the request?

21      A.    Yes, ma'am.

22      Q.    And then you are the individual that

23 then complies with the request of the dealer?

24      A.    Yes.

25      Q.    Is there another configuration that they

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1    can be shipped in?

2         A.    A wedge trailer.

3         Q.    Do you all make any recommendations to

4    your dealers as to how to transport them?

5         A.    It's a front-office question.

6         Q.    And after you've stacked them, then the

7    transport company or the individual who is going to

8    be transporting them, then they load?

9         A.    Yes.

10        Q.    And they are responsible after the

11   stacking only?  They don't take part in the

12   stacking process?

13        A.    That's correct.

14        Q.    Is it your recollection that there was

15   more than one tow dolly with broken fender bolts in

16   the three that were stacked, according to this bill

17   of lading?

18        A.    The only one I can recall is just this

19   one.

20        Q.    That's the only one?

21        A.    That's the only one that I can recall.

22        Q.    If I showed you an invoice of one of the

23   two other tow dollies that were stacked with this

24   one that also had two broken fender bolts, would

25   that -- you'd have no reason to believe that that's

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

42

```
 1   not the case; correct?
 2        A.    I have no reason to believe that you are
 3   lying to me.
 4        Q.    I guess what I'm saying, I know Michelle
 5   generates the invoices.  And that's -- is that
 6   anything that you even see?  Do you see the
 7   invoices that are sent --
 8        A.    No, I don't.
 9        Q.    So if I said, well, there's really two
10   tow dollies that had broken fender bolts, one that
11   had two broken, and then this one, 313, that had
12   one, you would agree with that contention?
13        A.    After I see it, yes.
14             (Exhibit Number 15 was marked for
15   identification prior to the deposition.)
16   BY MS. WITHROW:
17        Q.    Just to show you Exhibit 15, which is
18   Invoice 31893, and you will see that's tow dolly
19   321.  So you would agree -- you have no reason to
20   doubt the authenticity of this document?
21        A.    Yes.
22        Q.    But you knew nothing about that one in
23   terms of replacing the fender bolts?
24        A.    No.
25        Q.    Ryan, do you know anything about the
```

1    proper authorization for repairs?

2        A.    Yes.  Before anything is done to any of

3    our trailers, they need to contact us, based off

4    the warranty, and inform us of what's going on.

5        Q.    Based off the warranty, what are you

6    referring to specifically?  Is there a document

7    that you are referring to?

8        A.    It's our warranty form.

9        Q.    Okay.  Is that it?

10       A.    Yes, that's it.

11            MS. WITHROW:  Let the record reflect we

12   are looking at Exhibit 20, which is Elite Metal

13   Performance, LLC, Tandem Tow Dolly Limited

14   Warranty.

15            (Exhibit Number 20 was marked for

16   identification prior to the deposition.)

17   BY MS. WITHROW:

18       Q.    And this is the document you were

19   referring to that the dealer has to submit to the

20   manufacturer that they wish to make a repair; is

21   that correct?

22       A.    Yes.

23       Q.    What are the implications if they don't

24   do that?

25       A.    That's a front-office question.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

44

1    Q.    You don't know if it changes the

2    warranty?

3    A.    My uncle would be better able to answer

4    that question for you.

5    Q.    Has anyone specifically said to you that

6    the wheel that's implicated in this particular

7    incident, that it was taken off in order to do the

8    repair of the tow dolly, the fender bolt repair?

9    A.    No one has ever told me that.

10    Q.    They never said it to you?  Is it an

11    assumption that you've made based on what your

12    knowledge is of how to make the repair?

13    A.    I am not assuming what Best Price did to

14    repair those.  I don't know what they did.

15         (Exhibit Number 22 was marked for

16    identification prior to the deposition.)

17    BY MS. WITHROW:

18    Q.    I'd like you to look at Exhibit 22,

19    which is the Assembly Build Sheet.  If you could

20    look at that and tell me if there is anything on

21    that document that you are responsible for filling

22    out or filled out?

23    A.    I'm sorry.  Say that again, please.

24    Q.    Is there anything on here that you

25    filled out or are responsible for filling out, like

1    the DOT numbers on the bottom or any of the --

2        A.    Yes, we are responsible for filling any

3    of this out.  All of this information, we are

4    responsible for, including the tire information

5    that are put on our trailers when they leave our

6    factory.

7        Q.    All right.  Did you fill out this form?

8        A.    No, ma'am, this is not my handwriting.

9        Q.    And the DOT numbers that are on the

10   bottom, those refer to the tires?

11       A.    That's correct.

12       Q.    Are there certain specifications for

13   tires that go on tow dollies?

14       A.    We use radial tires.

15       Q.    I'm sorry, radial?

16       A.    Radial tires.

17       Q.    And the specific size?

18       A.    225/75-R15.

19       Q.    And is there another tire that would be

20   equally as functional?

21       A.    I'm not sure.

22       Q.    That's just what your specs are?

23       A.    This is what we use.

24       Q.    Did you examine the tow dolly when it

25   came back after this incident?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

362

```
 1        A.     I did see it.

 2        Q.     Tell me what it is that you saw.

 3        A.     Outside of the damage, there was a tire

 4   on there that we don't supply.

 5        Q.     And where was that tire located?

 6        A.     I can't remember where it was on the

 7   trailer.

 8        Q.     Could it have been the spare?

 9        A.     I'm not sure.

10        Q.     Did you make an assessment of the

11   damages of the tow dolly?

12        A.     Briefly.  We were kind of kept away from

13   it until insurance companies could come.

14        Q.     Who else inspected it besides you and

15   the insurance companies?

16        A.     I'm not sure.

17        Q.     Did your uncle inspect it?

18        A.     He looked at it, yes.

19        Q.     Did you manipulate any parts or change

20   anything or take anything off?

21        A.     No.

22        Q.     Everything just stayed as it was?

23        A.     Exactly where it was when it came into

24   the shop.

25        Q.     How long did it stay in the shop?
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

Appeal: 17-1303    Doc: 11    Filed: 06/01/2017    Pg: 368 of 455

47

```
 1        A.    I'm not sure.

 2        Q.    Was it days?

 3        A.    I'm throwing a number out, and that's

 4   wrong.

 5        Q.    Okay.  Ryan, I know you looked at the

 6   other invoice.  There's two invoices in particular,

 7   one related to 321, and one related to tow dolly

 8   313.  Strike that.

 9              Have you ever seen the e-mail

10   communications between Robin Hanger and I'm

11   assuming it was either Ms. Beck or your uncle?

12        A.    No.

13        Q.    You have not been a party to any of

14   that?

15        A.    No.

16        Q.    Have you been told what Mr. Hanger's

17   contention is?

18        A.    No.

19        Q.    Nothing?

20        A.    Nothing.

21        Q.    Okay.  When you have a new tow dolly, a

22   brand-new tow dolly, whose responsibility is it,

23   prior to it getting in the hands of the ultimate

24   end user, which in this case was Mr. Murphy, whose

25   responsibility is it to make sure that all parts,
```

364

1    whether they are manufactured by you or someone
2    else, are in working order?  Is that --
3        A.    I don't deal with the end user when we
4    had a dealer.  I dealt with the dealer.  When they
5    left my factory, they were in working order.  What
6    happens afterwards, I can't speak on.
7        Q.    And you can't speak as to the bearings
8    either because we don't have a document that's
9    reflective of whether the bearings were functioning
10   properly at the point that the tow dolly left your
11   facility; correct?
12           MR. BRAITHWAITE:  Object to the form.
13       A.    I think you just reworded what you asked
14   me earlier.
15       Q.    No, I am asking more specifically about
16   the -- I initially asked you generally.  But more
17   specifically, you don't have any document that you
18   can point to that says that the bearings were in
19   working order when they left Elite Metal
20   Performance?
21       A.    They traveled 500 miles to Florida, so
22   I would say they were working when they went to
23   Florida.
24       Q.    Of this particular tow dolly?
25       A.    That's what you're referring to;

1    correct?

2        Q.    Correct.  So the wheels were turning,

3    basically, but the bearings were working from the

4    way they were transported from your facility to

5    Florida, to Car Shop?

6        A.    They made it there.

7        Q.    So they are not loaded into another --

8    what's the word I'm looking for -- another truck of

9    some sort?  They are actually utilizing the wheels,

10   those wheels --

11       A.    That's correct.

12            (Exhibit Numbers 27 and 28 were marked

13   for identification prior to the deposition.)

14   BY MS. WITHROW:

15       Q.    There are two documents I want to ask

16   you about, Exhibits 27 and 28, and they are both

17   entitled, "Spindle Tolerance Check Sheet."

18            Are you involved with these?

19       A.    Yes, I am.

20       Q.    And we'll start with actually Exhibit

21   27, which was dated 4/13/15.  If you could tell me

22   and explain to me what exactly this is looking for?

23       A.    Camber is up-and-down tilt on your

24   wheel, and toe is in-and-out on your wheel.

25       Q.    Just pardon my ignorance here.  Does

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1   that have to do with alignment of this vehicle or

2   this tow dolly?  Does it deal with alignment at

3   all?

4        A.    It does.

5        Q.    When I see spindle, I'm thinking spindle

6   such as what's in Exhibit 30.

7        A.    That's it right there.

8        Q.    That's it?

9        A.    Uh-huh.

10        Q.    So tell me what this sheet is telling us

11   right here.

12        A.    This sheet is telling us that the camber

13   is within tolerance --

14        Q.    Okay.

15        A.    -- of .4 and .9.  And the toe, the in

16   and out of the wheel, is zero.  So it's running

17   dead center.

18        Q.    Since this Exhibit 27 is dated 4/13/15,

19   this is prior to it being shipped to Car Shop.  So

20   it was in the best condition it could be in at this

21   point in time?

22        A.    Yes.

23              MR. BRATTON:  Object to the form.

24        Q.    So then Exhibit 28, which is the same

25   Spindle Tolerance Check Sheet but it's dated

51

1    10/4/15 -- and I don't know if it's because it's a
2    copy, but I can't tell if "Pass" is crossed out or
3    if it's circled.  So if you could clarify, if you
4    know?
5         A.    I can't answer this question because I
6    wasn't the one who inspected this one.
7         Q.    So 27 has your name on the inspection?
8         A.    Yes.
9         Q.    Who inspected 28?
10        A.    Robert Farello.
11        Q.    Is he still with Elite Metal?
12        A.    Yes, he is.
13        Q.    And can you tell me, if you know,
14   whether he is saying that they passed or whether
15   they failed?
16        A.    They passed.
17        Q.    They passed.  So if you compare these
18   two documents, what story are they telling?
19        A.    It's telling me that this is the one we
20   had before it left our shop, and this is the one
21   after the repairs.
22        Q.    This was done after the repairs?
23        A.    Yes.
24        Q.    So this, clearly because of what we've
25   seen as an example in Exhibit 31, this was not

368

1    when it was brought back to the shop prior to

2    disassembly; this is after the repairs had been

3    made?

4            A.    This is after everything was done and we

5    were given the green light to repair the trailer.

6    That is the new tolerance on that spindle.

7            Q.    So if I am looking at these numbers

8    correctly again, they are within specs.  And it is

9    within specs, so it's safe to assume that it could

10   be used safely on the road?

11           A.    Yes.

12           Q.    Was there any kind of testing that was

13   done after this incident and before the disassembly

14   and repair?

15           A.    No.

16           Q.    Do you know of any testing that could be

17   done?

18           A.    No.

19           Q.    Do you know if Mr. Murphy did anything

20   inappropriately with the tow dolly to cause this

21   accident to occur?

22           A.    No.

23           Q.    Do you think he was irresponsible in any

24   way?

25                 MR. BRAITHWAITE:  Object to the form.

53

1      A.     (The witness shook head.)

2             I'm speculating.  I'm sorry, I'd be

3      speculating.

4      Q.     Just yes or no?

5      A.     No.

6      Q.     Do you know if there was anything that

7      he was towing that was in excess of the weight

8      limit for that particular tow dolly?

9      A.     I don't know what he was towing.

10     Q.     So you have no answer for that?

11     A.     I have no answer for that.

12     Q.     Did you all retain any parts, or do you

13     currently have any parts or remnants of this tow

14     dolly?

15     A.     No, we don't.

16     Q.     Do you know if anyone does?

17     A.     I believe Mr. Murphy does.

18     Q.     Do you know what Mr. Murphy has?

19     A.     No.

20     Q.     Did you ever have any conversations with

21     Mr. Murphy at all?

22     A.     No.

23     Q.     The other tow dolly that I showed you

24     the invoice, tow dolly 321, that also had the

25     fender bolts, did you ever examine that tow dolly

54

1    after this incident?

2        A.    No, I didn't.

3        Q.    Was it already --

4        A.    It was in Florida.

5        Q.    -- on the road?

6              Ryan, were there any questions that I

7    asked you, aside from the fact that I am not

8    well-educated when it comes to these kind of

9    technical terms, but were there any questions that

10   I asked you that you did not understand?

11       A.    No, I understood what you were asking.

12       Q.    Is there anything that you would want to

13   add?

14       A.    No.

15       Q.    Are there any other documents that

16   perhaps we have not looked at specifically today

17   that may be -- that we don't have here today --

18   that may be helpful in explaining anything that

19   happened relative to this incident?

20       A.    Not that I am aware of.

21       Q.    Do you have an opinion as to who is

22   liable to Ms. Moore for the injuries she sustained?

23             MR. BRAITHWAITE:  Object to the form.

24             MR. BRATTON:  Objection.

25       A.    No.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

371

55

```
 1        Q.    Do you have a contention that there is

 2   anybody other than the named defendants, being

 3   Mr. Murphy, Elite Metal Performance, or Car Shop

 4   Trailer Sales, that may be responsible?

 5              MR. BRAITHWAITE:  Object to the form.

 6              MR. BRATTON:  Objection.

 7        A.    No.

 8              MS. WITHROW:  Thank you.  That's all I

 9   have.

10                   CROSS-EXAMINATION

11   BY MR. BRATTON:

12        Q.    Ryan, is it okay if I call you Ryan as

13   well?

14        A.    Yes.

15        Q.    My name is Rufus Bratton.  I represent

16   Car Shop Trailer Sales in this case.  I've just got

17   a few follow-up questions.  I will try not to

18   rehash anything that she went through.  But I may

19   do that, and I apologize.  I just want to make sure

20   you understand that if I ask you a question that

21   you don't understand, please ask me to clarify

22   because I want to make sure that you understand my

23   questions.  Okay?

24        A.    Okay.

25        Q.    Knowing that, is it fair for me to
```

1    assume that if you answer my question, that you

2    have understood the question?

3         A.    Yes.

4         Q.    I believe it was your testimony earlier

5    that you indicated you don't know what Car Shop

6    Trailer Sales did in the repair of the fender bolt;

7    correct?

8         A.    Yes.

9         Q.    You don't know anything about how that

10   was performed; correct?

11        A.    Yes.

12        Q.    I think all your testimony was about how

13   Elite would have done it; correct?

14        A.    Yes.

15        Q.    So if that bolt was replaced without

16   removing the wheel, you wouldn't have any reason to

17   dispute that, would you?

18             MR. BRAITHWAITE:  Object to the form.

19        A.    (There was no response.)

20        Q.    Let me ask you this.  Would you agree

21   that there could potentially be other ways to

22   replace a fender bolt instead of removing the

23   wheel?

24        A.    I would say anything is possible, but I

25   am not aware of another way.


CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

57

```
 1        Q.    You were asked some questions about the
 2   use of a flat punch.  And I believe you indicated
 3   you had never used a flat punch?
 4        A.    Correct.
 5        Q.    Does that mean that Elite doesn't even
 6   have a flat punch on their premises?
 7        A.    We do have a flat punch.
 8        Q.    You do have a flat punch?
 9        A.    Yes, we do.
10        Q.    But you have never used one; correct?
11        A.    No.
12        Q.    Do you know if one has ever been
13   utilized by anyone with Elite in an attempt to
14   repair a fender bolt?
15        A.    No.
16        Q.    So you wouldn't know if a flat punch
17   could be used to knock out a fender bolt and then
18   replace that bolt without removing the wheel?
19        A.    That's pretty impressive, to break a
20   weld using a flat punch.  That's -- that's
21   impressive.
22        Q.    But you are not saying that it couldn't
23   be done; correct?
24            MR. BRAITHWAITE:  Object to the form.
25        Q.    You don't know; right?
```

1        A.      I don't.

2        Q.      So if somebody uses a flat punch to

3   knock out the bolt, that's a possibility; correct?

4                MR. BRAITHWAITE:  Object to the form.

5        A.      I don't feel like I can accurately

6   answer that question.

7        Q.      These fender bolts, they simply just

8   hold on the fender to the actual trailer; correct?

9        A.      Correct.

10       Q.      They have nothing to do with the wheel

11  or the bearings or anything in that regard;

12  correct?

13       A.      Correct.

14       Q.      You were asked about your communication

15  with folks at Car Shop Trailer Sales.  And you said

16  you had on occasion maybe some communication with

17  Robin Hanger, and that was it.  Does that sound

18  accurate?

19       A.      That's right.

20       Q.      What were the substances of those

21  conversations?

22       A.      If a pickup for him was going to be

23  ready on a certain day.  That's it.

24       Q.      So more of just delivery confirmation

25  type stuff?

1        A.      Yes.

2        Q.      Ever any communications with Mr. Hanger

3    about any issues with trailers that were delivered

4    to Car Shop?

5        A.      No, that is a front-office question.  I

6    have never spoken with him personally about those.

7    He's spoken to -- that's a question that should be

8    directed towards the front.

9        Q.      But you've never spoken with him?

10       A.      No.

11       Q.      Have you ever spoken with anybody else

12   at Car Shop Trailer Sales?

13       A.      No.

14       Q.      You indicated you were aware of a prior

15   time when a fender bolt -- there was an issue with

16   a broken fender bolt; correct?

17       A.      Yes.

18       Q.      When did you become aware of that?

19       A.      The exact day and year of it, I can't --

20   I can't recall.

21       Q.      Was it prior to this incident or after

22   this incident?

23       A.      It was prior to this incident.

24       Q.      What was your understanding of what was

25   done to repair that fender bolt?

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

376

1          A.    I have no understanding of what was done

2    to repair that fender bolt.

3          Q.    Do you know if that fender bolt was ever

4    repaired?

5          A.    I'm going to say, yes, it was.

6          Q.    Who would have repaired it?

7          A.    Probably, Best Price.

8          Q.    Do you know how they would have repaired

9    it?

10         A.    No, I don't.

11         Q.    So if they repaired it -- strike that.

12               I assume that you all became aware of

13    the problem that was communicated to you from Car

14    Shop to Elite; is that accurate?

15               MR. BRAITHWAITE:  Object to the form.

16         Q.    You became aware of an issue with a

17    broken fender bolt; correct?  Or Elite became aware

18    of an issue with a broken fender bolt; correct?

19         A.    Yes.

20         Q.    And that awareness comes after that

21    trailer has been delivered to Car Shop; correct?

22         A.    Yes.

23         Q.    Do you know who with Car Shop notified

24    Elite of the issue?

25         A.    No, I don't.

1        Q.    Do you know -- it's your understanding

2    that that issue was repaired; correct?

3        A.    Yes.

4        Q.    And I think you said you thought it was

5    repaired by Car Shop?

6        A.    Yes.

7        Q.    Do you know if Elite was invoiced by Car

8    Shop for that repair?

9        A.    I don't know.

10        Q.    Do you know who from Elite would have

11    authorized that repair?

12        A.    I don't know.

13        Q.    Not you?

14        A.    Not me.

15        Q.    Would you have been involved in the

16    discussion of an issue with a broken fender bolt?

17        A.    If I was at the office, maybe.  But

18    chances are, it's going to be handled at the front

19    office.

20        Q.    But they don't do the repairs.  They

21    don't know anything about the assembly; correct?

22        A.    The front office?

23        Q.    Yeah.

24        A.    They know a little bit, but not much,

25    no.


CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1    Q.    So you need to talk with somebody within
2    the shop who deals with the assembly; correct?
3    A.    Yes.
4    Q.    Do you know, on either the first
5    occasion that you mentioned or this occasion, who
6    would have been involved in those communications?
7    A.    If they were going to involve anybody,
8    it would be our fabricator who welds our trailers
9    together, or myself.
10   Q.    Who is the other; is that Farello?
11   A.    No, that's Chad Parker.
12   Q.    He is no longer employed there?
13   A.    He is employed there.
14   Q.    He is.  Do you recall ever being
15   consulted on either occasion about broken fender
16   bolts?
17   A.    No, I don't.
18   Q.    Were you aware that Car Shop Trailer
19   Sales was having issues with trailers being shipped
20   and arriving with broken fender bolts?
21   A.    Never heard anything of it.
22   Q.    Never?
23   A.    No.
24   Q.    How do you know they were repaired?  How
25   do you know the first one was repaired?

1    A.    I am stepping out on a limb, that if
2    they mentioned it to us, it was repaired.
3    Q.    I'm confused.  You said you hadn't --
4    you never heard anything of it.  But now you are
5    kind of acting as if you had heard something of it.
6    I'm just trying to understand what you're saying.
7    A.    I am trying to understand what you're
8    saying right now too.
9    Q.    Were you ever informed by anyone at
10   Elite that Car Shop was having issues with trailers
11   arriving with broken fender bolts?
12   A.    No.
13   Q.    How then did you learn about the issue
14   that you told me about earlier that took place
15   prior to this issue?
16   A.    You just told me, have I heard of a
17   broken fender bolt in the previous -- beforehand.
18   Q.    So that wasn't something you were
19   consulted on?
20   A.    No, I wasn't consulted on that.
21   Q.    That's just discussions with other
22   employees?  Or how did that come about?
23   A.    You just brought it up to me.
24   Q.    You said you had heard of it.
25   A.    I'm not understanding anything you are

1   saying right now.

2        Q.    I asked, I think -- again, I'm not

3   trying to confuse you.  I'm trying to make sure I

4   understand what you know about prior situations

5   with broken fender bolts.

6        A.    My answer is, I don't know any prior

7   situation of broken fender bolts.  I don't know

8   anything about broken fender bolts prior to this

9   incident.

10       Q.    So your understanding is, this is the

11  first incident with Car Shop and --

12       A.    I don't know anything else other than

13  that, what happened.

14       Q.    So you would defer to somebody else on

15  that?

16       A.    Yeah.  No one has ever spoken to me

17  about it.

18       Q.    After this incident, or during the time

19  this was all going on, did you ever learn anything,

20  that Car Shop had received trailers or multiple

21  trailers with broken fender bolts?

22       A.    I have no knowledge of any of that.

23       Q.    Ms. Withrow asked you some questions

24  about TexTrail Trailer Parts and Redneck Trailer

25  Supplies.  I'm just trying to make sure I

1    understand a response that was given in your

2    discovery responses, where it says:

3                        "The spindle and bearing

4                        assembly currently utilized by

5                        Elite Metal Performance is now

6                        manufactured by TexTrail

7                        Trailer Parts as opposed to

8                        Redneck Trailer Supplies."

9                The way I read that -- and I'm just

10   trying to clarify -- does that mean that you only

11   use TexTrail now?  Or did you only use Redneck

12   then?  I'm just --

13       A.    I can't answer that question.

14       Q.    So you don't have any involvement in

15   what bearing assemblies were utilized?

16       A.    No.

17       Q.    Elite Performance, is it still open for

18   business?

19       A.    Yes, it is.

20       Q.    Did you all recently change addresses?

21   The reason I ask is because I looked you up on the

22   Internet, and it said:

23                        "Closed for business."

24       A.    We did change address.

25       Q.    Do you think that's referring to a

1    different location?

2         A.    (There was no response.)

3         Q.    You don't know.

4               How did the decision to stack these

5    units come about?

6         A.    That was a request from the dealer, how

7    he wanted to receive the shipment.

8         Q.    Do you remember when that request was

9    made?

10        A.    No, sir, I don't.

11        Q.    Who would that request be made to?

12        A.    The front office.

13        Q.    Would you have been involved in the

14   process of that request at all?

15        A.    No.

16        Q.    When you refer to front office, who are

17   you talking about?

18        A.    Michelle and the president and CEO of

19   the company.

20        Q.    So those would be the three people when

21   you use the term "front office" that you would be

22   talking about, and that would be Walt, Ed, and

23   Michelle?

24        A.    Correct.

25        Q.    Are you involved in any of the paperwork

1   or the transactions or back-and-forth between Car
2   Shop and Elite?
3       A.    No.
4       Q.    Do you have any knowledge of or any
5   dealing with the stacking fee that was implemented?
6       A.    No.
7       Q.    I think it was your testimony that the
8   stacking would have been done by Elite, by
9   yourself; correct?
10      A.    That is correct.
11      Q.    So Elite would have had the decision-
12  making power to determine or to decide to stack or
13  not to stack; correct?
14      A.    I can't answer that question.  I'm not
15  -- I'm not sure.
16      Q.    You are just told to do it?
17      A.    That's right.
18      Q.    Were you involved in any discussions
19  with deciding whether to do that or not?
20      A.    No.
21      Q.    You said it was a request made by Best
22  Price, or Car Shop; is that right?
23      A.    That is what he wanted.  That is how he
24  wanted to get his shipments.
25      Q.    Did he communicate that to you or to

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1   someone else?

2        A.    To someone else.

3        Q.    Do you know who he would have

4   communicated that to?

5        A.    No.

6        Q.    If a dealer contacts you all about an

7   issue with a trailer, are you involved in the

8   authorization for the dealer to make repairs?

9        A.    No.

10       Q.    Who would that be?

11       A.    They would talk to Michelle first.

12       Q.    So Michelle authorizes it?

13       A.    Michelle doesn't authorize it.  They

14   would get in touch with Michelle, and Ed, the CEO,

15   would make a decision what to do.

16       Q.    Does he consult with anyone on making

17   that decision?

18       A.    Not that I'm aware of.

19       Q.    Just give me one minute.

20             Earlier, Michelle testified that Chris

21   Jazwinsky and John Cooper would have been involved

22   in the assembly of this trailer.  Does that sound

23   accurate to you?

24       A.    Yes.

25       Q.    I understand both of them are no longer

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

385

1    employed with Elite?

2          A.    Yes.

3          Q.    Is the work that they perform inspected

4    by anyone?

5          A.    Yes.

6          Q.    Who is it inspected by?

7          A.    I signed off on the inspection sheet

8    again.

9          Q.    Is that something we already reviewed

10   earlier?

11         A.    Yes.

12         Q.    Is that done after it's completely

13   fabricated, or is that done during like a

14   step-by-step process?

15         A.    After it's completed.

16         Q.    So you don't see it until the whole

17   thing is done?

18         A.    Yes.

19         Q.    Is your inspection visual or is it -- do

20   you use any kind of tools in this inspection?

21         A.    I mean, I use my torque wrench to check

22   the lug nuts.  But most of it is visual.

23         Q.    And there's no documentation that that

24   was done in this case?

25         A.    No, other than the final sign-off sheet.

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

386

70

1    Q.    You may have been asked this.  Were you

2    involved in the repair of this?

3    A.    No, I wasn't.

4    Q.    So when it came back into the shop, you

5    didn't have any -- you didn't have any involvement

6    with reviewing it, inspecting it, or anything at

7    that time?

8    A.    No.

9    Q.    Did you have any discussions with anyone

10   about it at that time?

11   A.    No.

12   Q.    Or since then?  I mean, have you

13   discussed the -- strike that.

14         Who specifically at Elite performed the

15   repairs?

16   A.    Matt Beaumont.

17   Q.    And is that -- the Assembly Build Sheet

18   and the invoice and I guess the Spindle Tolerance

19   Sheet, the check sheet, that were shown to you

20   earlier, are those the only documents that would

21   show or reflect what Matt Beaumont did?

22   A.    As far as I know, yes.

23   Q.    I just want to make sure there is no

24   other documentation out there that we are not aware

25   of.

71

```
 1        A.    I wasn't involved in it, so . . .

 2              MR. BRATTON:  I appreciate your time.

 3    That's all the questions I've got.  Thank you.

 4              THE WITNESS:  Yes, sir.

 5              MR. BRAITHWAITE:  Darby, do you have

 6    anything?

 7              MR. PLEXICO:  I do, just a couple quick

 8    ones.

 9                    CROSS-EXAMINATION

10    BY MR. PLEXICO:

11        Q.    My name is Darby Plexico.  I represent

12    Mr. Murphy, who is one of the defendants in this

13    case along with Elite Metal and Best Price.  I just

14    have a few follow-up questions for you.

15              Do you have any evidence that the

16    trailer was misused by Mr. Murphy before the

17    accident?

18        A.    I have no evidence.

19        Q.    Do you have any evidence that the

20    trailer was improperly or abnormally used by

21    Mr. Murphy before the accident?

22        A.    No.

23        Q.    Do you have any evidence that the

24    trailer was abused by Mr. Murphy before the

25    accident?
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

1        A.    No.

2        Q.    Do you have any evidence that the

3  trailer and all of its component parts were not

4  properly maintained in a safe and appropriate

5  manner by Mr. Murphy before the accident?

6        A.    No.

7        Q.    Do you have any evidence that Mr. Murphy

8  didn't adequately perform safety inspections on the

9  trailer and all of its component parts prior to

10  entering it into the public roadway before the

11  accident?

12        A.    No.

13            MR. PLEXICO:  All right.  Thank you for

14  your time.  That's it.

15            MR. BRAITHWAITE:  I don't have anything.

16            (Reading and signature were waived.)

17            (The deposition concluded at 2:40 p.m.)

18

19

20

21

22

23

24

25

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

73

```
 1   STATE OF NORTH CAROLINA)

                           )   CERTIFICATE OF TRANSCRIPT
 2   COUNTY OF MECKLENBURG  )

 3

 4        I, Linda D. Crane, RMR, CRR, and Notary

 5   Public in and for the aforesaid county and state,

 6   do hereby certify that the foregoing pages are an

 7   accurate transcript of the deposition of Ryan Keola

 8   Gouveia, which was reported by me, on behalf of the

 9   Plaintiff, in machine shorthand and transcribed by

10   computer-aided transcription.

11        The deponent and parties did waive the

12   signing of the deposition by the deponent.

13        I further certify that I am not financially

14   interested in the outcome of this action, a

15   relative, employee, attorney or counsel of any of

16   the parties, nor am I a relative or employee of

17   such attorney or counsel.

18        This 12th day of August, 2016.

19

                         _____
20                       Linda D. Crane, RMR, CRR
                         Registered Merit Reporter
21                       Certified Realtime Reporter
                         Notary Public 19932390064

22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC  *  704/545-3510

390

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.:  9:16-cv-318-RMG |
| PLAINTIFF, | |
| V. | **REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ELITE METAL PERFORMANCE'S MOTION IN LIMINE** |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS | |
| DEFENDANTS. | |

**COMES NOW** Defendant Elite Metal Performance, LLC, by and through its undersigned attorneys, supplementing its Motion in Limine by way of reply to the Plaintiff's Response in Opposition to said motion and respectfully moves this Court to exclude certain deposition testimony of Robin Hanger pertaining to any opinions and conclusions as to the presence of any condition of defect during the manufacture of the subject tow dolly, any negligent act or omission during the manufacturing process, the events immediately preceding and proximately causing any failure or separation of the wheel, wheel hub, or subcomponent of the subject tow dolly, and any opinion as to the ultimate causation of the wheel separation upon the following factual grounds and argument:

### I. FACTUAL SUMMARY

In addition to the facts set forth in Defendant Elite Metal's motion;

1.      Mediation of this matter was conducted on November 2, 2016, resulting in settlement between the Plaintiff and Defendants Murphy and Best Price Trailers. (ECF 40).

391

2.      On November 4, 2016, Plaintiff filed a motion to amend the Court's second scheduling order in this case seeking an extension of Plaintiff's deadline to identify an expert and produce an expert report or disclosure.  As cause for her motion and the extension, Plaintiff claimed that Hurricane Matthew had adversely affected counsel's ability to timely identify an expert in accordance with the original September 2, 2016 deadline despite the fact that this deadline ran nearly two months prior to Hurricane Matthew.  Accordingly, the Court denied this motion. (ECF 40, 42).

3.      To date, and inclusive of Plaintiff's Response to this Defendant's Motion in Limine, Plaintiff has never sought to identify or qualify Robin Hanger as an expert or seek admission of his opinions under Fed. R. Evid. 702.  (ECF 44).

4.      Plaintiff's Response references Robin Hanger's testimony concerning factual occurrences that took place within his purview and personal observations, including business records maintained by Defendant Best Price concerning the subject tow dolly.  Such business records include a tow dolly inspection and sales preparation checklist introduced by the Plaintiff at Hanger's deposition which, at face value, provides circumstantial evidence that Best Price Trailers torqued the lug nuts affixing the suspect wheel to the tow dolly to a pressure of 80 foot-pounds of torque. (Exhibit A).  Plaintiff questioned Walter Gouveia, as Elite Metal's 30(b)(6) representative, about this record from Best Price Trailers and their notation of adjusted torque pressure, to which Walter Gouveia responded that the wheel lug nuts on the subject trailer were torqued by Elite Metal to 115 foot-pounds of pressure in accordance with guidelines established by the National Association of Trailer Manufacturers.  The 115 foot-pound torque pressure was also clearly restated throughout Elite Metal's owner's manual for the subject trailer. (W. Gouveia Dep. 34:2 – 36:9, 56:3 – 57:10).  Prior to her Response to Elite Metal's motions, Plaintiff had maintained that this was a potential cause of the wheel separation attributable to Defendant Best

2

392

Price.

## II. ARGUMENT

Plaintiff's chief argument against the exclusion of Robin Hanger's opinions and conclusions rests upon admissibility under a combination of Fed. R. Evid. 701 and 602. At the risk of belaboring the issue, Fed. R. Evid. 602 is in and of itself a rule of exclusion in that it limits a witness to testimony derived from his or her personal knowledge, observations or cognizance, and Fed. R. Evid. 701 affords a narrow window of admissibility of opinion testimony from a lay witness when such opinion is:

        a)      Rationally based on the witness's perception;

        b)      Helpful to clearly understand the witness's testimony or to determine a fact in issue; and

        c)      Not based on scientific, technical, or other specialized knowledge within the scope of the Rule 702.

In the present case, Robin Hanger's deposition testimony includes an account of Defendant Best Price's possession and handling of the subject tow dolly; details of Best Price's relationship and communications with the other Defendants in this case, and statements of what parts of a wheel, wheel hub, or spindle are present or absent from a photograph of a damaged wheel spindle allegedly sent to him by Defendant Murphy following the wheel separation incident that is the basis of the Plaintiff's Complaint. These portions of Hanger's testimony can rationally be argued to be based upon Hanger's perception and familiarity with the subject tow dolly.

However, the remaining portions of Hanger's testimony – the opinions and conclusions obtained over Defendant Elite's objection and which form the basis of Elite's motion for exclusion – require a forensic analysis that far exceeds a lay witness's observations of objects in a photograph or events preceding the incident. Hanger was not present during the tow dolly's

3

393

manufacture, did not inspect the bearings referenced in his deposition prior to the incident, and he did not observe a bearing failure or the wheel's separation.   Thus, his opinions and conclusions regarding these events are not rationally based on his perceptions, and fall even further from the ambit of "personal knowledge" required by Fed. R. Evid. 602.   Further, the forensic analysis required to diagnose a bearing failure or manufacturing defect would necessarily require some, if not considerable, degree of mechanical, technical, or engineering skill and knowledge.   Accordingly, Hanger's testimony is not admissible under Fed. R. Evid. 701 or 602.

With respect to Defendant Elite's procedural and substantive arguments against admitting Robin Hanger's testimony as the opinion of an expert witness under Fed. R. Evid. 702, Defendant Elite would point out that Plaintiff's response to Elite's motion does not dispute this contention or seek admission of the testimony under 702, and that Plaintiff has never sought to identify or qualify Robin Hanger as an expert pursuant to the Federal Rules of Evidence or Civil Procedure.

## IV.  CONCLUSION

Accordingly, Defendant Elite maintains the facts and arguments set forth in its Motion in Limine, and upon said motion and the supplemented facts and arguments above, respectfully requests that the Court exclude Robin Hanger's opinions and conclusions detailed herein from presentation at trial or further hearings upon this matter.   Further, Defendant Elite renews its request for oral argument in support of this motion.

**(SIGNATURE ON FOLLOWING PAGE)**

4

394

**BRAITHWAITE TIMMERMAN, LLC**


BY:_s/ Taylor S. Braithwaite_____
    Taylor S. Braithwaite, Fed Bar No.  12219
    Robin A. Braithwaite, Fed Bar No.  1449
    Counsel  for  Defendant  Elite  Metal
    Performance, LLC
Aiken, South Carolina    Post Office Box 324
November 26, 2016    Aiken, South Carolina 29802-0324
    (803)649-4144

5

395

# EXHIBIT A TO DEFENDANT ELITE'S REPLY



EXHIBIT 25

Circle One: Cargo - Dump - Open - Stacker - Car Hauler - Pre-Owned    CONSIGNMENT - SOLD - STOCK

Checked In: [INITIALS] → Service (Check In) [INITIALS] → Back To Media If Warranty is not Needed [INITIALS]
If warranty is needed then goes to service

Visual Walk Around, Note ALL Dents Scratches, Imperfections, Missing Items, etc.

INITIALS

MATCH VIN TO VIN ON CHECK IN SHEET

5TDJ31FM525313

333 JF Qw    OHM    28I3

H1 Run 2-25/7s R15 CBD    WR SOL

Tech Initials: Check all of the following as applicable:
Remove other debris (JUNK) Stickers off trailer and Apply (HPU/OM) Stickers:
☑ Check Tires & Tire Pressure (side wall of tire) PSI.
☑ Torque all lug nuts to 80FP
Check Wheel Bearings on All Pre-Owned
Check breakaway Switch, pull cord & tie
Check 12v battery
Check battery bracket bolts:
☑ Check safety chains and hooks:
☑ Check ALL ext electrical connections & lights
Check ALL int electrical connections & lights
☑ Check tag bracket bolts  NO Bolts
☑ Check jack operation
Check ALL doors/locks, Keyed? YES/NO, If yes, label and return to front office.
☑ Check ball & coupler
Check roof vent

Remove ALL removable parts from trailer, give to parts counter for proper labeling:
list of all removable parts:
Spare tire, hubcaps, snaps wrench, man ds

**DUMP TRAILERS ONLY**
Inspect Unhook & Hoses
Check Operations of Hydraulics
Check 12v Remote & Battery
Check Pump & Roller
Install Tongue Change

4500 Gwe
4300 Cap
1200    lbs

Parts Received By: [INITIALS]
Time & Date That Parts
Were tagged and placed
into Shed

DATE:
LAST 5 VIN 525 313
MANUFAC.: Elite
HER: Black
COLOR: Black
MODEL # LD FRONTIER
KEY CODE:

**WARRANTY**    Repairs Needed
Broken Bolt
on Right Rear
fender

**MARKETING**
CREATE TAGS
TAKE PICTURES
UPLOAD TO WEBSITE
FINAL WALK AROUND
BEFORE TRAILER
GOES ON SALES LOT
[INITIALS]

397



EXHIBIT

MURPHY    6-5-15    10:30 AM.



Robin Hanger's
Car Shop
Trailer Sales

950 Ridgewood Ave
Holly Hill, FL 82117
386.258.1445
www.bestpricetrailers.com
sales@bestpricetrailers.com

# PRE-DELIVERY INSPECTION CHECKLIST:

*Our commitment to customer satisfaction!*    Mike

Please inspect the trailer. Do not deliver the unit until you have performed a thorough inspection.

OWNER    TECH

_____  JM    1. Perform a visual unit walk-around.

       JM    2. Check for proper tire pressure (see tire manufacturer's suggested rating.)

       JM    3. Check the wheel nuts for proper torque.

       _____ 4. Check the breakaway switch for proper operation (if applicable).

       _____ 5. Inspect breakaway battery connection and check auxiliary circuit for
             proper charge (if applicable).

       JM    6. Inspect safety chains and review proper connection to towing vehicle.

       JM    7. Check to ensure all lights are working.

       JM    8. Check jack operation (if applicable).        STRAPS

       _____ 9. Ensure keys work in ALL locks.               SPARE

       _____ 10. Check the vehicle connection plug.

       _____ 11. Explain tow vehicle requirements to customer.

       _____ 12. Check to ensure proper ball and coupler size.

       _____ 13. Check G.V.W.R (Gross Vehicle Weight Rating)*

       _____ 14. Check U.V.W. (Unloaded Vehicle Weight)*

       _____ 15. Check N.C.C (Net Carrying Capacity)*

*UNDER NO CIRCUMSTANCES SHOULD THE RESPECTIVE LOAD EVER EXCEED THESE RATINGS.

Date: 6-4-15

Model #: HDXL · 6x8          Dealer Signature: _____

Vin #: 1E9TD13MEM525313       Customer Signature: _____

398

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE, | CASE NO.: 9:16-cv-318-RMG |
| PLAINTIFF, | |
| V. | **REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ELITE METAL PERFORMANCE'S MOTION FOR SUMMARY JUDGMENT** |
| ROBERT W. MURPHY, ELITE METAL PERFORMANCE, LLC, and CAR SHOP TRAILER SALES, LLC d/b/a BEST PRICE TRAILERS | |
| DEFENDANTS. | |

**COMES NOW** Defendant Elite Metal Performance, LLC, by and through its undersigned attorneys, supplementing its Motion for Summary Judgment by way of reply to the Plaintiff's Response in Opposition to said motion and respectfully moves the Court to grant summary judgment in favor of Defendant Elite Metal on all causes of action alleged in Plaintiff's Complaint.

## I. FACTUAL SUMMARY

In addition to the facts set forth in Defendant Elite Metal's motion;

1.      During the course of discovery, Defendant Best Price produced a tow dolly inspection and sales preparation checklist which was introduced by the Plaintiff during the depositions of Robin Hanger (owner of Best Price Trailers) and Walter Gouveia (owner of Elite Metal Performance) and, at face value, provides circumstantial evidence that Best Price Trailers torqued the lug nuts affixing the suspect wheel to the tow dolly to a pressure of 80 foot-pounds of torque. (Exhibit A). Plaintiff questioned Walter Gouveia, as Elite Metal's 30(b)(6)

1

representative, about this record from Best Price Trailers and their notation of adjusted torque pressure, to which Walter Gouveia responded that the wheel lug nuts on the subject trailer were torqued by Elite Metal to 115 foot-pounds of pressure in accordance with guidelines established by the National Association of Trailer Manufacturers. The 115 foot-pound torque pressure was also clearly restated throughout Elite Metal's owner's manual for the subject trailer. (W. Gouveia Dep. 34:2 – 36:9, 56:3 – 57:10). Prior to her Response to Elite Metal's motions, Plaintiff had maintained that this was a potential cause of the wheel separation attributable to Defendant Best Price.

2.       The subject tow dolly departed Defendant Elite's shop with three wheels – two wheels mounted on the single axle of the tow dolly and one spare wheel affixed to the frame. Following the wheel separation incident, the damaged tow dolly was returned to Elite Metal for repairs, at which time two wheels remaining on the trailer were inventoried. Documentary evidence and deposition testimony obtained during the course of discovery revealed a discrepancy between the DOT serial numbers of the tires that were installed on the subject tow dolly by Elite Metal Performance and the tires present on the tow dolly when it was returned – specifically, the tow dolly was shipped by Elite Metal and received by Best Price Trailers with three "Hi-Run" brand radial tires and was returned with a tire of a different brand that Defendant Elite Metal has never purchased or used. (Exhibit A; Beck Dep. 58:13 – 64:10).

3.       Mediation of this matter was conducted on November 2, 2016, resulting in settlement between the Plaintiff and Defendants Murphy and Best Price Trailers. (ECF 40).

4.       On November 4, 2016, Plaintiff filed a motion to amend the Court's second scheduling order in this case seeking an extension of Plaintiff's deadline to identify an expert and produce an expert report or disclosure to November 11, 2016. As cause for her motion and the extension, Plaintiff claimed that Hurricane Matthew had adversely affected counsel's ability to

timely identify an expert in accordance with the original September 2, 2016 deadline despite the fact that this deadline ran nearly two months prior to Hurricane Matthew. Accordingly, the Court denied this motion. (ECF 40, 42).

5.      Despite the denial of her request to extend her deadline to identify an expert and provide a report, Plaintiff responded to Defendant Elite's motion for summary judgment on November 14, 2016 by filing an affidavit from John C. Glennon, signed and dated November 14, 2016, which the Plaintiff references as an expert report and expert testimony in support of her causes of action.

6.      Other than the improper introduction of John Glennon's affidavit and Robin Hanger's opinion testimony (the subject of Defendant Elite's Motion in Limine), Plaintiff's Response offers no additional testimony or evidence of design or manufacturing defect present in the subject tow dolly at the time that it left Defendant Elite's control.

## II.  ARGUMENT

Plaintiff's arguments in opposition of summary judgment would have the Court 1) apply South Carolina's warranty third party beneficiary statute, S.C. Code §36-2-318, to her breach of warranty claim as an action in tort; 2) find that the circumstance of time between Defendant Elite's manufacture and possession of the subject tow dolly and the wheel's separation necessarily implies a manufacturing defect; and in the alternative; 3) that the Court take notice of and permit Plaintiff to proceed against Defendant Elite upon the affidavit of an expert who was first obtained and identified by Plaintiff three months after her deadline to comply with Fed R. Civ. P. 26(a)(2) and several days after the Court denied her motion to extend her deadline for expert identification.

### A.    Breach of Warranty

Plaintiff's Response alleges that Defendant Elite's arguments for the application of

3

401

Florida or North Carolina's relevant commercial code sections are flawed in their reliance upon the reasoning that a breach of warranty sounds in contract. Conversely, Plaintiff argues that the action for breach of warranty sounds in tort, and would have the Court apply the warranty provisions of the South Carolina Commercial Code and its definition of third-party beneficiaries under an application of lex loci delicti. Plaintiff goes so far as to concede that if the breach of contract action were to sound in contract, "Ms. Moore would be precluded from making her claim for breach of warranty in this action." Without further belaboring the foundations for its argument set forth in the original motion, Defendant Elite would assert that a breach of warranty claim's foundation as an action in contract is a common legal principle that has been restated and commonly relied upon by the District Court of South Carolina (<u>Myrtle Beach Pipeline v. Emerson Electric Co.</u>, 843 F. Supp. 1027 (D.S.C.1993)) and is evidenced by the statutory scheme in which S.C. Code Ann. §36-2-18 (1977), the statutory basis for Plaintiff's cause of action, is found: Chapter 2 of the South Carolina Commercial Code governing contracts for the sale of goods.

      **B.**     **Plaintiff's argument that "absent a defect in the manufacturing of the brand new tow dolly, the wheel would not have spontaneous[ly] come off" necessarily invokes res ipsa loquitur and is not applicable to the evidence present or absent in the instant case.**

Defendant Elite would point out that Paragraph B.1. of the Plaintiff's argument seeks to invoke res ipsa loquitur on the basis of the amount of time separating Defendant's manufacture of the trailer and the wheel separation incident, thereby alleviating Plaintiff of proving that a bearing failure did in fact occur or that said failure occurred as a result of defect or negligence attributable to Elite Metal. In support of this position, Plaintiff cites to cases which apply an "inference" of negligence or burden-shift from Maryland and Pennsylvania, both of which

4

402

recognize and apply res ipsa loquitur to products liability cases. Further, the Plaintiff misinterprets the South Carolina Supreme Court's holdings in <u>Graves v. CAS</u>, which granted summary judgment to a manufacturer on the very basis that the plaintiff had failed to prove, by direct evidence, circumstantial evidence, or competent expert testimony, the presence of a specific defect in the subject product. 401 S.C. 63, 735 S.E.2d 650 (2012).

Plaintiff further tries to justify the absence of evidence in this case which supports her allegations by citing this Court's holding in <u>Morris v. Dorma Automatics, Inc.</u> that "South Carolina jurisprudence does not always require that a plaintiff present expert testimony in a manufacturing defect case." No. 2:09-cv-03267-DCN (D.S.C. Jan. 18, 2013). Plaintiff fails, however, to account for the remainder of the Court's findings in <u>Morris</u>, which granted summary judgment to the defendant manufacturer. After the plaintiff's expert was excluded for failure to timely produce a report under Fed. R. Civ. P. 26(a)(2) and neither document production nor deposition had yielded direct or circumstantial evidence of a specific defect – factors which are nearly identical to the instant case - the plaintiff was "essentially left with the argument that liability should be presumed based on the accident itself, but res ipsa loquitur is not a permissible theory of liability in this state." <u>Id.</u> Further, and based upon the facts and evidence concerning Best Price Trailers' modification of the lug nut torque and discrepancy in tires presented in this reply, Plaintiff Moore's claim presents yet another similarity to <u>Morris</u> in that she has not "provided sufficient evidence that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendants." If anything, the only circumstantial evidence suggesting a defect or negligence in this case – Exhibit A indicating a lug nut torque far short of both the manufacturer's specifications and industry standard (W. Gouveia Dep. W. Gouveia Dep. 34:2 – 36:9, 56:3 – 57:10) – attributes fault to Best Price Trailers after the tow dolly left the possession and control of Defendant Elite.

5

403

**C.    Plaintiff's expert affidavit is improperly before this Court and cannot be used for the purposes of this motion or at trial.**

As stated in the facts above, the Plaintiff clearly failed to satisfy any of the requirements of Fed. R. Civ. P. 26(a)(2) within the time permitted by the Court's scheduling order without good cause.  Without addressing the reliability of an "expert affidavit" prepared and signed on the same day as Plaintiff's Response to this motion, the inclusion and consideration of the affidavit would allow Plaintiff to eschew this Court's Order denying Plaintiff's request for an ex-post-facto extension of her expert deadline, and would violate Paragraph (c) of Fed. R. Civ. P. 37:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), *the party is not allowed to use that information or witness to supply evidence on a motion*, at a hearing, or at a trial, unless the failure was substantially justified or is harmless (emphasis added).

Accordingly, Defendant Elite would ask that the Court exclude Plaintiff's "expert affidavit" or any other claimed "expert" testimony or evidence from its consideration of this motion and any future hearing or trial of this case.

## IV.  CONCLUSION

Accordingly, Defendant Elite maintains the facts and arguments set forth in its Motion for Summary Judgment, and upon said motion and the supplemented facts and arguments above, respectfully requests that the Court grant summary judgment in its favor upon all claims and causes of actions alleged against Elite Metal by the Plaintiff.  Further, Defendant Elite renews its request for oral argument in support of this motion.

**(SIGNATURE ON FOLLOWING PAGE)**

6

404

**BRAITHWAITE TIMMERMAN, LLC**


BY:  _s/ Taylor S. Braithwaite_____ __
        Taylor S. Braithwaite, Fed Bar No.  12219
        Robin A. Braithwaite, Fed Bar No.  1449
        Counsel for Defendant Elite Metal
        Performance, LLC
Aiken, South Carolina        Post Office Box 324
November 26, 2016        Aiken, South Carolina 29802-0324
        (803)649-4144

# EXHIBIT A TO DEFENDANT ELITE'S REPLY

406





EXHIBIT

26

MURPHY    6-5-15    10:30 AM



Robin Hanger's
**Car Shop**
Trailer Sales

950 Ridgewood Ave
Holly Hill, FL  82117
386.258.1445
www.bestpricetrailers.com
sales@bestpricetrailers.com

## PRE-DELIVERY INSPECTION CHECKLIST:

*Our commitment to customer satisfaction!*    Mike

*Please inspect the trailer. Do not deliver the unit until you have performed a thorough inspection.*

OWNER    TECH

1. Perform a visual unit walk-around.

2. Check for proper tire pressure (see tire manufacturer's suggested rating.)

3. Check the wheel nuts for proper torque.

4. Check the breakaway switch for proper operation (if applicable).

5. Inspect breakaway battery connection and check auxiliary circuit for proper charge (if applicable).

6. Inspect safety chains and review proper connection to towing vehicle.

7. Check to ensure all lights are working.

8. Check jack operation (if applicable).

9. Ensure keys work in ALL locks.

10. Check the vehicle connection plug.

11. Explain tow vehicle requirements to customer.

12. Check to ensure proper ball and coupler size.

13. Check G.V.W.R (Gross Vehicle Weight Rating)*

14. Check U.V.W. (Unloaded Vehicle Weight)*

15. Check N.C.C (Net Carrying Capacity)*

STRAPS
SPARE

*UNDER NO CIRCUMSTANCES SHOULD THE RESPECTIVE LOAD EVER EXCEED THESE RATINGS.

Date: 6-4-15

Model #: HDXL · 6 x 8    Dealer Signature:

Vin #: 1E9TD13NEM525313    Customer Signature:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION
CIVIL ACTION NO. 9:16-cv-318RMG


D'JARIS A. MOORE,

       Plaintiff,

v.

ROBERT W. MURPHY, ELITE METAL
PERFORMANCE, LLC, and CAR SHOP
TRAILER SALES, LLC, d/b/a
BEST PRICE TRAILERS,

       Defendants.
_____/

30(b)(6) DEPOSITION OF

ELITE METAL PERFORMANCE, LLC

MICHELLE BECK, DESIGNATED REPRESENTATIVE

* * * * *

Taken By Plaintiff

Davidson, North Carolina

August 2, 2016

* * * * *

Reported by:
LINDA D. CRANE, RMR, CRR
Registered Merit Reporter
Certified Realtime Reporter

_____

*Cain & Crane Court Reporters, LLC*
*Post Office Box 23833*
*Charlotte, North Carolina 28227*
*Phone (704) 545-3510 * Fax (704) 545-3950*
*www.cainandcrane.com*

 COPY

409

58

1      Q.    Okay, so I'm seeing 313 on the top of

2    this. So I am assuming that this is applicable to

3    that specific unit only?

4      A.    Yes, ma'am.  And there was no customer

5    involved in this particular one, so therefore there

6    was no paperwork; there was no reason to go over

7    the weight distribution or the towing, loading, or

8    unloading.

9      Q.    Okay.

10      A.    So the items that have "NA," those items

11    were not gone over because there was no end user

12    involved in this particular item.

13      Q.    Is there any other checklist that's done

14    post-assembly of the trailer other than before they

15    are actually shipped out to the dealers?

16      A.    There are, but that's not in front of me

17    at this time.

18      Q.    Do you know what it's called or what it

19    looks like?

20      A.    Uh-huh, it's the Assembly Check Sheet.

21            (Exhibit Number 22 was marked for

22    dentification prior to the deposition.)

23    BY MS. WITHROW:

24      Q.    Okay.  This is Exhibit 22, Assembly

25    Build Sheet; is that correct?

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

410

59

1       A.    Yes, ma'am.  I don't know if this

2  matters, but this is the one that was done after

3  the fact.

4       Q.    After?

5       A.    After the repair work was done.

6       Q.    Okay, and how do you know that?

7       A.    Just from a note that's written on here.

8       Q.    (reading)

9                "Not installed by EMP"?

10      A.    Uh-huh.

11      Q.    So this was -- this note was made after

12  you knew that this trailer had been in a wreck?

13      A.    This particular tire right here is

14  circled because this tire is not a tire that Elite

15  Metal Performance would put on a trailer.

16      Q.    Okay, and we are referring to number 3,

17  JEJKDBL1115?

18      A.    Yes, ma'am.

19      Q.    And that's not a tire that Elite puts

20  on?

21      A.    Yes, ma'am.

22      Q.    And --

23      A.    That tire was already on the trailer

24  when we received it back from being involved in a

25  wreck.  That is not a tire that we put on our

411

60

1    trailers at all.

2        Q.    So when it left your custody and control

3    on June 3, 2015, that tire was not on there?

4        A.    That is correct.

5        Q.    Do you know who installed that tire?

6        A.    I do not.

7        Q.    So the other DOT numbers, 1 and 2 listed

8    above, what are those reflective of?

9        A.    Those are the DOT stamp numbers that are

10   issued at the time of manufacture from the vendor.

11       Q.    All right.

12       A.    If you'll look at the original assembly

13   sheet, the three original tires will be listed on

14   there.  That's the difference in the two sheets.

15   That's just something that I'm aware of.

16       Q.    Do we have another Assembly Build Sheet

17   that has just those two listed?

18       A.    You should, yes.

19            MR. BRAITHWAITE:  Yeah, it should be

20   4/13/2015.  It's EMP30.

21       Q.    Okay.  So EMP30 has three DOT numbers on

22   it, but it doesn't have this one that's circled on

23   Exhibit 22, "Not Installed by EMP."  Is that

24   correct?

25       A.    Yes, ma'am.

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

412

61

1               MR. BRAITHWAITE:  Do you mind if I give

2    her a copy?

3               MS. WITHROW:  Oh, yeah, absolutely.

4        Q.    So what are those three numbers

5    reflective of?

6        A.    These are the three original tires that

7    were put on the trailer.  1 and 2 would be the

8    driver and/or passenger tire.  Number 3 would be

9    the spare tire.

10       Q.    Okay.  So would it be a safe assumption

11   then that there was just a swap-out of the spare

12   tire?

13       A.    That is not my assumption because we

14   were not the ones that did that.

15       Q.    Okay.  But all you know is, it left with

16   this --

17       A.    It left with these three tires.  It came

18   back with this number 3 tire.

19       Q.    Okay.

20       A.    It also came back with -- actually, it

21   didn't come back with any of the tires that we

22   installed.

23       Q.    They were all three different tires?

24       A.    That is correct.

25       Q.    Do you have any documentation to support

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

413

62

1    where those tires were changed?

2        A.    If I look at the other two folders of

3    the two other trailers that left on the stack, I

4    can tell you that one of the tires, if I'm not

5    mistaken -- can I grab this?

6        Q.    Yes.

7        A.    So number -- I'm sorry -- number 2 --

8        Q.    On which form?

9        A.    The original assembly sheet --

10        Q.    So that's EMP30?

11        A.    Yes.

12        Q.    Okay.

13        A.    And number -- one of the tires stayed.

14        Q.    When you say --

15        A.    Number 3 on the original, this one.

16        Q.    Number 3 on EMP30 -- the one that's

17    333JF?

18        A.    Yes, ma'am, ending in 2313.

19        Q.    Okay.

20        A.    And then number 3 -- I'm sorry -- number

21    2 --

22        Q.    Which is that one, 333JF.

23        A.    -- those stayed the same.  That was one

24    of the remaining tires.

25             The other two tires are different tires.

CAIN & CRANE COURT REPORTERS, LLC    *    704/545-3510

414

63

1       Q.    Do you know where they are from?

2       A.    I do not.

3       Q.    So on Exhibit 22, the DOT numbers 1 and

4    2 are two different tires that were not put on the

5    trailer when it left Elite Metal; is that correct?

6       A.    That is correct.

7       Q.    And do they correlate with either VIN

8    321 or 322?

9       A.    They do not.

10       Q.    Do you have the Assembly Build Sheet for

11    321 and 322 as well?

12       A.    I do.

13       Q.    That's all in there?

14       A.    Uh-huh.

15       Q.    So you've checked those against those?

16       A.    Yes.

17       Q.    Did you or anyone from Elite Metal ever

18    have any conversations about these different tires?

19       A.    No, not with that -- not outside of

20    Elite Metal.

21       Q.    Okay.  You didn't have any conversation

22    with Robin Hanger or Jeanine or anyone else?

23       A.    No.

24       Q.    Nobody said:  How come it's got

25    different tires than what we sent it out with?

CAIN & CRANE COURT REPORTERS, LLC    *    704/545-3510

415

64

1      A.    No.

2      Q.    Do you know anything about the

3   differences in the tires?  Is there a different

4   grade, a different size, a different --

5      A.    They are the same size.  They are the --

6   they are all 225/75-15.  They are not the same

7   manufacturer.  They are not the same -- I cannot

8   speak if they are the same ply.  We used a 10-ply

9   tire.  I do not know if that is a 10-ply tire or

10  not.

11     Q.    So you have no idea whether this is an

12  improved tire, stronger tire?

13     A.    I do not.  I do not know if it had the

14  same pounds of pressure in it.

15     Q.    And again, you have had no discussion

16  with anyone at Car Shop regarding the tires?

17     A.    No.

18     Q.    Did you have any discussion with anybody

19  at Car Shop about the lug nuts?

20     A.    I have not.

21     Q.    Did anyone at Elite Metal have a

22  conversation about the lug nuts?

23     A.    I do not know.

24     Q.    Do you know if the tire was taken off to

25  replace the fender bolt?

CAIN & CRANE COURT REPORTERS, LLC    *    704/545-3510

416

122

```
 1   STATE OF NORTH CAROLINA)
                           )   CERTIFICATE OF TRANSCRIPT
 2   COUNTY OF MECKLENBURG  )

 3

 4        I, Linda D. Crane, RMR, CRR, and Notary

 5   Public in and for the aforesaid county and state,

 6   do hereby certify that the foregoing pages are an

 7   accurate transcript of the deposition of Michelle

 8   Beck, which was reported by me, on behalf of the

 9   Plaintiff, in machine shorthand and transcribed by

10   computer-aided transcription.

11        The deponent and parties did waive the

12   signing of the deposition by the deponent.

13        I further certify that I am not financially

14   interested in the outcome of this action, a

15   relative, employee, attorney or counsel of any of

16   the parties, nor am I a relative or employee of

17   such attorney or counsel.

18        This 10th day of August, 2016.

19                        _____

20                        Linda D. Crane, RMR, CRR
                          Registered Merit Reporter
21                        Certified Realtime Reporter
                          Notary Public 19932390064
22

23

24

25
```

CAIN & CRANE COURT REPORTERS, LLC   *   704/545-3510

417

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | |
|---|---|
| D'JARIS A. MOORE,<br><br>PLAINTIFF,<br><br>V.<br><br>ROBERT W. MURPHY, ELITE METAL<br>PERFORMANCE, LLC, and CAR SHOP<br>TRAILER SALES, LLC d/b/a BEST PRICE<br>TRAILERS<br><br>DEFENDANTS. | CASE NO.:  9:16-cv-318-RMG<br><br><br><br>**Rule 26(a)(3) Pre-Trial Disclosures of<br>Defendant<br>Elite Metal Performance, LLC** |

COMES NOW Defendant Elite Metal Performance, LLC, and pursuant to F.R.C.P. 26(a)(3), provides the following disclosures to all parties to this litigation now before the Court:

(i)    The name and, if not previously provided, the address and telephone number of each witness—separately identifying those the party expects to present and those it may call if the need arises:

**RESPONSE:**

**Defendant Elite Metal Performance expects to present the following witnesses:**

   **A.    Robert W. Murphy**
   **800 Kay Road**
   **Brandenton, Florida 34212**
   **c/o L. Darby Plexico, Esq. (803) 771-6600**

   **B.    Greg Mentzer**
   **Best Price Trailers**
   **1172 Pelican Bay Drive**
   **Daytona Beach, Florida 32119**
   **c/o J. Rufus Bratton, Esq., (843) 669-8787**

   **C.    Ryan K. Gouveia**
   **Elite Metal Performance, LLC**
   **211 McKenzie Road**
   **Mooreseville, North Carolina 28115**

418

c/o Taylor S. Braithwaite, Esq. (803) 649-4144

D.    **Walter G. Gouveia**
**Elite Metal Performance, LLC**
**211 McKenzie Road**
**Mooreseville, North Carolina 28115**
**c/o Taylor S. Braithwaite, Esq. (803) 649-4144**

**Defendant Elite Metal Performance may call the following witnesses should the need arise:**

A.    **D'Jaris A. Moore**
**35 Colleton River Drive**
**Bluffton, South Carolina 29910**
**c/o Daphne S. Withrow, Esq. (843) 341-9260**

B.    **Robin D. Hanger**
**Best Price Trailers**
**1172 Pelican Bay Drive**
**Daytona Beach, Florida 32119**
**c/o J. Rufus Bratton, Esq., (843) 669-8787**

C.    **Michelle R. Beck**
**Elite Metal Performance, LLC**
**211 McKenzie Road**
**Mooreseville, North Carolina 28115**
**c/o Taylor S. Braithwaite, Esq. (803) 649-4144**

**Defendant Elite Metal Performance may also call any witness designated by the Plaintiff in her Fed.R.Civ.P. 26(a)(3) disclosures.**

(ii)    The designation of those witnesses whose testimony the party expects to present by deposition and, if not taken stenographically, a transcript of the pertinent parts of the deposition;

**RESPONSE:**

**Defendant Elite Metal Performance does not intend to present witness testimony by deposition.**

(iii)    An identification of each document or other exhibit, including summaries of other evidence—separately identifying those items the party expects to offer and those it may offer if the need arises.

**RESPONSE:**

**Defendant Elite Metal Performance intends to present the following exhibits at trial:**

| Description | Bates Numbering |
|---|---|
| A. Best Price Inspection Sheet | CAR SHOP 41 |
| B. Best Price Pre-Delivery Checklist | CAR SHOP 42 |
| C. Tandem Tow Dolly Owner's Manual | EMP 208 - 305 |
| D. Car Shop Trailer Sales Order Form | EMP 25 - 26 |
| E. Elite Metal Invoice for Tow Dolly 313 | EMP 27 |
| F. Original Manufacture and Shipment Documents | EMP 28 – 34 |
| G. Limited Warranty for Tow Dolly 313 | EMP 36 – 37 |
| H. Post-Accident Repair Documents and Invoice | EMP 38 – 43 |
| I. Photographs of Tow Dolly 313 | EMP 44, 45, 48, 50, 52, 53, 54, 55, 56, 59, 60, 75, 89 |

**Defendant Elite Metal Performance may also present any document or exhibit identified by the Plaintiff in her disclosures.**

BRAITHWAITE TIMMERMAN, LLC


BY:  s/ Taylor S. Braithwaite
    Taylor S. Braithwaite, Fed Bar No.  12219
    Robin A. Braithwaite, Fed Bar No.  1449
    Counsel for Defendant Elite Metal
    Performance, LLC
    Post Office Box 324
Aiken, South Carolina    Aiken, South Carolina 29802-0324
January 11, 2017    (803)649-4144

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **RULE 26(a)(3) PRE-TRIAL DISCLOSURES** |
| | ) | **OF PLAINTIFF** |
| | ) | **D'JARIS A. MOORE** |
| Elite Metal Performance, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

COMES NOW Plaintiff D'Jaris A. Moore and pursuant to F.R.C.P. 26(a)(3), provides the following disclosure to Elite Metal Performance, LLC, the remaining Defendant in this action before the Court.

(i)    The name and, if not previously provided, the address and telephone number of each witness-separately identifying those the party expects to present and those it may call if the need arises:

**RESPONSE:**

Plaintiff D'Jaris A. Moore expects to present the following witnesses:

A.    D'Jaris A. Moore
4 Indigo Run Drive; Apt. 2323
Bluffton, South Carolina 29926
(843) 342-2377

B.    Robin D. Hanger
      Best Price Trailers
      1172 Pelican Bay Drive
      Daytona Beach, Florida 32119
      c/o J. Rufus Bratton, Esq., (843) 669-8787

C.    Walter Gouveia
      Elite Metal Performance, LLC
      211 McKenzie Road
      Mooresville, North Carolina 28115
      c/o Taylor S. Braithwaite, Esq. (803) 649-4144

D.    Ryan Gouveia
      Elite Metal Performance, LLC
      211 McKenzie Road
      Mooresville, North Carolina 28115
      c/o Taylor S. Braithwaite, Esq. (803) 649-4144

E.    Robert W. Murphy
      900 Kay Road
      Bradenton, Florida 34212
      c/o L. Darby Plexico, Esq. (803) 771-6600

Plaintiff D'Jaris Moore may call the following witnesses should the need arise:

A.    Michelle R. Beck
      211 McKenzie Road
      Mooresville, North Carolina 28115
      c/o Taylor S. Braithwaite, Esq. (803) 649-4144

Plaintiff D'Jaris A. Moore may also call any witness designated by the Defendant in its FRCP 26(a) disclosures.

(ii)    The designation of those witnesses whose testimony the party expects to present by

deposition and, if not taken stenographically, a transcript of the pertinent parts of the

deposition:

**RESPONSE:**

Plaintiff D'Jaris A. Moore does not intend to present witness testimony by deposition.

422

    (iii)    An identification of each document or other exhibit, including summaries of other evidence-separately identifying those items the party expects to offer and those it may offer if the need arises.

**RESPONSE:**

Plaintiff D'Jaris A. Moore intends to present the following exhibits at trial:

| Description: | Bates Stamp/Exhibit Number: |
| --- | --- |
| A.   South Carolina Traffic Collision Report | EMP 1, 2 |
| B.   Photographs of Plaintiff's vehicle | |
| C.   Photographs of spindle of subject tow dolly after wreck | Robin Hanger Deposition Exhibits, #26 and #27 |
| D.   Car Shop Trailer Sales, LLC Invoice 31894 | CAR SHOP 16 |
| E.   Car Shop Trailer Sales, LLC Invoice 31893 | CAR SHOP 21 |
| F.   Car Shop Trailer Sales, LLC Pre-Delivery Inspection Checklist | CAR SHOP 42 |
| G.   Elite Metal Performance, LLC Invoice 8611 | EMP 23,24 |
| H.   Photographs of damaged tow dolly | EMP 46, 55, 56 58, 59 64, 65 |
| I.   Letter of Thomas Lawhorne, M.D. | |
| J.   Medical Records/Bills of D'Jaris A. Moore | |
| K.   E-mail exchange between EMP and Car Shop Dated 8/25/15 | CAR SHOP 33 |

Plaintiff D'Jaris A. Moore may also present any document or exhibit identified by the Defendant in its disclosures.

{Signature on next page}

423

OLIVETTI, McCRAY & WITHROW, LLC

/s/ Daphne S. Withrow
Daphne S. Withrow
South Carolina Bar No. 102117;
Federal Court I.D. No. 12151
2 Corpus Christi; Suite 105
Hilton Head, SC 29928
P-(843) 341-9260
daphne@omwlawfirm.com

Attorney for Plaintiff

January 19, 2017
Hilton Head, South Carolina

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| D'Jaris A. Moore, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Elite Metal Performance, LLC, | ) |
| | ) |
| Defendant. | ) |

Civil Action No.: 9:16-cv-318-RMG

**ORDER**

This matter comes before the Court on Defendant's motion to for summary judgment. (Dkt. No. 38). For the reasons below, the Court **GRANTS** the motion for summary judgment.

## I. Background

The underlying facts that gave rise to this action are not in dispute. On June 9, 2015, Plaintiff was travelling south on Interstate 95 in Jasper County, South Carolina. In the northbound lane, Robert Murphy towed a vehicle on a tow dolly. A wheel detached from the tow dolly, crossed the median, and struck Plaintiff's vehicle. (*See* Dkt. No. 1-1).

Plaintiff filed this action in the Jasper County Court of Common Pleas on December 28, 2015, alleging various damages stemming from the June 9, 2015 incident. (Dkt. No. 1-1 at 2). The three defendants named in the initial complaint subsequently removed the case (Dkt. Nos. 1, 3, 9, and 12). The lone remaining defendant[1] subsequently filed this motion for summary judgment. (Dkt. No. 38).

## II. Standard

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[1] Plaintiff reached settlements with Murphy and the dealer/distributer that sold the trailer. (*See* Dkt. Nos. 49, 51).

56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### III. Discussion

Plaintiff's complaint sets forth three causes of action against Defendant: (1) breach of warranty; (2) strict liability for product defect; and (3) negligence. Defendant contends that there is no genuine issue of material fact as to any of the three claims. The Court addresses each claim below.

#### 1.  Breach of Warranty

The parties do not dispute that Plaintiff's warranty claim is governed by Article 2 of the Uniform Commercial Code (U.C.C.). They do disagree, however, about which state's third-

2

426

party beneficiary U.C.C. provisions apply. Plaintiff argues that South Carolina's provision controls. Defendant argues that the Court should apply either North Carolina or Florida's provision and is indifferent to which of these two states' provisions controls because they are functionally identical. For the following reasons, the Court finds that both North Carolina and Florida's U.C.C. provisions are more applicable to Plaintiffs' warranty claim than South Carolina's.

Because this is a diversity action, the Court applies the choice of law rules of the forum state—South Carolina. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). The South Carolina Commercial Code provides that when there is no agreement between the parties specifying the choice of law, "the Uniform Commercial Code applies to *transactions* bearing an appropriate relation to this state." S.C. Code Ann. § 36-1-301(b) (emphasis added). This Court uses the "most significant relationship test" to determine whether there was an appropriate relationship to South Carolina. *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 90 (4th Cir. 1989) (citing *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988)). This requires the Court to analyze factors such as "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied." *In re Merritt Dredging Co., Inc.*, 839 F.2d at 207 (citing Restatement (Second) of Conflict of Laws §§ 6, 244). The Restatement further directs courts to consider factors such as the place of contracting, the place of negotiation, the place of

3

427

performance, the location of the subject matter of the contract, and the domicile, residence, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2).

Applying these factors, this Court finds that both North Carolina and Florida have a more significant relationship to the transactions in this case than South Carolina. The Defendant designed, manufactured, and sold the tow dolly from its sole place of business in North Carolina to a dealer/distributer whose sole place of business is located in Florida. That Florida-based dealer/distributer, in turn, sold the tow dolly to Murphy, a Florida resident. Although the June 2015 incident took place in South Carolina and Plaintiff is a South Carolina resident, those facts have no bearing on the underlying transactions.

The applicable third-party warranty provisions of North Carolina and Florida limit third-party beneficiary warranties only to any natural person who is (1) in the buyer's family or household; (2) a guest in the buyer's home; or (3) an employee, servant or agent of the buyer. *See* Fla. Stat. § 627.318; N.C. Gen. Stat. § 25-2-318. There is no genuine dispute of material fact with respect to the breach of warranty claim because Plaintiff concedes that the North Carolina and Florida statues bar recovery as a matter of law. (Dkt. No. 45 at 5 ("If [North Carolina or Florida law applies], Ms. Moore would be precluded from making her claim for breach of warranty in this action.")). Accordingly, Defendant's motion for summary judgment is granted with respect to the breach of warranty claim.

**2. Strict Liability Product Defect**

The Court next turns to Plaintiff's strict liability product defect claim. To establish a prima facie claim in a products liability action, Plaintiff must establish that (1) she was injured by the product; (2) the product was in essentially the same condition as it was when it left the hands of Defendant; and (3) the injury occurred because the product was in a defective condition

4

428

unreasonably dangerous to the user. *Graves v. CAS Med. Sys., Inc.*, 735 S.E.2d 650, 658 (S.C. 2012). "It is well-established that one cannot draw an inference of a defect from the mere fact a product failed." *Id.* Accordingly, Plaintiff must offer some evidence beyond the fact that the product failed to prove that it was in a defective condition unreasonably dangerous to the user.

Here, Plaintiff has offered the lay testimony of Robin Hanger, the owner of the distributor/dealer that sold the tow dolly at issue to Murphy, to prove that the tow dolly was in an unreasonably dangerous defective condition. Hanger would testify, based on a photograph Murphy took shortly after the incident, that the "wheel came of[f] the ax[le] of the tow dolly." (Dkt. No. 44 at 5).[2] In providing this testimony, Hanger would rely on his "visual[] familiar[ity] with the proper components of the tow dolly in both their working and non-working condition." (*Id.* at 6). In other words, Hanger would testify that the wheel came off of the tow dolly, as evinced by a photograph showing a tow dolly without a wheel. (Dkt. No. 44 at 6).

Plaintiff has failed to offer any admissible expert testimony, and is, in fact, barred from doing so. Rule 37(c) of the Federal Rules of Civil Procedure prohibits a party that fails to provide information or identify a witness pursuant to Rule 26 from using that information or witness to supply evidence on a motion. Plaintiff failed to identify any expert witnesses by the August 3, 2016 deadline, and the Court denied Plaintiff's November 4, 2016 motion to amend the scheduling order because "the allegedly disrupting event, a hurricane, occurred two months *after* the deadline for identifying expert witnesses had expired." (Dkt. No. 42 at 2). Thus, any expert testimony or affidavits—from Hanger or any other individual—are inadmissible.

---

[2] Although this citation refers to Plaintiff's response to Defendant's motion in limine to exclude certain testimony by Hanger, Plaintiff referenced this filing in its response to the motion for summary judgment. (Dkt. No. 45 at 10). Accordingly, the Court has fully considered Plaintiff's representations regarding Hanger's proposed lay testimony contained in Plaintiff's response to Defendant's motion in limine.

In sum, the only evidence Plaintiff has offered of the tow dolly's alleged defectiveness is that the wheel came off. Hanger's testimony to this fact, while admissible, is insufficient to prove that the tow dolly was defective because it would invite a jury to infer that the tow dolly was defective simply because it failed. And although Hanger may possess the expertise to provide an expert opinion regarding a tow dolly's defectiveness, he may not do so in this case because Plaintiff failed to identify him as an expert by the Court's deadline and show good cause for missing the deadline. Therefore, the court holds that there are no genuine issues of material fact regarding Plaintiff's strict liability product defects claim and grants summary judgment to Defendant on this claim.

### 3. Negligence

In addition to the three elements of a strict liability product defect claim enumerated above, "[a] negligence theory [of product liability] imposes the additional burden on a plaintiff 'of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault.'" *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 9 (S.C. 2010) (quoting *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995)). The "fault-based element" of a negligence claim "is of no moment where . . . there is no showing in the first instance of a product in a defective condition unreasonably dangerous to the user." As stated above, Plaintiff cannot show, based on admissible evidence, that the tow dolly was unreasonably dangerous due to a specific manufacturing or design defect. Accordingly, the negligence claim also fails. *See id.* at 8 ("When an element common to multiple claims is not established, all related claims must fail.").

6

430

## IV. Conclusion

For the abovementioned reasons, the Court **GRANTS** Defendant's motion for summary judgment.  (Dkt. No. 38).

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Court Judge

January 24, 2017
Charleston, South Carolina

7

431

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

## BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MOTION TO RECOSIDER** |
| ELITE METAL PERFORMANCE, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

COMES NOW, Plaintiff, by and through her undersigned counsel, and respectfully moves this Court under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend its Order granting the Defendant's motion for Summary Judgment entered January 24, 2017. (Dkt. 55). In support of this Motion, Plaintiff relies on the accompanying Memorandum.

As shall be explained in the accompanying Memorandum, the Court's decision to grant summary judgment in favor of the Defendant was based on a clear error of law and in order to prevent manifest injustice, the Plaintiff respectfully requests that the Court grant this motion to reconsider, vacate the Order and judgment of January 24, 2017 and allow the parties to continue to litigate this matter.

{signature on next page}

1

432

RESPECTFULLY SUBMITTED,

**OLIVETTI, McCRAY & WITHROW, LLC**

<u>s/ Daphne S. Withrow</u>
Daphne S. Withrow
Federal ID # 12151
Post Office Box 7906
Hilton Head, SC 29938
Telephone: 843-341-9260
Facsimile: 843-341-9261
daphne@omwlawfirm.com

*Attorney for the Plaintiff*

This 3nd day of February 2017
Hilton Head Island, South Carolina.

2

433

FOR THE DISTRICT OF SOUTH CAROLINA

BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Case No.: 9:16-cv-318-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MOTION TO RECONSIDER** |
| ELITE METAL PERFORMANCE, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

_____

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 59(e) MOTION TO ALTER OR AMEND JUDGMENT**</u>

COMES NOW, Plaintiff D'Jaris A. Moore, through her undersigned counsel, and respectfully requests that this Court reconsider its decision of January 24, 2017 granting summary judgment to the Defendant. While the Court has ruled in the Defendant's favor, the Plaintiff submits this memorandum to ensure that she has "enable[d] the lower court to rule properly after it has considered all relevant facts, law and arguments." *Staubes v. City of Folly Beach,* 529 S.E. 2d. 543, 546 (2000). Plaintiff reaffirms all her previous allegations as stated in her Response to Defendant's Motion for Summary Judgment as if fully stated herein.

<u>**I. STANDARD FOR RELIEF UNDER 59(e)**</u>

The Fourth Circuit has recognized three grounds upon which a district court may grant a motion to alter or amend an earlier judgment "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; (3) to correct a clear error of law or prevent manifest injustice." *Pacific Insurance Co. v. American National Fire Ins. Co.,* 148 F.3d. 396,403 (4th Cir. 1998). The purpose of a Rule 59(e) motion is to permit "a district

1

434

court to correct its own errors, 'sparing the parties and the appellate courts the burden of unnecessary appellate proceedings.'" *Id.* So long as the Rule 59(e) is timely filed, the courts have considerable discretion. *EEOC v. Lockheed Martin Corp.,* 116 F.3d 110,112 (4th Cir. 1997).

## II. BACKGROUND AND PROCEDURAL HISTORY

As is likely well known to this Court, this matter involves a wreck with injuries which occurred on June 9, 2015. Plaintiff was driving her vehicle southbound on I- 95 in Hardeeville, South Carolina and Defendant Robert W. Murphy was traveling northbound on I-95 in his Recreational Vehicle (RV) which was towing a brand new tow dolly, manufactured by Defendant Elite Metal Performance. One of the two wheels came off the tow dolly, crossed the median and collided with the Plaintiff's vehicle, as well as one other vehicle. Plaintiff suffered both immediate and long-term injuries as a result of the tow dolly wheel striking and shattering the windshield and collapsing the roof of her vehicle.

The subject tow dolly was manufactured by Defendant Elite Metal Performance in Mooresville, North Carolina and sold to Robin Hanger, owner of Defendant Car Shop Trailer Sales, LLC, a dealer/distributor in Holly Hill, Florida. In turn, Car shop sold the tow dolly to a third party, Mr. Murphy. On June 4, 2015, immediately after the brand new tow dolly was received by Car Shop, it was discovered that it had incurred a broken fender bolt in transport. The repair was considered "minor" and Car Shop, as permitted, replaced the fender bolt without having to remove the wheel. Just days later, Mr. Murphy purchased the new tow dolly from Car Shop and on June 9, 2015, he attached it to his RV and headed from his home on his ill-fated trip to Charleston, South Carolina.

2

435

Mediation was conducted on November 2, 2016 wherein settlement was achieved with both Car Shop and Robert Murphy. Defendant Elite Metal Performance filed a motion for summary judgment on October 26, 2016 to which Plaintiff timely replied and this Court granted Defendant's motion on January 24, 2017.

### III. DISCUSSION

In its Order, this Court rested its decision on the finding that the Plaintiff was precluded from recovery under her breach of warranty claim as a third-party beneficiary under South Carolina law because, using the 'most significant relationship' test, either North Carolina or Florida law (which are functionally equivalent and would preclude the Plaintiff's claim) should apply. This Court also held that the place/location where the injury causing accident occurred had "no bearing" in determining the choice of law in this matter.

As to the strict liability manufacturing defect claim, this Court held that the Plaintiff could not establish a prima facie case because expert testimony was not proffered and because Plaintiff must offer evidence beyond the fact that the product failed. Plaintiff respectfully submits that there exists a clear error of law as to the analysis involving both the breach of warranty claim and strict liability product defect and provides the following analysis of the same in order to prevent manifest injustice.

**1.     Breach of Warranty-Third Party Claim**

As has been stated, the parties do not dispute that the Plaintiff's warranty claim is governed by article 2 of the Uniform Commercial Code (U.C.C.) but do vehemently dispute specifically which state's third-party provision is applicable. As this is a diversity action, the Court applies the choice of law rules of the forum, South Carolina. Additionally, as provided under the South Carolina Commercial Code, in the event there is no agreement between the

3

436

parties as to the choice of law, the U.C.C. applies to the transactions bearing an appropriate relation to the state.

In ruling on the motion for summary judgment, this Court determined that because one Defendant designed, manufactured and sold the subject tow dolly from its principle place of business in North Carolina, and a second Defendant distributed the tow dolly from his principle place of business in Florida and in turn sold the tow dolly to a Florida resident, this was sufficient to satisfy the 'most significant relationship' test, warrant application of either Florida or North Carolina law, and preclude the Plaintiff from third-party recovery. This Court also found that it was of "no bearing" that the accident that forms the basis of this Complaint took place in South Carolina.

This Court, as well as the majority of courts, use the 'most significant relationship' test to determine whether there is an appropriate relationship to the forum state to "best promote the U.C.C.'s policies of uniformity, predictability and effective facilitation of interstate commercial relations" *In Re: Merritt Dredging Co. Inc.,* 839 F. 2d. 203 (4th Cir. 1988). The holding in *In re: Merritt* plainly pronounced that a state in which a good is located at the time of the conveyance is not necessarily the state with the most significant relationship to the subject matter of the contract. *S.C. Tel-Con, Inc. v. World Tower* Co., 2012 U.S. Dist. Lexis 98726; WL 2913253. To further clarify, the court in *In re: Merritt* observed that most often the term "appropriate relation" has been construed to mean that "the law of the state with the 'most significant relationship' *to the matter at issue* is applied" (emphasis added) *In re: Merritt* at 206-207.

Plaintiff respectfully contends that this Court did not apply and analyze the proper factors of the 'most significant relationship' test which also includes the location of the subject accident and offers the following interpretation of law in support thereof.

4

437

In *Butler v. Ford Motor Co.,* 724 F. Supp. 2d 575 (U.S.D. 2010), a matter which very similarly involved a vehicle, personal injury and dispute as to which state's third-party beneficiary provision law was applicable, Chief U.S. District Judge Terry L. Wooten performed a comprehensive analysis of the factors to determine which state law should apply using the 'most significant relationship' test. Although, in *Butler* the court determined North Carolina law was applicable, this case is exemplary here for its proper analysis, not for which state's law was ultimately applied.

In *Butler,* Judge Wooten's analysis included a review of (1) where the accident occurred; (2) which state's emergency response personnel responded to the accident; (3) where the injured parties were transported for medical attention; and (4) where the witnesses to the accident were from to determine which state's law should apply. Precisely as in the matter at bar, the vehicle in *Butler* was manufactured, sold and titled in a state other than where the accident and injuries occurred. In direct contrast to what this Court has held, Judge Wooten found that the choice of law to be applied was from the state where the accident, injuries and other relevant transactions related *to the matter at issue* occurred, not where the vehicle was manufactured, sold and titled. (emphasis added).

Using the exact same analysis as Judge Wooten in *Butler*, Plaintiff has shown that she is a South Carolina resident who was driving in South Carolina when and where the accident occurred. A South Carolina Police Officer responded to the scene of the accident and Jasper, South Carolina Fire and Rescue arrived with South Carolina licensed paramedics providing the Plaintiff with medical treatment and transporting her to Coastal Carolina Hospital, which is located in South Carolina. Plaintiff offers additional supporting factors related to the matter at issue such as the fact that she required continued medical treatment for her injuries, all of which

5

438

have been, and will continue to be, provided by her South Carolina health care providers. Plaintiff's wrecked and totaled vehicle was towed by a South Carolina Towing Service Company. The driver of the RV and owner of the subject defective tow dolly, although a Florida resident, was in South Carolina on his way to an RV resort in Charleston, South Carolina. Judge Wooten's holding in *Butler* was that it was "clear" that the state that had matched all the factors as analyzed above "bears the most appropriate relationship to the matter at issue." *Butler* at 584-585. Plaintiff contends that had the *Butler* analysis been applied to her facts as stated above, it would be apparent to this Court that South Carolina law should apply, not North Carolina or Florida. More importantly, Plaintiff would no longer be precluded from recovery under her breach of warranty claim.

To further underscore the importance of the location of the accident as an essential factor in determining which state's law will apply, using the 'most significant relationship' test, Plaintiff points to *White v. American Motors Sales Corp* 550 F. Supp. 1287 citing *Bilancia v. General Motors Corp.*, 538 F.2d 621 (4th Cir. 1976). In *Bilancia*, the court held that absent any agreement to the contrary, "the law of the place of the accident has such 'an appropriate relation' to the transaction as to make the law of the place of the accident the controlling law." Similarly, in *Myrtle Beach Pipeline Corp v. Emerson Electric Co.*, 843 F. Supp. 1027 (1993), the court's analysis to determine if there was sufficient justification to apply the forum state's law included the fact that the injury had been sustained in South Carolina. Succinctly stated, the injury having occurred in the forum state of South Carolina "strongly favors the application of South Carolina law." *Id.* at 1034.

Lastly, the holding in *Butler* references the "public policy exception" which stands for the proposition that "foreign law will not be applied if it is repugnant to South Carolina's public

6

439

policy" or "for some such reason the enforcement of it would be prejudicial to the general interest of our own citizens." *Id.* at 581. Based on all of the above, the Plaintiff requests that this Court reconsider its opinion that the location of the wreck has "no bearing" on the choice of law applied and align with the holding in *Butler* to find that South Carolina law should apply, thus allowing the Plaintiff to recover under her third-party breach of warranty claim.

**2.     Strict Liability Product Defect**

Under a strict liability claim based on manufacturing defect, Plaintiff must show that (1) she was injured by the product (2) the product was essentially in the same condition as it was when it left the hands of the defendant; and (3) the injury occurred because the product was in a defective condition and unreasonably dangerous to the user *Claytor v. General Motors Corp.,* S.E.2d 129, 131 (1982). In the Order granting summary judgment for the Defendant, this Court held that the Plaintiff did not offer evidence under the third prong of the strict liability claim by not providing evidence beyond the fact that the product failed and not providing expert testimony in support of her claim. Quite the contrary, in support of her product defect claim Plaintiff properly offered circumstantial evidence from which a jury could infer that a manufacturing defect existed which caused the accident with injuries with the subject tow dolly without invoking *res ipsa loquitur.*

Plaintiff recognizes that she may not rest upon the happening of an accident as proof of a product defect, however the addition of *very little more* in the way of other facts may be enough to support the inference." (emphasis added). *Virgil v. Kash n'Karry Service Corp.*, 484 A. 2d. 652, 657 (Md App. 1984) (quoting Prosser, The Fall of the Citadel, 50 Minn. L. Rev. 791, 843-44 (1966). Plaintiff's burden may be met by inferring from circumstantial evidence as found in

7

440

(1) expert testimony; (2) the occurrence of the accident a short time after the sale; (3) same accidents involving similar products; (4) the elimination of other causes; and (5) the nature of the accident. *Harrison v. Bill Cairns Pontiac, Inc.*, 549 A. 2d. 385 (Md. App. 1988). These 'Harrison' factors are balanced to determine if the party has provided sufficient circumstantial evidence such that there exists a genuine issue of material fact as to the defectiveness of the product. *Stanley Martin Cos. V. Universal Forest Prods. Shoffner, LLC,* 396 F. Supp. 2d. 606 (U.S.D.C Md. 2005).

In review and analysis of the above cited factors which may be inferred from the evidence, Plaintiff offers the following.  In regard to the first 'Harrison' factor relative to expert testimony, much has been made of the fact that Plaintiff has not introduced an expert witness. However, there is no rule that expert witnesses must be offered to prove a product defect and the absence of expert testimony is not necessarily fatal in manufacturing defects claim. *Shreve v. Sears Roebuck &* Co., 166 F. Supp. 2d. 378 (U.S.D.C.  Md. 2001).  The South Carolina Supreme Court held that the test of whether a product is or is not defective is "whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product." *Branham v. Ford Motor Co.,* 701 S.E. 2d. 5 (2010). Paraphrased, this permits an inference by the jury as to whether a product contains a defect based solely on the fact that it did not meet the expectations of the consumer.  Certainly a wheel coming off of a newly manufactured tow dolly while traveling down I-95 does not meet the reasonable expectation of the user or consumer and provides circumstantial evidence from which a manufacturing defect can properly be inferred.

In support of the second 'Harrison' factor relative to the occurrence of the accident a short time after the sale, Plaintiff offers that there is no dispute and there can be no argument

8

441

among the parties that the subject tow dolly was brand new. Deposition testimony indicates that the tow dolly was delivered by the manufacturer to the distributor on or about June 4, 2015 and was sold to the end user on or about June 6, 2015. The subsequent accident with injuries occurred on June 9, 2015.

In *Virgil*, the court held that the passage of only three months from the purchase of a thermos to its subsequent implosion was sufficient to allow an inference of product defect.   The court in *Watson v. Sunbeam*, 816 F. Supp. 384 (U.S.D.C. Md. 1993) found that a passage of ten months from the time of purchase of an electric blanket to the time that it spontaneously caught fire was also sufficient to allow the jury to infer product manufacturing defect.  Here, where there are mere days from the time the tow dolly was purchased until it lost a wheel while traveling down I-95 causing permanent injuries to the Plaintiff, it should most certainly give rise to an inference of manufacturing product defect.

Analysis of the third 'Harrison' factor involves a review of same accidents involving similar products.  The Defendant contends that they have no previously reported accidents of wheels coming off their specific tow dollies.  However, Robin Hanger, owner of Defendant Car Shop, stated in his deposition in response to a question as to how many times he had dealt with a spindle or a wheel coming of a spindle (generally), he stated that he had seen it "[H]undreds of times."[1]

The forth 'Harrison' factor which requires elimination of other causes such as misuse or improper maintenance, also provides support for Plaintiff's inferences from circumstantial evidence.  There have been no allegations that the subject tow dolly was misused in any manner, either by carrying improper items or items above its appropriate weight capacity. Although Defendants have made allegations of improper tightening of lug nuts or tires of a brand different

---

[1] Deposition Testimony of Robin Hanger, Car Shop Trailer Sales, LLC. 130:7-10.

9

442

from those applied at manufacturing as the cause for the wreck, but there has also been deposition testimony in direct contradiction thereof. This presents a genuine issue of material fact that should be properly put before a jury.

Finally, the last 'Harrison' factor is whether the accident is of the type that would not happen absent a defect. As held in *Watson* "[I]f a product, at least *one* of which is mass produced, not experimental and *recently manufactured*, is involved in an accident and if all other possible causes of the accident are eliminated, the inference is almost inescapable that the product is defective." (emphasis added). Further, in *Phipps v. General Motors Corp.,* 363 A. 2d. 955(Md. App. 1975) the court held that there are certain circumstances in which a product may be deemed "defective and unreasonably dangerous", either by design or manufacture, even without the balancing of various factors. For example, the *Phipps* court held that steering mechanism of a *new* automobile should not cause a car to swerve off of a road, the drive shaft of a *new* car should not separate when driven in a normal manner, brakes of a *new* vehicle should not suddenly fail and the accelerator of a *new* automobile should not stick without warning causing sudden acceleration. (emphasis added) *Phipps* at 959.

Plaintiff has met her burden under her claim for strict liability product defect through circumstantial evidence and reasonable inferences therefrom. In review of the analysis of 'Harrison' factors, the Plaintiff contends that the preponderance (3 out of 5) of the factors lean in her favor (timing of the accident, elimination of other causes, type of accident that does not occur without defect) and thus provided a basis for a genuine issue of material facts in this matter.

**3.     Negligence**

Plaintiff contends that as she has been able to show by a preponderance of the 'Harrison'

10

443

factors that it can properly be inferred that a manufacturing product defect existed in the subject

tow dolly which ultimately caused her permanent injuries. Accordingly, her negligence claim

does not fail.

### IV. CONCLUSION

Plaintiff has provided analysis that shows that under the 'most significant relationship'

test, South Carolina law should apply to her breach of warranty claim and allow her recovery as

a third-party.  Additionally, Plaintiff met her burden under her claim for strict liability product

defect through circumstantial evidence and reasonable inferences therefrom. The standard for a

motion for summary judgment entitles the non-moving party to benefit from all inferences,

however small, which the evidence supports even if contrary inferences could ultimately be

drawn.  If the evidence as a whole is susceptible to more than one inference, a jury issue is

created.  For the foregoing reasons, the Plaintiff respectfully requests that this Court correct a

clear error of law as there are indeed genuine issues of material fact in this matter that are proper

to come before a jury.  Plaintiff requests that this Court grant her motion to reconsider, vacate its

prior decision, deny Defendant's motion for summary judgment and permit the parties to

continue to litigate this matter.

**OLIVETTI, McCRAY & WITHROW, LLC**

s/ Daphne S. Withrow
Daphne S. Withrow
Federal ID # 12151
Post Office Box 7906
Hilton Head, SC 29938
Telephone: 843-341-9260
daphne@omwlawfirm.com

February 3, 2017                                                        *Attorney for Plaintiff*
Hilton Head, South Carolina.

11

444

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| D'Jaris A. Moore, | ) | |
| | ) | Civil Action No.: 9:16-cv-318-RMG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| Elite Metal Performance, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

RECEIVED
USDC CLERK, CHARLESTON, SC
2017 FEB -7   PM 5: 29

This matter comes before the Court on Plaintiff's Motion for Reconsideration. (Dkt. No. 57). For the reasons below, the Court **DENIES** the motion for reconsideration.

### I. Background

The underlying facts that gave rise to this action are not in dispute. On June 9, 2015, Plaintiff was travelling south on Interstate 95 in Jasper County, South Carolina. In the northbound lane, Robert Murphy towed a vehicle on a tow dolly. A wheel detached from the tow dolly, crossed the median, and struck Plaintiff's vehicle. (*See* Dkt. No. 1-1).

Plaintiff filed this action in the Jasper County Court of Common Pleas on December 28, 2015, alleging various damages stemming from the June 9, 2015 incident. (Dkt. No. 1-1 at 2). The three defendants named in the initial complaint subsequently removed the case (Dkt. Nos. 1, 3, 9, and 12). The lone remaining defendant[1] filed a motion for summary judgment (Dkt. No. 38), which the Court granted on January 24, 2017 (Dkt. No. 55). Plaintiff subsequently filed this motion for reconsideration of the Court's order. (Dkt. No. 57).

---

[1] Plaintiff reached settlements with Murphy and the dealer/distributer that sold the trailer. (*See* Dkt. Nos. 49, 51).

1

445

## II. Standard

Federal Rule of Civil Procedure 59(e) governs motions to alter or amend a judgment; however, the rule does not provide a standard courts may use to grant such motions. The Fourth Circuit has articulated "three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997); *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993)). "Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Pac. Ins. Co.*, 148 F.3d at 403 (internal citations omitted). Rule 59(e) provides an "extraordinary remedy that should be used sparingly." *Id.* (internal citation omitted).

## III. Discussion

Plaintiff's motion for reconsideration asserts that the Court has made clear errors of law when it granted Defendant's motion for summary judgment on Plaintiff's breach of warranty, strict liability product defect, and negligence claims. The Court will address each in turn.

### 1. Breach of Warranty

Plaintiff asserts that the Court "did not apply and analyze the proper factors of the 'most significant relationship' test" when it dismissed Plaintiff's breach of warranty claim. (Dkt. No. 58 at 4). Specifically, Plaintiff asserts that the Court should have modeled its analysis of the factors on the analysis performed in *Butler v. Ford Motor Co.*, 724 F. Supp. 2d 575 (D.S.C. 2010).

2

446

*Butler* is a case involving a vehicle, personal injury, and a dispute as to which state's third-party beneficiary U.C.C. law applied. The first factor the *Butler* court analyzed was where the vehicle was manufactured, sold, and titled. *Id.* at 584. Because there was no evidence in the record of this factor, the court then analyzed (1) where the accident occurred; (2) which state's emergency response personnel responded to the accident; (3) where the injured parties were transported for medical attention; and (4) where the witnesses to the accident were from.

As a preliminary matter, the *Butler* court did not conclude that South Carolina's U.C.C. provisions applied. Instead, it assumed, for the sake of argument, that there was a sale of goods and the provision applied. *Id.* at 584 n.3. Moreover, because there was no evidence in the record that the "1991 Ford Econoline van at issue was manufactured, purchased, stored, or maintained in South Carolina[,] [the *Butler* court was] not sufficiently persuaded that the residency of Plaintiffs and Plaintiffs' decedent alone in South Carolina would trigger application of the law of South Carolina." *Id.* at 584. The fact that the accident occurred outside of South Carolina was merely an additional factor for determining that South Carolina did not bear the most significant relationship to the matter at issue, not the determinative factor.

As previously noted, the South Carolina Commercial Code provides that when there is no agreement between the parties specifying the choice of law, "the Uniform Commercial Code applies to *transactions* bearing an appropriate relation to this state." S.C. Code Ann. § 36-1-301(b) (emphasis added). This Court uses the "most significant relationship test" to determine whether there was an appropriate relationship to South Carolina. *Thornton v. Cessna Aircraft Co.*, 886 F.2d 85, 90 (4th Cir. 1989) (citing *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988)). This requires the Court to analyze factors such as "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant

3

447

policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied." *In re Merritt Dredging Co., Inc.*, 839 F.2d at 207 (citing Restatement (Second) of Conflict of Laws §§ 6, 244). The Restatement further directs courts to consider factors such as the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile, residence, and place of business of the parties. Restatement (Second) of Conflict of Laws § 188(2). Notably absent from this list are factors relating to the location of an accident (a concern for tort-based claims) and the location of potential witnesses (an issue better addressed when addressing venue or forum disputes than determining which state's substantive law applies).

Again applying the applicable factors, this Court finds that both North Carolina and Florida have a more significant relationship to the *transactions* in this case than South Carolina. The Defendant designed, manufactured, and sold the tow dolly from its sole place of business in North Carolina to a dealer/distributer whose sole place of business is located in Florida. That Florida-based dealer/distributer, in turn, sold the tow dolly to Murphy, a Florida resident. Although the June 2015 incident took place in South Carolina and Plaintiff is a South Carolina resident, those facts have no bearing on the underlying transactions. And this inquiry must focus on the underlying transactions because the clear statutory language requires it. S.C. Code Ann. § 36-1-301(b) ("[T]he Uniform Commercial Code applies to *transactions* bearing an appropriate relation to this state.") (emphasis added).

Plaintiff next cites *Bilancia v. Gen. Motors Corp.* for the proposition that "the law of the place of the accident has such 'an appropriate relation' to the transaction as to make the law of

4

448

the place of the accident the controlling law." 538 F.2d 621, 623 (4th Cir. 1976). Plaintiff, however, overlooks the facts that (1) *Bilancia* involved the Fourth Circuit's prediction of how Virginia courts—not South Carolina courts—would rule when faced with the question of what constituted "an appropriate relationship," *id.*, and (2) *Bilancia* predates by more than a decade the Fourth Circuit's determination that of "the most significant relationship test" applies South Carolina U.C.C. law, *see In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988). Accordingly, the Court denies Plaintiff's motion for reconsideration with respect to the breach of warranty claim.

**2. Strict Liability Product Defect**

The Court next turns to Plaintiff's attempt to revive its strict liability product defect claim. To establish a prima facie claim in a products liability action, Plaintiff must establish that (1) she was injured by the product; (2) the product was in essentially the same condition as it was when it left the hands of Defendant; and (3) the injury occurred because the product was in a defective condition unreasonably dangerous to the user. *Graves v. CAS Med. Sys., Inc.*, 735 S.E.2d 650, 658 (S.C. 2012). "It is well-established that one cannot draw an inference of a defect from the mere fact a product failed." *Id.* Accordingly, Plaintiff must offer some evidence beyond the fact that the product failed to prove that it was in a defective condition unreasonably dangerous to the user.

In her motion for reconsideration, Plaintiff cites several cases from Maryland state courts of appeals and the federal district court in Maryland. None of those cases have any precedential or persuasive value in this case because clearly established South Carolina law applies to the tort claims in this case in the federal district court in the District of South Carolina. Accordingly,

Plaintiff's analysis under *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 549 A.2d 385 (Md. Ct. Spec. App. 1988), a Maryland case from an intermediate court of appeals, is irrelevant.

As discussed in the order granting Defendant's motion to dismiss, the only admissible evidence Plaintiff has offered of the tow dolly's alleged defectiveness is that the wheel came off. Standing alone, this evidence is insufficient to prove that the tow dolly was defective because it would invite a jury to infer that the tow dolly was defective simply because it failed. Therefore, the Court denies Plaintiff's motion for reconsideration with respect to Plaintiff's strict liability product defect claim.

### 3. Negligence

Plaintiff cites only the *Harrison* case from Maryland's Court of Special Appeals as the reason why the Court should reconsider its grant of summary judgment on her negligence claim. (Dkt. No. 58 at 10-11). Because Maryland law is inapplicable to this case, the Court denies Plaintiff's motion for reconsideration with respect to Plaintiff's negligence claim.

### IV. Conclusion

For the abovementioned reasons, the Court **DENIES** Plaintiff's motion for reconsideration. (Dkt. No. 57).

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Court Judge

February 7, 2017
Charleston, South Carolina

6

450

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| D'JARIS A. MOORE, | ) | Docket No. 9:16-cv-00318-RMG |
| | ) | |
| vs | ) | |
| | ) | |
| | ) | NOTICE OF APPEAL |
| | ) | |
| ELITE METAL PERFORMANCE | ) | |
| LLC, | ) | |
| Defendants. | ) | |
| _____ | ) | |

  NOTICE IS HEREBY GIVEN that, D'Jaris A. Moore, the Plaintiff

named above, hereby appeals to the United States Court of Appeals for the Fourth

Circuit from an Order denying Plaintiff's Motion to Amend/Correct a Scheduling

Order entered on November 10, 2016, an Order granting Summary Judgment

entered on January 24, 2017, and an Order denying a Motion to Reconsider

entered on February 7, 2017 by the Honorable Richard Mark Gergel, United States

District Judge.

  Respectfully Submitted by:

/s/ James A.Brown, Jr.     March 7, 2017
James A. Brown, Jr, Esquire    Beaufort, SC

Law Offices of Jim Brown, P.A.
1600 Burnside Street, Suite 100
Post Office Box 592
Beaufort, South Carolina 29901

451